UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

KIMBERLY HUNT-BROWN,

Plaintiff-Appellant,

v. No. 26-2042

NEW MEXICO GENERAL SERVICES DEPARTMENT, VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ, In their official and individual capacities,

Defendants-Appellees.

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Sarah M. Davenport
District Court No. 1:23-cv-00782-SMD-KK

APPELLEES' SUPPLEMENTAL APPENDIX VOL. 1 OF 2

CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) the ECF submission is an exact copy of any hard copies that were filed (if any); (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program. I further certify that the information on this form is true and correct to the best of my ability and belief formed after the reasonable inquiry.

CERTIFICATE OF COMPLIANCE

The undesigned counsel certifies that this Response Brief of Supplemental-Appendix complies with 10th Cir. R. 25.5 and all privacy redactions required have

been made. The undersigned counsel certifies that paper copies submitted are or will be exact copies of the electronic version.

Respectfully Submitted,

JACKSON LOMAN DOWNEY & STEVENS-BLOCK, PC
/s/ Eric Loman
*Eric Loman*
Eric Loman
201 Third Street, NW, Suite 1500
Albuquerque, New Mexico 87102
(505) 767-0577
eric@jacksonlomanlaw.com

| Pg. # | Filer | Date of Filing | Doc. # | Title |
|---|---|---|---|---|
| 1-22 | Defendant | 8/15/2025 | 98 | Defendant's Motion for Summary Judgment. |
| 23-57 | Defendant | 8/15/2025 | 98-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 58-76 | Defendant | 8/15/2025 | 98-2 | Exhibit B - Deposition Transcript of Eunice Moya 7/9/2025 30(B)(6) Deposition. |
| 77-80 | Defendant | 8/15/2025 | 98-3 | Exhibit C - Affidavit of Jennifer Conn. |
| 81-83 | Defendant | 8/15/2025 | 98-4 | Exhibit D - Affidavit of Francine Martinez. |
| 84-96 | Defendant | 8/15/2026 | 98-5 | Exhibit E - Deposition Transcript of Michael J. Saavedra. |
| 97-108 | Defendant | 8/15/2026 | 98-6 | Exhibit F - Deposition Transcript of Francine Martinez. |
| 109-112 | Defendant | 8/15/2026 | 98-7 | Exhibit G – Emails. |
| 113-114 | Defendant | 8/15/2026 | 98-8 | Exhibit H – GSD Hours of Work and Overtime Policy. |
| 115-136 | Plaintiff | 8/15/2025 | 99 | Plaintiff's Motion for Partial Summary Judgment on Count III: FMLA Interference. |
| 137-139 | Plaintiff | 8/15/2025 | 99-1 | Declaration of Kimberly Hunt-Brown. |
| 140-143 | Plaintiff | 8/15/2025 | 99-2 | Exhibit 1 - Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act. |
| 144-146 | Plaintiff | 8/15/2025 | 99-3 | Exhibit 2 - Email. |
| 147 | Plaintiff | 8/15/2025 | 99-4 | Exhibit 3 - Employer's Guild to the Family and Medical Leave Act - Appropriate Medical Facts. |
| 148-152 | Plaintiff | 8/15/2025 | 99-5 | Exhibit 4 - Email. |
| 153-155 | Plaintiff | 8/15/2025 | 99-6 | Exhibit 5 - General Services Department Family and Medical Leave Policy. |
| 156-158 | Plaintiff | 8/15/2025 | 99-7 | Exhibit 6 - Text Message. |
| 159-161 | Plaintiff | 8/15/2025 | 99-8 | Exhibit 7 - Email. |
| 162-168 | Plaintiff | 8/15/2025 | 99-9 | Exhibit 8 - General Services Department Attendance and Leave Policy. |
| 169-170 | Plaintiff | 8/15/2025 | 99-10 | Exhibit 9 - Deposition Transcript of Natalie Martinez. |
| 171-173 | Plaintiff | 8/15/2025 | 99-11 | Exhibit 10 - Deposition Transcript of Valerie Polk. |
| 174-175 | Plaintiff | 8/15/2025 | 99-12 | Exhibit 11 - Email. |

| | | | | |
|---|---|---|---|---|
| 176-179 | Plaintiff | 8/15/2025 | 99-13 | Exhibit 12 - Email. |
| 180-182 | Plaintiff | 8/15/2025 | 99-14 | Exhibit 13 - Demand Letter to General Services Department. |
| 183-185 | Plaintiff | 8/15/2025 | 99-15 | Exhibit 14 - Employment Application for FMLA Leave. |
| 186 | Plaintiff | 8/15/2025 | 99-16 | Exhibit 15 - Sick and Annual Leave Sheet. |
| 187-190 | Plaintiff | 8/15/2025 | 99-17 | Exhibit 16 - Deposition Transcript of Eunice Moya 7/09/2025 30(B)(6) Deposition. |
| 191 | Plaintiff | 8/15/2025 | 99-18 | Exhibit 17 - General Services Department Response to Demand Letter. |
| 192-193 | Plaintiff | 8/15/2025 | 99-19 | Exhibit 18 - Deposition Transcript of Eunice Moya. |
| 194-196 | Plaintiff | 8/15/2025 | 99-20 | Exhibit 19 - Email. |
| 197-199 | Plaintiff | 8/15/2025 | 99-21 | Exhibit 20 - Email. |
| 200-207 | Plaintiff | 8/15/2025 | 99-22 | Exhibit 21 - Payable Time Summary. |
| 208-211 | Plaintiff | 8/15/2025 | 99-23 | Exhibit 22 - Email. |
| 212-213 | Plaintiff | 8/15/2025 | 99-24 | Exhibit 23 - General Services Department Donation of Annual Leave Policy. |
| 214-217 | Plaintiff | 8/15/2025 | 99-25 | Exhibit 24 - Certificate of Health Care Provider for Employee's Serous Health Condition under Family and Medical Leave Act. |
| 218-219 | Plaintiff | 8/15/2025 | 99-26 | Exhibit 25 - Pay Stubs. |
| 220-229 | Defendant | 9/2/2025 | 104 | Defendants' Response to Plaintiff's Motion for Summary Judgment on Count III: FMLA Interference (Doc. 99) |
| 230-239 | Defendant | 9/2/2025 | 104-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 240-271 | Plaintiff | 9/2/2025 | 105 | Plaintiff's Response in Opposition to Defendants Motion for Summary Judgment. (Doc. 98) |
| 272-276 | Plaintiff | 9/2/2025 | 105-1 | Declaration of Kimberly Hunt-Brown. |
| 277-278 | Plaintiff | 9/2/2025 | 105-2 | Exhibit 1 - Deposition Transcript Excerpt. |
| 279 | Plaintiff | 9/2/2025 | 105-3 | Exhibit 2 - Sick and Annual Leave Sheet. |
| 280 | Plaintiff | 9/2/2025 | 105-4 | Exhibit 3 - Family Medical Leave Policy Insert. |
| 281-282 | Plaintiff | 9/2/2025 | 105-5 | Exhibit 4 - Email. |
| 283-284 | Plaintiff | 9/2/2025 | 105-6 | Exhibit 5 - Affidavit of Jose Puentes. |
| 285 | Plaintiff | 9/2/2025 | 105-7 | Exhibit 6 - Michael Saavedra Interview Notes of Amber Sanchez. |

| | | | | |
|---|---|---|---|---|
| 286 | Plaintiff | 9/2/2025 | 105-8 | Exhibit 7 - Francine Martinez Interview Notes of Amber Sanchez. |
| 287 | Plaintiff | 9/2/2025 | 105-9 | Exhibit 8 - Rey A. Maestas Interview Notes of Amber Sanchez. |
| 288 | Plaintiff | 9/2/2025 | 105-10 | Exhibit 9 - Deposition Transcript Excerpt of Vanessa LeBlanc. |
| 289 | Plaintiff | 9/2/2025 | 105-11 | Exhibit 10 - Deposition Transcript Excerpt of Francine Martinez. |
| 290-297 | Plaintiff | 9/2/2025 | 105-12 | Exhibit 11 - Employment Application of Andric Fisher. |
| 298-300 | Plaintiff | 9/2/2025 | 105-13 | Exhibit 12 - New Mexico Register, General Government Administration, Recruitment, Assessment, Selection Rules. |
| 301 | Plaintiff | 9/2/2025 | 105-14 | Exhibit 13 - Employment Application of Unknown Applicant. |
| 302-310 | Plaintiff | 9/2/2025 | 105-15 | Exhibit 14 - Employment Application of Unknown Applicant. |
| 311-321 | Plaintiff | 9/2/2025 | 105-16 | Exhibit 15 - Employment Application of Amber Sanchez. |
| 322 | Plaintiff | 9/2/2025 | 105-17 | Exhibit 16 - Defendant's Answer to Plaintiff's Interrogatory No. 8. |
| 323-325 | Plaintiff | 9/2/2025 | 105-18 | Exhibit 17 - SPD IT Procurement Specialist II (GSD #49191) Job Post. |
| 326-330 | Plaintiff | 9/2/2025 | 105-19 | Exhibit 18 - Regional Finance Branch Manager Job Description. |
| 331 | Plaintiff | 9/2/2025 | 105-20 | Exhibit 19 - Deposition Transcript Excerpt of Eunice Moya 07/09/2025 30(B)(6) Deposition. |
| 332-346 | Defendant | 9/12/2025 | 107 | Defendants' Reply in Support of Motion for Summary Judgment. (Doc. 98) |
| 347-353 | Defendant | 9/12/2025 | 107-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 354-360 | Defendant | 9/12/2025 | 107-2 | Exhibit B - Deposition Transcript of Eunice Moya 7/09/2025 30(B)(6) Deposition. |
| 361-364 | Defendant | 9/12/2025 | 107-3 | Exhibit C - Deposition Transcript of Vanessa LeBlanc. |
| 365-366 | Defendant | 9/12/2025 | 107-4 | Exhibit D - Deposition Transcript of Eunice Moya. |
| 367-377 | Plaintiff | 9/12/2025 | 108 | Plaintiff's Reply in Support of Her Partial Motion for Summary Judgment on Count III: FMLA Interference. (Doc. 99) |

| | | | | |
|---|---|---|---|---|
| 378 | Plaintiff | 9/12/2025 | 108-1 | Exhibit 26 - SHARE Timekeeping System Time Reporting Comment. |
| 379 | Plaintiff | 9/12/2025 | 108-2 | Exhibit 27 - Plaintiff's Timesheet/Leave Modifications. |
| 380-399 | District Court | 2/6/2026 | 146 | Order Granting Defendants' Motion for Summary Judgment in Part Plaintiff's Motions for Partial Summary Judgment and for Sanctions. |
| 400-401 | Plaintiff | 4/8/2026 | 154 | Notice of Appeal. |
| 402-418 | District Court | 07/17/2026 | - | US District Court, District Court of NM Court Docket |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**

**Plaintiff,**

**v.** **Case No. 1:23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**and VALERIE PAULK, EUNICE MOYA, JENNIFER**
**MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ**
**In their individual and official capacities,**

**Defendants.**

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their counsel, Jackson Loman Downey & Stevens-Block, P.C. (Eric Loman and Sarah Downey) move the Court for summary judgment as follows:

## Introduction

Plaintiff is a procurement agent in General Service Department's ("GSD") State Purchasing Division ("SPD"). Her job requires her to draft and revise contracts on behalf of State agencies. The individually named Defendants are GSD managers and coworkers who have interacted with Plaintiff in different capacities.

Since 2017, Plaintiff has been taking intermittent leave pursuant to the Family Medical Leave Act ("FMLA"). Plaintiff occasionally reports a flare up of symptoms related to multiple sclerosis or chronic migraines. It is not uncommon for Plaintiff to take one or more days off per week related to her FMLA-approved condition.

Pursuant to FMLA and GSD policy, Plaintiff is required to apply and recertify for FMLA leave annually. Plaintiff claims that in 2023 and 2024 Defendants interfered with her FMLA

benefits by delaying her FMLA approval, although in both years her FMLA was ultimately approved and she was permitted to take off as many days as requested with no consequence.

Plaintiff claims she not been promoted in violation of the New Mexico Human Rights Act ("HRA"), alleging discrimination based on her age and medical condition. She claims another HRA violation for not being allowed to work from home. Plaintiff claims she has been subjected to a hostile work environment by her current and past two supervisors. Finally, Plaintiff claims a violation of the New Mexico Minimum Wage Act, alleging she was not paid for approximately 1.5 hours of work on a single day. There has been no adverse employment action. Plaintiff has never been disciplined, suspended, demoted or placed on a performance improvement plan. She is currently employed by GSD and takes intermittent FMLA leave as she requests it. As discussed below, Plaintiff's claims should be dismissed.[1]

**Legal Standard**

Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law and the material facts are undisputed. See Fed. R. Civ. P. 56(a). The purpose of summary judgment is to terminate claims that are factually unsupported. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986). "Such a movant may make its prima facie demonstration [for summary judgment] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

[1] This Motion is opposed. Plaintiff has agreed the exhibits to this Motion may exceed the page limit set forth in D.N.M.LR-Civ 10.5.

**Statement of Undisputed Material Facts**

1. **Background and Work Environment:** When Plaintiff applied to work at GSD in 2014, she was living in Santa Fe. See Deposition of Kimberly Hunt-Brown, attached as Exhibit A, p. 15:5-14. Approximately one year later, Plaintiff chose to move to Rio Rancho and commute to work in Santa Fe. *Id.* p. 17:7-17. Plaintiff first requested intermittent FMLA leave from GSD in approximately 2017. Ex. A, p. 30:4-7. Prior to the 2020 COVID pandemic, Plaintiff never worked remotely for GSD. Ex. A, p. 17:18-23.

2. Defendant Natalie Martinez became Plaintiff's direct supervisor in the Spring of 2020, just as State employees began working from home due to the COVID pandemic. Ex. A, p. 37:12- 38:5.

3. During the COVID-related telework period, Ms. Martinez started weekly progress meetings with Plaintiff because of a concern Plaintiff's workload was not moving along as quickly as it should. Ex. A, p. 45:4-20.

4. For approximately three months in the Summer of 2022, Ms. Martinez took an extended leave of absence. Ms. Martinez's superior, Defendant Valerie Paulk acted as Plaintiff's supervisor during that period and continued the weekly progress meetings with Plaintiff. Ex.A, p. 51:17 – 52:7.

5. Plaintiff claims she is placed under increased scrutiny and micromanaged because her supervisors (over a period of time Natalie Martinez, Valerie Paulk, and currently Vanessa Leblanc) have maintained the weekly progress meetings with Plaintiff to go over her pending assignments. Ex. A, p. 125:20 – 127:7.

6. Plaintiff found the meetings to be sometimes helpful and professional in tone. Ex. A, 50:15-18; 52:8-17.

7. Plaintiff recalls one meeting where things got "a little heated," but noted that can happen in "any meeting." Ex. A, p. 52:12- 53:7. Plaintiff does not recall any other instance in which the tone of a meeting with her supervisors bothered her. Ex. A, p. 54:2-13; 20-23.

8. Neither Ms. Martinez nor Ms. Paulk ever insulted Plaintiff or called her names. They "never engaged in that type of behavior with [Plaintiff]" and were professional at all times. Ex. A, p. 54:24- 55:9; 56:3- 57:5.

9. Defendant Vanessa Leblanc has been Plaintiff's direct supervisor since approximately February 2024. Plaintiff feels Ms. Leblanc is sometimes less friendly to Plaintiff than others in the office, but cannot provide any examples of Ms. Leblanc being hostile to her. Ex. A, p. 123:19- 124:22.

10. Plaintiff once returned to work after being out for an extended illness and recalls her managers wanted her to finish the work that had gotten backed up while she was out. Plaintiff was not disciplined or reprimanded for the backlog of work, but considers this an example of hostility in the workplace. Ex. A, p. 129:24- 130:15.

11. Plaintiff does not claim anyone other than Natalie Martinez, Valerie Paulk and Vanessa Leblanc have ever done anything to create a hostile work environment. Ex. A, p. 130:16-20.

12. Plaintiff has never been disciplined, suspended, demoted or terminated by GSD. Ex. A, p. 127:8-16.

13. **Plaintiff's 2023 FMLA Renewal:** Plaintiff's intermittent FMLA leave must be recertified on an annual basis. Ex. A, p. 64:4-11. Plaintiff's FMLA certification for 2022 expired on December 13, 2022. *Id.*, p. 68:4-13. Beginning in December 2022, Plaintiff worked with a human resources employee, Kelly Howley, to recertify her FMLA benefits for 2023. Ex. A, p. 64:15-24.

14. After Plaintiff submitted the FMLA forms to Ms. Howley, Ms. Howley returned them to Plaintiff, telling her additional information was needed from Plaintiff's medical provider. Ex. A, p. 65: 4-21. Around that same time, Plaintiff's medical provider was out of the office for approximately one month for an illness of her own. The absence caused additional delay in submitting a revised certification to GSD, which was no fault of GSD. Ex. A, p. 66:6 – 67:8.

15. While Plaintiff and GSD worked together to get her FMLA leave recertified for that year, Plaintiff continued calling in sick as needed. Because her FMLA had not yet been recertified, Plaintiff's time on those days would be coded as "Leave Without Pay." Ex. A, p. 68: 4 – 69: 3.

16. On March 30, 2023, GSD approved Plaintiff's request to take intermittent FMLA and she was approved for the year. Ex. A, p. 69:9-11. GSD retroactively applied Plaintiff's FMLA approval, such that her missed days were recoded from "Leave Without Pay" to FMLA leave. Ex. A, p. 72:23-74:6.

17. That retroactive application simply changed a number of Plaintiff's missed time from "Leave Without Pay" to unpaid FMLA leave, resulting in no lost wages or benefits. Ex. A. p. 74:2-25.

18. **Plaintiff's 2024 FMLA Renewal:** In the beginning of 2024, Plaintiff sought to recertify her FMLA leave for the upcoming year. Ex. A, p. 130:23-131:3.

19. The certification provided by Plaintiff's medical provider indicated Plaintiff was estimated to have as many as 4 episodes per month, which GSD understood to mean she might miss up to 4 days per month. As such, when she called in for the fifth time in a month, GSD told her she was not approved for additional FMLA leave, and that time was coded instead as "Leave Without Pay-Authorized". Ex. A, p. 131:20 – 132:8; 139:21-23.

20. Defendant Jennifer Morfin, a GSD human resources representative, told Plaintiff if she wanted to take more than four days per month of FMLA leave, she would just need to get an updated certification from her medical provider. Ex. A, p. 132:17-133:1. Ms. Morfin later sent Plaintiff a 'polite reminder' to update her medical certification and provided the necessary documents. Ex. A, p. 134:12-21.

21. Plaintiff provided an updated certification from her provider stating she might have up to 31 episodes per month. GSD accepted the certification and approved Plaintiff for intermittent FMLA leave up to 31 days per month. Ex. A, p. 135:19 – 136:21. Prior to that new certification, Plaintiff would take time off as needed and it was coded as Leave Without Pay, and since then Plaintiff has had no issue taking as much FMLA leave as she requests. Ex. A, p. 137:14-23, p. 139:14-18.

22. Leave Without Pay-Authorized and FMLA leave are both unpaid leave. Ex. A, p. 71:22-23.

23. **Plaintiff's Request To Telework:** At the end of 2022, the Governor issued orders rescinding the COVID telework orders and requiring State employees to return to the office by February 2, 2023. Ex. A, p. 57:6-19; 58:12-14.

24. Plaintiff submitted a formal request to continue teleworking as a reasonable accommodation, citing a particular vulnerability to COVID. Ex. A, p. 59:11-23. Plaintiff was approved to continue teleworking until August 2, 2023.

25. As State employees transitioned back to working in the office, a number of other GSD employees made similar requests and were also permitted to continue teleworking for a trial period. However, no other employee was permitted to telework longer than Plaintiff. In other words,

Plaintiff received the longest extension and was the last one to return to the office. Ex. A, p. 63:16-64:3.

26. As Plaintiff's extension to telework until August 2, 2023, was near expiration, she submitted a new request to continue teleworking because of COVID sensitivity. On July 31, 2023, Plaintiff attended an interactive process meeting with her counsel, Defendant and GSD Human Resources Director Eunice Moya, and manager Dorothy Mendonca. Ex. A, p. 107:7-16.

27. During that meeting, Plaintiff said she was now requesting telework because of her migraines, not her risk of COVID exposure. Ex. A, p. 107:17 – 108:9; 110:3-13.

28. Specifically, Plaintiff claims on some days she awakens with a migraine, rendering her unable to work. On those days, she takes her migraine medication, which might take several hours to take effect. Once her medication takes effect, her migraine may go away, but the medication has side effects affecting her balance and depth perception, rendering her unable to drive for the rest of the day. Plaintiff claims, rather than taking FMLA leave for the entire day, she should be permitted to work from home for that period of the work day after her migraine resolves, despite having light sensitivity, balance and depth perception problems so severe she cannot safely operate a vehicle to drive to her office. Ex. A, 98:12- 101:11.

29. Plaintiff's migraine medication affects her depth perception such that when she reaches for something, she does not know "where something on the other end of [her] hand is." Ex. A, p. 189:17 – 190:9. Plaintiff testified the medication affects her balance such that she "stagger[s] around the house holding onto the wall." Ex. A, p. 100:12-25. However, Plaintiff claims these side effects do not prevent her from effectively doing her job, which requires her concentration and focus on a computer screen and drafting procurement contracts. Ex. A, 99:23 – 100:4.

30. On August 4, 2023, Plaintiff submitted a formal request to telework as a reasonable accommodation pursuant to the ADA. This request cited her migraines, as was discussed during the July 31, 2023 interactive process meeting. Ex. A, p. 90:25- 91:25.

31. Plaintiff had another phone call with Eunice Moya to discuss her request to telework as an accommodation for her migraines. GSD did not approve telework as an accommodation, but GSD did discuss accommodations that could be made in the workplace. Ex. A, p. 114:25 – 115:9.

32. GSD does not permit telework or working from home for any employees. See Rule 30(b)(6) Deposition of GSD, attached as Exhibit B, p.91:11-17; 93:10-18.

33. GSD has determined working in the office is an essential function of its positions. Ex. B, p. 84:25- 85:16; 101:22 -102:19;

34. Plaintiff accepted a position located in Santa Fe, New Mexico and is required to report to her office located at 1100 S. St. Francis Dr. when she is able to work. Ex. B, p. 85:19-25.

35. GSD's position is that staff must work in person so they can be effectively supervised. If employees were permitted to work from home, they could not adequately supervised. Ex. B, 87:11-25.

36. When Plaintiff applied for her current position, the job description indicated "[w]ork is performed in an office setting…" Ex. B, p. 103:7-18, Ex. 16 thereto.

37. After the COVID emergency telework ended for State employees, the State Personnel Office circulated a directive to all State agencies that "non-manager and non-supervisor employees… **must** return to the office full-time ***no later than*** February 2, 2023." Ex. B, Ex. 21 thereto (emphasis in original).

38. GSD Attendance Policy, GSD-030, at § 6.11.1 provides "[e]mployees must arrive and be prepared to commence work at the scheduled start time." Ex. B, Ex. 3 thereto (pg. GSD.00676).

39. GSD's Code of Conduct, GSD-002, § 7.2 provides "[e]mployees shall report to work on time, each scheduled workday…" and "[e]mployees shall report to work able to perform essential job functions…" Ex. B, Ex. 22 thereto (pg. GSD.00615).

40. During her interviews for other positions at GSD, Plaintiff has consistently told the interviewers she needs no accommodation to perform the duties of those jobs. Ex. A, p. 157:25-158:5; 164:1-4; 166:4-7.

41. **Plaintiff's Claims for Failure to Promote**: From August 17, 2023 to June 20, 2024, Plaintiff applied for six higher-paying jobs at GSD but was not selected for them. See 2nd Am. Compl, (Doc. 43), ¶¶ 94-106, 128-130.

42. In September 2023, Plaintiff was interviewed for Construction Unit Supervisor (Job #2954). See Affidavit of Jennifer Conn, attached as Exhibit C, ¶ 3. The applicant selected for hire, Tami Concha, performed better and scored higher in her interview than Plaintiff. Ex. C, ¶ 4-6. Ms. Concha was able to give detailed answers about her approach to projects and problems, and impressed the interview panel with her organizational skills and attention to detail. *Id.*

43. During Plaintiff's interview, she appeared to be less familiar with procurement processes and was unable to answer some questions on the topic. *Id.* The hiring panel unanimously chose Ms. Concha for Construction Unit Supervisor (Job #2954). Ex. C, ¶ 7

44. In September 2023, Plaintiff also interviewed for the position of Purchasing Deputy Director (Job #2961). Natalie Martinez was selected for hire. Ex. C, ¶ 8-9. Deputy Director is a supervisory position, and Ms. Martinez had management experience. Ex. C, ¶ 10. Plaintiff has never been a supervisor at GSD. *Id.* Ms. Martinez had many years more experience than Plaintiff and was Plaintiff's Bureau Chief (i.e. direct supervisor) at the time. *Id.* The interview panel found

Ms. Martinez gave a better interview than Plaintiff and unanimously selected Ms. Martinez for the position. *Id.*, ¶ 12-13.

45. In January 2024, Plaintiff applied and was interviewed for Procurement Specialist Bureau Chief (Job #10106555). Ex. C, ¶ 14. Vanessa Leblanc was selected for hire. Ms. Leblanc had more years of experience that Plaintiff and had worked in several positions in the State Purchasing Division. Ex. C, ¶ 15-16. Ms. Leblanc generally gave better answers during her interview, while Plaintiff was non-responsive to at least one question and answered other by discussing experience that was not relevant to position she was seeking. *Id.*

46. The panel unanimously selected Ms. Leblanc for the Bureau Chief position (Job #10106555). Ex. C, ¶ 17.

47. In February 2024, Plaintiff applied for I.T. Procurement Specialist (Job #3018) and was interviewed for the position. Yuli Wulandari was selected for hire. See Affidavit of Francine Martinez, attached as Exhibit D, ¶ 4.

48. In the interviews, Ms. Wulandari described her extensive experience in I.T. and I.T. procurement, while Plaintiff stated she had very little experience in that area. Ms. Wulandari clearly and in detail explained how her experience would relate to the position and give several examples of I.T.-related procurements and purchasing she handled before. Ex. D, ¶ 5-6.

49. The hiring panel was unanimous in its selection of Ms. Wulandari to fill the position (Job #3018). Ex. D, ¶ 7.

50. In March 2024 Plaintiff applied for I.T Procurement Specialist (Job #2972). Plaintiff was interviewed and Andric Fisher was selected for hire. Ex. D, ¶ 8.

51. When asked what experience she had "relative to the skills required of the I.T. unit," Plaintiff told the interviewers she had "little to none." Ex. D, ¶ 9. In contrast, Mr. Fisher answered

that question by discussing prior jobs in which he handled procurements and I.T. procurement specifically. Ex. D, ¶ 10. The hiring panel was unanimous that Plaintiff was not the best candidate for the position (Job #2972). Ex. D, ¶ 11.

52. In June 2024, Plaintiff applied for I.T. Procurement Specialist II (Job #49191) and was interviewed. Amber Sanchez was selected for hire because she had experience as a buyer, experience with I.T. contracts, and excelled in her previous position. See Deposition of Michael Saavedra, attached as Exhibit E, 41:17-42:3. Ms. Sanchez also generally interviewed well and gave better answers to the interview questions. Ex. E, p. 50:1-11; Deposition of Francine Martinez, attached as Exhibit F, p. 154:6-12.

53. Plaintiff interviewed poorly for I.T. Procurement Specialist (Job #49191). Ex. E, p. 52:17-53:1. When asked what relevant experience she had, Plaintiff responded "little to none." Ex. F, p. 187:10-188:3.

54. The decision to hire Ms. Sanchez was unanimous among the hiring committee. Ex. E, p. 44:20-45:3; Ex. F, p. 184:13-24.

55. During the interviews for I.T. Procurement positions (Jobs #3018, #2972, and #49191), Plaintiff did not appear to be engaged in the interviews or truly interested in the positions, but rather as if she was simply 'going through the motions' of the interview process. Ex. D, ¶ 12.

56. The interviewers did not know Plaintiff had a medical condition, and Plaintiff told them she could perform the duties of the jobs without any accommodation. Ex. C, ¶ 18, Ex. D, ¶ 13. See also, Ex. A, p. 157:25-158:5; 164:1-4; 166:4-7 (Plaintiff testifying she told the interviewers she needed no accommodation to perform the jobs for which she applied).

57. Plaintiff's age was not a factor in these hiring decisions. Ex. C, ¶ 19, Ex. D, ¶ 14, Ex. E, p. 52:2-16.

58. Plaintiff has no evidence that her age or medical condition were factors in the hiring decisions at issue, other than the fact that others were selected for those positions. Ex. A, p. 165:19-22.

59. **Plaintiff's MWA Claim**: On September 6, 2024, Plaintiff had a doctor's appointment and wished to "flex" her time- meaning to adjust her working hours just for that day- so she could leave early and make the appointment. However, she forgot to ask her supervisor, Vanessa LeBlanc for approval to flex her time until approximately 4:19 pm on September 5, 2024. Ex. A, p. 139:3 – 140:5.

60. GSD employees who want to flex their workday, are required to have the prior approval of their supervisor. Ex. A, p. 140:6-16. When Plaintiff emailed Ms. Leblanc at 4:19 p.m., she knew Ms. Leblanc had already left the office for the day. Ex. A, p. 141:8-13. Ms. Leblanc was out of the office the next day, September 6, 2024. *Id.* p. 141:14-17.

61. Plaintiff agrees she was required to have approval from her supervisor to flex her schedule and did not get the required approval to flex her schedule on September 6, 2024. Ex. A, p. 148:13-23. In the past, Plaintiff had been reminded by her supervisors before that if she could not work outside her regular schedule without prior approval because it caused an "FLSA Issue" (meaning an issue with overtime pay.) Ex. A, p. 185:1- 186:7.

62. Because she worked outside her regular work schedule without approval, Plaintiff was not paid for approximately 1 hour and 15 minutes she claims to have actually worked. Ex. A. p. 141:19-24.

63. Although Plaintiff testified she worked a full 8-hour day on September 6, 2024, she only worked about 7.5 hours. See Plaintiff's Emails, attached as Exhibit G (indicating Plaintiff worked

approximately 5 hours in the morning and 2.5 hours in the afternoon that day), and 2nd Am. Compl, (Doc. 43), ¶ 134 (confirming Plaintiff worked less than an 8-hour day).

**Points and Authority**

There has been no discriminatory action taken against Plaintiff. She has not been disciplined, nor has she been subjected to a hostile work environment. GSD has offered to make accommodations for Plaintiff in the workplace, but is not required by law to permit an employee to work from home as an accommodation. Although there were paperwork issues and delays in approving Plaintiff's FMLA leave for the years 2023 and 2024, her FMLA was ultimately approved both years and she has taken as many days off as requested, with no adverse action as a result. Defendants are entitled to summary judgment.

**I. Defendants Have Not Interfered With Plaintiff's FMLA Benefits.**

Following Tenth Circuit law, this District has recently found to "succeed on an FMLA interference claim, an employee must show that (1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." See, Rodriguez-Ortega v. Rich, *et al*, 1:21-cv-1129 JCH/KK (D.N.M.)(September 26, 2024), p. 16 (citing *Tadlock v. Marshall County HMA, LLC*, 603 F. App'x 693, 709 (10th Cir. Feb. 25, 2015)).

A plaintiff can meet the second element- requiring adverse action- by showing "that he was prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave," or by "discouraging an employee from using FMLA leave." See, Rodriguez-Ortega, p. 16-17 (citing *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).

In Rodriguez-Ortega, the plaintiff was approved for intermittent FMLA leave, but was eventually terminated because, among other things, he did not follow the employer's call-in procedures and was marked Absent Without Leave ("AWOL") on some days. *Id.*, pp. 3-4, 7-8, 13. The plaintiff claimed his employer interfered with his FMLA rights by marking him AWOL and ultimately terminating him. The Court granted summary judgment for the defendant, finding the employer correctly followed its "policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA."* Id., p. 22 (citing *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008-09 (10th Cir. 2011)(emphasis in original)). The Court found the defendant ultimately provided Mr. Rodriguez-Ortega the forms to apply for FMLA leave and approved him for intermittent FMLA leave. *Id.*, p. 24. The decision to mark Mr. Rodriguez-Ortega as AWOL for a few days was not to interfere with his FMLA rights, but to enforce the employer's leave notification policies. *Id.*, p. 24-25. Judge Herrera granted summary judgment, dismissing Mr. Rodriguez-Ortega's FMLA interference claim.

The case now before the Court is even weaker than the one Judge Herrera dismissed last year. Unlike Mr. Rodriguez-Ortega, Plaintiff has not been terminated, nor disciplined in any way by Defendants. Plaintiff cannot meet the second element of her claim because there has been no adverse employment action.

The undisputed facts are that Plaintiff submitted her application for FMLA renewal for 2023 and GSD's H.R. department told her the documents needed more information from her medical provider. There was then a delay of several weeks because Plaintiff's provider had an extended illness. By the end of March 2023, Plaintiff's FMLA was certified and approved by GSD. During the meantime, she continued calling in sick for her FMLA-qualified condition as needed, and those days were initially coded as authorized leave without pay, rather than unpaid

FMLA. Even if GSD H.R. was incorrect and Plaintiff's initial certification was sufficient, she was not prohibited from taking off the days she needed for her medical condition, and her FMLA was approved weeks later.

In 2024, GSD initially interpreted the certification from Plaintiff's provider as to limit her to four days per month of FMLA leave. When Plaintiff took more than 4 days per month, she was asked to get another certification from her provider and continued calling in sick as needed for her FMLA-qualifying condition. Again, her FMLA for 2024 was ultimately approved and she was permitted to take up to 31 days per month of FMLA leave, as needed and requested by her.

Further, Plaintiff has no evidence to support the third element of her claim: that some adverse action was "related to the exercise or attempted exercise of" her FMLA rights. *Tadlock*, *supra.* Even if Plaintiff could show an adverse action here, there is no evidence that any action was taken as a result of her application for FMLA leave.

In both 2023 and 2024, GSD ultimately approved Plaintiff's requests for intermittent FMLA leave and allowed her to take as many days off for her qualifying medical condition as she requested. Plaintiff has never been disciplined as a result of some days being coded "Leave Without Pay- Authorized" rather than FMLA Leave. Plaintiff has never called in sick and been told she was required to report to work that day or face some consequence. Plaintiff has not lost any pay as a result of some days being coded as one kind of unpaid leave rather than another. She continues taking intermittent FMLA leave as requested to this day. Plaintiff's FMLA claim must be dismissed.

## II. Plaintiff Is Not Entitled To Work From Home.

Count II of the Second Amended Complaint alleges GSD violated the HRA by not allowing Plaintiff to work from home as an accommodation for a medical condition.

Like many employees across the country, Plaintiff did not want to come back to the office after the COVID emergency ended. First she sought permanent telework, citing a vulnerability to COVID. When it was explained that accommodations could be made in the office to help prevent contraction of COVID, Plaintiff pivoted to the position that she should be able to telework on days she takes migraine medication that allows her to perform her job, but not drive a vehicle.

GSD has determined in-office attendance is an essential function of Plaintiff's and other office-based positions. The State Personnel Office indicated at the beginning of 2023 that all "non-manager employees and non-supervisor employees … **must** return to the office full-time **no later than** February 2, 2023." UMF ¶¶ 23, 37. This was not a policy directed at Ms. Hunt-Brown, but all non-manager/non-supervisor State employees, which would include Ms. Hunt-Brown. GSD explained the ability to adequately supervise employees when they are not in the office is a business necessity and the inability to do so creates an undue hardship. UMF ¶ 35.

In *Duffee v. T-Mobile USA, Inc.*, 1:23-cv-536 MIS/LF (D.N.M.) (October 2, 2023) a plaintiff asked to work from home as an accommodation for her disability. Judge Strickland found "the Tenth Circuit has firmly established that requests to work remotely are not, as a matter of law, reasonable accommodations." *Id.*, p. 8. (citing *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050-51 (10th Cir. 2017)). Judge Strickland was correct. In *Punt,* the Tenth Circuit held:

> "Physical attendance in the workplace is itself an essential function of most jobs, and an employee's request to work from home is, as a matter of law, unreasonable if the employer has decided that physical presence at the workplace is an essential function of the position."

*Id.* at 1051. An "employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Id.*

The Tenth Circuit's holding in *Punt* built on its prior holding that courts are "require[d] to consider the employer's judgment as to what functions of a job are essential." *Mason v. Avaya*

*Comm's, Inc.*, 357 F.3d 1114, 1119-1120 (10th Cir. 2004) (noting other circuits have held physical attendance is an essential function of most jobs). The Court concluded "physical attendance [at the workplace] is an essential function of the [position]. Mason's request to work at home would eliminate physical attendance at the [workplace]." *Id.* at 1123. Therefore, the plaintiff failed to establish her claim for failure to accommodate. *Id.* at 1125.

The Fourth Circuit has held:

> "in addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise. Therefore, a regular and reliable level of attendance is a necessary element of most jobs"

*Tyndall v. Nat'l Educ. Centers, Inc. of California,* 31 F.3d 209, 213 (4th Cir. 1994)(internal citations omitted).

If asked, GSD will provide reasonable accommodation to Plaintiff in her workplace, but Defendants are not required to permit Plaintiff to work from home as a matter of law. Plaintiff's claim for failure to accommodate should be dismissed.

**III. Plaintiff Has Not Been Subjected To A Hostile Work Environment.**

Having no adverse employment action taken by Defendants, Plaintiff claims she has been retaliated against by being exposed to a hostile work environment. To "prevail on a discrimination claim based on a hostile work environment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gerald v. Locksley*, 784 F.Supp.2d 1074, 1119 (D.N.M. 2011) (citing *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir.2004)). The Court must consider "the work atmosphere both objectively and subjectively, looking at all the circumstances from the

perspective of a reasonable person in the plaintiff's position. We may consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance." *Id.* *See also, Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (holding a hostile work environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."). "[P]etty slights, minor annoyances, and simple lack of good manners" do not amount to adverse employment actions. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S.53, 68, 126 S.Ct. 2405 (2006).

Plaintiff's own testimony describes no hostile work environment. She has never been insulted. To the contrary, her supervisors (Defendants Martinez, Paulk and Leblanc) have always acted professionally. See UMF ¶ 8. Plaintiff merely perceives Ms. Leblanc is sometimes 'less friendly' with her than others in the office. UMF ¶ 9. She does not describe an environment so abusive and pervasive that it alters the terms of her employment. There has been no hostile work environment and no adverse employment action here. This Motion should be granted.

**IV. Plaintiff's Minimum Wage Act Claim (Count V) Must Be Dismissed.**

Plaintiff's New Mexico Minimum Wage Act ("MWA") claim is based on the premise she had authority to work outside her approved work schedule on September 6, 2024, also known as 'flex time.' The parties agree that GSD employees are only permitted to flex their time if they have prior approval of a supervisor.[2] It is also undisputed that Plaintiff forgot to request a flex day until late September 5, 2024, when she knew her supervisor had already left for the day.

[2] In addition to Plaintiff's own testimony on this point (UMF, ¶ 61), Defendants attach the policy, GSD-003, § 6.2.4 as Exhibit H ("An employee may not change or flex their approved [work schedule] without prior approval from the employee's immediate supervisor/manager.")

Plaintiff's supervisor did not see her request until she returned several days later and therefore did not pre-approve the request. It is further undisputed Plaintiff did not work a full 8-hour day on September 6, 2024. Plaintiff did not seek approval to flex her time from any other manager and simply worked outside her approved work schedule on September 6, 2024 without approval to do so. Plaintiff was paid for the hours she actually worked within her approved work schedule. The MWA claim should be dismissed.

**V. Plaintiff's Failure To Promote Claims Must Be Dismissed.**

After this lawsuit was filed[3], Plaintiff began applying for promotions; six positions in all. Plaintiff met the minimum qualifications and was interviewed for those positions but was not selected for them. Count I of Plaintiff's 2nd Am. Compl. claims a violation of the HRA, alleging she was not selected for hire for these positions because of her medical condition. (Doc. 43), ¶ 140, *et seq*. Count IV alleges Plaintiff was not selected for one position because of age discrimination, I.T. Procurement Specialist II (Job #49191). *Id.*, ¶ 218, *et seq.*

When considering a HRA claim for employment discrimination, New Mexico courts follow the "federal burden-shifting methodology under Title VII of the Civil Rights Act of 1964." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12. (adopting the framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817 (1973). Under "the *McDonnell Douglas* framework, an employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate." *Id.* As such, even if Plaintiff could make a *prima facie* case of discrimination, she must still overcome

[3] Plaintiff's initial complaint was filed in State Court on August 15, 2023.

the undisputed evidence of GSD's legitimate non-discriminatory reasons for selecting other applicants for the positions at issue. *See, e.g., Brenneman v. MedCentral Health System*, 366 F.3d 412, 417-418 (6th Cir. 2004) (holding "the plaintiff always retains the ultimate burden of persuasion).

To show pretext, "the plaintiff must establish that the employer's proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief. But mere conjecture that the employer's explanation is pretextual cannot defeat summary judgment." *Ford v. Jackson Nat'l Life Ins. Co*., 45 F.4th 1202, 1216 (10th Cir. 2022) (internal citations omitted). As in this case, the employer in *Ford* noted the plaintiff "was not promoted because other candidates performed better in interviews and were thus more qualified than her." *Id.* The Tenth Circuit held interview performance is a legitimate nondiscriminatory reason to select one applicant over another. *Id.*

Although Plaintiff cites a general belief that her age and medical condition "might have had something to do with" these hiring decisions, she has no evidence to support her belief. Indeed, her interviewers did not know she had a medical condition. UMF ¶ 56. *See, e.g., Trujillo v N. Rio Arriba Elec. Co-op, Inc.*, 2002-NMSC-004, ¶ 18, 131 N.M. 607 (holding an employer cannot discriminate against an employee because of a disability "unless it knows of the disability. If it does not know of the disability, the [action] is 'because of' some other reason."). Further, the interviewers for these positions have testified why they selected other candidates for hire, including that Plaintiff did not interview well, did not have the experience other candidates did, and in many cases, did not seem engaged in the interviews.

Although a younger applicant was hired for I.T. Procurement Specialist II (Job #49191), Plaintiff has no evidence age was the reason, and certainly no evidence to overcome the rebut the testimony of the members of the hiring panels. These claims should be dismissed.

## Conclusion

Plaintiff has experienced neither adverse employment action nor retaliation. She has not described a hostile work environment. Rather, Plaintiff testified her supervisors have treated her professionally. Plaintiff's intermittent FMLA leave has never been interfered with. She has never been forced to work nor disciplined for taking a sick day. Plaintiff continues her employment with GSD to this day, taking as much intermittent FMLA leave as she wants.

While GSD has offered to make accommodations for Plaintiff in the workplace, GSD is not required to allow Ms. Hunt-Brown to work from home as an accommodation. Plaintiff's job is in GSD's office, and that is where she must report when she is able to work. The undisputed material facts in this case do not support Plaintiff's claims and the should be dismissed. This Motion should be granted.

**WHEREFORE** Defendants respectfully prays this Court enters summary judgment on all Counts of Plaintiff's Second Amended Complaint (Doc. 43).

Respectfully submitted,

**JACKSON LOMAN DOWNEY**
**& STEVENS-BLOCK, P.C.**

/s/ by Eric Loman_____
Eric Loman
Counsel for Defendants
201 Third St. N.W., Ste. 1500
Albuquerque, NM 87102
(505) 767-0577
eric@jacksonlomanlaw.com

I certify the foregoing was filed via the Court's
CM/ECF system on August 15, 2025, which
causes all counsel of record to be served electronically.

/s/ by Eric Loman
Eric Loman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ In their individual and official capacities,

Defendants.

DEPOSITION OF KIMBERLY HUNT-BROWN
MARCH 5, 2025
9:14 A.M.
201 THIRD STREET, NORTHWEST, SUITE 1500
ALBUQUERQUE, NEW MEXICO 87102

PURSUANT TO THE NEW MEXICO FEDERAL RULES OF CIVIL PROCEDURE this deposition was:

TAKEN BY: ERIC LOMAN, ESQ.
ATTORNEY FOR DEFENDANTS

REPORTED BY: KIM KAY SHOLLENBARGER
NEW MEXICO CCR#236
ALBUQUERQUE COURT REPORTING SERVICE, LLC
3150 CARLISLE BOULEVARD, NORTHEAST, SUITE 104
ALBUQUERQUE, NEW MEXICO 87110





EXHIBIT A

Page 14

A. Yes.
Q. How long have you been in Rio Rancho?
A. We purchased a house there coming up on, I believe 11, 12 years now maybe.
Q. So approximately 2013?
A. This is 2025. So, yeah.
Q. Where did you live before that?
A. We do have a permanent residence down in Carlsbad. We still have the home that I purchased down in Carlsbad. We still have the house down there.
Q. Prior to Rio Rancho you were living in Carlsbad?
A. No. We have the house in Carlsbad, so I was living there part time. My husband was working different areas in the state and doing work for the Department of Transportation. He was doing consultant work, so he was working different assignments around the state. So depending on where I was and what I was doing, I would go and stay with him for awhile if I was between jobs, I would go and stay with him. And then if I was working somewhere, then I would just go visit him on weekends or he would come home if I was at home, that kind of thing. So some of the time he would be living in Alamogordo, he would be living in Albuquerque, so we had sort of a moving residence around the state. So we moved -- we lived in different areas, so -- can you clarify what you need to know specifically.

Page 15

Q. Well, my question was just, where did you live? I don't know how to ask a more simple question than that. But I understand that maybe it's not just a simple answer.
A. Yeah, it's not a simple answer.
Q. I appreciate your explanation. When you applied in 2014 with the state, were you living in Rio Rancho at that time?
A. No.
Q. Where were you living?
A. We actually were living in that time, we were living in an RV, in our one recreational vehicle that we had and we were living just outside Santa Fe in a little RV park. It happened to be in the movie about Something About Paul, I think. Cute movie.
Q. How long did you live in an RV park?
A. Oh, we were there, I would say maybe a year, a year and a half at that park. We lived for awhile in one up off of Cerrillos Road also. And when I was living -- when we were living there I was actually working down at Sandia Labs on contract for them. You skipped over it.
Q. Well, I didn't skip over it. I had asked you where you had worked and you hadn't mentioned Sandia Labs. Tell me, and I'll ask you again, it wasn't on Exhibit 1 here, between 2012 and 2014, I asked if you had any other jobs and I think you said no, but you recall now that you were working

Page 16

at Sandia Labs?
A. That one wasn't between 2012 and 2014.
Q. When did you work at Sandia Labs?
A. That was between 2004 and 2006.
Q. So what I'm asking you now is when you applied to work with the state in 2014, where were you living?
A. We were living right outside Santa Fe.
Q. In the RV park?
A. In the RV park.
Q. How long did you live in that RV park?
A. Until we purchased the house in Santa Fe -- or in Rio Rancho.
Q. I thought you had told me you bought the house in Rio Rancho in approximately 2013. So do you recall now when you purchased the house in Rio Rancho?
A. We've been in the house in Rio Rancho just a little over ten years now.
Q. So maybe that was 2014 or 2015? I'm asking you.
A. 2014, 2015 time frame, yes. About ten years ago.
Q. Going back in time, how long did you live in the RV park?
A. So we waited until I was through my probationary period.
Q. And I'm sorry, that's not what I'm asking. I understand that you -- you told me when you left the RV park

Page 17

and moved to Rio Rancho. I want to know when you started living in the RV park.
A. I don't recall that.
Q. Do you remember approximately how long you lived in the RV park?
A. A year maybe.
Q. When you bought the house in Rio Rancho you were already working for the state in Santa Fe; is that correct?
A. I had been working for the state in Santa Fe for a year at that time. At least a year.
Q. Why would you take a job in Santa Fe and then a year later move to Rio Rancho?
A. It was cheaper in Rio Rancho to purchase a home. Not all of us can afford to live in Santa Fe on a state pay.
Q. You commuted from Rio Rancho to Santa Fe for your job, yes?
A. Yes, that's correct.
Q. Prior to COVID and when everybody -- well, prior to COVID, because things changed then. I think we can all agree.
A. Oh, yes.
Q. Did you ever work remotely for GSD?
A. No.
Q. You went to work every day in the office in Santa Fe, right?

Page 30

would use sick leave at the time. I did go ahead and put in -- that was when I first found out about FMLA paperwork and I first went ahead and did my very first FMLA provision.
Q. Do you remember the year that you first requested FMLA benefits from GSD?
A. I think it might have been around 2017. Do you happen to have that on file?
Q. Not in front of me. Not at my fingertips.
A. I probably have it. Again, it's something that I probably have in my files, but...
Q. If you're off by a year or two, that's okay. I'm just asking what you know. Asking what you remember.
A. Can I?
Q. Yes.
A. I should have mentioned, that's another lovely side effect of the MS, is that MS does things, myelinating or demyelinating the nerves and such in the brain and what I equate it to is, basically it's drilling swiss cheese, making swiss cheese out of my....anyway, it affects my memory. So sometimes I have trouble retrieving things, so I write everything down. So that's one of the reasons I keep saying, "I have it written down," because I write anything that's important to me, I write it down and that way I have it. I can go back and look it up.
Q. Do you find, does it affect your short-term or

Page 31

long-term memory one more than the other?
A. It's sort of arbitrary, as far as which one it affects more than the other. I can't say it affects one more than the other. But I have a lot of memories, I'm 63, so a lot of memory to drill holes into.
Q. Looking at 2019, before COVID, let's say in the last six months before everything changed with COVID, you had intermittent FMLA benefits, right?
A. I believe so.
Q. And approximately, and I understand it varies and it fluctuates, but approximately how often would you take an FMLA day during that time period?
A. I honestly wouldn't even know. I would have to go back and look at my timesheets to tell you something like that honestly and...
Q. Once a week? Once a month?
A. I would be guessing and I don't want to do that.
Q. So then in 2020 -- oh, I understand that during that 2019, early 2020 time frame, who was your direct supervisor at GSD?
A. In 2019, that would have been Terese Montoya.
Q. My understanding is that she left GSD in February of 2020. Does that sound about right to you?
A. That sounds about right, yes.
Q. How long had she been your direct supervisor?

Page 32

A. Since she came to State Purchasing. So from whatever date she came into State Purchasing, I would say it was probably about a year, maybe a little over a year.
Q. And who was her direct supervisor?
A. Her direct supervisor would have been Valerie Paulk.
Q. So we have exchanged written discovery, requests and responses in this case, interrogatories and requests for production, right?
A. Yes.
Q. You're familiar with that. And in response to Interrogatory Number 10 we asked you to identify individuals who essentially -- essentially we asked you to identify witnesses. And you mentioned Ms. Montoya, personal supervisor and -- I'm sorry, former supervisor and personal friend of plaintiff, discussions with Paulk about plaintiff's work, quality and quantity of work, FMLA leave, absences from work, hostility and retaliation. So I want to understand what you think Ms. Montoya will testify to if she's called as a witness in this case, okay. This response says, "discussions with Paulk about Plaintiff's work, et cetera." What discussions did Terese Montoya have with Valerie Paulk about your work?
MS. BURKE: Objection, foundation.
MR. LOMAN: You can answer.
A. What discussions did she have with Valerie?

Page 33

Q. Uh-huh.
A. I wasn't there, so I...
Q. So this is your response to my question of who you might call as a witness and what testimony they might give.
A. Uh-huh.
Q. It says, "for each witness identified, state the subject matter and subject of the witness's anticipated testimony." Okay?
A. Right.
Q. Your response was for her anticipated testimony, "discussions with Paulk about Plaintiff's work, quality and quantity of work, et cetera." And I'm just trying to understand what you meant by that.
A. One of the things that she told me was that Valerie was unhappy with my work, with how quickly I would be getting work done. She didn't necessarily think that I was doing the job. She called that into question with Terese.
Q. And Terese told you about this?
A. She shared that with me and she said, "that is a concern that Valerie has and that she wants me to be monitoring you more closely and be looking at that."
Q. Did Teresa have that concern?
A. She did not. She knew what I was doing and she knew that I was doing the work. She had no concerns about my work. She was very pleased with it.

Page 34

Q. Anything else that comes to mind?
A. Anything else in terms of what Valerie might have said to Terese?
Q. Yes.
A. Nothing that I can think of right now. What happens if I remember something later?
Q. That's a great question. As we go on today if something jogs your memory, you remember something that you wish you had told me earlier, please let me know. All right.
A. Okay.
Q. You also said, that you anticipate Ms. Montoya will testify about FMLA protected leave, absences from work, hostility and retaliation. What can you tell me about that?
A. That she felt as though Valerie was thinking that I was using FMLA as an excuse to get out of coming to work to not do my job.
Q. Terese told you that Valerie said this?
A. She may have paraphrased it.
Q. How did she paraphrase it?
A. I don't recall the exact words, but she, she basically indicated to Terese that she felt I was abusing FMLA. I believe part of the question was hostile work environment.
Q. Hostility and retaliation is what you said.
A. That it was creating a very hostile work environment

Page 35

between Terese and -- with Terese and myself being sort of on one team and Valerie being on the other team, so it was setting up this very hostile kind of situation.
Q. Are you saying that Terese Montoya believed that she was subject to a hostile work environment?
A. I'm saying that Valerie was creating this very hostile situation.
Q. So just limiting it right now to the time that Terese was still working there, okay. What was Valerie doing that, in your view, created a hostile work environment?
A. She was putting pressure on Terese to get me to work harder, work faster, to not take my FMLA, my leave, or to -- she was seeing things and she was concerned about things and raising concerns to Terese that Terese did not have concerns about and when Terese would tell her, "those are not concerns, Kim is not abusing leave, Kim has serious medical conditions, she is doing her work."
Q. Terese Montoya told you that she said all those things to Valerie Paulk?
A. Yes.
Q. Anything else that Valerie did to create a hostile work environment during that time period?
A. There may have been -- she may have also been involved in denial of some of my FMLA forms.
Q. You had FMLA forms that were denied prior to

Page 36

February of 2020?
A. I had some trouble getting them through, I believe in February in 2020.
Q. You said that Valerie may have been involved. Do you know whether Valerie had any involvement in your FMLA application in 2020?
A. I think she had to sign off on it. Again, I don't have paperwork in front of me so I don't recall if she was the one who signed off on it. Do you happen to have that?
Q. I do not. I'm asking you what you recall. Did you get intermittent FMLA in 2020?
A. Eventually, yes.
Q. Other than what you have already told me, is there any other way that Valerie Paulk created a hostile work environment for you during the time that Terese Montoya still worked there?
A. I cannot think of anything specific at this time, which doesn't mean it didn't happen.
Q. So what you described so far are mostly communications through Terese Montoya, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Terese left -- let's take a break, we've been going about an hour. Let's take a little break.

Page 37

(Recess at 10:20 a.m. to 10:33 a.m.)
Q. When we broke we were talking about the time period just before COVID, which is an easy way to remember to plant it in time when Terese Montoya was your direct supervisor.
A. Yes.
Q. And you described what you considered to be a hostile work environment during that time; is that right?
A. Uncomfortable, yes, hostile.
Q. During that time did you make any complaint to anybody about a hostile work environment?
A. No.
Q. So moving on. Again, my understanding is Terese Montoya left in February of 2020. Does that sound about right to you?
A. It does.
Q. And then shortly after that the world stops, right?
A. My world changed.
Q. And you along with lots of other folks, including me, went to work from home in 2020, right?
A. Yes.
Q. So during that time that you were remote working because of COVID, did you continue taking intermittent FMLA leave?
A. Yes.
Q. When Terese left who became your new supervisor, was

Page 38

that Natalie Martinez?
A. I believe it was Natalie Martinez, yes.
Q. Was there anybody in between?
A. I do not, I do not recall there being anybody in between.
Q. So focusing now just on the year 2020, the best you can.
A. All right.
Q. Do you remember approximately how often you might call in to take intermittent FMLA leave, once a week, once a month? I'm just trying to get a sense of how frequent it would be.
MS. BURKE: Objection, foundation and form.
MR. LOMAN: You can answer.
A. Honestly, I would need to -- I would feel better going back and looking at timesheets or something rather than just guessing.
Q. I understand that during the time that Natalie was your direct supervisor, at some point she set up weekly meetings with you; is that right? Weekly progress meetings.
A. Yes. Are we still talking 2020?
Q. No, not just limiting it to 2020. I understand it happened after that, that you started these weekly meetings with Natalie, right?
A. Yes, after I became a buyer.

Page 39

Q. Well, actually, thank you for that saying that. That reminds me. I do want to go through that history a little bit. You started with the State with GSD in 2014, right?
A. Yes.
Q. Were you with the Administrative Services Division at that point?
A. Yes.
Q. First, tell me what did your job entail when you were at ASD?
A. I was hired in as a policy and procedure writer. Basically I was working with them to take their old and outdated policies that they had in place, both for Administrative Services Division and also for the entire General Services Department, and to rewrite those, bring them up-to-date and also to then develop new policies and procedures as needed. So I was working with all of the various divisions within GSD. It's a fairly large agency.
Q. Are we talking about HR employment policies?
A. Yes, that was one of the areas that I did write policies for.
Q. What other areas?
A. Transportation Services, which would have been things like working on surplus property. I had started working on one of them for their airplane and for Facilities

Page 40

Management Division. They had a number of different areas that they were looking at to develop some policies.
Q. And I understand that in August 2017 you joined the State Purchasing Division. Does that sound right?
A. Yes.
Q. And I'm looking at your application here, Exhibit 1.
A. Uh-huh.
Q. You joined State Purchasing Division as a compliance officer. What does a compliance officer do, or what did you do as a compliance officer, I should say?
A. As a compliance officer my duties were to go through and collect the reporting from the vendors who were sending us reports based on sales against what we call Statewide Price Agreements, those are contracts essentially that are for -- generally for goods, not services, but goods. So boxes of Kleenex, papers, pens, that type of thing. Materials, in other words. And they would send those in on a quarterly basis to us. I would collect that information and enter it into a spreadsheet. We would collect fees, a percentage fee, off of those and then they would send us in a check for that percentage and that was the way that our operations were funded in State Purchasing. So I was responsible for making sure that the reporting was correct, for making sure that it was complete, for making sure the vendors actually sent it in when they were supposed to, and

Page 41

for making sure that we did get the checks as we were supposed to. And then Terese took care of the actual processing of the check itself. That was part of our separation of duties that we had under the regulations.
Q. You say in August 2018 you became a Certified Chief Procurement Officer or you obtained that certification, right?
A. Yes.
Q. Tell me what that entails, what do you have to do to get that certification?
A. Initially when you certify as a Chief Procurement Officer you go through a week of training, classroom training. Ours was in person, because that was pre-COVID. So we had a week of training, in-person training. What you do is you learn all of the ins and outs, nitty-gritty, these are the requirements of purchasing, these are the state regulations, this is the best practices, this is why you should do things a certain way, just all of the fundamental purchasing practices. Everything that basically goes into making a procurement officer good, responsible procurement officer. It's a requirement for each agency, for each entity, to have a Chief Procurement Officer within their organization and that that Chief Procurement Officer then is responsible for essentially for monitoring all of the procurements that are made by that agency or entity. So it

Page 42

is a -- it's an intense session of procurement trainings. It covers a lot of ground and it all has to do with a lot of different aspects of procurement. I don't know how much detail you want me to go into about -- I could go on for hours. It's a passion of mine and I could bore you to tears, I promise.
Q. Let's jump ahead.
A. Okay.
Q. You say May 2018 you began working as a buyer with minor procurement assignments, but you were still a compliance officer at that point, right?
A. Uh-huh, yes.
Q. So tell me how that worked. You were a compliance officer, but were working part time it sounds like as a buyer?
A. Yes.
Q. How did that come about?
A. So what was happening there was, I was still doing my job full time as a compliance officer, but I had started to pick up some minor procurement assignments. And by minor that means that I was working generally on amendments, and that's basically when we're looking at taking an existing procurement that's already been awarded, it's already gone through the whole initial award process, whether it was from a Request for Proposal or from an ITB, Invitation to Bid, and

Page 43

it's already gone through that whole initial agonizing process, it's been awarded, but now we're extending it or we're changing it to update a vendor's address or we're updating their pricing or we're making some other change that requires that we officially change the contract document. So those are relatively minor things that can be done and it gives a new buyer a way to get familiar with the processes that are involved with -- both with the systems that we use within State Purchasing and also kind of get familiar with the documents themselves. So that would have been what I was doing with minor assignments for State Purchasing.
Q. Who asked you to take on -- start taking on those assignments?
A. That would have been Valerie and Natalie.
Q. In 2018?
A. I don't recall the exact timing on that.
Q. Well, I'm looking at your application where you say you began working as a buyer with minor procurements assignment in May of 2018.
A. Yes, and it would have been 2018, it would have been probably Natalie. Probably Valerie if she was in place at that time, so the direction would have come down from her.
Q. October 2020 you fully transitioned out of compliance officer, began working full time as Executive Procurement Officer, right?

Page 44

A. Correct.
Q. Did that require you to apply for a new job?
A. It did not.
Q. Was it a change in -- is that a different position to go from compliance officer to Executive Procurement Officer.
A. It is a different job, but I don't recall that I actually had to interview for that position. I believe it was simply shifting me from one set of duties to another set.
Q. Did your pay band change?
A. It did not.
Q. So earlier I asked you when Natalie Martinez became your direct supervisor and I think you said when you became a buyer. Is that what you meant when you became the full time executive procurement officer?
A. Yes, when Terese left. When Terese left and I became a buyer, yes.
Q. Natalie was your direct supervisor from that time in 2020 until I think sometime in 2023, right, when she took another job?
A. Yes.
Q. And that's when Valerie left GSD. Does that sound about right?
A. Yes.
Q. Let me back up. I had asked you when those weekly

Page 45

meetings started, I think that's how we got off on this digression, so let's go back to that.
A. Okay.
Q. I'm not going to ask you what month or year those weekly meetings started, but do you recall at some point Natalie asked you to have a weekly progress meeting with her?
A. Yes.
Q. And that request was from Natalie; is that right?
A. I believe so. Either Natalie or Valerie, but I believe it was Natalie.
Q. I mean, Natalie would have been the one to raise it with you, I assume.
A. Natalie would have been the one to meet with me, yes.
Q. Did Natalie tell you why she wanted to have those meetings with you?
A. I believe, from what I can remember, that there may have been some concern with my workload at the time, possibly that it was not moving along as quickly as it should have been.
Q. Did you think that your workload was moving slowly?
A. No. I thought my workload was large. Extremely large.
Q. Why is that?
A. Because I saw the number of procurements that I had

Page 50

understand there had been some communication between you and Natalie about your workload, about being behind on projects, right? She had raised that as a concern with you.
A. Possibly, yes.
Q. When those weekly meetings started, those weekly -- and by the way, this is still in the era of COVID, right? So were all these weekly meetings on Zoom or Microsoft Teams or whatever?
A. Right, it would have been -- if we're talking about it's during COVID, then yes, we would have had them on Zoom or Teams, but I don't recall what we were using at the time.
Q. Let's just say 2022 and going forward, right. During 2022 you were still working remotely, right?
A. Yes.
Q. Did you find those weekly meetings, were they helpful, did they help your projects move along at a faster pace?
A. They were sometimes helpful.
Q. And these meetings were just with Natalie, right? Just you and Natalie.
A. Sometimes we might have someone join in, like maybe Valerie or -- yeah.
Q. Why would Valerie join a meeting, any reason in particular?
A. She's Natalie's supervisor, she could drop in

Page 51

whenever she wanted. Maybe she had additional concerns.
Q. Is that what happened, would she show up at a meeting, one of these progress meetings, and tell you that she had additional concerns or any concerns?
A. I do recall one time when she was in a meeting and had additional concerns, yes.
Q. Do you remember when that was, approximately?
A. I do not, but I do remember that there was discussion. I want to say that it might have been in the Spring. I believe we put that in our discovery.
Q. In the Spring of 2023?
A. Maybe.
Q. My understanding is that there was a time in the Summer of 2022 when Natalie took a leave of absence, do you remember that? Her son passed away.
A. Yes, her son passed away.
Q. I believe that was in the Summer of '22. Does that sound right to you?
A. Yes, yes, uh-huh.
Q. During the time that Natalie was out, did Valerie fill in as your direct supervisor?
A. Yes.
Q. Did Valerie have those weekly progress meetings with you during that time?
A. During that time, yes. I apologize, I had forgotten

Page 52

that.
Q. When you were having those meetings just with Valerie, do you think they helped keep you on track and keep your procurements moving?
A. As much as they did with Natalie.
Q. And I think you said they were sometimes helpful?
A. Sometimes helpful, sometimes not, yes.
Q. Were Valerie and Natalie in these weekly progress meetings with you, were they professional? Was the tone professional or were you two arguing back and forth? What were those meetings like?
A. Thinking back, I have to say overall, for the most part, they were professional meetings. There may have been times when one or both of us, or all of us if there were three of us in the meeting, would get a little heated over something that was being discussed, which happens in any meeting.
Q. Give me an example of a time that things got heated and what was said or what was being discussed?
A. The one time that comes to mind that I can think of is the one time that I'm thinking of specifically that I said that we had turned over in discovery, was one where my production of work, the amount of work that I was generating, was being called into question. And Valerie essentially had said to me, if we don't feel as though you are -- I'm

Page 53

paraphrasing because I can't remember what she said exactly, but essentially it was, if we don't feel as though you are working, we can bring you back into the office to make sure you are. Now, again, I am loosely paraphrasing that. I think when I wrote it down and that was submitted, when I wrote it down it's much closer to what was actually said in that meeting.
Q. You followed up that meeting with an email to Valerie and Natalie, right, and you say, "here's what we discussed," and summarized what was discussed in the meeting. Is that what you're referring to?
A. I'm referring to a note that I made to myself and I put a snippet of that into the discovery.
Q. Did you also send an email to Valerie and Natalie saying, "here's what we discussed in the meeting," and you referenced what you just said, that they could bring you back to work in the office if you weren't getting your work done?
A. I believe that I might have done that, but I will not tell you for sure that I did, because I cannot remember that.
Q. Fair enough. I can't remember every email I sent two years ago either, but I will tell you I have seen an email like that describing exactly what you're describing, I believe it was from February of 2023. Does that sound about right?

Page 54

A. That was kind of Spring, yeah.
Q. So let's talk about that. We were going to get into all of that a little later, but -- well, before we do that, do you remember any other -- well, let me start over. So what I had asked you was, do you remember a specific time that things got heated, and this was your example right? So other than Valerie saying something like, if you don't get your work done we'll make you come back to the office to work, I'm paraphrasing obviously. But other than that, was there anything else that was said in that meeting that was heated or that bothered you?
A. Again, there may have been at the time, but I'm not -- MS memory, I'm not specifically remembering it right now.
Q. Do you recall --
A. If I read the email there might be more context for me to remember that.
Q. We might look at it a little later and we can talk about it then.
A. Okay.
Q. Do you recall any other meetings that you had with Valerie or Natalie where things got heated?
A. Not specifically, but I'm sure we might have had them.
Q. During that meeting did they insult you or call you names or anything like that?

Page 55

A. I do not remember that happening.
Q. I'm not suggesting it did. I'm asking you what happened.
A. No, it was -- they remained professional and I believe I remained professional.
Q. Do you remember any other time that Valerie or Natalie called you names, insulted you, anything like that?
A. I can't say I ever remember any conversation with either Natalie or Valerie devolving to that level.
Q. During that time period when you were working from home, and I know this from my own experience during that same time, during that time that you were working remotely was because you all were not in the office together, was most of your communication with your co-workers through email?
A. Generally it was through email. Occasionally we would text each other when we were using a VPN, virtual private network, and occasionally we would have trouble connecting. I'm sure you've experienced that well.
Q. Sure.
A. Right. So we would have trouble connecting and then we would be relying on text to -- which of course wasn't affected in the same manner, so we would be texting each other, especially if we had to be talking to each other for like bid opening or something, so we would be talking to each other by text or we would be calling each other and saying,

Page 56

"hey, are you having trouble?" That kind of thing. So we did talk both verbally and by text.
Q. I would assume that if you had emails or text messages from Valerie and Natalie where they were being nasty to you, saying nasty things, calling you names, insulting you, you would have produced those already, right?
A. I believe that I produced all of the messages between myself and Natalie and myself and Valerie already. So whether they called names or not, they're all there. They have already been turned over.
Q. Well, I haven't seen one like that. I'm asking you if there are any out there that maybe I haven't seen.
A. No, no. Again, they never engaged in that kind of behavior with me. Are they saying they did?
Q. No, ma'am. I'm asking you --
A. Okay.
Q. So part of this exercise here today is for me to know what you might testify to at trial, right. So I'm just trying to get a sense of what is out there and what you might say, and this is the only time I get to talk to you until we get to trial.
A. Okay, okay.
Q. A lot of this is just me searching for information, wanting to know what's out there.
A. Okay. No, they never said anything, never.

Page 57

Q. They have never said anything of that sort to me either.
A. No, there was no name calling.
Q. Okay, good.
A. Ever.
Q. Thank you. As I'm sure you recall, as we were getting into the end of 2022, the governor tells state employees that the COVID remote work era is ending and state employees are going to have to come back to the office, right?
A. Yes.
Q. I'm paraphrasing the governor's words, but that's what was happening towards the end of '22 and at the beginning of 2023, right?
A. Yes.
Q. It's my understanding that originally everyone was going to have to come back to the office at the beginning of '23, and then there was some extensions or whatever, right?
A. Yes.
Q. We're going to call this Exhibit 2. Give me one second, I'm going to go grab a handful of paperclips.
(pause)
Q. Do you recall seeing this email before?
A. Oh, I'm sure I saw it. Specifically, I -- I'm sure I saw it, yes.

Page 58

Q. So this is from the State Personnel Office, right?
A. Yes.
Q. And it's explaining how the return to the office was going to happen and the expectation was that -- if you go to the second page it talks about some negotiations that had to take place with the Unions. Are you covered by a Union?
A. My position is a Union position, yes.
Q. Going on to the second page, it says, "all exempt employees, managers, supervisors and directors," that's not you, right?
A. I'm not exempt, no.
Q. So the next bullet point is, "non-manager, non-supervisor employees will return to the office full time on or before February 2, 2023." Right?
A. That is what it says.
Q. That's what it says here. At that time you asked for an accommodation to continue working at home, right?
A. Correct.
Q. I'm going to hand you Exhibit 3. Take a moment to flip through this, if you would like, and tell me if you are familiar with this document.
A. All right.
Q. You've seen this before?
A. Yes, I have.
Q. If you'll flip to the third page, this is a nurse

Page 59

practitioner, I believe, correct?
A. Yes.
Q. Anna Nance.
A. Yes.
Q. She signed this on January 5, 2023, right?
A. 5th or 8th.
Q. Looks like a 5 to me, but you can certainly correct me. I don't know if it matters much if it's the 5th or the 8th.
A. Yes.
Q. Your provider filled out this form at your request, right?
A. Yes, I submitted it to her requesting her to -- I told her -- I gave her the accommodation request form as well and said I was submitting to request this accommodation and as part of that request that I was required to also go ahead and get a physician's statement and would she go ahead and fill out the physician statement.
Q. And did you tell Anna Nance that your concern with going back to the office was because you were at high risk for complications from COVID?
A. I did. As part of my MS I do have a lower immune system. I do have a very compromised immune system.
Q. So I will tell you that one thing that I would like to do is make sure we agree on what this says, because like a

Page 60

lot of medical providers her handwriting --
A. Horrible.
Q. That stereotype doesn't come out of nowhere. Let's start on the first page. It says date of last exam was December 6, 2022, right? The top, date of last exam.
A. Yes.
Q. But she signed this on January 5th, 2023. So what I want to know is, did you go in for an exam just for this ADA request or did you just send in the paperwork to the office for your provider to fill it out?
A. I do not recall at this time.
Q. If you were there in her office on January 5, 2023, it seems to me she would say the date of your last exam would have been that day, right?
A. I would think that she probably would have, unless she was filling out the paperwork at a later time. Again, I can't presume to say why she would have dated it for a different date.
Q. Do you think you asked her to fill out this statement on December 6th, when you were in for an exam?
A. No. It is possible that I did see her on December 6th. Again, I don't know.
Q. I mean, it appears to me you did see her on December 6th, '22 and I'm not disputing that. What I'm asking you is, would you have been talking to her about ADA accommodation

Page 61

requests on December 6th, 2022?
A. At that time?
Q. Yes.
A. Since I can't even remember for sure whether I went in to see her on December 6th, I can't speak to whether or not I talked with her about an ADA accommodation at that time. I know that one of the things that I turned over was a medical release form. Did you happen to get medical records from her, from her office?
Q. I have no medical records of yours from anybody, other than what you -- this sort of thing that you submitted.
A. That probably would have shown --
Q. I'm sure it would show everything, and I got somewhere around 9,000 pages worth of documents in this case. I did not intend to go through all of them with you today, all right.
A. Okay.
Q. So I'm just trying to take out the things I want to ask you about, if that makes sense. When you said you signed a release for medical records, that was for me, right, as part of discovery for this case, that's what you were referring to?
A. Yes.
Q. Going down, do you see where it says, halfway down the page, on the side it says, "functional limitations."

Page 62

A. Yes.
Q. I'm going to read what I think this handwriting says and if you disagree, if you think it says something else, I want you to tell me, okay.
A. Yes.
Q. Under mental impairment it says, "work from home due to high risk of complications from flu and COVID." Do you see that?
A. Yes, yes.
Q. Going down towards the bottom there's more handwriting and it looks to me like it says, "needs to work from home due to compromised immune system."
A. Yes, yes.
Q. Going on to the next page, she checks the box for slight limitation, capable of light work, 35 to 55 percent. What does that mean?
A. You know, I don't know.
Q. If you aren't having one of your flare-ups, if you're not having a migraine, if you're having a good day, do you have any physical limitations that affect your ability to do your job?
A. No.
Q. Going down to the bottom, I think it says, requesting to continue work from home. Is that what you see?
A. Yes.

Page 63

Q. You can put that aside. And you were approved to continue teleworking for several more months, right, after this?
A. Correct.
Q. Until August, I believe; is that right?
A. Yes, early August.
Q. And we'll get to that, but from January on for several months you were still working from home, right?
A. Correct.
Q. Do you know if any other GSD employees also sent in a request for an accommodation to keep working remotely?
A. At that time, I did not.
Q. We recently produced some of that information in discovery, have you reviewed that?
A. I have not yet.
Q. You said you were not aware at the time. So are you aware now that other people also requested extensions to keep working at home in '23?
A. Yes.
Q. How are you aware of that?
A. Office talk.
Q. Fair enough. Do you know of anybody who was denied that accommodation who asked for it?
A. Not certain. Not certain.
Q. Do you know if anybody had a longer extension than

Page 64

you did to keep working from home?
A. I believe that Eunice told me that I was the one who had the longest extension.
Q. That's my understanding as well. So going forward through the Spring of 2023, so you understand that you need to recertify your FMLA benefits every year, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And you understand that that's provided in the law?
A. Yes.
Q. You're not claiming that it's illegal for them to ask you to recertify annually, are you?
A. Correct.
Q. In the beginning of 2023 or maybe even towards the end of 2022, I don't think I have that document here, you applied to have your FMLA, intermittent FMLA recertified for the year 2023, right?
A. Correct.
Q. So we're on Exhibit 4. At that time, that year, do you recall working with Kelly Howley?
A. Yes.
Q. Kelly Howley worked in the HR office at GSD?
A. She did.
Q. And I understand there was an issue, a delay getting

Page 65

your FMLA certified for that year. Would you agree with that?
A. There was.
Q. Tell me what you recall -- well, just tell me, what do you recall about that, why did you understand that there was a delay?
MS. BURKE: Object to the form of the question.
MR. LOMAN: You can answer.
A. I actually didn't understand why there were delays in having my FMLA recertified, because I was submitting exactly as I had submitted before in previous years. Yet, I was being told, for whatever reason, that there were additional requirements that had to be met.
Q. What is your recollection of that? First let me ask, who was the one that told you that there were some additional requirements?
A. This was Kelly Howley that I was corresponding with, she was the one who was designated at that time by Eunice. Eunice is the head of the HR department of GSD and at the time Kelly Howley was the one who was handling FMLA and ADA paperwork
Q. I will hand you Exhibit 4. This is a string of emails. Feel free to skim through these. Do you remember having this back and forth with Kelly?
A. Yes.

Page 66

Q. You'll notice at the bottom there are numbers GSD36, GSD37, and so on. Do you see that?
A. Yes.
Q. I'm going to refer to those page numbers.
A. Okay.
Q. If you flip to the last page, which is 39, and I understand that this is not the entire communication between you and Kelly. Like I said, I've got an awful lot of paper here and I'm just trying to draw attention to certain things. So on February 17, 2023, you emailed Kelly and said, "hi, Kelly, the provider got the form back to me today, sorry it took so long, she's been really busy," et cetera. Do you see that?
A. Yes.
Q. My understanding was that your provider around that time had been out of the office for awhile, she may have gotten sick herself. Do you recall that?
A. She had COVID.
Q. Was that Anna Nance?
A. Yes.
Q. Do you remember approximately how long she was out of the office, as far as you know?
A. I do not recall that.
Q. Was it a period of weeks?
A. Yes.

Page 67

Q. Was it more than weeks? Was it a month?
A. Possibly around a month.
Q. And that was right around the same time that you were trying to get your FMLA approved, right?
A. Yes, of course.
Q. It's not Kelly Howley's fault that your doctor got sick, right?
A. It was not.
Q. So you have this back and forth with Kelly. On February 23rd, it looks like you sent her a document. I assume that was the doctor's form, looks like you meant to attach it the day before, but didn't attach it. Do you remember that, or do you see that in the emails?
A. I see it in the email. Do I remember not attaching it.
Q. It happens to all of us, right?
A. Right.
Q. You sent the email without the attachment, not a big deal. But you sent it to her the next day.
A. Yes.
Q. Kelly says, "good morning, received, and thank you, have a wonderful day." Did you have any face-to-face interaction with Kelly Howley during this period?
A. I have never met the woman.
Q. She's being very polite here, have a nice day, thank

Page 68

you so much, right, those sort of things?
A. She was very sweet to me through the entire interaction.
Q. So you ask her a question about your FMLA, this is on page 37, and there's some confusion. You say, "I'm really confused about your FMLA." And then moving on to the first page, she explains that your FMLA expired on December 13, 2022, so you can't invoke FMLA until your new request is approved. And then Eunice chimes in later that day. So during this time period that we're trying to get your FMLA recertified for the year, you were still having flare-ups and migraines as they come, right?
A. Yes.
Q. And when those would happen, my understanding is you would take a day and during this period that your FMLA was not yet recertified it would be recorded as absence without leave, as an unexcused absence essentially, right?
A. It would be recorded as either absent without leave, it would be recorded as sick leave, it would be recorded however I needed to record it.
Q. Do you remember if you took any of your accrued sick leave or annual leave during this period?
A. Specifically, I don't recall if I took -- I believe that had I had any accrued leave at the time, that I would have taken it, had I been able to.

Page 69

Q. But if you didn't have any sick leave to take it would have been coded as a leave without pay?
A. As a leave without pay, yes.
Q. Moving forward, you got your form back from your medical provider, right?
A. Yes.
Q. You sent that to HR.
A. Uh-huh.
Q. We'll call this Exhibit 5. On March 30, 2023, your intermittent FMLA was approved for that year, right?
A. Yes, yes, GSD approve it.
Q. Right. My understanding is, the next thing that happened was GSD retroactively applied your FMLA leave so that those absences you had that were coded as leave without pay, they went back and changed those to FMLA leave, right?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer.
A. I don't recall specifically if those were changed to FMLA on my timesheet.
Q. Let's talk about it. We're on Exhibit 6. Around this time you retained Heather Burke as your attorney, right?
A. Yes.
Q. Do you remember approximately -- let me just be clear. I am not asking you to tell me any conversations you've had with her. I'm only asking for a date, a time, a

Page 70

time frame. Do you recall approximately when you retained Ms. Burke?
A. I don't.
Q. Well, let me put it this way, if your FMLA was approved March 30th, do you remember if you retained her shortly before then?
A. I remember that I had talked with her. I had called her and had conversations with her, had conversations with her earlier, because I had concerns that something was happening, because I did not like the way that this whole FMLA thing was going, because I had never had an issue with my FMLA before and it, to me, seemed really sketchy.
Q. So sometime would have been March of '23, February '23 that you first reached out to her then, does that sound about right?
A. Again, I don't recall.
Q. By this point she was certainly involved, because Exhibit 6 is an email from Eunice Moya to Heather Burke, right? So this is Exhibit 6. My understanding is Ms. Moya was communicating directly with Ms. Burke because she was representing you at that point. Does that sound correct?
A. Yes.
Q. And you're not copied on this email, but have you seen this email before?
A. Yes.

Page 71

Q. Was it shared with you?
A. It was shared with me.
Q. The paragraph that begins, in good faith. Do you see that?
A. Yes.
Q. It says, "Ms. Hunt-Brown's FMLA has been retroactively approved to January 19, 2023," when the physician signed the first time, which was the first time your doctor signed the certification form. Do you understand that?
A. Yes, yes.
Q. And going on she says, "your timesheet will be updated to reflect FMLA for the dates she invoked FMLA." And then it goes on from there. Do you see that?
A. Yes. Yeah, I do remember this.
Q. I just want to know where we agree and where we have disputes, okay. Do you agree that as of this point -- well, let me start over. Do you agree now that once your FMLA was approved for that year they went back and retroactively applied it to all the days that you had called in sick?
A. Yes.
Q. This FMLA leave is unpaid leave, right?
A. It is under the law unpaid leave, yes.
Q. So when we retroactively apply it, we're going back into the time records and changing it from one kind of unpaid

Page 72

leave to a different kind of unpaid leave, right?
MS. BURKE: Objection, form and foundation.
A. Unless there's another way that -- within GSD system that FMLA leave can be applied as a type of paid leave that is still FMLA, because there are paid FMLA leave within GSD system. Donated leave, as an example, is a paid leave.
Q. So going back to March 30, 2023, when Eunice says that she would retroactively apply all those absences and change them all to FMLA leave, right?
A. Uh-huh.
Q. Do you recall, was there a discussion about whether it would be FMLA paid or FMLA unpaid?
A. I don't recall a discussion as to whether it was going to be paid or unpaid, no, I do not recall that discussion.
Q. As you sit here today do you believe that you were entitled to have any of those days change to some form of paid leave?
A. I would want to see specifically which days those are within Share and how they were applied in terms of whether or not -- in terms of whether or not it was applied properly. I don't understand the question.
Q. My question is, we agree now that as of March 30, 2023, GSD retroactively applied FMLA, right?
A. Yes.

Page 73

Q. And all those days in the month leading up to that that had been booked as leave without pay, they changed those in the system to reflect that they were FMLA absences, right?
A. We agree that that was what to happen, yes.
Q. Yes. Do you have any reason to believe that it did not happen?
A. No.
Q. So the next question is, when they went back and changed those to FMLA leave, those days.
A. Yes.
Q. Are you claiming that those should have been something other than FMLA unpaid leave?
A. No. I was just pointing out that there is a possibility that FMLA unpaid leave within GSD system can also be paid leave if it is donated leave. I don't recall if I had donated leave that I was not being allowed to take at that time, because I was not under FMLA leave at that time.
Q. Would there be any email or anything from you where you're asking about using donated leave during this time period?
A. Possibly there would be. I recall that there was a situation that came up where I was being told I could not use my donated leave.
Q. When was that?
A. It seems like it was either in the beginning of '23

Page 74

or '24.
Q. Just want to make sure we're on the same page here. As you sit here today, is it your recollection, is it your understanding that around March 30, 2023, they went back and changed your leave without pay to FMLA unpaid leave?
A. Yes, it is my understanding.
Q. Are you claiming that you have any lost wage damages as a result of that, the active application of your FMLA or the delay in getting your FMLA certified for that year?
A. Possibly not for '23, but possibly for '24.
Q. Well, we'll talk about what happened in 2024, but can we agree that in 2023 you didn't have any lost wages as a result of this issue with the certification of your FMLA leave?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: Go ahead.
A. Can we tentatively agree on that?
Q. Well, only if we can tentatively agree that you will come back for another deposition if you change your mind down the road.
A. Can I do a sidebar or something?
Q. No.
A. No, okay, all right, all right. Yeah.
Q. Can you answer that question?
A. All right, I'll agree to it.

Page 75

MR. LOMAN: We've been going for awhile and it's 11:52. I would like to give you a break and I would like to give Ms. Shollenbarger a break. So do you want to come back at 12:30? Does that work for you, Heather?
MS. BURKE: Let's do an hour, just because I don't know where to go for lunch around here and how long it will take. You probably know better than us.
MR. LOMAN: There is a deli downstairs by the elevators. There's also a restaurant in the hotel, on the hotel side around the corner. If you venture out of the building there's a number of -- there's sandwich shop right here on the plaza called Friends, across the street there's -- and Central is a block away. I'm fine coming back at 12:50. We have a lot to get through today.
MS. BURKE: Right.
MR. LOMAN: I don't want to extend this into a second day if we don't have to.
MS. BURKE: No, of course not.
MR. LOMAN: If that works for you, we'll come back at 12:50.
MS. BURKE: Okay.
(Recess at 11:50 a.m. to 12:59 p.m.)
Q. Are you ready, Ms. Hunt-Brown?
A. Yes. One second, if you will. Are we going to continue on from where we were or are we going into a new

Page 76

direction or something?
Q. I just keep asking you questions.
A. Okay, so before we continue on, I need to -- I wanted to go back in and take a moment to correct the record or --
Q. Okay, sure, go ahead.
A. Is that what you call it, correct the record. Okay, so on the last thing that we were talking about, about the time and everything in 2023.
Q. The retroactive --
A. The retroactive --
Q. -- changing of the --
A. Yes.
Q. Okay.
A. We were talking specifically about the unpaid leave.
Q. Uh-huh, yes.
A. I don't want to say, "yes, all of the unpaid leave has been changed and corrected." There was a leave without pay that happened in 2023 and that was a damage, that should not have been corrected, that was not corrected. That was, was part of this whole thing.
Q. It should not have been corrected?
A. No, no, that was very specifically held out.
Q. What do you mean it should not have been corrected?
A. That was not to have -- that was specific

Page 77

instruction was to not correct that, because that was a -- that was a damage.
Q. Specific instruction by whom?
A. By myself.
Q. You instructed GSD not to change one of the days from leave without pay?
A. From leave without pay, yes.
Q. Why?
A. The damage.
Q. I don't understand what you're telling me.
A. Because that is something that they should not have done to me. Leave without pay is not the same -- I'm sorry, excuse me. The AWOL, the AWOL should not have been changed, because it's not the same. Them, them taking an AWOL away from me and just changing it to leave without pay is not the same.
Q. I'm not following you, so let me ask some follow-up questions. GSD offered to change a day from AWOL to FMLA; is that correct?
A. Yes, I believe that is correct.
Q. And you instructed them not to?
A. Yes, I believe that is correct. There is email about that instance and I don't want to -- I don't want -- I'm reluctant to speak to any great depth about it, other than to say that I did not want them to simply change the

Page 90

Valerie, in a meeting, said something about, she might revoke your telework approval, something like that, right?
A. Status, yes.
Q. But that never happened, right?
A. Correct.
Q. As you got close to August you applied for another ADA accommodation, right?
A. Yes.
Q. I'm going to hand you Exhibit 9 and 10. And I'm sorry, before we move on, let me ask you one more question. So once your FMLA was approved for '23 and all that, you continued taking your intermittent FMLA leave through that year, right?
A. Uh-huh, yes.
Q. And no one ever told you you couldn't or tried to stand in your way of taking FMLA leave for the rest of that year, right?
A. I can't say at this time I specifically remember any -- getting any kind of pushback or not.
MR. LOMAN: Heather, did I give you a copy of Exhibit 10 yet?
MS. BURKE: No, I don't think so.
MR. LOMAN: I think that's yours.
MS. BURKE: Thank you.
Q. So Exhibits 9 and 10, these are part of your request

Page 91

for a new accommodation, right?
A. Yes.
Q. Exhibit 9 is dated August 4th, '23, correct?
A. Yes.
Q. And Exhibit 10, if you flip to the last page, Susan Robinson, I understand to be one of your medical providers, right?
A. Yes.
Q. She signed Exhibit 10 on August 3, 2023?
A. Yes.
Q. So let's talk about Exhibit 10 first. Ms. Robinson says your last exam had been on July 27, 2023. Did you have a separate appointment, a separate exam just to talk about this ADA accommodation or that just happened to be the last time you were there?
A. I had only one exam with Susan Robinson and it was specifically to go over my migraine headaches, to establish a background for my migraine headaches, to set up the information for my neurologist on that so that she could provide me the best treatment.
Q. Did you send this physician statement, did you send this to Susan Robinson to complete?
A. She completed this, yes.
Q. At your request?
A. Yes, following our meeting.

Page 92

Q. Did you go back in and see her in person or did you just send these forms to her office and she filled them out for you?
A. She filled them out while we were basically in the meeting, to the best of my knowledge.
Q. This is reason I'm asking, she says her last exam with you is on July 27th, but she signs it on August 3rd, that's the reason I'm asking. I just want to know if she actually examined you on August 3rd or if you just sent her these documents to fill out.
A. I sent her the documents. I did not see her in person.
Q. Thank you, that was my question, all right. Did you talk with her on the phone or someone from her office on the phone about what you were trying to accomplish by submitting this form?
A. It was telehealth.
Q. Did you speak with Susan Robinson?
A. Yes, yes, it was a video call. It was a video --
Q. Got it, okay. Thank you. It says you had a brain MRI in May of '23. This may be the word you were giving us earlier, identifying-something moderate burden of demyelinating disease. I think you had said something about demyelinating earlier.
A. Demyelinating, uh-huh.

Page 93

Q. And does she think that's the cause of your migraines?
A. I do once a year, I go in for -- because of my MS, and I have MRIs done of both my head and my neck. My neck and spine up near my head and that's just a part to track the progression of my disease. So I have that done yearly.
Q. Susan Robinson here refers to the MRI with the demyelinating disease and diagnoses you with chronic migraines. All I'm asking is, was it your understanding that Susan Robinson thinks the demyelinating disease is what's causing your migraines? She seems to have them tied together here.
A. No. Susan Robinson works with my neurologist, so she is aware that I have MS as well. So what she is doing is, and I believe indicating, and I can't speak for Susan Robinson, but she is indicating that she has seen those MRIs.
Q. "She also has sleep apnea." Is that related to your MS.
A. No, I've had that for years.
Q. Going down to the bottom of this page it says, "when experiencing migraine," and I'm looking at her handwritten notes. When experiencing migraine you have difficulties with concentration, right? She checks that box. That's certainly understandable. And headache, nausea, photo and photophobia. So what I understand this document to mean is, when you are

Page 98

should, if there are no side effects and everything just went exactly.
Q. How often is that your experience? You wake up, take the medicine and by four hours or so you're able to leave the house?
A. With a severe migraine, with a severe migraine and two doses, usually not, not -- by early morning not so much, but I would say definitely half a day. Usually I can manage by early afternoon so that I can maybe be looking at getting in around one o'clock or so, if I can drive. If I don't have a ride in, if I'm not carpooling.
Q. Do you not have the ability to drive yourself to work?
A. Not when I'm taking my migraine medication.
Q. So if you take your migraine medication at 5:15 a.m., let's say, you can't drive at all that day?
A. Not necessarily. There are occasions when I can. And again, this is sort of the unpredictable nature of what happens, what's going on in my brain when I'm getting that migraine, that sometimes, sometimes that migraine and the medication will work to -- while it takes away the pain, it still affects my balance and it really affects my depth perception, which is wildly critical when it comes to driving a car, so...
Q. So there are days where you take your migraine

Page 99

medication and the migraine goes away, but you're not able to drive, is that what you're saying?
A. Exactly.
Q. I'm going to read some more of this handwriting and I want you to tell me if I misread something, okay. "Summary, Kimberly experiences episodic migraine headaches which are typically present upon awakening that restrict her to her bed in a dark, quiet room until a board of migraine medicine takes effect, approximately two to three hours. During a migraine the patient is unable to drive or work. Kimberly is taking a migraine" does that say prophylactic?
A. Yes.
Q. "medication, which has reduced the frequency of her migraines. Post-migraine symptoms of sensitivity to light, sound and movement make it difficult for the patient to drive following a migraine headache." Do you see that? I mean, did I read that correctly?
A. Yes.
Q. So are you saying that when you are on your migraine medication on a day that you're having a migraine, you're unable to drive, but you would be able to work?
A. Yes, normally.
Q. Even as you're having your light sensitivity issues? She says, "post-migraine symptoms are sensitivity to light, sound and movement." And your testimony is that you're

Page 100

having depth perception, light sensitivity issues, but you're able to sit in front of a computer screen and focus and concentrate on procurement contracts?
A. Yes.
Q. Suggested accommodations, on to the next page, asks that, "allow Kimberly to take her work laptop home each evening. If she awakens with a migraine, allow her to work from home VPN telework beginning after headache symptoms diminish, typically no later than midday." Did I read that correctly?
A. Yes.
Q. If you have a migraine that is affecting you 'til midday or early afternoon, wouldn't you rather just take the day off?
A. Again, it depends on how severe that migraine is. Sometimes, sometimes, absolutely I have to take the day off, because some days when I have a migraine I stay curled up in that darkroom with pillows and blankets over my head and herbal packs on my head and I don't come out until the next morning. So, yes, would I -- but other days the medicine will kick in, I'll be feeling well enough that I can stagger around the house holding onto the wall. I'm capable of functioning. I'm capable of doing my work.
Q. As you're staggering around the house holding onto the wall?

Page 101

A. Doing my job, which consists basically of sitting in front of a computer typing.
Q. If you take your migraine medicine in the morning when are you able to drive again?
A. Ballpark estimate, just based on what I see in myself, has been three o'clock, two o'clock to four o'clock time frame. So late afternoon is when it usually comes back to where I think I would be safe driving, to where I think I don't feel like I have to worry about myself being out on the road, but I still don't go out in the car the rest of the day.
Q. What is the name of this migraine medication that you take?
A. I actually have three of them.
Q. What are they?
A. I'll give you the name and spell them.
Q. Please do.
A. The first one is Topiramate, T-o-p-i-r-a-m-a-t-e.
Q. Okay.
A. The second one is Qulipta, Q-u-l-i-p-t-a. And the one that I take immediately is Sumatriptan, and I take that either as a nasal, S-u-m-a-t-r-i-p-t-a-n.
Q. That's nasal spray?
A. It comes either as a nasal or as a pill.
Q. And that's the one you take -- that's the

Page 106

A. That is fair.
Q. And then she says, "Dorothy and I are available to meet," then she gives you some other days. And she says, "as requested, I included the ADA forms," right?
A. Yes.
Q. Going back up, Eunice talks about the rescission of the -- well, she says that your telework trial period ended on August 2nd, or it is ending on August 2nd. And you accepted a position in Santa Fe, so you're going to need to report to the office on August 3rd. That's what she says, right?
A. That is what she says, yes.
Q. So my understanding is that on August 4, 2023 you had a meeting with Eunice and your attorney was present for that, right? Do you remember that meeting?
A. I remember the meeting. I don't remember the date, but I believe that was the date.
Q. Maybe it was just a phone call, so I shouldn't assume these things. I'm going to hand you Exhibit 12.
A. It was a Zoom meeting or something.
Q. Well, I wasn't there, so you can tell me what it was. Look at Exhibit 12. Do you recall getting this letter from Eunice?
A. Yes.
Q. It says on August 4th received request for

Page 107

accommodation. It says a phone conversation took place today, August 4th at 1:25, with Eunice and yourself. Was there a meeting -- was Ms. Burke part of that meeting?
A. Yes, this was, this was the -- this was the Zoom meeting that was rescheduled. This was the meeting that was rescheduled so that she could attend.
Q. Let me hand you another one, because you actually got two letters that day from Eunice. This is Exhibit 13. I'm not trying to trick you, I'm trying to understand the sequence of events. This one refers to a meeting that was held on July 31, 2023, virtually on Teams with Dorothy, Eunice and Heather Burke.
A. All right, that's...
Q. Do you recall having this virtual meeting on July 31st with Dorothy, Eunice and Ms. Burke?
A. I do remember the meeting, yes.
Q. Tell me what you remember about that meeting.
A. All right. So this is the meeting that was supposed to be the interactive, interactive -- what did they call it? Interactive meeting, which we would re-evaluate things, and there was nothing interactive about it. It was basically, I was told that I was reporting back to work, and I said -- I remember that I did request to, because of my migraines, go ahead and do a telework accommodation based specifically on taking my -- taking the computer home with me at night and

Page 108

then if I woke up with one of the severe migraines, that I would be able to -- if it cured to the point where I could go ahead and work part of the day at least, I would be able to do that. Even if I couldn't drive, I would still be able to do however how many hours of productive time to do my job, and I was told that basically that probably couldn't be accommodated. And I expressed my desire to go ahead and submit the formal accommodation anyways so that they could formally deny me and that's exactly what happened.
Q. Going on to the second page, they offered some other accommodations on a six-month trial basis to allow you to have your office door closed during work hours, attend meetings via Teams or provide an alternative work schedule. Do you recall those things being discussed?
A. Oh, yes, yes.
Q. Did you ever apply for an alternative work schedule?
A. The alternative work schedule is something that's done on a -- no, I didn't.
Q. What were you going to say?
A. It's something that's done on a -- it's not flex time. It's something that's done on a permanent basis, so it permanently changes your schedule. An alternative work schedule isn't going to help me with chronic migraines or with MS, that doesn't address those issues.
Q. Well, if the issue is there are days that you can't

Page 109

drive in the morning, but you might -- do I understand that you might be able to drive later in the day?
A. Yes.
Q. So if you had an alternative work schedule that was later, wouldn't that maybe give you time to be able to drive to work and work at the office?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer.
A. That's assuming that I have some idea of when I'm going to have a migraine. I can't predict that.
Q. But when you have a migraine it's typically in the morning, is my understanding, right?
A. Typically, but not always.
Q. During this meeting did you speak for yourself or did Ms. Burke do most of the talking for you?
A. She did quite a bit of the talking. I won't say that she did all of the talking for me.
Q. Was everybody professional? Did everybody behave themselves in this meeting?
A. To the best that I can recall, yes.
Q. Going to Exhibit 12, Eunice refers to a phone conversation just between the two of you that day on August 4th. Do you recall that phone call?
A. I remember a phone call from Eunice, I don't remember any details of it, but I do remember receiving a

Page 110

phone call from her and I remember -- yes, she probably said exactly what she says here in the bullet point.
Q. Let's go back to Exhibit 13, please. This meeting that you had that Ms. Burke was involved in, I want to make sure I understand what was happening here. Was this to discuss your request for accommodation based on MS and migraines and not being able to drive or was this still asking for an accommodation because of your vulnerability to COVID?
A. No, this is for the migraines specifically not being able to drive in for the migraine. This is related to the accommodation request that I had filled out and sent in to her, your Exhibit Number 9.
Q. So Exhibit 9 was filled out by your doctor on August -- I'm sorry, you submitted Exhibit 9 on August 4th, right?
A. Yes.
Q. August 4, 2023.
A. Yes.
Q. So we need to go backwards a few days because you had this meeting that Ms. Burke attended on July 31st, okay. If you look at Exhibit 13.
A. My days are getting confused here.
Q. We're trying to get this sorted out here. In Exhibit 13 it says a meeting was held on July 31st, right?
A. Uh-huh.

Page 111

Q. If you go up a couple of paragraphs, do you see the paragraph that begins, "your accommodation request." Do you see that? Right here, that paragraph.
A. This paragraph, right?
Q. Yes. So that paragraph doesn't say anything about migraines or inability to drive. It's talking about COVID and that you want to continue to live and work isolated from unnecessary and casual contact, et cetera. Do you agree with me that's what it says?
A. This is what the paragraph says, yes.
Q. And it's before you submitted your accommodation request for migraines, right? This was a few days before that.
A. Sorry, I'm looking through the paperwork. I'm having trouble with the timeline on this right now. There's a possibility -- I'm not entirely certain. I was thinking we only had one meeting where Heather was present.
Q. Well, that's consistent with these documents. So Exhibit 13 describes a meeting that took place on July 31st and Ms. Burke was there and what was being discussed was your accommodation request to continue working from home because of COVID and your immune system, right?
A. And what she is speaking of in that second paragraph on this memo is that initial accommodation request.
Q. It would make sense to me that you're asking to

Page 112

extend the telework for COVID because your telework for COVID was about to expire just a couple of days later, right? So you were told that your telework was ending on August 2nd, so on July 31st we had a meeting to discuss extending that as an ADA accommodation. Does that make sense?
A. Yes. And that is true, that was on January 24th, that is true. And that accommodation request then was to continue working at home and that request was granted through August -- or up 'til August 4th or something, whatever day.
Q. That's Exhibit 11, right, is where Eunice tells you that you need to be back to work on August 3rd.
A. Back to work on August 3rd, yes, right.
Q. So I would understand, as you're approaching August 3rd you're asking to extend that accommodation request, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. So you had a meeting, it was rescheduled so your attorney could attend and that meeting occurred on July 31st, that's what this letter says, right?
A. Yes.
Q. It doesn't say anything in here about migraines or MS. It talks about your immune system and COVID, right?
A. On this August 4th letter, yes.

Page 113

Q. On Exhibit 13.
A. On Exhibit 13, yes.
Q. And then going on to the next page, GSD is offering to let you work with your office door close, to attend meetings remotely from your office and have an alternative work schedule. Wouldn't those be potential accommodations for someone who's worried about having contact with other humans because of COVID?
A. Yes, those would be accommodations for COVID, yes. Now, on the email, however, that I sent to Eunice on July 28th, I did say that this has to do with the ADA paperwork related to migraines and that was something that we brought up during that meeting.
Q. In that meeting you were talking about both COVID and the migraine issue?
A. Yes, and the accommodation was not for COVID. The accommodation didn't have anything to do with COVID.
Q. Well, it did in January.
A. It did in January, but this was a new accommodation. Completely new, not related to COVID.
Q. In January of 2023 you didn't ask for any accommodation based on --
A. Migraine.
Q. Let me finish my question.
A. I'm sorry.

Page 114

Q. In January of 2023, you did not ask for any accommodation based on your migraines or your MS or your inability to drive on certain days, right?
A. That is correct.
Q. But when your accommodation for COVID was ending, now you're asking for a new one because of the migraines, right?
A. Correct. Because now we have driving that comes into the equation and I am 70 miles away from the office, that's a concern.
Q. You weren't 70 miles away from the office when you started the job though, right?
MS. BURKE: Objection, form.
Q. When you started the job you lived near Santa Fe in an RV park, right? Correct?
A. Correct.
Q. And then you chose to move from Santa Fe to Rio Rancho, right?
A. Correct.
Q. This July 31st meeting, since it was virtual, was your husband listening in? Was he in the room while you were on this virtual meeting? Did he hear anything that was being said during the meeting?
A. On July 31st, I honestly don't remember.
Q. So after that meeting you submit the forms from your

Page 115

doctor, we've already talked about those, and we get Exhibit 12. So tell me about this phone call, what do you recall from this phone call to Eunice on August 4th?
A. I remember being on the phone with Eunice at one point and she said -- we talked about possibly getting some room darkening for the lights, that's really about the only thing that I remember. And she was empathic about the migraines, but there wasn't a lot that could be said at that point. It was kind of like, well, it is what it is.
Q. Is that a phrase that she used?
A. No, that's a phrase that I am using.
Q. So we're clear, the accommodation that you're asking for is not to help you do your job, it's -- strike that. You don't need the accommodation to perform the task of your job. You need the accommodation because you can't get to your job on certain days, you can't drive to work, right?
MS. BURKE: Objection, form and foundation.
A. I can't necessarily access the tools from my home location because I'm not allowed to bring the primary tool with me, which would be my computer, which is portable.
Q. I understand. Let me ask it this way, if you're having a migraine, which sounds awful and I don't -- certainly don't mean to make light of any of that. If you're having a migraine and you are not able to work at home, you would be unable to work at the office too, right?

Page 116

A. Yes.
Q. You're having a migraine, you're unable to work in any setting, in any room, I would imagine, right?
A. When the migraine hits and it is right there present and I am treating it with the medication, yes, that is an absolutely accurate statement.
Q. So the accommodation that you are asking for to be able to work from home is not because you need the accommodation to do your job, it's because you may not be able to drive on those days and get to your job, right?
A. Because of, it's because of lingering affects from that migraine, from the medication or from the migraine itself.
Q. I understand.
A. Yes.
Q. But your testimony has been that on those days the medication kicks in and even if you're unable to drive still because of depth perception or what have you, you would be able to work?
A. On some days, yes.
Q. So there are days where, if you could magically be transported, snap your fingers and be transported from home to your office in Santa Fe, you might be able to work at your office in Santa Fe, as long as didn't have to drive there, right?

Page 117

A. Yes.
Q. So you had this phone call with Eunice. Was there any discussion about you teleworking after that? Was this the end of -- is this the last communication you had with GSD about teleworking?
A. To the best of my knowledge, I can't remember, I can't remember having any additional emails or ADA requests or anything after this. Now, I may be mistaken, but I think this was kind of after they gave me the denial. I don't think, I don't think we had anywhere further to go with it at that time.
Q. In your lawsuit you allege that in the Spring of 2023 you wanted to go to a NASPO conference, right?
A. Yes.
Q. That's N-A-S-P-O. And you allege that Valerie or Natalie told you that you could go as long as you were caught up on your projects. Is that true?
A. Yes, that is correct.
Q. So tell me about that. I understand you're alleging that as you got close to the time of the conference they said, you're behind on your work, so they weren't going to approve you to go to the conference, right?
A. Yes.
Q. Did you have a meeting with them where that was discussed?

Page 118

A. Yes.
Q. Tell me about that meeting.
A. I can't remember specific details about that meeting, because I believe it was brought up in my weekly meeting. Myself and another one of my colleagues, we were both scheduled to go. She told me the day before I was told that she was not going to go and I was told the next day then that I was not going to be allowed to go as well.
Q. Who was that other coworker?
A. Karen Acosta Gonzales.
Q. So is it your understanding that your supervisors determined you were both too far behind in your work to be able to take the time off to go to that conference?
A. I don't know the reason that Karen was not going. I don't know if that was her choice or if she was told she couldn't go.
Q. Did they tell you that if you wanted to take your own time off, take annual leave to attend the conference, you certainly could?
A. Yes, they did.
Q. Do you need to take a break? Let's take a five minute break.
(Recess at 2:32 p.m. to 2:37 p.m.)
Q. Let's go back on the record. Ms. Hunt-Brown, I'm not sure if I got an answer to my last question, I'll ask it

Page 119

again. When your supervisors told you that they would not approve you going to the NASPO conference, did they also tell you that you could take time off? You could take accrued leave, if you had any, to go.
A. Yes. And they told me that I could take leave, if I wished, to attend the NASPO conference. The NASPO itself is a professional organization for procurement officials. This was a very valuable training experience. This happened to be in my home state and the reason that this one, besides the training opportunities that it provided to me, being important, my mother was in hospice care and I had intended to see her the weekend before and the weekend after. The conference itself was completely paid for by NASPO, including airfare, and they were willing to fly me in early and to fly me back later with no additional expense, all I had to do was essentially pay for my additional hotel nights or whatever in between. So there was no cost whatsoever to GSD to do this.
Q. I saw in the documents your mother passed away, I understand, right?
A. Last year about this time.
Q. Sorry to hear that. You applied for bereavement leave at that time, right?
A. I did.
Q. And it was approved for you, right?
A. It was.

Page 120

Q. We talked about the NASPO conference, we talked about some of your meetings that you had with Valerie and Natalie, so I don't want -- I'm not asking you to repeat testimony you've already given today, whatever you said is on the record. Is there anything else that's occurred at GSD that you believe is evidence of a hostile work environment?
A. Are we talking about just in 2023 or 2024 or now or --
Q. Any time.
A. That's a real broad question.
Q. Well, it's a very broad claim you're making, and so I need to know when you testify at trial what are you going to testify about and say that this was a hostile work environment.
A. Hostile work environment is sometimes kind of a squishy thing to try to define. Sometimes it can be being very overt, with people making fun of other people, that has not happened, to my knowledge, in my case. I haven't seen that. However, I have felt excluded, isolated. I have felt like I have been under increased scrutiny. I have felt micromanaged.
Q. Are you finished? I don't want to cut you off. Your answer's complete?
A. Yeah.
Q. So tell me who has done what to exclude you.

Page 121

A. There have been a number of times when information has been disseminated and I don't seem to get that information when there have been changes to the way we do things procedurally.
Q. Can you give me an example.
A. What was the last thing? One just came up a couple of weeks ago. Evidently now we -- when we make changes to vendors on a procurement cover sheet, we're listing the vendors at the top of the cover sheet instead of listing them in the center of the cover sheet as we used to, that's not a change that I ever had communicated to me. It's a small change, but since I have to send everything through my supervisor for review, what that does is that creates an additional review cycle for me to have to send it through her and it essentially makes me appear as if I don't know how to do my job or I don't know how to stay current with information. I never had that information communicated to me, but it's a change in the process, it's a change in the way we're doing information on the cover sheet.
Q. Well, at some point it was communicated to you that that was changing.
A. No, it was not.
Q. You're talking about it now, so how do you know about now if it was never communicated to you?
A. Because I sent a procedure -- or sent a procurement

Page 122

through and it came back to me that it needed to be changed. That's not generally the way we communicate a process change to a group. We generally communicate, there's going to be a change to the process going forward, this is the way we will do this process. We don't communicate it piecemeal each time one comes through, because that's a change that's not uncommon. So it's not a one off kind of change. That's an example. You asked me for an example.
Q. Yes, I did. Are there any other examples of you being excluded?
A. There was a recent meeting where someone had been let go. It was initially communicated as a Teams meeting, and this was right after I came back to the office in January after an illness. It was communicated as a Teams meeting on email and I saw the message, we're having this meeting. It was held in person in the conference room, no one came to tell me that they were actually holding it in person in the conference room. So the information was all communicated to everyone else in the division except me.
Q. Did you find your way to the conference room for the meeting?
A. No. As a matter of fact, I happen to be walking down the hallway and I saw that the office was empty and I said to my boss, who happens to have the office right across the hallway, and I said, "what happened, did he get another

Page 123

job?"
Q. So the purpose of that meeting was to let everyone know that this person --
A. Let everyone know that he had been let go, and that the front door would be locked.
Q. And that was a recent...
A. Yes, in January.
Q. Of '25?
A. '25, yes. January '25, yeah.
Q. Any other examples of somebody -- hold on, before we move on. Who do you blame for you not being invited to that meeting in person?
A. In this case I would have to, I would have to blame my manager, because she knew I was in the office. It was her responsibility to make sure that I was -- you know, I would have thought she would have said, "hey."
Q. Are you talking about Vanessa?
A. Yes.
Q. Has Vanessa harassed you? Has Vanessa created a hostile work environment for you?
A. I feel like she has.
Q. In what ways?
A. I went into her office for something the other day to pass along information to her. As I was giving her that information she was sitting at the computer at her desk and

Page 124

she was tapping her fingers together, fingernails together, very dismissively like, can't you please just get out of my office, like she couldn't wait for me to leave. So I quickly finished up what I was saying and left.
Q. And that was recent?
A. That was about a week ago, maybe two.
Q. Can you think of any other things that Vanessa has done or said that you believe are part of a hostile work environment?
A. With her it's kind of an overall attitude. I passed her in the hallway the other day and she just kind of gave me a look, like just a really look of -- like I was something that she wanted to scrape off her shoe or something. I just don't -- I don't know how to describe resentment and disgust better to you than that. With the rest of the group she is extremely friendly and in her office all the time chitchatting, visiting.
Q. Any other instances of Vanessa being hostile? Anything else that you can describe for me today?
A. There are a lot, a lot of times. Just a lot of things that I can think of, but nothing, nothing that I can give you a specific date or example right now.
Q. So you said excluded, and the next thing you said was isolated. Let me ask you, are there any more examples of you being excluded?

Page 125

A. Not that I can specifically point to right now.
Q. And then you said isolated, you feel isolated. Other than what you have already described, what are instances of you -- and I need to know not just how you feel, which is important, but I need to know what other people have done to isolate you.
A. There are a lot of times when I might come into a meeting or something and she will be talking with someone and she'll just stop, and a lot of times these are my colleagues, people on my team.
Q. Who is she?
A. Vanessa. Or she'll be talking with Natalie, Vanessa will be talking with Natalie and the two of them will just immediately stop talking, sometimes this will be like when I'm coming into a meeting with them and they'll just immediately stop talking, whatever. And I understand that sometimes maybe they're talking about another personnel matter to which I'm not necessarily privy, and I understand that. However, it doesn't feel that way.
Q. You said you feel like you're being -- increased scrutiny and micromanaged. Again, we already talked about some of your emails and the meetings with Vanessa -- with Valerie and Natalie, so I don't want to have you repeat anything you've already told me today. Any other examples of you being micromanaged in a way that you believe creates a

Page 126

hostile work environment?
A. One of the things that is currently going on is that Vanessa has a meeting with me on Tuesday morning and we go over work assignments. We are expected to turn in a close of business report on Friday and that report goes to her on all those work assignments, but it is also copied to our division director. It is my understanding, although not necessarily my knowledge, that everyone in the division is to be doing this, but I don't think that's happening. So I think it's selective. On the work assignments, when she goes through this list with me, this is generally only a meeting between Vanessa and myself, we go over a spreadsheet that usually she has selected from the tracker assignments. Sometimes she updates it in her tracker, but not always. Sometimes she will pick up additional assignments that have been on there. There was an instance about a month ago where an assignment was not picked up and it sat out there for three weeks on tracker without being added onto the worksheet. Because I had been out for a period of time she was having me focus on the assignments on the worksheet and she was telling me I needed to get this done, this done, this done and they were priorities, and I had to have them done by such and such a date, you know, right away, today, I need this by today. We have certain metrics, certain time periods by which we have to have something done and this is evidently tracked in a

Page 127

report that goes to the legislature and our management, upper management, is sensitive to those numbers. That one item not being on that report caused that procurement to sit out there for 21 days, that meant it missed two deadlines immediately, without me even being really cognizant of the fact that it was out there, because I wasn't focused on tracker, I was focused on the worksheet that she was having me focus on.
Q. Were you disciplined as a result of that?
A. No.
Q. Have you ever been disciplined?
A. I have not.
Q. Have you ever been suspended or demoted?
A. No.
Q. Obviously not terminated, right, you still work there?
A. Right.
Q. Other than what you have already discussed today, any other examples of you being scrutinized or micromanaged? I'm sorry, when did that take place, the situation you were just describing?
A. Within the last month. I would say probably two weeks ago, three weeks ago.
Q. Thank you. Anything else?
A. Well, this is essentially a pattern that I have noticed, both with Natalie and with her. But the thing is,

Page 128

when they assign deadlines, they assign these deadlines and all of the projects are just due the same day, at the same time, right away, is usually is the phrasing, has to be done right away, has to be done by close of business today. Now, when I am taking FMLA leave there is nothing afforded to me in terms of being able to push back deadlines or having someone else pick up to push something forward, especially when it's a priority project, that just means the work gets further behind, but it doesn't help me get anything -- it doesn't help me push anything further ahead, it just makes it further behind, and then new projects continue to be added in to my workload while I'm gone. This got really, really bad at Christmastime when my husband brought COVID home to us for the first time, ever, and we were both flat on our backs. Me for over three weeks until -- I mentioned the January, being sick in January. I didn't get back into the office until January 15th, and I went out December 20th, was my last day in the office, December. I had several priority projects at that time, one of which Natalie was going to finish up and push through -- that only needed to be awarded. In other words, finished up and the contract needed to be awarded and she was going to finish it up. She was going to be working on it to finish it up those couple of days that she and I were going to be working together, the last couple of days right after Christmas. But she didn't touch it, she didn't

Page 129

review it, she did absolutely nothing to it. Nothing on that priority list of projects that absolutely had to be done got moved forward, nothing. That to me is just ridiculous. If you're going to hammer on somebody and tell them that these things are priority and they've got to be done right away and it's ridiculous that they've been hanging out there for so long. Well, they must not be much of a priority if you can let them sit there for almost a month while somebody is sick.
Q. So you think Natalie should have --
A. I think --
Q. -- taken care -- let me finish my question.
A. I'm sorry.
Q. While you were out sick, you're saying that Natalie should have done your work, right?
A. No. I think Natalie should have gone ahead and done the review that she said she was going to do on January 26th, or 27th, or maybe even the next week, because I was still out then, doesn't matter. She didn't do the work that she said she was going to do on that document. She could have moved it forward. She didn't touch it the entire time I was gone. It was still waiting her action. Vanessa had the responsibility to go ahead and reassign that work to someone who could pick it up while I was gone.
Q. When you came back that work was still there waiting for you it sounds like.

Page 130

A. Absolutely. Every bit of it.
Q. Did you get to work on it and complete it?
A. Absolutely. Every bit of it.
Q. And were you disciplined or reprimanded as a result of any of that?
A. No, I was simply hammered on to get it done.
Q. Anything else that we haven't already discussed?
A. Have you gone through all of your questions and such?
Q. No.
A. No?
Q. Got a long way to go. I'm not sure we're going to finish today.
A. Well, that's pretty much it in terms of hostile work environment and such.
Q. Other than Valerie, Natalie and Vanessa, who you've discussed, is there anyone else in the office who you believe is creating a hostile work environment for you? Has anyone else been hostile to you?
A. Not that I can say, no. Can I run to the bathroom?
MR. LOMAN: Yes. Let's take five.
(Recess at 3:06 p.m. to 3:13 p.m.)
Q. Back on the record. As we get into the end of 2023 going into 2024 it's time to renew your FMLA again for the upcoming year, right?

Page 131

A. Yes.
Q. Okay.
A. Every year.
Q. Let's talk about that. So I will hand you Exhibit 14. This is part of your --
MS. BURKE: I'm sorry, is there a page 1 that's supposed to be here?
MR. LOMAN: No, it starts on GSD 24.
A. This is the one that came back from the medical provider.
Q. Is this part of your FMLA renewal application for the year 2024?
A. They all look like. Yes, yes, it is. 1/18/24.
Q. Anna Nance signed this on 1/18/24, right?
A. Yes.
Q. And again, as you had in years past, you're applying for intermittent FMLA because of your chronic condition of migraine headaches and multiple sclerosis, right?
A. Yes.
Q. Going down to the bottom of page 325, the doctor says, "these episodes are estimated to occur three to four times per month," right?
A. This is what she has on there, yes.
Q. And as I understand it, as we got into 2024, you started taking your intermittent FMLA. And did there come a

Page 132

time you took four days in a month and wanted to take another day that month and they said you weren't approved for it?
A. Yes, as a matter of fact.
Q. Because your doctor certification said up to four times per month, and so they were interpreting that to mean that you could only take four days per month, is that more or less what happened?
A. Yes, this is a doctor's estimate.
Q. I understand, I'm just trying to --
A. Yes.
Q. -- summarize --
A. Yes.
Q. -- this part of the case. Now, by 2024, Kelly Howley is gone and you're now working with Jennifer Morfin at the HR office, right?
A. Yes.
Q. Was it your understanding that Jennifer Morfin worked in the HR office under Eunice?
A. Yes.
Q. Was Jennifer the one who told you that you're only approved for up to four days per month?
A. By email, yes.
Q. Did she tell you more or less that if you wanted to take more days than that you would just need to get an updated certification from your provider?

Page 133

A. Yes. Vanessa had initially told me that I was no longer approved for -- that I had exceeded my FMLA allotment for the month. And then I reached out to HR, to Jennifer in this case, and she's the one who said, "yes, you have exceeded and yes, you will have to recertify."
Q. So we're going to go a little out of order here, and that's my mistake. I handed you Exhibit 17, it's an email from Jennifer Morfin to you and I think this is more or less what you were just describing, right?
A. This email has to do with donated leave, soliciting donated.
Q. Right, that's the first paragraph.
A. Right. The second paragraph, yes, four days a month of FMLA use.
Q. Going back up to the first paragraph though, you had requested to be eligible for donated leave?
A. Yes.
Q. And Jennifer worked with you to get that approved, right?
A. She coordinated that on the GSD side of soliciting those donations, yes.
Q. Did she stand in your way of getting donated leave?
A. Not to my knowledge.
Q. Did she do anything to -- she helped you with getting the donated leave request approved, right?

Page 134

A. That is her job.
Q. Yes.
A. As HR, yes.
Q. Did anyone donate annual leave to you?
A. One of my colleagues donated a week of his leave, which came in, yes.
Q. And you were able to use that in 2024?
A. I was, eventually.
Q. That was nice of him. Who was that?
A. That was a colleague. My colleague was Clark Fountain.
Q. Going down, she says, "polite reminder, you are authorized up to four days a month of FMLA," and she's attached paperwork so you can get it renewed. This looks to me like it was a follow-up. Not the first time you had discussed this with Jennifer. Had you discussed this issue before with her, that she was interpreting your provider's form you were only approved up to four days?
A. I believe, I don't know for certain at what point the, at what point the actual interpretation that she had came into play. There's an email string, I know, out there somewhere, that -- between us.
Q. Between you and Jennifer?
A. Between myself and Jennifer, yeah, where I was saying, what is going on with this, I don't understand.

Page 135

Because we never had a definition of FMLA like this before, where you take a physician's estimate and say, well, this is how much you get per month.
Q. But that's how Jennifer was interpreting it at that time, right?
A. That's how she was doing it, yeah. So, yeah, that's a restatement of that and I don't know at what point -- I don't know if I had corresponded. Obviously I must have.
Q. So then I'll give you Exhibit 15. If you flip to the last page, it looks like your provider signed this on April 27th, I think. It could be a 29. Of 2024, right?
A. Yes.
Q. If you will flip to page -- if you see the small page numbers at the bottom -- KHB 751.
A. Yes.
Q. And I am going to read this handwriting and I want you to tell me if I'm reading something incorrectly, okay.
A. Handwriting at the top or the bottom?
Q. I'll start at the top. It says, "intermittent leave for flare-ups of chronic conditions, MS, migraines," right?
A. Yes, MS, migraines, yes.
Q. At the bottom she says, "over the next six months, episodes of capacity are estimated to occur up to 31 times per month," right?
A. Yes.

Page 136

Q. "And each episode can last from 4 to 72 hours," is what she says, right?
A. Yes.
Q. "Due to the unpredictable nature of these illnesses, I cannot guess about the frequency of episodes."
A. Yes.
Q. Does that say chosen frequency?
A. Yes.
Q. "Chosen frequency to account for all possibilities." Signed Anna Nance, right?
A. Yes.
Q. Ms. Nance filled out this form at your request, right?
A. Yes.
Q. And you submitted it back to Jennifer, right? Jennifer Morfin.
A. Yes.
Q. I will hand you Exhibit 16. On Exhibit 16 on May 3rd, Ms. Morfin emails back to you and says you're approved for intermittent leave up to 31 times per month, right?
A. That is what she says.
Q. Do you dispute that's what happened, that you are now approved to take up to 31 days a month of intermittent leave?
A. That is what her email says.

Page 137

Q. You're agreeing with me, right?
A. I'm agreeing that that is what her email says.
Q. Well, do you think that her email is not true? Do you think that something else is the case other than what's in her email? I don't understand why you're answering the question quite that way.
A. I'm answering the question based on what came after that email.
Q. What came after that email?
A. What came after that email is that she artificially restricted my FMLA leave by applying the physician's estimate that she had previously applied that artificial estimate, which is why the physician changed it.
Q. Right. But here we are May 3rd. On May 3rd you're approved to take up to 31 days per month of FMLA leave, right?
A. Right. So, yes, at this point and since then I have not had a problem with FMLA leave.
Q. Meaning you request it and they approve it, right?
A. I request it and they approve.
Q. Prior to this May 3rd email had you taken time off and had it coded as leave without pay during that year 2024?
A. Yes.
Q. Did GSD retroactively apply the FMLA leave to change all those leave without pay days to FMLA days?

Page 138

A. I would have to go back and look at my Share record to make sure that that all got changed.
Q. Was it your understanding that that's what they were going to do?
A. It is my understanding that that was going to happen, yes.
Q. And you don't know that it did not happen. I mean, as far as you know it happened, right?
A. As far as I know it happened, yes, yes.
Q. When did you use your seven days of donated leave?
A. Once the FMLA was returned back to a standard interpretation and I could actually take it so that it was FMLA leave, because that is the restriction that is imposed on donated leave according to HR, then I was able to go ahead and use that donated leave.
Q. I'm asking you, when did you use that donated leave?
A. Over a period of time. I would have to look at Share.
Q. A day here, a day there?
A. Oh, yeah. It wasn't all at once. I didn't go on vacation, you know.
Q. Are you aware that in your most recent Complaint you have made a claim under the New Mexico Minimal Wage Act?
A. Yes.
Q. And that is related to an incident that occurred in

Page 139

September of 2024, right?
A. On or about that time, yes.
Q. We'll mark this as Exhibit 18. This is a series of emails. Tell me what happened here, what happened on September 5th and 6th?
A. Give me just a moment to review the string, please. So I had a doctor's appointment and I had forgotten to go ahead and email Vanessa about that doctor's appointment to put in that leave ship through the Leave Management System and I think there had been an issue the previous week with my time, which was part of the problem with why I had not put in that leave slip.
Q. I'm sorry, say that again.
A. There had been an issue the previous week with my time reporting related to FMLA absences and such, and I was waiting to hear from Eunice on how I should code that and I didn't hear back from her. And Vanessa and I had a conversation about it and by the time Vanessa had left and by the time -- by the time Vanessa had left, I hadn't heard anything from Eunice, which is what I am conveying to her. I hadn't heard back from Eunice about my time.
Q. You're at the bottom of page --
A. I'm sorry, at the bottom of page 842, yes. The appointment I had was in Rio Rancho at five o'clock, so I had to leave no later than 3:30 on that day, from the office. I

Page 140

had worked an entire day.
Q. 4:19 p.m. on September 5th, right, you see that email. You email Vanessa and asked her if you could flex your time for the next day, right?
A. Yes, yes.
Q. And typically the way it would work is, if you needed to -- if you or anybody in the office needed to adjust your schedule for a day for an appointment or whatever, you would need to get approval from your supervisor first, right?
A. Yes. If we have an appointment, if we have a doctor's appointment or something like that, typically we turn in a leave slip by five o'clock and normally that's fine.
Q. But it needs to be preapproved by your supervisor; is that right?
A. Most circumstances, yes.
Q. When did you make this appointment, this doctor's appointment? Had it been on your calendar for some time?
A. I assume it had been.
Q. In other words, it wasn't an emergency appointment that you just made that day, right?
A. I don't think so. I don't think it was like a toothache or something that I had to -- no, it wasn't an emergency appointment.
Q. And you note that you forgot to put in a leave slip

Page 141

earlier for it, but you let her know about the appointment and sent this email at 4:19 p.m. on Thursday, right?
A. Uh-huh.
Q. Yes?
A. Yes, I'm sorry.
Q. And you were physically in the office this day?
A. I was, yes.
Q. Are you aware that Vanessa had already left the office that day at that point?
A. She had.
Q. And you knew that when you sent the email that she was gone for the day?
A. She normally leaves at 3:30, yes.
Q. And then she was out of the office for a couple of days after that, it looks like, right? Going on to the next email.
A. She was out and had no access to email through 9/9, whenever that was. Monday.
Q. Here on September 11th Vanessa says, "because you did not receive prior approval you'll have to claim leave from 3:45 to 5 p.m," and that's for September 6th, right?
A. Which page are you on?
Q. 842.
A. Oh, yes.
Q. She reminds you -- she says, "if she is out of the

Page 142

office you need to get prior approval from Natalie and if Natalie is unavailable, from Dorothy," right? And that's going straight up the chain of command in your office?
A. That is the chain of command, yes.
Q. Going up to page 841, there's some back and forth here between everybody, but at the top of this page on September 11th, at 2:07 Vanessa says, "you have enough sick leave to cover this, it was a doctor's appointment you can use sick leave." Why are you shaking your head?
A. She was incorrect about that.
Q. You did not have any sick leave?
A. I did not have any sick leave. This was part of the -- when I said something about speaking with Eunice and coding time for the previous week or the previous -- about my time, haven't heard back from Eunice about my time, that was part of that problem that we were trying to fix and that sort of switched away my leave time that we thought -- that she thought that I had that she was seeing in the system. So, no, I did not have sick leave time.
Q. So what hours did you actually work that day?
A. I believe, and I would have to check my Share records to be sure, but I believe I probably worked until 3:30.
Q. Did you get in early that day? Did you go in early that day?

Page 143

A. No.
Q. So you started at 8 a.m.?
A. 8. I would have possibly -- again, I'll have to check Share to be sure. It looks like I probably shortened my lunch to 30 minutes and then left at 3:30, so that would have allowed me -- 4:30, 5, that would have allowed me an hour and a half to get to the doctor's appointment.
Q. So you start your day at 8 a.m., right?
A. Yes.
Q. And instead of an hour for lunch you take a 30-minute lunch?
A. Yes.
Q. So let's say you work from 8 to 12, right, that's four hours?
A. Yes.
Q. And you worked from 12:30 to 3:30.
A. Yes.
Q. That's three hours. That's seven hours.
A. Seven-and-a-half -- 9, 10, 11, 12 -- 1, 2, 3 -- I would have to look at Share. I would have to look at the Share record, that's all I can tell you. You're asking me about something that happened what, a year ago.
Q. I'm asking you about the claim that you are making in this lawsuit, right?
A. Right.

Page 144

Q. So I'm trying to understand what is the basis for this claim.
A. The basis for the claim is that I worked time and didn't get paid for it.
Q. Are we talking about 30 minutes then? Are you saying that you should have been paid for seven hours that day, but you only got six-and-a-half?
A. Again, let me check the Share records and I can give you a good answer on that.
Q. It's your recollection that you got to work at your regular time that day, took a short lunch, and left at 3:30?
A. Got to work at the regular time, took a short lunch, and I left early. And I believe I may have flexed earlier during the week to make up for some of that time that I left early, that generally is what we do when we work flex time. If we know that we're having a doctor's appointment we generally work earlier in the week.
Q. Did you get pre-approval to flex another day to make up for the time you missed on this day?
A. She and I may have discussed that. Vanessa and I may have discussed that. I see on page 840 where I am saying, Vanessa knew I had the doctor's appointment and that we had evidently talked about the snafu from the previous Friday because of the car accident.
Q. You say that Vanessa knew you had the doctor's

Page 145

appointment, but she didn't know that --
A. That was the car accident.
Q. Vanessa didn't know you had a doctor's appointment, right, because she was already gone for the day. She didn't learn about this until she came back next week, right?
A. She knew I had the doctor's appointment on Friday because we -- my husband and I had someone hit us when we were coming home from work the previous week, on Thursday, so somebody hit us in the car and I was off that previous Friday. So that was part of the snafu with the time that I had email been Eunice about where we were trying to get that sorted out. Vanessa knew that I had a doctor's appointment, because I had already scheduled that doctor's appointment for something else and they were going to check me at the time on that doctor's appointment, they were going to check me over for the car accident as well.
Q. So it is your testimony now that you told Vanessa verbally about this doctor's appointment and got approval for it verbally?
A. What I'm saying is, Vanessa knew about it. It's in the email chain.
Q. Well, you say that she knew about it. I don't see anywhere in here where she says that she knew about it ahead of time. Would you turn to page 841. Do you see page 841?
A. Yes.

Page 146

Q. Here's an email from you to Vanessa.
A. Uh-huh.
Q. September 11th at 12:02 p.m. Do you see that?
A. Yes.
Q. Where you say, "I understand I can't flex off the hour that I worked by coming in early and shortening my lunch because I did not receive prior approval from you." Isn't that you telling Vanessa -- agreeing that you did not get prior approval from her?
A. That is me restating what she has told me in a previous email.
Q. The one where she says you did not receive prior approval --
A. Yes.
Q. -- to take?
A. That is not me agreeing to it, that is me simply saying, I understand what you're telling me.
Q. But it's your testimony that you did get prior approval from her, is that what you're testifying to today?
A. I am saying that she and I had discussed it. She knew that I had the appointment. I am telling her in writing here that I forget to put in the leave slip, but you know already that I am going to be out.
Q. But that's not what it says, though, is it? You say you forget to put in a leave slip, so now you're telling her,

Page 147

after she's already left for the day and you know that she's gone for the day, that the appointment is at five and will need to leave by 3:30, right?
A. Yes.
Q. And then you say at the end of that email, "let me know if you're good with this and I'll do the leave slip tomorrow." So if she had already approved this for you then why did you need to ask her, "let me know if you're good with this"?
A. Verbal approval isn't as good as a written approval.
Q. So it's your testimony that you already -- Vanessa had already approved this, but you still sent her an email that said, "let me know if you're good with this." And sent her an email a couple of days later saying -- you saying that you did not get prior approval from her, that's your testimony?
A. Because she says I was out without approval, "this is what you need to do." I'm sending her an email that says, "thank you for the email, I understand what you're telling me that I need to do, I'm going to do it, and this is what I will do going forward."
Q. I'm sorry, where did she tell you -- where did she say that she had already approved it?
A. Where does she say she's already approved it?
Q. Is that what you just said?

Page 148

A. No. Where she says -- where she tells me what to do.
Q. Where are you looking? What page are you --
A. Oh, I'm sorry. Page 842, at the top, Vanessa's email. She says, second sentence, "because you did not receive prior approval you will need to claim leave from 3:45 to 5 p.m."
Q. Right.
A. So that's me saying, thank you, I understand I can't flex it off. Regarding coding, can I do this.
Q. Okay.
A. So I'm saying, yes, I understand.
Q. But you believe that you -- okay. Just so clear we're clear, you understand that if you're going to flex your day you're required to get prior approval from your supervisor, right?
A. Yes.
Q. And I think you are now agreeing with me that you did not have prior approval from your supervisor to flex your time on this day. You sent her an email about it after she was already gone, but she did not actually approve that time for you, right?
A. In this case she did not.
Q. I want to make sure I understand what your lawsuit is about here. On September 25th, 2024, your lawyer filed on

Page 149

your behalf your Second Amended Complaint in this lawsuit. Are you aware of that?
A. Yes.
Q. Did you review the Second Amended Complaint before it was filed?
A. Yes.
Q. We're going to talk about, you make claims for failure to promote, essentially. Do you understand what I mean by that?
A. Yes.
Q. You had applied for several promotions and not gotten them, right?
A. Yes.
Q. And you're claiming that is -- and correct me if I'm wrong, but I think you're claiming that you are legally entitled to those promotions; is that right?
A. I am arguing that, yes, I am qualified for those positions.
Q. Do you believe that it was illegal for GSD not to give you those promotions?
A. Illegal?
Q. Uh-huh. Did they violate the law by not giving you those promotions?
A. It would probably depend on which law you're looking at.

Page 150

Q. Well, it would. This is your lawsuit.
A. Right.
Q. You get to decide what laws we're talking about.
A. If we're talking about age discrimination, I would say yes.
Q. Count IV of your Second Amended Complaint is for age discrimination. It refers to your age of 63. It says in June of 2024 you applied for the IT Procurement Specialist 2 position.
A. Yes.
Q. And you were not offered this promotion.
A. Correct.
Q. Correct? It says, "individuals who have been selected for positions that Plaintiff applied to have been younger than she." Do you believe that to be true?
A. Correct.
Q. Now, this one has my notes on it and it's 30-some page long, so I don't want to print a new one, but are you claiming -- the only one that is stated under your age discrimination count here, right, Count IV, age discrimination, the only job that's listed is that one that I just read off to you.
A. Right.
Q. Are you claiming that there were other promotions that you did not get because of age discrimination or is it

Page 151

just that one?
A. That is the primary one that we're looking at. In each case the persons who were selected for the jobs were younger.
Q. So let me ask again, are you claiming that all of those promotions were denied to you because of age discrimination or is it just this one that's identified in this part of the Complaint?
A. I am aware that there are components to age discrimination that aren't just limited to age.
Q. What do you mean?
A. When someone looks at an age discrimination case, it's not just because somebody is older they should get the job. I mean, that would open up an ugly can of worms in some cases. A lot of cases. So I realize that that's not the standard that you're looking at. That being said, my contention is that the IT Specialist position, specifically this last one, yes, I am contending that flat out is a case of age discrimination and it very clearly says that on the claim.
Q. And it does. I just want to know if there's more to it, okay. That that job, you state very clearly in the Complaint, that job was denied for age discrimination or that promotion, you did not get that promotion because of age discrimination, I understand that.

Page 152

A. Yes.
Q. You also describe in the Complaint four or five other promotions that you applied for and did not get. Do you believe that those others were also because of age discrimination?
A. I believe that played a factor in the selection, yes.
Q. What else do you believe was -- were there other factors involved in you not getting those promotions that you're claiming here?
A. Those other factors?
Q. The other promotions.
A. The other positions?
Q. The other promotions, yes.
A. I think there were cases where my experience, my overall experience was not taken into consideration.
Q. Do you think that's illegal? What I'm asking is -- I'm trying to understand what your claims are here. What you are claiming violated the law, okay. So do you intend to claim that all of those promotions you applied for that are identified in the Complaint, do you believe you were passed over for those promotions because of your -- because you have MS and have chronic migraines?
A. No, that doesn't have anything to do with my age, does it?

Page 153

Q. I don't think so.
A. Okay.
Q. But do you also claim -- you said that on those age was just one of many factors.
A. Right.
Q. So are you claiming that you did not get those promotions because of your medical condition?
A. I believe that does play a factor. I know for certainty with the IT position that the individual who received the job does not have the level of education that I have. She does not have anywhere near the level of experience that I have.
Q. What does that have to do with your medical condition?
A. Nothing to do with my medical condition, but my medical condition plays a role, I believe, simply from the perspective of, does it impact how I might be able to do my job? It could from a hiring manager's perspective. Yet, I don't think -- it's a subjective decision. Hiring is a subjective decision. And I work in that division, so...
Q. The first one I have is Procurement Construction Unit Supervisor. You applied for that job approximately in August 2023. Does that sound about right?
A. Yeah.
Q. Do you recall being interviewed by a panel of

Page 154

Michael Saavedra, Jennifer Kahn, who had a different last name back then, and Dorothy Mendonca?
A. Yes, maybe. That sounds like maybe the right panel of people.
Q. Do you know who was selected for that job?
A. Yes, I do.
Q. Who?
A. That would have been Tami Concha.
Q. I'm going to hand you Exhibit 19.
MS. BURKE: You said 19, right?
MR. LOMAN: 19.
Q. Have you seen these documents before?
A. No, I have not.
Q. These are the notes that your interviewers made during your interview for this Construction Unit Supervisor position. Okay.
A. All right.
Q. I don't think it's written on here, but I believe these interviews took place on September 5, 2023. Does that sound about right?
A. Yes.
Q. Let me just ask, do you believe that Tami Concha was hired instead of you because of your medical condition?
A. I don't know.
Q. Do you believe that Tami Concha was hired for this

Page 155

position instead of you because of your age?
A. I believe that might have been a factor.
Q. I imagine you would have told me by now today if this ever happened, but let me ask, has anyone ever made a comment to you about your age or told you that you're too old to get these jobs, anything like that?
A. No.
Q. Do you remember speaking, and I understand there was a lot of interviews you've done over the years?
A. Only the IT Specialist.
Q. What do you mean? I hadn't asked a question yet. What's, only the IT specialist?
A. You said a lot of these interviews that you've been to over the last couple of years.
Q. Yes.
A. Only the IT Specialist position have I interviewed for a lot.
Q. I understand, but you have been in a lot of interviews in the last year and a half or so with GSD, right?
A. Yes.
Q. Do you remember being interviewed by these three people that we just identified, Dorothy, Michael and Jennifer, for this position?
A. I remember vaguely being in the Construction Bureau or the Construction Supervisor interview, yes.

Page 156

Q. As of September 23rd when this interview took place, did you have experience in the construction industry?
A. Not what I would call direct experience, no. Indirect, yes.
Q. What indirect experience?
A. I used to work for nuclear industry and a lot of what we did was -- a lot of what I had to do was writing procedures and policies and a lot of the work that we did involved construction, so we did rebuild, refit. And I would be --
Q. Was that at Sandia Labs?
A. Oh, no, this was all over the country, Ohio, Michigan.
Q. When was --
A. South Carolina.
Q. So we didn't talk about that morning. Was this --
A. No, that was --
Q. -- in the '80s, '90s?
A. Yeah, yeah, that was in a previous life.
Q. If you flip to page 9650, these are Dorothy's notes from your interview. Do you see that?
A. Uh-huh.
Q. At the top she has a note where she says, "knows procurement, but no construction." Do you see that?
A. Yes.

Page 157

Q. Do you recall telling these interviewers that you didn't really have experience in construction?
A. In construction procurement, procurement for construction, yes, which is a true statement.
Q. Right, okay.
A. If that was the question, do you have experience in doing construction procurements, I would have said no. However, then I would have followed it up, hopefully.
Q. Going on to page 9652, to question number 8, you were asked, "are you able to perform the duties of the position with or without accommodation," and Dorothy's notes here indicate your response was, no accommodation, and that you are currently performing without accommodation. Do you recall telling the interviewers that?
A. That is correct.
Q. We get to Jennifer's notes, who at the time was Jennifer Catechis, right?
A. Yeah, she got either married or divorced.
Q. But now she goes by Jennifer Kahn?
A. Exactly. She's gotten married or divorced to the same individual, so now she's back to Catechis, yeah.
Q. Go to the last page of this exhibit.
A. 55?
Q. Uh-huh.
A. Where you were asked, "are you able to perform the

Page 158

duties of this position with or without accommodation," and you said, "no accommodation needed," right?
A. Right.
Q. And that's what you said in the interview?
A. Yes.
Q. The Construction Unit Supervisor, this job that you were interviewing for, was it in the same office in Santa Fe?
A. Yes.
Q. And similar office job, sitting at a desk using a computer, right?
A. Yes.
Q. I'm going to hand you Exhibit 20. You'll note that some of these documents are marked confidential on too. I will assume -- well, I don't want to ask what you and your attorney discussed. If you have any questions about that, you should talk to your attorney after the deposition, but these documents are not to be shared or discussed outside of the deposition, okay.
A. Got it.
Q. Exhibit 20, have you ever seen this before?
A. No.
Q. Tami's resume.
A. I have not.
Q. And you understand that as a confidential document you're not to discuss anything that's in here with anybody

Page 159

outside of this deposition.
A. Correct.
Q. Other than your attorney.
A. Yes.
Q. Were you aware that Tami had been with the State Purchasing Department since August of 2021?
A. Yes.
Q. Had the two of you worked together?
A. Yes.
Q. Get along with her okay?
A. Absolutely.
Q. Prior to that did you know that she had been a procurement officer for the Town of Taos from May 2017?
A. Absolutely.
Q. Did you know that? Okay.
A. Yes, I did.
Q. Do you know whether she had any experience in construction procurements?
A. I am only somewhat familiar with her experience at the Village of Taos, or City of Taos. Town of Taos. I don't have any direct knowledge of her experience.
Q. You've never supervised people before, have you?
A. Yes, I have.
Q. With the State of New Mexico have you been a supervisor?

Page 160

A. No, I have not.
Q. When is the last time you were a supervisor?
A. '83, 1983. '84. Possibly '85.
Q. The next one you applied for I have here. Do you recall September 5th, on or about September 5th, 2023, around the same time you interviewed for the deputy director position?
A. Yes.
Q. Exhibit 21, these are the interviewers notes. I'm sorry, approximately September 12, 2023 do you recall interviewing for the deputy director position?
A. Yes.
Q. I believe the panel that you interviewed was Dorothy Mendonca, Anna Silva and Jennifer Catechis again. Does that sound right to you?
A. Yes.
Q. Were you aware that at that time that Natalie had also applied for that job?
A. Aware, no.
Q. You're aware now that she got that job?
A. Yeah, yeah.
Q. That was the position that was vacated by Valerie when she left the state, right?
A. Yes, yes.
Q. Do you believe that Natalie was selected for that

Page 161

position instead of you because of age discrimination?
A. I believe that might have been a factor.
Q. Do you believe that Natalie was selected for that position instead of you because of your medical condition?
A. I believe that could have been a factor also.
Q. So Natalie, that was one step up in the chain of command for her, right, to take Valerie's job?
A. Yes.
Q. And if they had selected you, you would have had to leapfrog Natalie to take Valerie's old job, right?
A. Yes.
Q. You would agree with me that Natalie had more experience supervising people, particularly in the State Purchasing Division?
A. She has been there longer, yes.
Q. And she's been a supervisor, right?
A. She's been a supervisor longer, yes.
Q. Well, she's been a supervisor, period.
A. Yes, I said that's indisputable.
Q. Right. You really believe that they chose Natalie here because they were discriminating against you based on your age or medical condition and not because she was already higher in the chain of command?
A. Again, hiring is subjective and just because someone has more years at the state or more years as a manager

Page 162

doesn't mean they're the better candidate.
Q. As you sit here today under oath, you believe that you were the better candidate for the deputy director job than Natalie Martinez?
A. Do I honestly believe that I am the better candidate?
Q. Yes.
A. I do.
Q. Do you understand how these decisions are made, it's the interview panel who decides who's going to be selected for that position?
A. Yes.
Q. And those three people interviewed you, Dorothy, Anna and Jennifer, you believe that they all discriminated against you based on your age and/or medical condition?
A. I can't say that's necessarily what was in their mind, was to intentionally discriminate. What I am saying is that that is the basis of my claim.
Q. That they subconsciously discriminated against you based on your age or medical condition, is that what you are claiming?
A. I'm saying it's a subjective decision. Hiring is a subjective decision and the hiring panel made the decision they wanted to make.
Q. And you believe it was based on illegal

Page 163

discrimination, is that what you're saying?
A. I believe it was probably some kind of a discrimination, yes.
Q. Will you please flip to page 8964 in Exhibit 21. And again you were asked, "can you perform the duties of this position with or without accommodation."
A. Uh-huh.
Q. And it notes here that attribute to you, either way you can perform duties with or without. Do you remember having that discussion in the interview?
A. Oh, yes, I do.
Q. Again, on page 8967, I'm not sure whose handwriting this is, they also heard a similar answer. You say, "yes, with or without either way, you can perform the duties with or without accommodation." Right? Either way.
A. Yes.
Q. And you're telling them that you don't need an accommodation to perform the duties of this job; is that right?
A. Correct.
Q. Again on page 8970, this interviewer heard you say, "yes, without accommodation, can perform duties without" -- "yes, without accommodation, can perform duties. Yes, can perform with accommodation." Do you --
A. Yes, yes.

Page 164

Q. And these interviews, these two so far, you told the interviewers that you did not need any accommodation to perform all the duties of the job, right?
A. That is correct.
Q. On or about January 11, 2024, do you recall interviewing for the Specialist Bureau Chief position.
A. Yes.
Q. Vanessa was ultimately chosen for that position, right?
A. Yes.
Q. That would have been the position that was vacated by Natalie leaving to take Valerie's old job, right?
A. Yes, yes. Can I...
MR. LOMAN: Want to take a break, of course.
(Recess at 4:16 p.m. to 4:24 p.m.)
MS. BURKE: Ready to go.
A. Yes.
Q. I'm going to hand you Exhibit 22. When we broke we were just starting to discuss the bureau chief position that you interviewed for, and I've got January 11, 2024. Does that sound about right?
A. Yes.
Q. Do you recall the interviewers being Chris Lee, Jennifer Catechis and Natalie Martinez?
A. Who?

Page 165

Q. Chris Lee.
A. Oh, Chris Lee, yes.
Q. Jennifer Catechis and Natalie Martinez. Does that sound right?
A. Yeah, yeah.
Q. And those would have been the three to decide who was selected for this position, right?
A. That was the panel, yes.
Q. And you understand they selected Vanessa LeBlanc.
A. Yes.
Q. Right? Do you believe they selected her because of the illegal discrimination based on age or medical condition?
A. I believe that's the person they selected.
Q. Do you believe that they selected her, Chris, Jennifer and Natalie, they selected Vanessa instead of you because of age or medical condition discrimination?
A. I believe those could have been factors, my age and my medical condition.
Q. You don't have any evidence of that, though, other than you did not get the job, right? That someone else got the job.
A. Correct.
Q. These again are the interviewers notes from your interview. Flip to page 9735. Are you there?
A. Yes.

Page 166

Q. You were asked if you could perform these duties with or without accommodation and you said without, correct?
A. Yes.
Q. The next interviewer on Page 9738 records the same answer that said you could perform the duties without accommodation, right?
A. Yes.
Q. And again on Page 9741, records the same answer?
A. Yes.
Q. And this is for the bureau chief job. I think you said that office is right across the hall from yours? I think I heard you say Vanessa's office, is it right across the hall from yours?
A. No, she is down the hall from me.
Q. Down the hall, okay.
A. Down the hall.
Q. But in the same office?
A. Yes.
Q. This is Exhibit 23. Again, these documents are marked confidential and you are not to discuss them outside of this deposition. This is Valerie LeBlanc's, her application for this bureau chief job. It states on the first page of Exhibit 23 she was the IT Procurement Specialist since October of 2017. Do you see that?
A. On the first page?

Page 167

Q. Uh-huh.
A. Yes.
Q. And it goes through all of what that entailed. If you flip to 9165, according to this Vanessa had been a Procurement Officer A from 2015 to 2017 with the State Purchasing Division, right?
A. Yes.
Q. And if you flip to page 9168, from 2014 to 2015 she was a Purchasing Officer O with the State Purchasing Division. Do you see that?
A. Yes.
Q. Page 9171, Vanessa was a Purchasing Officer B with New Mexico State Purchasing from 2013 to 2014. Do you see that?
A. There she is.
Q. Page 9171?
A. Yes.
Q. Page 9172, 2010 to 2013 she was an Associate Buyer with New Mexico State purchasing. Do you see that?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Do you agree?
A. I'm sorry, yes.
Q. Would you agree with me that Ms. LeBlanc had been working in purchasing for the state government since 2010 until the time that you both applied for this bureau chief position?

Page 168

A. Yes.
Q. Based on that do you think that she was selected for that position because of age discrimination or medical condition discrimination?
A. That could have been a factor.
Q. What is your current pay band?
A. 75.
Q. And do you know what her pay band was as an IT Procurement Specialist? You applied for that job, right? Do you know what that pay band is?
A. It is an 85. I assume that she was an 85 when she became Strategic Sourcing Bureau Chief. We had a reclassification.
Q. I wasn't asking about bureau chief. I was asking if your knew what her pay band was an IT Procurement Specialist?
A. I don't know what her pay band was.
Q. You believe it was 85?
A. I believe it was an 85.
Q. Do you think that might factor into their decision of who to promote if one person is already at a higher level versus someone who's at a lower level?
A. It could be a factor. I wasn't on the hiring panel.

Page 169

Q. If that was a factor they considered that would have nothing to do with your age or medical condition, right?
A. No.
Q. Let's see, the next one I have, in February of 2024 you applied for the IT Procurement Specialist. Does that sound right?
A. Yes.
Q. And I believe you interviewed with Michael Saavedra, Francine Wagner and Ray Maestas.
A. Yes.
Q. Is Francine Wagner now Francine Martinez?
A. Yes, she is.
Q. We're going to see that name a bit, want to make sure we agree that's the same person. Do you know who was selected for that position?
A. I believe that is the one that Andric -- his last name escapes me right now.
Q. I think this one, I believe Yuli was selected.
A. Oh, Yuli was selected for this one, okay. Yuliastuti.
Q. Sure.
A. Sure.
Q. I will let you...
A. Do you need me to spell that?
Q. It sounds good when you say it.

Page 170

A. It's really pretty when she says it.
Q. I'm sure. She goes by Yuli, I imagine.
A. Yes, we call her Yuli, because it's way shorter and easier.
Q. This will be Exhibit 24. Your interview notes from your interview panel for this IT Procurement Specialist job, I believe your interview took place on March 8, 2024. Does that sound right to you?
A. Yeah.
Q. Do you recall being in the interview with Michael, Francine and Ray?
A. Sure, yes.
Q. Are these in person?
A. Yes.
Q. Do you recall telling them that you had very little experience with IT?
A. I believe I told them that I had very little to no experience with IT procurements, yes.
Q. I'm on Page 9218, these are Michael Saavedra's notes. It sounds like you said you have a little experience with IT regs. Do you recall having that discussion?
A. IT regs?
Q. Uh-huh. That's what it looks like to me. I'm asking you if you remember discussing this in the interview?
A. Oh, requirements, I think. Reqs.

Page 171

Q. Go to page 9222. These are Francine's notes from the same interview. Number 1, she wrote down that you said, "very little experience with IT requirements and specific requirements." Do you see that?
A. Yes.
Q. Do you agree that's a fair record of what you said during the interview?
A. Yes.
Q. Flipping a few pages to 9224, you were asked, "are you able to perform the position with or without an accommodation," and you said, "either way, yes." Do you remember that?
A. Yes.
Q. You agree that you said that?
A. Yes.
Q. Or something like that.
A. Something like that, yes.
Q. Page 9226, Ray Maestas wrote down that you said you had very little experience regarding IT procurements, has limited experience with amendments. Do you agree that you said something to that effect?
A. Including IT specific amendments, yes.
Q. Do you know anything about Yuli's experience with IT?
A. I know a little bit. I think she told me that

Page 172

before she started to work at the state she was working maybe for an IT provider of some type. I don't remember if it was like a service provider or a help desk-type thing, but she did have some direct IT experience, from what I remember.
Q. If these three interviewers factored that into the decision to hire her instead of you, that wouldn't have anything to do with age or medical condition, would it?
A. It would not.
Q. Exhibit 25. Again, this is a confidential document, you are not to share it or discuss it outside of this deposition. According to this on the first page, Yuli started with State Purchasing in January of 2022. Do you see that under work experience?
A. Oh, there it is, yes.
Q. I'm sorry, in that current position. Prior to that, going to the next page, 9245, from 2017 to 2022 she was an Executive Procurement Officer. Do you see that?
A. Yes.
Q. Still on Page 9245, under description, she says that she had experience working with agencies to define procurement needs and develop specifications for various commodities, including IT-related goods and services, right? Do you see that?
A. No. Where do you see that?
Q. Are you on Page 9245?

Page 173

A. 9245. Are you at the top?
Q. So you see bold letters in the middle of the page, it says country code?
A. Uh-huh.
Q. Go down from that a couple of sentences.
A. Uh-huh.
Q. Do you see that?
A. Including Invitation To Bid, ITB.
Q. No, the next line.
A. Oh, right there, IT-related goods and services.
Q. Do you have any reason to dispute what Yuli is stating here, that she had experience with IT procurements?
A. No, I'm not disputing what she says in her resume.
Q. And she had been doing procurement with the state longer than you have, right? It looks like she started in 2017.
A. No.
Q. You weren't doing procurements in 2017 were you? You were still...
A. I was doing compliance.
Q. Right. This morning --
A. I started doing the procurement in '18.
Q. This morning you said that you started doing kind of part-time procurement amendments in 2018, became a full-time procurement officer in 2020, correct?

Page 182

A. At ATA, yes, uh-huh.
Q. And you started doing part-time procurement work on the side in 2018 when you were a compliance officer, right?
A. Yes.
Q. Do you have any reason to believe that you have more IT experience or IT procurement experience than Amber Sanchez?
MS. BURKE: Objection, foundation.
MR. LOMAN: I'm asking if she knows.
A. If I know?
Q. Uh-huh.
A. Based on what I'm reading in her resume, I would say I have equally as much if not more, just based on that. I have also done a lot of policies and procedures for IT.
Q. Well, did you tell your interviewers that?
A. Not at the time. I should have.
Q. Is that your interviewers fault, that you didn't tell them all of your relevant experience and the reasons why they should hire you?
MS. BURKE: Objection, form.
A. Is it my interviewers? No, that is not their fault. However, it was on my application.
Q. But if you think that you had now -- you're telling me that you might have had relevant experience that you should have shared with them and did not, that's not their

Page 183

fault, right, that you didn't share that with them?
A. Again, it was on my application. I did not verbalize it to them in the interview.
Q. So I have not met -- well, based on your comment it sounds like you would guess Amber Sanchez is in her 30s or 40s?
A. 30s, definitely 30s. She is not 40 years old.
Q. You know for a fact or are you just guessing from her appearance?
A. Appearance and presentation.
Q. The first one of these positions that you have alleged that you applied for, we talked about it some time ago, but that was the Construction Unit Supervisor job?
A. Yes.
Q. You applied for that in August of 2023, do you remember that? We talked about that.
A. Yes.
Q. Did you apply for any promotions before then?
A. Within GSD?
Q. Uh-huh.
A. I do not believe there have been any promotion opportunities within GSD for which I felt I met requirements.
Q. So the answer would be no, right? Prior to August of 2023 you had not applied for any promotions within GSD?
A. Correct, before I moved to State Purchasing, yes.

Page 184

Q. We talked about your Minimum Wage Act claim and this thing that happened in September of 2024, where you did not have prior approval to flex your time to get your doctor's appointment, right? Remember we talked about that.
A. Yes.
Q. And I just want to be sure we're on the same page, you understood that you must have -- to flex schedule to make up time you must have prior approval, right? You understand that was the policy.
MS. BURKE: Objection, form.
A. I understand that we do have policies in place that say that. I also understand that in general that we can go ahead and -- we have always been able to flex our time to do that.
Q. As long as you get approval from your supervisor first, right?
A. Yes, and that can be verbal, that has also been understood.
Q. Handing you Exhibit 31. Do you recall in February of 2024 having an exchange with Vanessa about needing to get prior approval if you're going to flex your time or change your lunch hour?
A. Give me a moment to look at this, please. So, yes, here we do have clear direction from the Vanessa on exactly what she needs in terms of flex time.

Page 185

Q. And it had also been explained to you before then that the reason they need to be mindful of flex time and needing employees get prior approval is because it's an FLSA issue, right? In other words, if you work past five but you don't have approval to work past five, even if you started later in the day, it was explained to you that that could be an issue with FLSA, do you remember that?
A. I don't --
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer. You don't remember that?
A. I don't remember that ever coming up into the discussion, no.
Q. We're on Exhibit 32. This is an email exchange between you and Natalie and Valerie from March of 2023. On the second page of this exhibit, on March 24th at 9:11 a.m. Do you see that?
A. 9:11 a.m., yes.
Q. Natalie says, "good morning, Kim. I haven't seen response to email." She says, "it looks like you were working after 5 p.m. yesterday, as you do quite often. Please remember, as we mentioned to you before, any time worked after 5 p.m. cannot be compensated unless you make prior arrangements," right?
A. Yes, that is what it says.

Q. And then there's some back and forth. And then Valerie says, back on the first page of this exhibit, Valerie says, "Kim, the reason I address the time is you are FLSA covered and any time you are beyond five becomes an FLSA issue." Do you remember having this exchange now with Valerie and Natalie?
A. Specifically, no, but obviously I had it, because...
Q. And then you said, "okay, thanks."
A. I said, "okay."
Q. When you were still working at home in July of 2023, do you recall having an exchange with Natalie and Valerie about you taking personal calls while working from home during the day? Doesn't ring a bell? So this is Exhibit 33.
MR. LOMAN: I don't think I have a third copy, Heather, I'm sorry.
MS. BURKE: Okay.
MR. LOMAN: Yes, I do, it's right here.
Q. This is Exhibit 33. So here we are in July of 2023. Do you recall having this exchange now, with your supervisors?
A. This specific exchange, no. However, I don't dispute it.
Q. Earlier today you said you kept a log of the time -- did you call it a headache log, is that your phrase or is that something I made up?



A. I believe I might have called it a headache log, yes.
Q. I'm going to hand you Exhibit 34. These were the documents that were produced to us in discovery. Is this the log you were referring to?
A. Minus the medical comments.
MS. BURKE: The notes you made for me we talked about earlier, right?
THE DEPONENT: Yeah.
MS. BURKE: Yes, that's what...
THE DEPONENT: Yes.
Q. Let me make sure I understand what's going on here. So you created a spreadsheet tracking your time on these days, I understand, but it sounds like you also added in some medical notes?
A. Yes, there's medical notes in there.
Q. Are you and Ms. Burke telling me that those notes are attorney/client privilege?
MS. BURKE: Those are the notes to describe to me what those mean, right.
Q. Would those notes also be helpful for me to understand what these mean or to help the jury understand what they mean?
A. I really don't -- most of the notes are going to read something along the lines of, woke at 3 a.m., typical



migraine, crown pain, nausea, took Ondansetron for nausea, took Imitrex at nasal. So it's going to be, it's going to be very -- I don't know how helpful it's going to be for a jury.
Q. Well, all I'm trying to understand is whether --
A. It's going to describe symptoms.
Q. What I'm trying to understand is whether you made those notes for your attorney or whether you were making notes for your doctor or for your own notes to try to understand why you were having -- it looks like, trying to find what triggers your headaches or something like that.
A. They were made for my medical provider.
MR. LOMAN: All right. I do not want to get into attorney/client privilege issues here, but I'm also looking at a lot of numbers here in a vacuum and I suppose this is something we can address later.
MS. BURKE: Yes, that's fine.
MR. LOMAN: Okay.
Q. Tell me then, Ms. Hunt-Brown, to the best of your recollection without -- if you had those notes included here would it help you explain why you had six hours here or five hours there, et cetera?
A. Essentially what this is -- obviously the date. Hours off is the number of hours that I took off for the day. Available hours would be that, depending on how soon the migraine medication works and I am at a point where I feel as



though I can now drive, I can now function to do the essential functions of my job, those being sitting behind a computer and typing.
Q. So, for example, if I understand what you're saying, on August 16, 2023 you took off a full day of FMLA leave, right?
A. Uh-huh.
Q. But you could have worked six hours that day.
A. Yes.
Q. If you were permitted to work from home.
A. Yes.
Q. Is that what you're saying.
A. That I was unable to drive myself; however --
Q. I understand.
A. However, I could work. I could sit in an upright position.
Q. I understand. Does this mean that by 10 a.m. on August 16th, your symptoms had passed and you were able to sit at a desk and work?
A. Yes, I assume that is what that note in there says. By 10 p.m. I am now feeling as though I am capable of working.
Q. But not driving?
A. Not driving.
Q. Has a doctor told you that you can't drive for a

Page 190

period of time after taking these medicines or is this just a conclusion you've come to on your own based on your own symptoms?
MS. BURKE: Objection, form.
MR. LOMAN: You can answer.
A. If I don't know, when I reach for something, where something on the other end of my hand is, if I have no depth perception, I don't need a doctor to tell me that I cannot be safe to drive.
Q. And that's what I'm asking, okay.
A. Right. I don't need a doctor to tell me that.
Q. On September 7th, 2023, for example, you took a full day off, eight hours of FMLA leave, but it sounds like that was probably more severe episode and you would not have been able to work at all that day.
A. Yes, yes, because that has a zero. That was evidently a really bad one.
Q. And all of these are assuming that you are permitted to start work at 8 and end work at 5 p.m., right?
A. I would have been basing all of these numbers on an 8 to 5 workday, yes.
Q. For example, on February 26, 2024, you took a full day off, but said you were available to work four hours. Do I take that to mean that by 1 p.m. that day you think you could have been working and work from 1 to 5?

Page 191

A. Yes, yes.
Q. What is the color coding in the date column? What do the different colors mean?
A. There's a change in, I believe in pay, at that point, and I think that's what the color coding is indicating in the spreadsheet.
Q. And it changes again on the second page, it changes a few times. So does that --
A. Yes.
Q. Does that help jog your memory?
A. Yes. There was a reclassification starting at 12/4/23, we had a reclassification go into effect, 12/4/23 on Page 981, that's the light blue. And then I believe -- and again, without the -- because -- without referring to the whole log, there's some kind of little code at the bottom that I put in there that speaks to that.
Q. But all these days listed on the spreadsheet are days that you took off for FMLA; is that right?
A. Yes, yes.
Q. A few weeks ago you, in working with your attorney, put together responses to another round of written discovery requests, right?
A. (Nonverbal response)
Q. And one of my questions was, ask you to calculate your damages as a result of the alleged interference with

Page 192

FMLA leave as described and alleged in your complaint. The number you gave was $14,605.52, which is very specific. So tell me, how was that calculated?
A. Part of that was calculated on this log.
Q. That's what I figured.
A. Right, right, so that's where you get kind of a weird number in there.
Q. Do I understand that you took the available hours from the spreadsheet and multiplied them by whatever your hourly rate was at the time?
A. Yes, that's part of the way that was being calculated, along with, I believe, adding in the calculation for the hours lost for the wage discrimination claim.
Q. You mean the minimum wage claim?
A. The wage act, sorry.
Q. And for that we're talking about half an hour or so of damages; is that correct?
A. I had looked at the Share log at that point, so whatever that Share log had said on the hours and the hours that I had to take unpaid.
MS. BURKE: Eric, I think we're out of time, just so you now. We're at seven hours.
MR. LOMAN: And we can call it a day, but I'm not done.
MS. BURKE: You get seven hours for a plaintiff, you

Page 193

know that.
MR. LOMAN: For a party?
MS. BURKE: Yes, seven hours is your max for a party.
MR. LOMAN: I'll have to take a look at the scheduling. Are you terminating this deposition then at this moment?
MS. BURKE: I'll let you finish up with this, but we should call it a day after that. I mean, we've been here seven hours. I think over seven hours by this point if we were 6 hours and 48 minutes at 5:10 and it's 5:30 now, right?
Q. In your Complaint you state that you worked a full eight hours on September 6, 2024 and you say you were not paid for all those hours worked on September 6th.
A. Correct.
Q. Correct?
A. Correct.
Q. And when we went through this earlier, you think you were shorted somewhere between 30 minutes and maybe an hour and a half? It's not really clear to me, is that what you're claiming?
A. Again, I said, yeah, I need to look at the Share log to be sure as to how much -- how many hours we were looking at. It wasn't a huge amount of hours, I know that. It's not eight hours. It's not a full day.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CASE NO.: 23-CV-00782 SMD-KK

KIMBERLY HUNT-BROWN, )
)
Plaintiff, )
)
vs. )
)
NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual and official capacities, )
)
Defendants. )

CERTIFIED TRANSCRIPT

VIDEOTAPED DEPOSITION OF EUNICE MOYA 30(B)(6)

Wednesday, July 9, 2025
9:11 a.m.
Cumbre Court Reporting Services, L.L.C.
531 Harkle Road, Suite A
Santa Fe, New Mexico 87505

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this DEPOSITION was:

TAKEN BY: HEATHER BURKE, ESQ.
ATTORNEY FOR PLAINTIFF

REPORTED BY: MAHLIA J. KENDRICK, RPR, CSR, CCR
CALIFORNIA CSR No. 14858
NEW MEXICO CCR No. 631
CUMBRE COURT REPORTING SERVICES, L.L.C.
531 Harkle Road, Suite A
Santa Fe, New Mexico, 87505
(505) 984-2244
cumbrecourt@comcast.net



EXHIBIT B

condition, it's okay if they call in at noon that day?
A. No, that's not -- no.
Q. That's not okay?
A. No, it's not because, I guess, if you -- could you rephrase your question?
Q. When an employee is unable to call in because of their FMLA qualifying condition first thing in the morning but then are able to call in after that period has passed, say, at noon, would that still be within that one to two business days of notice of this policy?
A. That's for the Application of Leave. That's not for invoking Family Medical Leave. This is the procedure when you're applying for leave.
Q. Okay. What's the procedure for when they already have it?
A. I believe that would be in the Attendance and Leave Policy. If they aren't able to invoke FML first thing in the morning because of the onset, whatever their medical situation may be, then as soon as they are able to contact their employee would be sufficient -- employer, your supervisor.
Q. Once that period of incapacitation has passed, you mean?
A. Correct.
Q. Is that covered where it says the Reporting While



on Leave section which is 7.3? And it says, 7.3.2, "Additionally, an employee must give notice as soon as practicable, within two business days if feasible, if the dates of leave change, or are extended, or initially were unknown."
A. Yes.
MS. BURKE: Exhibit 3 is that Attendance and Leave Policy.
MR. LOMAN: Thanks.
(Exhibit 3 was marked for identification.)
BY MS. BURKE:
Q. Is this the policy you just mentioned, Ms. Moya?
A. Yes.
Q. Does this policy include a section for Family Medical Leave?
A. No.
Q. So how does an employee on FMLA leave know what the notice requirements are for their leave?
A. So that would be -- there's not a separate -- for Family Medical Leave there's not something separate, but it would be under Call-In/Early Departures.
Q. What do you mean?
A. The process would be on 6.11.
Q. So how does this 6.11 section give notice to an employee on Family Medical Leave what their notice



requirement is?
A. They would just have to notify their employee that they were going to invoke Family Medical Leave, and that would be 6.11.12. They would notify the reason that they're absent -- going to be absent from work or tardy that day, and they would say they were invoking FML.
Q. Okay. On page 13 of the policy, it's Section 7.3.1, looks like the heading is Call-In/Tardy/Early Departures. It says Employee's Responsibilities; correct?
A. Yes. No later than 30 minutes.
Q. And is that true even when an employee is incapacitated by their FMLA qualifying condition?
A. That would be true in most circumstances unless there was something that prevented them from being able to call in 30 minutes prior to their shift, that they were unable to due to their medical situation.
Q. So what you're saying is if they're able to call in, they still need to call in no later than 30 minutes after their start time; but if they're unable to because of their their FMLA qualifying condition, then GSD extends leeway for that?
A. Yes, based on the situation.
Q. Okay. Here at this section where is says 7.3.1.3, "Notification from an immediate family member or



friend does not constitute proper notification unless, due to exigent circumstances, the employee is unable to contact the supervisor. In such cases, the employee must personally contact their supervisor/manager as soon as possible?"
Why does GSD consider notification from a family member not proper notification?
A. Because unless the employee wasn't able to contact them on their own, it's their responsibility to notify the supervisor. It's not the responsibility of an immediate family member or friend.
Q. If the employee is taking FMLA leave, is that different?
A. It depends on the situation, on the condition; every condition is different. So it would just depend on that condition, that the employee wasn't able to reach out to the supervisor or the manager on their own.
And, you know, if there was an issue that prevented them from calling in on their own and a family member called in and after that family member called in, if the employee was able to talk to the supervisor, I guess, they could explain the reason but...
Q. Is not allowing an immediate family member to give notice when an employee is taking FMLA leave consistent with what's required under the Family Medical

(Exhibit 9 was marked for identification.)
A. Yes.
Q. And on March 26th the end of that text says, "Mom is still alive"?
A. Yes.
Q. Because Ms. Hunt-Brown's mother was dying during this period; correct?
MR. LOMAN: Same continuing objection.
THE WITNESS: I don't recall when she was.
BY MS. BURKE:
Q. Does this text message to Ms. LeBlanc communicate whether or not Ms. Hunt-Brown's mother is alive?
A. Yes.
Q. Is it GSD's testimony here that Ms. Hunt-Brown's doctor would have known that Ms. Hunt-Brown's mother would be dying in March of 2024?
A. I don't know. I don't know how to answer that. I don't know.
MS. BURKE: So Exhibit 10 -- well, actually let's take a break.
MR. PADILLA: We're going off the record. Time is 11:32.
(The deposition was recessed from 11:32 a.m. to 11:39 a.m.).
MR. PADILLA: We're back on the record. Time is



11:40.
BY MS. BURKE:
Q. Okay. Exhibit 10 is a GSD Disability Accommodations Policy. Ms. Moya, are you familiar with this policy?
(Exhibit 10 was marked for identification.)
A. Yes.
Q. What is the purpose of this policy?
A. To assist individuals who need an accommodation.
Q. And who administers this policy?
A. Human Resources.
Q. Is there somebody specific in Human Resources that administers it?
A. Yes. Gloria Quintana.
Q. When did Ms. Quintana start administering this policy?
A. She started administering it in February of 2025, and I administered it prior to that along with Jennifer Morfin.
Q. What did you do to prepare for this topic?
A. I reviewed the policy.
Q. The Disability Accommodations Policy?
A. Yes.
Q. Did you talk to anybody?
A. Yes, to my counsel sitting here with me.



Q. Did you talk to Ms. Quintana?
A. No.
Q. Did you have any meetings with anybody other than counsel?
A. No.
Q. Are there any other policies or practices that GSD follows in relation to disability accommodations?
A. SPO, NMAC, the law, and ADA.
Q. Is this policy consistent with those other things?
A. Yes.
Q. This policy was signed on March -- or sorry, May 3rd, 2016; correct?
A. Yes.
Q. Why are some policies signed by four people and some policies such as this one only signed by two?
A. I do not know.
Q. What is the process that GSD follows when they learn of the need for an accommodation?
A. We provide the individual with the ADA accommodation requests packet.
Q. And then what happens?
A. Then the employee completes the packet. They submit it to HR. Then HR schedules an interactive meeting with the employee and the supervisor.



Q. So the supervisor is always a part of an interactive process meeting?
A. The supervisor or manager, yes.
Q. How is the decision made about who to include in that meeting?
A. If the manager is not available, then the manager -- it's usually the manager. And if the manager is not available, if they were on scheduled leave, then it would be the deputy. And if there's not a deputy, then the Division Director.
Q. When an employee submits their recertification for their need for accommodation, what happens then?
A. HR reviews it. And based on what they're requesting, we will see if we are able to make that accommodation or reasonable accommodations to assist them to perform their essential function.
Q. Does GSD employ medical providers to help it interpret the information they get from the employee's medical provider?
A. If there was a need, we could, but we have not.
Q. What about an occupational specialist to determine what accommodations would be effective?
A. Yes, so we have -- in Risk Management, we have our -- I forgot their name with the bureau, but it's ADR.
Q. What does that stand for?

Page 74

A. Alternative Dispute Resolution.
Q. And what do they do?
A. They provide trainings and like ergonomic assessments for occupational needs.
Q. So does that mean that ADR department is involved in a request for accommodation?
A. No. If the employee requests an ergonomic assessment of their workstation, at that time is when we would get ADR involved.
Q. Okay. And if the request isn't an ergonomic issue, are there other occupational specialists that GSD employs to help?
A. We usually use Ask JAN, provides a lot of information. They provide a lot of tools to help with the ADA process.
Q. What kind of training does GSD provide for its Human Resources staff for accommodations requests?
A. So Workforce Solutions provides ADA training. I believe it's every quarter, and it's an option of either being in person or join through Zoom.
Q. Does GSD require employees to take that training?
A. Yes.
Q. How often?
A. Every session that they offer.
Q. So every quarter?

Page 75

A. Yes. So it's different topics.
Q. Okay.
A. Different topics related to ADA.
Q. And does that training teach GSD's HR employees how to process a request for accommodation?
A. Yes. They provide you with the tools. And then GSD, we also provide training. I provided training to Gloria, and I was provided training from the State Personnel Office to administer ADA when I was employed with PED and then also again at SPO.
Q. And does that teach you how to know whether or not an accommodation will be appropriate for a specific disability?
A. Yes.
Q. How so?
A. So it takes you through all of the procedures. It gives you different examples of accommodations and how to administer, how to review the different forms. When you go to Ask JAN, it gives you alternative accommodations or recommended accommodations.
BY MS. BURKE:
Q. On page 4 of Exhibit 10, the top of the page, it says, "After receiving a request for accommodation, management and HRB will communicate with the employee to determine the scope of the disability and explore

Page 76

reasonable accommodations that will allow the employee to perform the essential job functions."
Is that correct?
A. Yes.
Q. How does the employee get trained to know what accommodations would help with performance of essential job functions?
A. An employee -- we don't provide training on ADA to employees that I'm aware of.
Q. Okay. What about HR staff?
A. It would be what I had mentioned earlier is that we go through the training through Workforce Solutions; and we are provided the tools like updated forms, what to look for, different resources. Ask JAN is the big one.
Q. Does Exhibit 10 list reasons that GSD would deny reasonable accommodations?
A. If it imposes an undue hardship to the department.
Q. What is the definition of "undue hardship?"
A. If it's not financially feasible to provide that reasonable accommodation or if it would create some type of interference in the day-to-day operations of the department.
Q. What's an example of interference of operations?
A. I'm sorry, ma'am. Let me think.

Page 77

If it interferes with the needs of the agency by providing any type of support to our customers, our constituents, other State agencies.
Q. Who makes that determination?
A. Who makes the determination of what? Of the undue hardship?
Q. Of whether it's interfering with business processes.
A. It would be on each individual accommodation, each assessment based on the position that they're performing, based on the accommodation. It would just depend on what that accommodation request was.
Q. Okay. But who decides if it's an undue hardship?
A. If we're not providing services to the agency, that would be probably the Cabinet Secretary.
Q. So the Cabinet Secretary decides each accommodation request?
A. No, it does not. They do not.
Q. So who decides whether to accommodate an employee?
A. HR and the manager if we're able to provide an accommodation based on what the accommodation need is.
Q. Okay. So who's making the decision?
A. HR and the manager.
Q. Which manager? The direct manager of the

Page 82

requested a Telework accommodation, which was back in January, because all employees were -- all classified employees were required to report back to work in February. She provided an ADA accommodation.

The interactive meeting was going to let her know that we would -- there was no longer a Telework in place, so she would need to report to work in the office. And we were going to talk about alternative accommodations when she reported back to work.

Q. So after you denied the accommodation, you were going to talk about other accommodations?

MR. LOMAN: Object to form.

THE WITNESS: I did not deny the accommodation. I let her know that she had to report back to work, and we will make alternative accommodations. That whole meeting was to inform her that the Telework Policy was rescinded, and therefore, she was going to have to report back to work on August 3rd.

And during that meeting we were -- I wanted to talk about other alternative recommendations that we could provide for her or if she had any other accommodations that we could reasonably assist her with when she returned back to work.

BY MS. BURKE:

Q. Okay. When you sent the e-mail in Exhibit 11,

Page 83

you hadn't had any interactive process meeting yet?

A. No.

Q. But you said GSD is unable to accommodate your Telework schedule due to the rescission of the Non-Mandatory Telework Policy; correct?

A. Yes.

Q. So before engaging in the interactive process, the previous accommodation was denied; correct?

MR. LOMAN: Object to form.

THE WITNESS: It was rescinded, correct.

BY MS. BURKE:

Q. No. The accommodation was denied.

A. It was rescinded.

Q. What was rescinded?

A. The Telework.

Q. Okay. What does that have to do Ms. Hunt-Brown's accommodation?

A. We were informing her that we could not accommodate the Telework anymore because all employees needed to report back to work because of the rescission of the Telework agreement.

Q. What was the purpose of the Telework agreement?

A. The Telework was -- it allowed people during the COVID Pandemic to work from home.

MR. LOMAN: I hate when I do that.

Page 84

MS. BURKE: Sorry.

BY MS. BURKE:

Q. Okay. But it was for everybody; right?

A. Yes.

Q. Not just disabled employees; correct?

A. It was for everybody, every classified employee and anybody under the Governor's administration.

Q. Exhibit 13 is the General Services Department's Non-Mandatory Telework Policy. Is this the policy that you're talking about?

(Exhibit 13 was marked for identification.)

A. Yes.

Q. On page 5 of this policy in Section 4.1.4, it says, "Requests for leave under the Family and Medical Leave Act or reasonable accommodations under the American's With Disabilities Act, as amended, are not governed by this policy."

Correct?

A. Yes.

Q. And it says, "Such requests are governed by the General Services FMLA Policy and ADA policy, respectively."

Correct?

A. Uh-huh.

Q. So why was Ms. Hunt-Brown's accommodation denied

Page 85

based on a policy that didn't apply to her accommodation?

A. It's GSD's stance that an essential function of the job is to be in an office setting on GSD premises, and that's the reason. Telework no longer existed, so therefore, the essential function would be based off of the work at the office setting environment.

Q. So GSD believed that the accomodation of Telework no longer existed after the Telework Policy was rescinded?

A. Yes.

Q. Why would an accommodation be affected by the policy that doesn't apply to accommodations?

A. So it's GSD's stance that the essential function of the job is to perform the duties of the position in an office environment at GSD.

Q. For all disabled employees?

A. For all employees.

Q. And where does it say that on Exhibit 11?

A. Where does it say?

Q. That an essential function of Ms. Hunt-Brown's position is --

A. It doesn't say that it's an essential function, but it states, "You accepted a position located in Santa Fe, New Mexico; therefore, you're required to report to your office located at 1100 South St. Francis Drive on Thursday, August 3rd."

Page 86

Q. Ms. Hunt-Brown accepted that position in 2017; correct?
A. Yes.
Q. And Ms. Hunt-Brown had been working -- Teleworking for three years by this point; is that correct?
When did GSD employees start Teleworking during the COVID Pandemic?
A. I do not know. I was not a classified employee during this implementation of this the policy.
Q. Okay. But Ms. Hunt-Brown had been accommodated and working from home since January, you said; correct?
A. She requested a Telework accommodation in January. Yes, in January.
Q. Okay. And she worked from January to the beginning of August in her position; correct?
A. Yes.
Q. And so Ms. Hunt-Brown was told to return to the office because of the rescission of the Non-Mandatory Telework Policy, not because there was anything that wasn't happening because of her job duties; correct?
A. It was because of the rescission.
Q. In the Exhibit 10, the background of the policy on page 2 says, "GSD complies with the ADA, as amended by the ADAAA, and all applicable State and local fair

Page 87

employment practices laws, and it committed to providing equal employment opportunities to qualified individuals with disabilities. Consistent with this commitment, GSD will provide reasonable accommodations to disabled applicants and employees if the reasonable accommodation would allow the individual to perform the essential functions of the position, unless doing so would create an undue hardship."
Correct?
A. Yes.
Q. What hardship is created by Ms. Hunt-Brown Teleworking?
A. The supervision within -- by her not having a -- by her not being supervised in person.
Q. Why is that an undue hardship?
A. Because it would not -- because to effectively supervise the staff, the supervisor needs to be able to supervise them in person. By allowing Ms. Hunt-Brown to Telework, there would be no adequate supervision of her job duties, her job functions.
And it's the stance of GSD that all essential functions are performed in the office, in an office setting because we provide services to the public, to other State agencies; and those need to be done in the office.

Page 88

Q. Ms. Hunt-Brown at this point had been Teleworking for three years; correct?
A. I don't know what the onset of employees starting to Telework, but yes. And there were issues that I am aware of that were performance issues and that was when I first started with GSD.
Valerie Paulk along with Natalie Martinez contacted me informing me that Ms. Hunt-Brown would invoke Family Medical Leave which she is allowed to do during the eight-hour period. At the onset of -- I believe at that time it was the onset of a migraine, but then she would be okay. She would say, "I'll log on when I feel better."
Ms. Hunt-Brown started logging on after 5:00 o'clock in the evening, and she was setting her own office hours not within the alternative work schedule which would still have applied during that time frame, even though there was Telework which is you can't begin your workday before 7:00 A.M. or after 6:00 P.M.
And so I don't -- I believe her schedule workday was 8:00 to 5:00, so she was logging on after 5:00 o'clock and working until hours in the morning. They were receiving e-mails between 5:00 and after 5:00 P.M. and midnight. And there were procurements that weren't being processed on time, so there were issues with performance.
Q. So for three years -- over three years she didn't

Page 89

have adequate supervision?
A. So for over three years she wasn't performing -- she was creating her own work schedules.
Q. And how does working in person in the office prevent Ms. Hunt-Brown from working after 5:00 P.M.?
A. Because all hours after 5:00 P.M. have to be preapproved, and she was not getting preapproval to work outside of -- she didn't have an alternative work schedule. She wasn't -- she didn't have preapproval to work outside of that scope from 5:00 to 6:00 P.M.
Q. Okay. So how does that -- how does working in person stop her from working from 5:00 to 6:00 P.M.?
A. She would have to preapproval. She's not following procedure.
Q. Does somebody come and escort Ms. Hunt-Brown from her office at 5:01 P.M.?
A. No.
Q. So Ms. Hunt-Brown can continue to work after 5:00 P.M. physically in the office; correct?
A. You're right.
Q. So not allowing Ms. Hunt-Brown to Telework doesn't change her working after 5:00 P.M.; correct?
A. Correct.
Q. You said a minute ago that Ms. Hunt-Brown didn't ever submit another request for full-time Telework after

Page 90

July 28th; correct?
A. No, I didn't say that.
Q. Okay. Did Ms. Hunt-Brown submit a request for full-time Telework?
A. Yes.
Q. When?
A. I believe it was in July.
Q. When in July?
A. Off the top of my head, I don't know. The later part.
Q. So Exhibit 11, at the bottom, she says that she wants to submit a new set of ADA paperwork; correct?
A. Yes.
Q. So is that the one that you're talking about, or was there another paperwork that she --
A. That might have been August. I don't recall the dates. I'm sorry.
Q. Okay. Exhibit 14 is an Accommodation Request Form submitted by Ms. Hunt-Brown. The date is August 4th, 2023; is that correct?
(Exhibit 14 was marked for identification.)
A. Yes.
Q. Does this accommodation request involve full-time Telework?
A. No.

Page 91

Q. Was this accommodation request granted?
A. No.
Q. Why not?
A. Because there's no -- we did not have Telework. Telework was not -- we did not have the policy of Telework in place. They were expected to perform their work in the office.
Q. So as we discussed in Exhibit 13, the Telework Policy doesn't apply to accommodations; correct?
A. Correct.
Q. So why would whether or not you had that policy control in your decision to grant Ms. Hunt-Brown's requested accommodations?
A. Because performing an essential function is within an office setting in the State-owned building, wherever her office was located or any employee's office was located.
Q. And where is that communicated to Ms. Hunt-Brown?
A. It would have probably been in that same -- other letter that I sent her that same day.
Q. Now looking at Exhibit 10, Disability Accommodation Policy, does it state in this policy that Telework is not allowed as an accommodation?
A. It doesn't say that, but at this point in time -- and I don't know, but I'm just assuming that in 2016

Page 92

Telework was not even on the radar, as that there was no -- Telework did not exist prior to when it went into effect during the COVID Pandemic.
Q. You don't think anyone was able to Telework prior to 2016?
A. I don't know. I don't know. For the agencies that I worked at, the answer would be no, but I don't know what GSD was doing at that time.
Q. If GSD's policy is that every GSD employee has in-person work as an essential function, wouldn't that have to be in this Disabilities Accommodations Policy?
MR. LOMAN: Form. Foundation.
THE WITNESS: I don't know.
BY MS. BURKE:
Q. So Topic 1-G is "Defendant's reasons for not providing Telework as an accommodation and when and why the policy change occurred."
MR. LOMAN: On F, you mean?
MS. BURKE: Oh, yeah. I must have accidentally hit enter on this version.
BY MS. BURKE:
Q. So why -- if the policy change happened at some point since 2016, when did it happen?
MR. LOMAN: Objection to form and foundation.
You can answer.

Page 93

THE WITNESS: There hasn't been a policy change to the ADA.
BY MS. BURKE:
Q. Because the ADA still recognizes Telework as an accommodation; correct?
MR. LOMAN: Object to form and foundation.
BY MS. BURKE:
Q. Go ahead and answer.
A. Yes.
Q. And it's GSD's own policy that Telework is not an accommodation?
A. It's GSD's stance that employees -- an essential function of the job is to perform work in the office setting within a GSD facility or a State-owned facility or a State facility.
Q. And so that means GSD believes no employee can ever Telework in performance of their job?
A. Yes.
Q. So that means no working from other State buildings; correct?
A. From other State buildings? You can work from other State buildings.
Q. Isn't that Telework?
A. You can work from other State buildings.
Q. So why can you work from other State buildings

Page 98

Exhibit Number 15 is another letter sent August 4th, 2023, by Eunice Moya to Kimberly Hunt-Brown. Is this the letter that you were talking about?

A. Yes.

Q. Do you need to take a moment to review it?

A. Yes.

(Exhibit 15 was marked for identification.)

BY MS. BURKE:

Q. Was this letter issued in response to the request for accommodation that is Exhibit 14?

A. Yes.

Q. And that's different than the accommodation that was denied in Exhibit 12; correct?

A. Yes.

Q. Okay. But both letters were issued the same day; correct?

A. Yes.

Q. Why is that?

A. So one letter was issued based on the original request which was in January, and then this one was based after we had the -- I can't remember if I received it before or after our inactive meeting, but it was denied after that.

Q. Exhibit 12 is also dated the 4th; correct?

A. Yes.

Page 99

Q. So you denied Ms. Hunt-Brown's request for accommodation the very same day she submitted?

A. Yes.

Q. Why?

A. I had spoke with her, and I let her know that GSD did not have a Telework Policy, so I was going to deny this request. And if she wanted to provide or talk about alternative accommodations that we could go over those. And I never received -- I don't believe I ever received anything after this.

Q. Isn't that what you said the interactive process meeting was for?

A. Yes.

Q. But you hadn't discussed alternative accommodations?

A. We discussed -- during the first meeting for that original request, we did talk about alternative accommodations.

Q. For the previous request?

A. For the previous request. This was in regards to the onset of a migraine.

Q. Okay. And we discussed the onset of the migraine in that interactive process meeting, though; correct?

A. Yes.

Q. What was your process in denying the

Page 100

accommodation once you received the doctor's recommendation?

A. We didn't have an interactive meeting because it was already -- we had already discussed most of the accommodations that we would be able to provide in the office, and this was also brought up.

The interactive meeting, as I recall, wasn't very productive because it was back and forth between you and your client. I don't believe that you were on the same page, and I just didn't feel like it was very productive.

And I think at one point Ms. Hunt-Brown just said I'll report to work on -- I'll report to work on Tuesday or Monday, whenever. On Thursday, August 3rd, she said she would report to work.

Q. So she had already reported to work before she received notice of either denial of accommodation?

A. No. Let me see. We had the meeting, and that was -- the meeting was on Friday. Wait. Let me look at these again. I can't recall. I don't recall what day we met.

Yes, we met on the 31st. And then she said she would report to work on the 3rd, so I sent it out after that date.

Q. So she didn't know yet that you were going to deny her request -- her second request for accommodation?

Page 101

A. I spoke with her on August 4th, I believe.

Q. Now, the letter that's Exhibit 12 discusses the accommodation for a different condition; correct?

A. Uh-huh.

Q. And that was because Ms. Hunt-Brown was high risk for COVID?

A. Yes.

Q. And then the letter in Exhibit 15 shows that Ms. Hunt-Brown requested an accommodation for part-time Telework for a migraine; correct?

A. Correct.

Q. Looking at Exhibit 10 on page 4, 7.3.1, it says, "GSD makes determinations about reasonable accommodations on a case-by case basis."

In both of these cases in Exhibit 12 and 15, Ms. Hunt-Brown was denied an accommodation; correct?

A. Yes.

Q. And in both cases the reason for the denial of accommodation was the rescission of the Non-Mandatory Telework Policy?

A. Yes.

Q. So how is that a case-by-case basis if the reason for denial doesn't have anything to do with what the disability is?

A. The denial was based on that an essential

function of the job is to perform work in an office setting. GSD does not recognize Telework as an accommodation.

Q. Where on Exhibit 15 does it tell Ms. Hunt-Brown that her accommodation request is being denied because she has to work in person as an essential function?

A. It doesn't. I informed her it was due to the rescission of the Non-Mandatory Telework Policy.

Q. So the reason that GSD gave Ms. Hunt-Brown didn't have anything to do with essential functions, did it?

A. It had to do with the Non-Mandatory Telework Policy that was not in place.

Q. And that's the one we've discussed already that says it doesn't have anything to do with ADA accommodations; correct?

A. Yes. And I stated that it was GSD's stance that Telework is not an essential function of the job, and so reporting to the office and working in an office environment is an essential function of the job.

Q. Where did you say that?

A. I said that, I think, during Exhibit 11.

Q. Where on Exhibit 11?

A. "You accepted a position located in Santa Fe, New Mexico; therefore, you will be required to report to your office located at 1100 South St. Francis Drive."



Q. Does that say "essential function"?

A. No.

Q. So where does it say that it's being denied because there's an essential function of her position to be working in person?

A. I didn't write that anywhere.

Q. Okay. Exhibit 16 is a State of New Mexico Purchasing Agent-Advance (GSD #2964+), position that Ms. Hunt-Brown filled; correct?

(Exhibit 16 was marked for identification.)

A. Yes.

Q. And this opened it on June 22nd, 2017, and closed on July 2nd, 2017; correct?

A. Yes.

Q. Does this job description say that Ms. Hunt-Brown's essential function of her position is to be working in person?

A. "Work is performed in an office setting."

Q. Does that mean that it has to be in the Santa Fe office?

A. It doesn't spell it out, but that's what it means.

Q. How can you tell that's what it means?

A. Because at the time of advertisement, all jobs within -- I'm guessing because this was with the old -- It



wasn't SHARE. It was NEOGOV, I believe.

It was a blanket template for all of the job postings. So prior to that there was no Telework in place before the twenty -- whenever COVID hit, 2021.

Q. Now, the Conditions of Employment say, "Working conditions for individual positions in this classification will vary based on each agency's utilization, essential functions, and the recruitment needs at the time of vacancy is posted."

Correct?

A. Yes.

Q. And the next line says, "All requirements are subject to possible modification to reasonably accommodate individuals with disabilities."

Correct?

A. Possibly, yes. "Possible."

Q. Possible modifications to all requirements?

A. Yes.

Q. Correct. And that means even if being in person were a component of Ms. Hunt-Brown's job, this document tells her that all of those requirements are possible -- are subject to possible modification for reasonable accommodation; correct?

A. Like I said earlier, this is a template that was NEOGOV, and that was the format that the State of



New Mexico used to advertise their positions. So it was just pretty much a cookie cutter for all positions within State Government under the classified section that this is what was used.

So if you needed additional information, it would have been on the Position Action Form or the SDF form, whichever was in use at that point of time in regards to the position, and that's where you would find the essential functions of the job.

And I believe that's where this Condition of Employment comes into where it's based on the position -- on each agency's utilization of the essential functions. So this is just pretty much a template that the agencies used at that point in time. So the essential functions would be on either the SDF or the PARF form.

Q. But the essential functions are just one of the requirements or some of the requirements that are subject to possible modification here; correct?

A. Yes.

Q. So when Ms. Hunt-Brown applied for this position, she could reasonably rely on the information that GSD communicated to her in these other conditions; correct?

A. Yes. It would be based on the Position Action Form. This is just what the working conditions were where work is performed in an office setting. It's very generic

Page 110

condition."

Correct?

(Exhibit 18 was marked for identification.)

A. Yes.

Q. So if somebody later changed this back to FMLA Unpaid on Exhibit 17, would it leave the Absent Without Leave designation there even if there's no hours?

A. That's a good question. I would have to see the full pay period of the time sheet, before and after, before I could answer that question correctly because I don't know how it shows.

Q. Okay. And then Exhibit 17 it shows Ms. Hunt-Brown is otherwise Teleworking that week; correct?

A. Yes.

Q. Exhibit 19 are the associated text messages giving notice of the need for FMLA on that day. The date for some reason got cut off from this top one, but on the second one down you can see March 2nd or the last page is the next day.

(Exhibit 19 was marked for identification.)

MR. LOMAN: I'm going to object to form and scope on this.

MS. BURKE: Okay.

//

Page 111

BY MS. BURKE:

Q. We discussed the Attendance and Leave Policy's prohibition of family members giving notice; correct?

A. Uh-huh.

Q. We can see on the second page it says, "This is Joe, Kim's husband"; correct?

A. Yes.

Q. So why would the notice in Exhibit 19 -- or would the notice in Exhibit 19 be a violation of the Attendance and Leave Policy's notice?

MR. LOMAN: Same objection.

THE WITNESS: I don't know what the situation was at that time. So if she was not -- at the beginning it says she was nauseous with vertigo. "Took meds." I don't know if she was sleeping because of the meds. I don't know.

BY MS. BURKE:

Q. But she did give notice of her need for FMLA; correct?

A. Yes.

Q. Earlier we talked about whether or not somebody who was exercising their need for FMLA would be marked AWOL under the notice policy. Why would somebody trying to take FMLA be marked AWOL?

MR. LOMAN: Same objection.

Page 112

THE WITNESS: According to this text message Valerie asked her if the FML was approved.

"Just confirmed that your FMLA has not been approved. It will have to be regular sick leave."

BY MS. BURKE:

Q. And was Ms. Hunt-Brown's FMLA leave not approved because of a mistake made by the HR Department?

A. Yes, it was.

Q. So she should have been approved for FMLA at that time; correct?

A. Yes.

Q. Exhibit 20 is Defendant GSD's Responses to Plaintiff's Third Interrogatories and Third Requests For Production. On the last page of this exhibit, there's a verification signed by Eunice Moya; correct?

(Exhibit 20 was marked for identification.)

A. Yes.

Q. Are you familiar with these responses?

A. Yes.

Q. In the answers and response to Interrogatory Number 9, Defendant's list several Bates numbers. Exhibit 21 is Bates Numbers 502 through 505, which is one of the Bates numbers listed in Exhibit 20. Where on this document does it state that Ms. Hunt-Brown has an essential in-person function for her job?

Page 113

(Exhibit 21 was marked for identification.)

A. What was your question?

Q. Where on Exhibit 21 does it state that in-person attendance in Santa Fe is an essential function of Ms. Hunt-Brown's position?

A. It doesn't say that.

Q. Nowhere in Exhibit 21?

A. No.

Q. Exhibit 22 is GSD's Code of Conduct. This is referred to in the response to Interrogatory Number 9 as Bates Number 612 through 624. Where in this Code of Conduct does it State that Ms. Hunt-Brown's position has an essential function of in-person attendance at the Santa Fe office?

(Exhibit 22 was marked for identification.)

A. 7.2.1. "Employee shall report to work on time, each scheduled workday or otherwise comply with the Department's policies and procedure regarding timekeeping...."

"Employees shall report to work able to perform essential job functions and meet applicable qualitative and quantitative standards for their jobs. Reporting to work unable to perform these essential functions...."

Q. And that was seven point --

A. 7.2.1 and 7.2.2.

Page 114

Q. Does it say "in person"?
A. It does not say "in person."
Q. And the time that was recorded by Ms. Hunt-Brown in Exhibit 17 as Telework wasn't in violation of the Code of Conduct; correct?
A. One more time.
Q. The Teleworking time recorded by Ms. Hunt-Brown in Exhibit 17 was not time worked in violation of the Code of Conduct; correct?
A. Correct.
Q. Exhibit 23. Exhibit 23 is GSD000546 and 000547. It's referred to as evidence for in-person attendance and Interrogatory Number 9. Can you tell me where on either of these two pages of documents it says that Ms. Hunt-Brown is agreeing or being noticed that she must attend only in person as an essential function?
(Exhibit 23 was marked for identification.)
A. May I see the policy?
Q. Which policy?
A. Oh, never mind. I have it. I am so sorry.
So on 5.0, "GSD has established attendance procedures to support the strategic course of the agency."
Q. Which exhibit are you referring to?
A. I'm sorry. 3.
Q. Okay. Where does it say "in person"?

Page 115

A. It does not say "in person," but it -- "performance and essential function." An essential function is -- GSD office setting is considered an essential function.
Q. So attendance --
A. Performance and attendance shall be "an essential function of all staff positions."
Q. So does that mean that when Ms. Hunt-Brown takes FMLA leave, she's in violation of Attendance and Leave Policy?
A. No.
Q. But she's not in attendance at that time; correct?
A. She's not in attendance. She's on Family Medical Leave.
Q. And when she was designating time in Exhibit 17 as Telework, she was still in attendance for her job; correct?
A. Yes.
Q. Because you can be in attendance at your job while you're Teleworking; correct?
A. You should be in attendance at your job when you're Teleworking.
Q. Okay. And so, therefore, Teleworking is not contrary to the Attendance and Leave Policy; correct?

Page 116

A. So this policy was created in 2017. Prior to that Telework was not in existence as part of -- day-to-day, the policy didn't even -- was not even established. It was established during the Pandemic.
Prior to that there was no VPN resources for an employee to be able to Telework. We didn't have that capability in 2017. I don't believe that was even -- I don't know at GSD, but I know at other State agencies VPN was not something that an employee could log on to and could access their documents from outside of their office.
And I know that because when I worked for the State Personnel Office I worked as a mobile HR person to provide HR services to other State agencies that were 100 or less FTEs, and we had to carry a portable drive with us because we didn't have access to our internal documents.
So all of this Telework was new to employees, and it wasn't until 2021, I believe, when that policy was put in place that Telework became known to employees. I know that you could probably work remotely from other areas like I was doing as a mobile HR person under the Shared Services Department.
Q. When you started working at General Services Department, was Karen Baltzley still the CIO?
A. Yes, she was there for about six months. She left about six months after I started with GSD.

Page 117

Q. And did Karen ever discuss with you that she Teleworked at GSD as an accommodation?
A. No.
Q. Is it your belief that nobody Teleworked as an accommodation?
A. I don't know that. I won't know the history. All I know is from when I started with GSD -- and I believe it was 2021 of September or July. I'm sorry. I don't remember, but it was 2021.
And when I started, I was -- it was towards the tail end or probably right in the middle of COVID, and everybody was either on Telework, on a hybrid schedule.
Q. Exhibit 24 is the General Services Department's Remote Network Access Policy. This policy was effective December 9th, 2016, assigned by Karen Baltzley, the CIO; Christopher Lee, the Chair of the GSD IT Governance's Committee; Alexis Johnson, General Counsel of GSD; and Edwynn Burckle, Secretary of GSD.
Do any of those individuals still work at the General Services Department?
(Exhibit 24 was marked for identification.)
A. Christopher Lee and Alexis Johnson.
Q. The purpose of this position on the second page says, "This policy establishes minimum-security rules and requirements for remote access to General Services

Cumbre Court Reporting
Exhibit 11K
Date 07/09/2025
F. Eunice Moya



STATE OF NEW MEXICO
invites applications for the position of:

# Purchasing Agent-Advanced (GSD #2964+)

**SALARY:** $15.28 - $26.59 Hourly
$31,782.40 - $55,307.20 Annually

**JOB TYPE:** Permanent Position
**OPENING DATE:** 06/22/17
**CLOSING DATE:** 07/02/17 11:59 PM
**DEPARTMENT:** General Services Department
**LOCATION:** Santa Fe (City)

**JOB DESCRIPTION:**
NEOGOV is currently working on a system update for applicants who use screen readers. If you are applying with a screen reader and need assistance, please contact Andrea Rivera-Smith @ (505) 695-5606.

**IMPORTANT NOTICE:**
**Attached resumes will not be reviewed or considered. You are required to include your work experience in the Work Experience section of your application. If you have previously included work history on a resume you must transfer your work history into the Work Experience section prior to submitting your application. For more information please visit our website: Employment with the State of New Mexico**

**Purpose of Position:**
This position is responsible for ensuring compliance with the Procurement Code, General Services Department (GSD) Rules and Regulations, and all applicable State statutes. This position will be responsible for performing and processing Request for Proposals (RFPs) and Invitation to Bids (ITBs), and establishing price agreements and/or contracts. The Purchasing Agent will determine the validity of protests and respond to purchasing complaints by state agencies and/or protests filed by aggrieved bidders or offerors.

This position is a Pay Band 65.

**CLASSIFICATION DESCRIPTION:**
Purchasing Agent, Except Wholesale/Retail Advanced

**MINIMUM QUALIFICATIONS:**
Bachelor's Degree in Business or Accounting and Finance and two (2) years of experience in accounting, finance, purchasing, procurement and/or warehouse clerking. Any combination of education from an accredited college or university in a related field and/or direct experience in this occupation totaling six (6) years may substitute for the required education and experience.

**Employment Requirements:**
N/A

GSD000526

**Statutory Requirements:**
Subject to the Procurement Code, Sections 13-1-28 through 13-1-199, NMSA 1978 and NMAC 1.4.13, as applicable.

**SUPPLEMENTAL INFORMATION:**
**Benefits:**
Do you know what Total Compensation is?
http://www.spo.state.nm.us/total-compensation.aspx

**Working Conditions:**
Work is performed in an office setting with exposure to Visual/Video Display Terminal (VDT) and extensive personal computer and telephone usage.

**Conditions of Employment:**
Working Conditions for individual positions in this classification will vary based on each agency's utilization, essential functions, and the recruitment needs at the time a vacancy is posted. All requirements are subject to possible modification to reasonably accommodate individuals with disabilities.

**Default FLSA Status:**
Exempt. FLSA status may be determined to be different at the agency level based on the agency's utilization of the position.

**Bargaining Unit:**
This position is covered by a collective bargaining agreement and all terms/conditions of that agreement apply and must be adhered to.

**Agency Contact Information:**
Tanya Rodriguez, (505) 827-2114.

**Link to Agency:**
http://www.generalservices.state.nm.us/

**Applicant Help/How to Apply:**
http://www.spo.state.nm.us/State_Employment.aspx

Facebook

LinkedIn

---

APPLICATIONS MAY BE FILED ONLINE AT:
http://www.spo.state.nm.us

2600 Cerrillos Road
Santa Fe, NM 87505

ustin.naiaka@state.nm.us

Job #2017-02249
PURCHASING AGENT-ADVANCED (GSD #2964+)
AS

---

**Purchasing Agent-Advanced (GSD #2964+) Supplemental Questionnaire**

* 1. Please indicate the highest level of education you have completed. If you have responded that you have an education higher than a high school diploma or GED, you must attach a

GSD000527

Cumbre Court Reporting
Exhibit 21
Date 07.09.2025
Eunice Moya

O

**Moya, Eunice, GSD**

| | |
|---|---|
| **From:** | Padilla, Teresa, SPO |
| **Sent:** | Monday, January 9, 2023 2:32 PM |
| **To:** | SPO-Cabinet Secretaries; SPO-AgencyHeads-NonCabinet; SPO-HR Managers |
| **Cc:** | SPO-- Employees |
| **Subject:** | CLARIFICATION: Sent on behalf of the State Personnel Office - ANNOUNCEMENT -- CLARIFICATION OF STATE EMPLOYEE RETURN TO OFFICE |
| **Importance:** | High |

Good afternoon,

We are receiving questions about the "on or before" language of our December 30, 2022, State Employee Return to Office announcement, attached below.
To clarify:

- Non-manager and non-supervisor employees on a 100% telework or hybrid telework schedule may work with their supervisor to coordinate return to the office full-time *before* February 2, 2023, and must return to the office full-time *no later than* February 2, 2023.

Thank you,

NEW MEXICO
STATE PERSONNEL OFFICE

L Teresa Padilla | Director
(505) 396-1982 | Teresa.Padilla@spo.nm.gov | spo.state.nm.us

Diversity · Partnership · Consistency

This email, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

**From:** Announcements, SoNM <SoNM.Announcements@doit.nm.gov>
**Sent:** Friday, December 30, 2022 2:22 PM
**Subject:** Sent on behalf of the State Personnel Office - ANNOUNCEMENT -- STATE EMPLOYEE RETURN TO OFFICE

Good afternoon,

Negotiations on the effects of the rescission of the statewide Non-Mandatory Telework Policy have concluded with both Unions. The important changes in implementation are as follows:

- All exempt employees, Managers, supervisors and directors will return to the office full-time on **January 3, 2023**.
- Non-manager and non-supervisor employees on a 100% telework or hybrid telework schedule will return to the office full-time **on or before February 2, 2023**.

Note that Employees already working in person in the office full-time will continue to report to the office.

Thank you for your continued service to the State of New Mexico.

NEW MEXICO
STATE PERSONNEL OFFICE

**L Teresa Padilla** | Director
Willie Ortiz Building – 2600 Cerrillos Road, Santa Fe, NM 87505
(505) 396-1982 | Teresa.Padilla@spo.nm.gov
spo.state.nm.us

**Diversity · Partnership · Consistency**

This email, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

Cumbre Court Reporting
Exhibit 3
Date 07.09.2025
Eunice Moya

**GENERAL SERVICES DEPARTMENT**
***Agency Policy***

| Subject: | Number: GSD-030 |
|---|---|
| **Attendance and Leave Policy** | Effective Date: 5/30/2017 |
| | Number of Pages: 14/17 |

**REVISION LOG**

| Revision Number | Date | Responsible Party | Comment |
|---|---|---|---|
| Revision 0 | 05/30/2017 | Angela Dawson | New; supersedes and replaces and cancels all previous approved or draft versions of GSD policy documents written to prescribe requirements and processes for the various types of employee leave and employee attendance expectations; also supersedes and cancels those portions of GSD Policy HR 12-01 (approved 01/20/2012) that apply to attendance and leave for GSD employees. |
| | | | |
| | | | |
| | | | |

**Table of Contents**


1.0 Purpose .......... 2
2.0 Scope/Applicability/Organizations Affected .......... 2
3.0 References .......... 2
4.0 Definitions .......... 2
5.0 Background .......... 3
6.0 Policy .......... 3
7.0 Procedures .......... 11
8.0 Attachments and Enclosures .......... 14
9.0 Approval .......... 14


Policy contains 14 pages of policy text plus three 1-page form attachments, for 17 total pages.

6.10.6 With the approval of a supervisor/manager, an employee shall be entitled to paid administrative leave to interview for vacant GSD positions during the course of their workday.

6.11 Call-In/Early Departures

6.11.1 Employees must arrive and be prepared to commence work at their scheduled start time. Employees are responsible for notifying their supervisor/manager or designee of sick time (absence), late arrival (tardy), or early departure.

6.11.1.1 Notification of same day absence, tardy, or early departure must be provided by the employee or they will be considered AWOL, except for an emergency situation. Employees may be required to provide documentation of the emergency.

6.11.1.2 Employees must state a reason why they will be absent from work or tardy arriving to work, and must notify their supervisor/manager if the absence is due to a documented/approved leave of absence (e.g., Military Leave, FMLA).

6.11.2 An employee who fails to call in and report to work as scheduled for three consecutive scheduled work days will be viewed as having abandoned their job, which may result in dismissal except in emergency situations.

6.12 Request for Union Time

6.12.1 In accordance with Article 2, Union Rights, Section 3, of the Collective Bargaining Agreement (CBA) a union steward or officer shall be entitled to use union time.

6.12.1.1 Union time must be preapproved, but will not be disapproved except for operational reasons or when the union steward or officer is in an overtime status.

6.12.1.2 Requests for union time shall state the general purpose of the request without being invasive.

6.12.2 All union time must be pre-approved by the HRB Bureau Chief in consultation with the immediate supervisor/manager.

6.13 Personal Leave Day

6.13.1 Employees in career status are entitled to one personal leave day each calendar year. Such leave must be requested and approved in advance.

6.13.2 The personal leave day must be taken in consecutive hours.

6.13.3 The personal leave day must be taken by December 31st, or it will be lost.

6.13.4 Employees who do not take their personal leave day before separating from the classified service shall not be paid for it upon separation.

Cumbre Court Reporting
Exhibit 22
Date 07.09.2025
Eunice Moya

**GENERAL SERVICES DEPARTMENT**
**Agency Policy**

| Subject: | Number: |
|---|---|
| | GSD-002 (2014) |
| **Code of Conduct** | Effective Date: 5/15/2014 |
| | Number of Pages: 12 |

**REVISION LOG**

| Revision Number | Date | Responsible Party | Comment |
|---|---|---|---|
| Original | 05/15/2014 | Michael Gallegos and Lara White Davis | Replaces 350-2.00 |
| | | | |
| | | | |
| | | | |

## Table of Contents

1.0 PURPOSE ....... 2
2.0 SCOPE / APPLICABILITY / ORGANIZATIONS AFFECTED ....... 2
3.0 REFERENCES ....... 2
4.0 BACKGROUND ....... 2
5.0 DEFINITIONS ....... 2
6.0 POLICY STATEMENT ....... 3
7.0 PROCEDURES ....... 4
8.0 APPROVAL ....... 12
9.0 ATTACHMENTS ....... 12

**7.1 Personal Conduct**

**7.1.1** Employees shall perform their duties in a professional and ethical manner with the upmost integrity and in conformity with all State laws, rules and regulations, Department policies and procedures, and the Governor's Code of Conduct (attached). Any conduct which compromises the integrity of the Department's operation or is otherwise illegal, unethical, or unprofessional will be considered a violation of the Code of Conduct and may result in disciplinary action up to and including termination.

**7.1.2** Employees will not report to work impaired by alcohol or drugs. An employee's appearance in the workplace while impaired will be considered a violation of the Code of Conduct and may result in disciplinary action up to and including termination.

**7.1.3** Consumption of alcoholic beverages in State-owned vehicles, personal-owned vehicles used on or during the conduct of State business, or in or on Department property is prohibited. The use or possession of illegal drugs, drug paraphernalia, or any illegal activity at any time in or on Department property is prohibited. Violations of these prohibitions will be considered a violation of the Code of Conduct and may result in disciplinary action up to and including termination.

**7.1.4** Employees are prohibited from carrying firearms or other dangerous weapons while conducting State business, even if the employee is licensed to carry a concealed weapon. Violation of this prohibition will be considered a violation of the Code of Conduct and may result in disciplinary action up to and including termination.

**7.2 Rules of Conduct**

**7.2.1** Employees shall report to work on time, each scheduled workday and otherwise comply with the Department's policies and procedures regarding timekeeping of work, leave, and overtime hours. Repeated failure to report to work on time or comply with the Department's policies and procedures regarding timekeeping of work, leave, and overtime hours will be considered a violation of the Code of Conduct and may result in disciplinary action up to and including termination.

**7.2.2** Employees shall report to work able to perform essential job functions and meet applicable qualitative and quantitative standards for their jobs. Reporting to work unable to perform essential job functions may result in an employee being required to leave work. More than one instance of reporting to work unable to perform essential job functions, may be considered a violation of the Code of Conduct, and may result in disciplinary action up to and including termination.

**7.2.3** The following instances of misconduct on the job will not be tolerated and will be considered a violation of the Code of Conduct which may result in disciplinary action up to and including termination.

A. INSUBORDINATION is defined as the intentional refusal to follow a supervisor's

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**
**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782-SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**AFFIDAVIT OF JENNIFER CONN**

I, Jennifer Conn, being first on my oath duly sworn, state that the following is true and correct to the best of my knowledge:

1. My name is Jennifer Conn. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am employed by New Mexico General Services Department ("GSD") as a Deputy Cabinet Secretary. My duties include participating in three-person hiring panels and interviews of applicants for positions in GSD.

3. I was part of the interview panel for Construction Unit Supervisor (Job #2954) in September 2023. Kimberly Hunt-Brown interviewed for that position. Tami Concha was selected for that position.

4. Ms. Concha scored higher than Ms. Hunt-Brown. Ms. Concha generally gave better answers to the interview questions than Ms. Hunt-Brown.

5. Ms. Concha gave detailed answers about how she approached projects and problems. Her organizational skills and attention to detail impressed the other panelists and me.

6. Ms. Hunt-Brown did not appear to be as familiar with procurement processes and was unable to answer some questions.

7. The hiring panel was unanimous in its selection of Ms. Concha.

8. In September 2023, I participated in an interview panel for the position of Purchasing Deputy Director (Job #2961).

9. Ms. Hunt-Brown was interviewed for this position. Natalie Martinez was selected for hire.

10. Deputy Director is a supervisory position, and Ms. Martinez had management experience as a GSD Bureau Chief. Ms. Hunt-Brown had not been a manager at GSD. Ms. Martinez had been Ms. Hunt-Brown's Bureau Chief, meaning Ms. Martinez was Ms. Hunt-Brown's direct supervisor at that time.

11. Ms. Martinez had many years more experience with GSD's State Purchasing Division than Ms. Hunt-Brown.

12. Ms. Martinez gave a better interview than Ms. Hunt-Brown, and the panel unanimously selected Ms. Martinez for that position. Ms. Martinez was familiar with every aspect of procurement discussed in the interview as well as management processes.

13. During her interview, Ms. Hunt-Brown discussed at some length experience she had in other jobs that was not relevant to the position she was interviewing for.

14. In January 2024, I participated in the interview panel for Procurement Specialist Bureau Chief (Job #10106555). Ms. Hunt-Brown interviewed for this position. Vanessa LeBlanc was selected.

15. Ms. LeBlanc had more years of experience with GSD than Ms. Hunt-Brown. Ms. LeBlanc had worked in several positions in State Purchasing Division and had performed many duties required of a bureau chief.

16. Ms. LeBlanc generally gave better responses to the interview questions than Ms. Hunt-Brown. Ms. Hunt-Brown was non-responsive to at least one question and discussed experience that was not relevant to the position.

17. The interview panel unanimously selected Ms. LeBlanc for the position.

18. Prior to these interviews, I did not know Ms. Hunt-Brown had any medical condition. In each interview she stated she could perform the job duties without any accommodation.

19. Ms. Hunt-Brown's age was not a factor in the decision to recommend hiring of other candidates for these positions.

Jennifer Conn

SUBSCRIBED AND SWORN TO before me this 14th day of August 2025, by Jennifer Conn.

STATE OF NEW MEXICO
NOTARY PUBLIC
TERESA HARPER
COMMISSION # 1138703
EXPIRES SEPTEMBER 6, 2026

Notary Public

My Commission Expires:

9/6/2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**
**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782-SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**<u>AFFIDAVIT OF FRANCINE MARTINEZ</u>**

I, Francine Martinez, being first on my oath duly sworn, state that the following is true and correct to the best of my knowledge:

1. My name is Francine Martinez. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am employed by New Mexico General Services Department ("GSD") as a Bureau Chief in the State Purchasing Division. My duties include participating in three-person hiring panels and interviews of applicants for positions in GSD.

3. I was deposed in this case and asked about my participation in the interview of Kimberly Hunt-Brown and others for the I.T. Procurement Specialist II position (Job #49191). In my deposition I was not asked about my participation in the hiring process for other positions.

4. I was part of the interview panel for I.T. Procurement Specialist (Job #3018) in March 2024. Ms. Hunt-Brown interviewed for that position. Yuli Wulandari was selected for that position.

5. Ms. Wulandari generally gave better answers to the interview questions than Ms. Hunt-Brown. For example, when asked what experience she had relative to the skills required of the position, Ms. Hunt-Brown stated she had "very little experience".

6. During Ms. Wulandari's interview, she spoke at length about her experience with I.T. and I.T. procurements. Ms. Wulandari clearly and in detail explained her experience and how it would relate to this position. She was able to give several examples of I.T.-related procurements and purchasing she had handled before.

7. The hiring panel was unanimous in its selection of Ms. Wulandari.

8. In April 2024, I participated in the interview panel for I.T. Procurement Specialist (Job #2972). Ms. Hunt-Brown was interviewed for that position. Andric Fisher was selected and hired.

9. When asked what experience she had "relative to the skills required of the I.T. unit," Ms. Hunt-Brown stated she had "little to none."

10. In response to the same question, Mr. Fisher discussed prior jobs in which he handled procurements and I.T. procurements in particular.

11. The hiring panel was unanimous that Ms. Hunt-Brown was not the best applicant for that position.

12. During my interviews of Ms. Hunt-Brown, she did not seem as though she was truly interested in the positions, but was just 'going through the motions' of the interview process.

13. Prior to these interviews, I did not know Ms. Hunt-Brown had any medical condition. In each interview she stated she could perform the job duties without any accommodation.

14. Ms. Hunt-Brown's age was not a factor in any hiring decision in which I was involved.

Francine Martinez

SUBSCRIBED AND SWORN TO before me this 13th day of August 2025, by Francine Martinez

Notary Public

My Commission Expires:
6/2/26

STATE OF NEW MEXICO
NOTARY PUBLIC
DOROTHY M MENDONCA
COMMISSION # 1086057
EXPIRES JUNE 2, 2026

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF MICHAEL J. SAAVEDRA
March 19, 2025
9:06 a.m.
119 East Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(510P) RAB

specialist two at state purchasing and NMDOT purchasing supervisor and several other NMDOT positions before that, correct?
**A. Correct.**
Q. And on the back page it shows that he went to Luna Community College and New Mexico Highlands University, correct?
**A. Correct.**
Q. And that he had special technical training at Xerox Document University?
**A. Correct.**
MS. BURKE: Let's take a quick break, because I'm missing something.
(Recess was taken from 9:33 to 9:52 )
(Exhibit 7 marked.)
Q. Exhibit 7 is an applicant for position 2972, correct?
**A. Correct.**
Q. And this shows the individuals that were actually interviewed?
**A. Correct.**
Q. It says looks like applicant C and D declined to interview.
**A. Correct.**
Q. So you interviewed Kimberly Hunt-Brown,



the first internal candidate, Andric Fisher, and then the second internal candidate, correct?
**A. Correct.**
**(Exhibit 8 marked.)**
Q. Exhibit 8. Exhibit 8 is the application for Andric Fisher. This is the candidate that you selected for this position?
**A. Correct.**
Q. Now, looking at page five, which is GSD 9439, the education level says highest education level is some college, correct?
**A. Correct.**
Q. And it looks like the work experience for Mr. Fisher was that he was an IT supervisor for the previous eight years, correct?
**A. Correct.**
Q. And looking at page 52, which is GSD 9441, at the bottom of that page it says, are you a resident of the state of New Mexico? And on the next page, Mr. Fisher answers he's not a resident, correct?
**A. I don't have page 51 or 52.**
Q. You don't?
**A. Can you repeat the question?**
Q. So on the last page at the top is the



answer to the question on the previous page, which is are you a resident of New Mexico; is that correct?
**A. Correct.**
Q. And Mr. Fisher marked no, correct?
**A. Correct.**
Q. Do you know why the application asks that question?
**A. I do not.**
Q. Is there a statutory preference to hire New Mexican residents for this state?
**A. Not that I'm aware of.**
**(Exhibit 9 marked.)**
Q. Exhibit 9. Exhibit 9 are reference checks for Andric Fisher. Did you conduct these reference checks, Mr. Saavedra?
**A. Yes.**
Q. What is the purpose of these reference checks?
**A. To check the past history of an individual, see if they have been tardy to work, see what type of person they are, how they handle conflict, pressure, to see how the previous supervisor or reference, how they felt that person was as an employee.**



Q. So you ask, halfway down the page, did he/she miss a lot of work, correct?
**A. Correct.**
Q. Why is that important?
**A. Because you need to make sure that your staff are -- are attending work on a regular basis to complete their tasks. We have a lot of high-pressure tasks, a lot of tasks that are very urgently needed, and we have to make sure our staff are present as much as possible.**
Q. So does that mean you have a preference for staff that doesn't miss work?
MS. DOWNEY: Objection. Form. Go ahead.
Q. Go ahead and answer.
**A. Not necessarily. I understand everybody needs to miss work. I know I miss work. Everybody misses a certain level of work, but when it becomes to a point when somebody is missing excessively, that's where there might be an issue.**
Q. You asked that question of all three of these references, correct?
**A. Yes, it is HR mandated.**
Q. And in two of -- I notice that the second page doesn't include writing of any job duties or

Q. And Ms. Hunt Brown has a master's degree and experience in state procurement, correct?
**A. Correct.**
Q. And Ms. Concha has technical school, correct?
**A. Correct.**
Q. And she's a resident of New Mexico?
**A. Correct.**
Q. And she has state procurement experience?
**A. Correct.**
Q. Why did you select the candidate with no state procurement experience and no college degree?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. He brought to the table quite a bit of experience in IT, because the position not only requires procurement experience, but it also requires actual IT hands-on experience, and that means setting up computers, that means helping vendors out with technical IT support, and so we were looking for somebody who has both experiences with contracts, experiences with IT, and so we felt that he was a good fit.**
**He also had a very good interview, much better interview than the other applicants.**



Q. What do you mean, he had a good interview?
**A. He -- he had good responses. He -- he seemed to have -- he seemed to be better prepared for the interview.**
Q. Does Mr. Fisher still work for you?
**A. No.**
Q. Why not?
**A. He resigned.**
Q. He was a probationary employee?
**A. Yes, he was.**
Q. And he resigned his employment?
**A. Yes.**
Q. He wasn't terminated?
**A. He resigned.**
Q. Was he sleeping at work?
**A. Yes.**
Q. And he decided to resign after he was caught sleeping?
**A. Yes.**
Q. You realize you're under oath here today, Mr. Saavedra?
**A. Yes.**
Q. Was he given the option to resign in a lieu of termination?
**A. Yes.**



Q. GSD has an IT department, correct?
**A. Yes.**
Q. That's TSSB?
**A. Yes.**
Q. The technology systems and service bureau?
**A. Yes.**
Q. Are they charged with setting up computers?
MS. DOWNEY: Objection. Form.
**A. They're set up to -- to put up computers and to work on general software issues and hardware issues. However, the previous IT bureau chief took it upon himself to have our staff and state purchasing division to do some of that work so we wouldn't have to rely on TSSB. That's why we have two staff members who handle those types of -- of work.**
Q. And that is Theresa Mandibles, correct?
**A. Correct.**
Q. And who else?
**A. We currently don't have that position filled at this time.**
Q. So state purchasing, the IT department services all of state purchasing?
**A. Yes.**



Q. So Theresa Mandibles installs computers for anybody else in state purchasing?
**A. Yes.**
Q. And Theresa Mandibles sets access rights for everybody in state purchasing?
**A. Only for certain programs. She does not have access to all the programs. TSSB has to provide access to some of the programs, so she only does that for, like, the E-pro system.**
Q. Okay. So recently I understand that state purchasing got new computers; is that correct?
**A. Yes, that's correct.**
Q. Does that mean Ms. Mandibles installed all those computers?
**A. Actually, TSSB did at this time.**
Q. Why did TSSB do it this time?
**A. There's been discussion internally within the IT bureau and with upper management. We've been in discussion to try to remove these job duties from Theresa Mandibles and the unfilled position so that they don't have to set up computers anymore.**
**And so I don't know where we're at with that with HR, because they were supposed to change their -- modify their job descriptions, and I don't know at what step we're at with this.**

Q. Is that because it takes time away from Ms. Mandibles's time to actually do her procurements?
**A. Yes.**
**(Exhibit 12 marked.)**
Q. Exhibit 12 is the NMAC code for recruitment, assessment, and selection. On the second page under assessment of qualifications, letter D says preference points, and number two of that says: In accordance with the provisions of section 10-9-13, NMSA 1978. Applicants who meet minimum qualifications should have two preference points added for each year of residency in New Mexico not to exceed ten points.
Were all of the other candidates besides Mr. Fisher given extra points for their residency?
**A. They were not, as far as I know.**
Q. So it -- does that meet this requirement --
MS. DOWNEY: Objection. Form. Foundation.
Q. -- in NMAC?
**A. Do I answer?**
Q. Yes, please.
**A. Would you repeat the question?**



Q. Does not giving preference to internal New Mexico resident candidates comply with this provision?
**A. No.**
MS. DOWNEY: Again, objection. Form and foundation.
You've got to give me a minute to object.
THE WITNESS: Sorry.
MS. DOWNEY: That's okay.
Q. (By Ms. Burke) You stated earlier that you don't have a background in IT, correct?
**A. Not -- not a hands-on.**
Q. And you've been able to perform the duties of an IT procurement specialist, correct?
**A. Correct.**
Q. To your knowledge, does Natalie Martinez have an IT background?
**A. Yes, she does, as far as I know.**
Q. What was her IT background?
**A. She had worked in a previous agency, handling the contracts for IT.**
Q. But does she have hands-on IT experience?
**A. Not that I'm aware of.**
Q. And Vanessa LeBlanc, does she have an IT background?



**A. Not that I'm aware of.**
Q. And both of those individuals were able to be IT buyers, correct?
**A. That's correct.**
Q. It didn't affect their ability to do a good job in those positions, correct?
MS. DOWNEY: Form and foundation.
Q. Go ahead and answer.
**A. Natalie Martinez, I can't answer for her, because I was never her supervisor, so I don't know her work.**
**However, Vanessa, she was able to complete her tasks.**
Q. Natalie Martinez is your boss, correct?
**A. Correct.**
**(Exhibit 13 marked.)**
Q. Exhibit 13. Exhibit 13 is the SPD IT procurement specialist position for number 49191, job ID 145350.
Mr. Saavedra, are you familiar with this posting?
**A. Yes.**
Q. And is this the same requirements as the previous posting we reviewed?
**A. I believe it's slightly different.**



Q. What are the differences?
**A. I'm going to read it just for a moment. I believe with this position it does not rely heavily on support for setting up computers, as does the job description for a person like Theresa Mandibles.**
Q. Would -- is this position the same pay band as the previous position?
**A. Yes.**
Q. And so this one does not require as specific of IT experience?
**A. Can you repeat the question?**
Q. Does this position require as -- you said that this isn't requiring as much hands-on experience as the previous position?
**A. That's correct.**
Q. Where does it say that in Exhibit 13 -- or where's the difference between Exhibit 1 and Exhibit 13?
**A. Okay. I'm going to look at the two so I can -- it would be in the "how does it get done" section.**
Q. Okay.
**A. If you see in Exhibit 1, the last bullet, provide desktop support for coworkers, troubleshoot, and submit tickets if issues cannot be resolved.**

Q. And that was based on the agreement with TSSB to have IT buyers provide IT support?
**A. Correct.**
**(Exhibit 14 marked.)**
Q. Exhibit 14 is the applicant list for job ID 145350. Are you familiar with this applicant list, Mr. Saavedra?
**A. Yes, I am.**
Q. Does this show there were three internal applicants for the -- the position 145350?
**A. Yes.**
Q. And so all three were interviewed, correct?
**A. Yes.**
**(Exhibit 15 marked.)**
Q. Exhibit 15. Exhibit 15 is the application report for Amber Sanchez for the position 145350 or 49191. Was Ms. Sanchez selected for this position?
**A. Yes.**
Q. On page 24, which is GSD 9502, at the bottom of this document it says education level is high school graduate or equivalent, correct?
**A. Correct.**
Q. Were you employed at GSD when Ms. Sanchez started working at GSD?



**A. I believe I was.**
Q. So you're aware, as per her application, that Ms. Sanchez started working at GSD in 2018, correct?
**A. Correct.**
Q. And on page four of this Exhibit 15, it shows that Ms. Sanchez started as a temporary employee in October of 2018, correct?
**A. Correct.**
Q. And in November of 2018, Ms. Sanchez was hired as a purchasing agent A, correct?
**A. Correct.**
Q. And after that, Ms. Sanchez started in 2020 as a financial coordinator, correct?
**A. Correct.**
Q. The financial coordinator is not a buyer, correct?
**A. Correct.**
Q. Their focus is on ensuring compliance with the fees for state purchasing; is that correct?
MS. DOWNEY: Objection. Form. Foundation.
You can answer.
Q. Go ahead and answer.
**A. Correct.**



Q. So starting in October of 2018, you say 2018 to 2019, 2019 to 2020, 2020 to 2021, 2021 to '22, '22 to '23, '23 to '24. This position was hired in July, correct?
MS. DOWNEY: Objection. Form.
**A. I don't recall when she was hired.**
Q. Here on Exhibit 14 it shows the interview date is 7/5/2024; is that correct?
**A. That's correct.**
Q. So it wasn't quite six years that Ms. Sanchez had been in purchasing, correct?
MS. DOWNEY: Objection. Form.
Q. Do you want to count those years for me?
**A. Correct.**
Q. Looking at page two of Exhibit 13, the minimum qualification for this position was a bachelor's degree in business admin or IT-related field and four years of experience.
MS. DOWNEY: Objection. Form. Foundation.
Q. Correct?
**A. Do I answer?**
Q. Yes, please.
**A. Correct.**
Q. But there's a substitution table allowed,



which says with a high school diploma and eight years of experience, that would meet the minimum qualification, correct?
**A. Correct.**
Q. Ms. Sanchez didn't have eight years of experience; did she?
**A. Now that I'm looking at it, I do not believe so.**
Q. So looking back at Exhibit 10, as we discussed before, Ms. Hunt Brown has a master's degree, correct?
**A. Correct.**
Q. And Ms. Hunt Brown has between four and six years of experience at state purchasing, correct?
MS. DOWNEY: Objection. Form.
You can answer.
**A. Correct.**
Q. Ms. Hunt-Brown started at state purchasing in a compliance position, correct?
**A. I believe so.**
Q. And then Ms. Hunt-Brown transitioned to being a buyer, correct?
**A. Correct.**
Q. According to Exhibit 13, Ms. Hunt-Brown,

with a master's degree, would only need two years of experience to satisfy the minimum requirement for this position, correct?
MS. DOWNEY: Objection. Form. Foundation.
Q. Go ahead and answer.
**A. Correct.**
Q. Ms. Hunt-Brown had at least two years of experience, correct?
**A. Correct.**
**(Exhibit 16 marked.)**
Q. Exhibit 16. Exhibit 16 is the application for the other internal candidate, which is the same as the application for James Ortega in the last position; is that correct?
MS. DOWNEY: Objection. Foundation.
You can answer.
Q. Go ahead and answer.
**A. Correct.**
Q. And as discussed before, Mr. Ortega had approximately 12 years of state purchasing experience, correct?
**A. Correct.**
Q. And Mr. Ortega had an associate's degree, correct?



**A. Correct.**
Q. Looking back at Exhibit 13 in the substitution table on page two, an associate's degree and six years of experience would meet the minimum qualification for that position, correct?
**A. Correct.**
Q. So both Ms. Hunt-Brown and Mr. Ortega met the minimum qualifications for this position, correct?
MS. DOWNEY: Objection. Form.
You can answer.
Q. Go ahead and answer.
**A. Correct.**
Q. But Ms. Sanchez did not meet the minimum qualifications for this position, correct?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. Repeat the question.**
Q. Ms. Sanchez did not meet the minimum qualifications for this position as stated in the job posting, correct?
**A. Correct.**
THE WITNESS: Can I have a break?
MS. DOWNEY: Yeah.
MS. BURKE: Sure.



(Recess was taken from 10:30 to 10:37.)
(Exhibit 17 marked.)
Q. (By Ms. Burke) Exhibit 17. Exhibit 17 is a resume of Amber Sanchez. On page 36, which is GSD 9514 of this document, says, education Albuquerque High School, high school diploma 2004, correct?
**A. Correct.**
Q. Ms. Sanchez is in her 30s, correct?
MS. DOWNEY: Objection. Foundation.
**A. I don't know.**
Q. Go ahead and answer.
**A. I don't know her age.**
Q. Based on Ms. Sanchez saying she graduated in 2004, assuming she was around 18 years old, correct?
MS. DOWNEY: Objection. Form. Foundation.
Q. What's 20 plus 18?
**A. 38.**
Q. So Ms. Sanchez is below 40 years old, correct?
MS. DOWNEY: Objection. Foundation.
You can answer.
Q. Go ahead and answer.
**A. Correct.**



Q. As we discussed before, Mr. Ortega and Ms. Hunt-Brown are over 50, correct?
**A. Correct.**
**(Exhibit 18 marked.)**
Q. Exhibit 18. Exhibit 18 is IT procurement specialist 49191, interview score sheet by Mr. Michael Saavedra for Amber Sanchez.
Mr. Saavedra, are you familiar with this document?
**A. Yes, I am.**
Q. Did you fill out this score sheet?
**A. I filled out this document.**
Q. The answer to number one, Ms. Sanchez tells you that she has six years of experience, correct?
**A. Correct.**
Q. Why was Ms. Sanchez hired for this position?
**A. She had experience as a buyer. She had experience with IT contracts when she was in the fees position, because she had to be able to read a contract in -- in IT in order to work with her vendors, and so she understands IT contracts quite well.**
**She also did very well in her position as**

**the financial coordinator by helping to clean up some messes and increase the fees that were brought in. That's my understanding.**
Q. So the fact that Ms. Sanchez could read contracts is what qualified her for this position?
MS. DOWNEY: Objection. Form.
You can answer.
**A. Along with her experience as an IT -- not IT buyer, a procurement buyer prior to being the fees coordinator.**
Q. Looking back at Exhibit 15, Ms. Sanchez, on page four of this document, started as a temp agent in October of 2018, correct?
**A. Correct.**
Q. And she was a buyer until October of 2020, correct?
**A. Correct.**
Q. So she had two years of experience buying, correct?
**A. Correct.**
**(Exhibit 19 marked.)**
Q. Exhibit 19. Exhibit 19 is financial coordinator position description. Ms. Sanchez became a financial coordinator, correct?
**A. Correct.**



Q. Which level of financial coordinator was she?
**A. I do not know. The financial coordinator position is not a state purchasing position; is it?**
MS. DOWNEY: Objection. Foundation.
Q. I mean, it's not specific to state purchasing.
MS. DOWNEY: Objection. Foundation.
Q. Do you know whether the financial coordinator position is specific to state purchasing?
**A. No.**
Q. No, you don't know, or no, it's not?
**A. It's not.**
Q. Do any of these financial coordinator position descriptions describe procurement duties?
**A. I haven't read through it, so I don't know.**
Q. Go ahead and take a look, please.
**A. Would you repeat the question?**
Q. Do any of the financial coordinator positions describe procurement duties?
**A. Does not appear to.**
Q. The financial coordinator position at state purchasing was not a procurement position,



correct?
**A. Correct.**
Q. Did you sit on the hiring panel for the financial coordinator position when Ms. Sanchez was hired?
**A. No. I sat on a number of other hiring panels, but not that one.**
**(Exhibit 20 marked.)**
Q. Exhibit 20 is the State of New Mexico nondiscrimination clause. Again, this does not have a position numbering on it, but the date is July 5th, which is consistent for the date of the interviews for this position.
Mr. Saavedra, are you familiar with this document?
**A. Yes, I am.**
Q. What is this document?
**A. This document states that the panel members will not discriminate.**
Q. Did you hire Ms. Sanchez for this position?
**A. Yes.**
Q. Was that your decision?
**A. That was the entire committee's decision.**
Q. What do you mean, it was the entire



committee's decision?
**A. It was a unanimous decision of the committee to hire Amber.**
Q. So that each of the people -- I notice that this document, for some reason, you didn't sign it at the bottom. Do you know why?
**A. Because I signed it in the middle.**
Q. The last document that we looked at, you signed it in both places, correct? It's Exhibit 3. Why is Exhibit 3 signed on the bottom and in the middle but Exhibit 20 only signed in the middle?
**A. I guess I just assumed that by signing in the middle, I'm still signing that I'm attesting that I'm not discriminating.**
Q. Could it be perceived as discrimination to hire a person under 40 years old that doesn't meet the minimum qualifications for a position --
MS. DOWNEY: Objection. Form. Foundation.
Q. -- when the other applicants are over 40 years old?
MS. DOWNEY: Sorry to cut you off.
MS. BURKE: That's okay.
MS. DOWNEY: Same objection. Form. Foundation.

**A. I want to add something to the record. Whenever HR is reviewing the applicants, they're the ones who screen them and determine which applicants we can -- we can interview and which applicants can be hired.**
**So if there's any discrepancies where somebody did not have enough years of experience or an -- or education, that's something that must have been missed at the HR level.**
Q. But you review their applications, correct?
**A. Yes.**
Q. And you review their resumes, correct?
**A. Yes.**
Q. And you started working at state purchasing before Ms. Sanchez started working there, correct?
**A. Yes.**
Q. So you were well-aware Ms. Sanchez could only have worked there for six years, correct?
**A. Correct.**
Q. And you were responsible for the job posting to that position, correct?
**A. Correct.**
Q. And so you knew that the substitution



table required eight years of experience for a high school graduate, correct?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. I relied on HR to do the reviews, and so I did not double-check their work.**
Q. Okay. Looking back at Exhibit 12, and so -- on the second page, the selection 1.7.5.12, it says: In accordance with the purpose of the personnel act NMSA section 10-9-2, selection shall be based solely on qualification and ability, correct?
**A. Correct.**
Q. And it says: Selection for any positions in the classified service shall be justified in writing and made from employment lists. Correct?
**A. Correct.**
Q. And the section above says, assessment of qualifications, it's 1.7.5.11, A says: Assessments shall measure critical or important knowledge, skills, and abilities necessary for successful job performance, correct?
**A. Correct.**
Q. So is it your testimony here today that you had no responsibility to ensure that the person



you selected to hire for a position met the minimum qualifications for that position?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. I relied on HR to verify whether applications met the minimum qualifications.**
Q. And you don't believe that there's any responsibility for you as the hiring manager to ensure the person that you select is qualified for that position?
MS. DOWNEY: Objection. Form.
You can answer.
**A. Now I do.**
Q. What do you mean, now you do?
**A. Now I feel I need to double-check HR's work.**
Q. Is it a problem that you've hired a person to this position that didn't meet the minimum qualifications?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. I don't know.**
Q. On the first page of Exhibit 12 under recruitment, letter C says: Any qualified applicant shall have the opportunity to compete for vacant



positions open for recruitment without regard to race, color, religion, national origin, ancestry, sex, sexual orientation, age, or mental or physical disability unless based on bona fide occupational requirement. Correct?
**A. What section was that again?**
Q. Recruitment, 1.7.5.9, letter C.
**A. Correct.**
Q. Mr. Ortega and Ms. Hunt-Brown were both qualified applicants, correct?
**A. Correct.**
Q. Did you hire Ms. Sanchez for the position of IT procurement because you liked her?
**A. No.**
Q. You said that Ms. Sanchez helped you out of some jams. What did you mean?
**A. When did I say that?**
Q. When you said earlier today -- you said that Ms. Sanchez, what made her qualified was the fact that she had had some procurement experience and that she had helped you guys out of some situations.
MS. DOWNEY: Objection. Form.
You can answer.
**A. I don't recall saying that.**

Q. Okay. Why did you hire Ms. Sanchez?
**A. I hired her because she was given splendid work-related -- I was given information from her supervisor that she was a very good worker. She knew IT contracts. She was a buyer for multiple years prior to being a financial coordinator. And so -- and she also had a good interview, so she -- she -- and I want to remind you that she was -- this was a unanimous decision of the committee, not just my choice. It was all three of us had her as our number one choice.**
Q. So looking at page 25 of Exhibit 15, which is GSD 9503, the top of the page Ms. Sanchez lists three references, correct?
MS. DOWNEY: I'm sorry. What exhibit are you on?
MS. BURKE: Exhibit 15.
**A. Correct.**
Q. And one of those three references is Francine Martinez, correct?
**A. That's correct.**
Q. Does Francine Martinez sit on this panel?
**A. I don't recall, but --**
Q. Looking back at Exhibit 20, the nondiscrimination clause, is Francine Martinez



signing there?
**A. Yes, that's correct.**
Q. Is it a problem that one of Ms. Sanchez's references was going to be selecting her for hire?
MS. DOWNEY: Objection. Form.
**A. I did talk to upper management, and I asked them if that would be a problem, and I was told no, and so I continued on to leave her on the panel.**
Q. So of the three people who unanimously selected Ms. Sanchez, one of them was her reference?
**A. Correct.**
Q. And all three of these people selected a person with six years of experience over Mr. Ortega with over 12 years of experience, correct?
**A. Correct.**
Q. And all of these people selected Ms. Sanchez, with six years of experience and a high school degree, over Ms. Hunt-Brown, who has a master's degree and four to six years of experience, correct?
**A. Correct.**
Q. Based on those tables, Ms. Hunt-Brown would have only needed two years to even meet the minimum qualifications, correct?



**A. Correct.**
Q. So all three people on this committee chose somebody under 40 years old, with less experience than two internal candidates over 50 with more experience and education, correct?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. Never was the issue of age an issue. It was never brought up. It was never in my mind. I can't vouch for the others, but never did I ever say that one person, because of their age, is not qualified or qualified. Age never was a factor.**
Q. So you're saying consciously age was never a factor?
**A. Subconsciously and consciously, never a factor.**
Q. So why would you choose somebody with -- why would you not select somebody with 12 years of experience directly related to the position?
**A. Because they didn't interview well.**
Q. What do you mean, they didn't interview well?
**A. They just didn't have a good interview. They weren't prepared. Some people get out in the weeds with stuff. They get sidetracked. Some**



**people have some just really poor responses.**
Q. How does the way that somebody interviews determine how well they do the job?
MS. DOWNEY: Objection. Form.
Q. Is there a direct correlation between how somebody interviews and how well they perform a position?
**A. I've seen different times when someone that interviews well might do good. A person that doesn't interview well might not do good, and vice versa, so it could go either way.**
Q. So Mr. Fisher interviewed well, correct?
**A. Correct.**
Q. And Mr. Fisher didn't even make his year of probation, correct?
**A. Correct.**
Q. Because Mr. Interview -- Mr. Fisher interviewing well did not correlate to him performing well in that position; did it?
**A. In that case, yes.**
Q. Ms. Sanchez performing well in an interview doesn't mean she meets the minimum qualifications for the position, correct?
MS. DOWNEY: Objection. Form.
You can answer.

**A. Correct, but she is a good worker, and she's done well so far, so I don't have any complaints about her work.**
Q. So is Ms. Sanchez -- that -- you like Ms. Sanchez, so it doesn't matter that she's not qualified for the position?
MS. DOWNEY: Objection. Form.
**A. I never said I liked her.**
Q. How do you determine that she's performing well in the position?
**A. I see her work. I review her work on a daily basis. I interact with her by talking with her about how to handle certain procurements. She is a smart individual. She is very dedicated to her work. She just does a very good job.**
Q. Do you believe that Ms. Hunt-Brown is not a smart individual?
**A. I believe Ms. Brown is a very smart individual.**
Q. Do you believe Mr. Ortega is not a smart individual?
**A. I believe he's a smart individual as well.**
Q. Why would Ms. Sanchez not -- why would Ms. Sanchez being smart play into why she was hired for this role?



**A. Well, you need somebody who can be able to handle the work, who can be -- have the intelligence to solve problems.**
Q. Looking back at Exhibit 7 -- not 7. 14. It says here in the interview results that Ms. Sanchez was selected for hire. James Ortega's the second choice, and Ms. Hunt-Brown was the third choice, correct?
**A. That's correct.**
Q. You say in the notes for Ms. Hunt-Brown that she needs to provide transcripts and an updated resume at interview, correct?
**A. Correct.**
Q. So you knew at the time, obviously, Ms. Hunt-Brown had a master's degree, correct?
**A. Correct.**
Q. So of the selection, your first choice was somebody with a high school education and six years of experience, correct?
**A. Correct.**
Q. Your second choice was somebody with an associate's degree and 12 years of experience, and your third choice was a person with a master's degree and four to six years of experience, correct?
**A. Correct.**



Q. Does that seem like your decision was based on the qualifications of those individuals?
MS. DOWNEY: Objection. Form.
You can answer.
**A. When -- when we are interviewing people, we're looking at multiple things. We're looking at the interview. We're looking at their education level. We're looking at their experience. It's a combination of everything, and we don't just hire just because one person has one education level higher. We don't hire somebody because they have more experience. We don't hire somebody only because they had a good interview. It has to be a combination of the three.**
Q. But in Exhibit 13, you can't hire somebody who's not qualified for the job, correct?
MS. DOWNEY: Objection. Form. Foundation.
Q. Looking at Exhibit 13 --
**A. Correct.**
Q. -- and looking at Exhibit 12, the NMAC code, page two, the assessment of qualifications discusses whether or not the person is qualified for the position, correct?
MS. DOWNEY: Objection. Form.



Go ahead.
**A. Correct.**
Q. So if you're not qualified for a position by meeting the minimum qualifications, you can't be selected, according to the NMAC code, correct?
MS. DOWNEY: Objection. Form. Foundation.
Q. Go ahead and answer.
**A. Correct. But I relied on HR to do the work to verify whether the applicant's qualified for the positions.**
Q. Because Ms. Sanchez told you in her interview she had six years of experience, so she stated this to you, and you still hired her, correct?
**A. Correct.**
Q. So you knew that she had less than eight years of experience at the time of her interview --
MS. DOWNEY: Objection. Form.
Q. -- correct?
**A. Correct. Now the thing is I want to add for the record I do multiple interviews of people throughout state purchasing throughout TSSB, and in my prior employment I've done multiple interviews. I've probably done over 40 in my history.**

**So sometimes you think that certain requirements are one way when they may have changed from one job to the other, so sometimes these things get missed.**
Q. But looking at Exhibit 1, which was the previous IT procurement position you hired for, correct?
**A. Correct.**
Q. This also says that if you have a high school diploma, you need eight years of experience, correct?
**A. Yes.**
Q. So that is standard for these IT procurement positions, correct?
**A. Yes.**
MS. BURKE: Okay. Let's take a quick break.
(Recess was taken from 11:05 to 11:11.)
Q. (By Ms. Burke) Back on the record. So we were discussing Ms. Sanchez, and as we discussed, Ms. Sanchez stated in the interview that she had six years of experience, correct?
**A. Correct.**
Q. But four of those years were the compliance position, correct? Look at Exhibit 15.



**A. Correct.**
Q. So she actually only had two years of experience related to the purpose of the IT position, correct?
MS. DOWNEY: Objection. Form.
**A. Correct. But within two years an individual can grasp enough to understand the position. I think that a person might need only six months to a year to really grasp state procurement, but two years or more I think is adequate.**
Q. Okay. But it -- it doesn't meet the eight years of experience she's required to have for that position, correct?
**A. Correct.**
**(Exhibit 21 marked.)**
Q. Exhibit 21. Exhibit 21 is the IT procurement specialist 49191, Michael Saavedra, and this must be James Ortega's interview score sheet, because it's redacted, correct?
**A. That's what it appeared to be.**
Q. What answers did you not like that Mr. Ortega gave you in this interview?
**A. I'd have to reread this in order to refresh my memory. I do recall one question that I was not too impressed with, was question number**



**four. Explain the process you go through when doing an RFP. I know as a supervisor supervising him, he hasn't had much experience with RFPs.**
Q. Are RFPs assigned by his supervisor?
**A. Yes.**
Q. And were you his supervisor?
**A. Yes. And the reason why not too many were assigned to him, because in the construction unit there are not as many RFPs assigned to these staff members in construction compared to the strategic sourcing or IT bureaus.**
Q. So it's your belief that in 12 years Mr. Ortega had less RFP experience than Ms. Sanchez in two years?
MS. DOWNEY: Objection. Form.
**A. I can't answer to Ms. Sanchez's history with RFPs.**
Q. Did you ask her that in her interview?
**A. I asked her to -- the same question, explain the process you go through when handling an RFP.**
Q. And does the IT procurement department do ITBs as well as RFPs?
**A. Yes.**
Q. So if Mr. Ortega had experience in ITBs,



he'd still have experience enough to do IT procurements, correct?
**A. Repeat the question.**
Q. If Mr. Ortega had experience with ITBs, he could also do those in IT procurement, correct?
**A. Yes, but we were talking about RFPs.**
Q. Okay. So what in Ms. Sanchez's interview notes suggest to you that she would be better at RFPs than Mr. Ortega?
MS. DOWNEY: Objection. Form. Foundation.
Go ahead.
Q. Go ahead and answer.
**A. Okay. I'd have to review her response. And I -- after reviewing her response, I believe that she touched on the key points to an RFP.**
Q. What do you mean, the key points?
**A. The different steps in the process.**
Q. And Mr. Ortega here, when he's outlining the RFP steps, he doesn't?
**A. Not as well as Ms. Sanchez.**
Q. Your decision to hire was based just on how well they performed under pressure in the interview?
MS. DOWNEY: Objection. Form and

foundation.
Q. Go ahead and answer.
**A. No. Stated earlier, it's based on their qualifications. It's based on their education and their interview. That's why we look at all of them, and we don't just do one or the other.**
**If we only wanted to choose somebody based on education, we would only look at education, not whole interview.**
**If we only wanted to look at their procurement experience, we would only look at procurement experience.**
**If we wanted only interview, then we would only interview.**
Q. So you looked at their qualifications by looking at Ms. Sanchez's two years of buying experience compared to Mr. Ortega's 12 years of buying experience, correct?
MS. DOWNEY: Objection. Form and foundation.
Q. Go ahead and answer.
**A. Yes, and I also want to remind you that Ms. Sanchez also had experience during the years as financial coordinator working with IT contracts. Maybe it doesn't state it in her job description,**



**but that's what she did.**
Q. And Ms. Hunt-Brown also was the finance coordinator, correct?
**A. I believe so.**
Q. So she also had the exact same experience that Ms. Sanchez did, correct?
**A. Correct.**
Q. So why was Ms. Hunt-Brown not as qualified as Ms. Sanchez?
**A. Ms. Hunt-Brown did not give a good interview.**
Q. So it doesn't matter how much experience or education somebody has as long as -- I mean, if they don't perform well in an interview?
MS. DOWNEY: Objection. Form. Foundation.
Q. Go ahead and answer.
**A. It's a combination of the three, and somebody can really fail an interview, and that tells you quite a bit of the person, what type of work they might be producing or not producing.**
Q. What do you mean?
**A. Just by the responses you can see whether they understand certain concepts. You can see whether they have experience with certain things,**



**and you could see the type of person they are when it regards getting into the work.**
Q. Now, IT procurement specialist is a pay band 85, correct?
**A. Correct.**
Q. So for many of these people, it's a promotion, correct?
**A. Correct.**
Q. And so Ms. Sanchez was a pay band 75 as the financial coordinator?
**A. I'd have to look back at the paperwork.**
MS. DOWNEY: Objection. Foundation.
Q. I think -- look at her interview.
**A. Correct.**
Q. So you promoted Ms. Sanchez from a 75 to an 85 when you hired her?
**A. Correct.**
Q. Is that the same pay band for Mr. Ortega?
**A. I believe so.**
**(Exhibit 22 marked.)**
Q. Exhibit 22 are the interview notes by Michael Saavedra for Kimberly Hunt-Brown. Looking at number four, there's a lot of notes written in number four, correct?
**A. Correct.**



Q. So Ms. Hunt-Brown gave you an extremely thorough response to that question, correct?
**A. Correct.**
Q. Ms. Sanchez's, by comparison in Exhibit 18, is not nearly as thorough, correct?
MS. DOWNEY: Objection. Form.
**A. Correct. But what I would like to add to the record is there are nine questions not including the HR-mandated questions, and we use them all together to make a determination on an individual, not just one question.**
Q. So, like, question number eight, the question of if you were stuck in a vehicle with a stranger for a long trip, that question determines whether or not somebody gets hired for this position?
MS. DOWNEY: Objection. Form.
**A. I should have recalled, but I did not at the time, that one of these questions -- a weird question is always added to this per the GSD policies.**
Q. Okay. Why would Ms. Sanchez -- why would the shorter answer for Ms. Sanchez be a better answer than the longer more thorough answer for Ms. Hunt-Brown?

of education and experience in both positions, correct?
**A. Correct.**
MS. DOWNEY: Objection.
Q. So how does the education and experience matter most to you?
MS. DOWNEY: Objection. Form.
**A. Repeat the question.**
Q. How does education and experience matter most to you if you have, for two positions in a row, chosen the candidate with the least amount of education and the least amount of experience?
MS. DOWNEY: Objection. Form again.
**A. I never said education and experience is most important.**
Q. Okay. What's most important?
**A. I say it's a combination of the three.**
Q. And for both of the individuals selected for both of the positions discussed today, it was the interview that made you decide to hire them?
MS. DOWNEY: Objection. Form. Foundation.
**A. It was a combination of the three.**
Q. How was it a combination of the three for Mr. Fisher?



**A. Well, some people just interview really terribly, some people interview decent, some interview well, and he interviewed very well.**
**Some of the applicants just had really bad interviews, and along with education and experience -- we look at everything combined, and I want to remind you that this was a unanimous decision of the committee, not just my choice.**
Q. But you're the hiring manager for this position, correct?
**A. Correct, but I chose to go along with the entire committee, which was unanimous.**
Q. Ultimately, the decision is yours, correct?
**A. I believe so.**
Q. And you submitted the hiring justification paperwork, correct?
**A. Correct.**
MS. BURKE: Let's take a quick break and let me go over stuff, and I think we're pretty much done.
MS. DOWNEY: Okay. Like five minutes?
MS. BURKE: Yeah, five minutes, just to make sure I didn't miss something.
(Recess was taken from 11:41 to 11:46.)



Q. (By Ms. Burke) in each of the interview scoresheets which are Exhibits 18, 21, and 22, the last question asked in the interview is: Are you able to perform the duties of the position with or without an ADA confirmation? Correct?
**A. Correct.**
Q. When that question was asked, were applicants provided a list of the essential duties of the position?
**A. Sometimes we would ask them at the beginning of the interview if they're aware of the essential duties of the position, and sometimes we would hand them a list of the job description.**
Q. The same one that we looked at as Exhibit 13?
**A. Yes, but I can't recall if in this one we did.**
Q. Whether you gave them the job description in this one?
**A. That's correct. I do not recall.**
Q. So how would the applicant know whether or not -- or how to answer that if they didn't know what the essential functions were when they answered?
**A. I assume that they read the job**



**description when they first applied.**
Q. When you ask interviewees that question, do people answer that they don't have a disability?
MS. DOWNEY: Objection. Form.
Q. Go ahead and answer.
**A. They'll respond with yes or no or with or without.**
Q. You never have anyone tell you that they don't have a disability?
**A. I -- I've never had anybody say that they have a disability.**
Q. In any of the interviews you've ever conducted?
**A. That's correct.**
Q. Why is that question important?
**A. That's a --**
MS. DOWNEY: Objection. Form. Foundation.
Go ahead and answer.
Q. You can answer.
**A. That's an HR-mandated question, and I don't know what the purpose is for having it in here. It's up to them.**
Q. Looking at Exhibit 13, is the working conditions portion of the job description what is

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CASE NO.: 23-cv-00782 SMD/KK

KIMBERLY HUNT-BROWN,

Plaintiff,

vs.

NEW MEXICO GENERAL SERVICES DEPARTMENT; AND VALERIE PAULK; EUNICE MOYA; JENNIFER MORFIN; VANESSA LeBLANC; AND NATALIE MARTINEZ, In their Individual and Official Capacities,

Defendants.

CERTIFIED TRANSCRIPT

DEPOSITION OF FRANCINE MARTINEZ

THURSDAY, JULY 3, 2025

1:10 P.M.

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this Deposition was:

FOR PLAINTIFF KIMBERLY HUNT-BROWN:

BURKE LAW
BY: HEATHER C. BURKE, ESQ.

REPORTED BY:

DAVID M. LEE, RMR, CCR,
Certificate Number 50391
New Mexico CCR Number 537
Cumbre Court Reporting Services, L.L.C.
513 Harkle Road
Suite A
Santa Fe, New Mexico 87505
(505) 984-2244
cumbrecourt@comcast.net





EXHIBIT F

Page 26

Q. Okay. How many positions did you review the Interviews for?
A. So from what I can recall I gather it was IT positions, so a total of 3 positions.
Q. So 3 different IT Procurement Specialist positions.
A. Yes, ma'am.
Q. How many people do you currently supervise?
A. Five.
Q. And what are their names?
A. Charlotte Carrillo;
Susan Inman;
Crystal Bowers;
Barbara Montoya; and,
Danny or Danielle Fresquez.
Q. And are all of these individuals Procurement Specialists?
A. They are.
So we are the operational side, so I have 3:
Charlotte;
Susan; and,
Danielle.

Page 27

There are more mobile CPOs to the State of New Mexico. They assist Agencies that are lacking a Chief Procurement Officer for their Agency, and they take on a lot on behalf of the Agency. They have to understand the Agency's needs and Mission in order to complete the tasks that they need to do on behalf of the Agencies.
Q. And is a Mobile CPO titled differently than one of the --
A. Yes.
Q. What is the job title then?
A. Mobile CPO.
Q. That's what it's called as its formal SPO?
A. Yes, ma'am.
Oh, you're saying the official title.
Q. Yeah.
A. Procurement Specialist....
I would have to take a look, but I refer to them as Mobile CPOs, or Procurement Specialists, but there's a number, I believe, after the main

Page 28

title.
Q. Is it I or II?
A. I can't....
I cannot answer that question.
Q. What's the Pay Grade of that position?
A. 75.
Susan Inman is our Trainer to the entire State of New Mexico. She is well versed in the Procurement Code.
They also maintain -- they all maintain their CPO Certification.
She has a strong knowledge in RFP training, and she trains the entire State, including the local public bodies and municipalities.
Q. Is having a CPO Certification required to be a Procurement Specialist?
A. To become a...
In the positions that I supervise underneath me it is not a requirement, but it is encouraged, or

Page 29

I would say yes, they would technically have to have it.
I have to think back because these are newer positions to the State in order to do the work of the CPOs for the Agencies, so yes.
Q. For each Procurement Specialist, and even the nonmobile ones, everyone needs a Procurement Certification.
A. So specific to my staff, it's expected.
Q. Okay.
A. You have to have it because of the fact that they are doing actual Procurements on behalf of the Agency, so yes.
Q. Okay. That's your own personal requirement.
A. No, it is in the Job Description I believe.
When you refer to them as a "Procurement Specialist...."
I'm sorry, I didn't mean to cut you off.
Their specific title is

Page 34

They can either self-report,
or try to submit it and see if it gets
approved.
Q. Do Agencies typically self-
report?
A. It just depends how honest the
Agency is.
MS. BURKE: Okay. This will be
Exhibit 1.
(Deposition Exhibit 1 was
marked for identification.)
THE WITNESS: (Witness reviews
Deposition Exhibit 1.)
Q. BY MS. BURKE: This is the Job
Description for the State Purchasing
IT Procurement Specialist II, which is
GSD #49191.
A. (Witness reviews Deposition
Exhibit 1.)
Q. Was this one of the positions
for which you were on an Interview
Panel?
A. Yes.
Q. And this position is a Pay Band
85; correct?

Page 35

A. Yes.
MS. BURKE: Let's just do this
(indicating).
(Deposition Exhibit 2 was
marked for identification.)
THE WITNESS: (Witness reviews
Deposition Exhibit 2.)
Q. BY MS. BURKE: Exhibit 2 --
A. Wait, this is...
Let me just read this again.
(Witness reviews Deposition
Exhibit 1.)
THE WITNESS: Okay.
Q. BY MS. BURKE: So Exhibit 2 is
the IT Procurement Specialist
Interview Questions for Amber Sanchez
as reviewed by Francine Martinez;
correct?
A. Yes, ma'am.
Q. And these are the notes that you
were talking about having reviewed.
A. Yes, ma'am.
MS. BURKE: Okay. This is
Exhibit 3.
(Deposition Exhibit 3 was

Page 36

marked for identification.)
THE WITNESS: (Witness reviews
Deposition Exhibit 3.)
Q. BY MS. BURKE: This is the
Application for Amber Sanchez for the
IT Procurement Specialist II position,
GSD #49191.
A. (Witness reviews Deposition
Exhibit 3.)
Q. Did you review Exhibit 3 before
conducting the Interview for this
position?
A. Yes, ma'am.
Q. Now we touched, earlier on
today, about the fact that Amber
Sanchez was working in the Compliance
position prior to applying, or when
she applied for the #49191 position;
correct?
A. Yes, ma'am.
Q. And how long had she worked in
that position?
A. Prior to the...
This position?
Q. Yes.

Page 37

A. This was in...
Was this last...
This was last year; I'm
having a hard time with dates.
This was in 2024, so she was
in the position for...
2019, '20...
Between 4, 4 and a half to
5 years from what I can recall, but I
am not exactly certain.
Q. Okay. Looking at the bottom of
Exhibit 3, page 1, it says that she
started as a Financial Coordinator on
October 17.
A. Oh, I can refer...
Q. Yes.
A. Sorry about that; I thought I
was having to memorize that.
Q. No, you can certainly look at
the exhibits.
A. Okay. Thank you.
Q. Okay.
A. What page are you on?
Q. The first page of Exhibit 3 at
the bottom of that page.

A. If I had to go to the folder, the shared folder, I believe it's Kimberly Hunt-Brown that was responsible for the Compliance piece.

Q. And that was while Therese Montoya was there.

A. Yes.

Q. And so there is a record of Kim's underperformance in the Compliance role.

MS. DOWNEY: Objection; form.

THE WITNESS: (No audible response.)

Q. BY MS. BURKE: Go ahead and answer.

A. I don't know.

Q. So your Testimony was that Valerie Paulk brought Amber into this position because Kim was underperforming; correct?

A. There -- may I elaborate?

Q. Yes.

A. I know that there was an Org. There was some sort of change within the positions because the position was



not being met.

To my knowledge, from what I can recall, she did Compliance and she did some sort of Policy, or was supposed to do a Policy and Procedure Manual of some sort. To my knowledge, my employee, Susan Inman, created a Policy and Procedure Manual because Valerie tasked her with it because that wasn't fulfilled.

Q. Are you saying she was tasked with completing Policies other than the one she was doing when she worked for the Administrative Services Division?

A. I don't know. I don't know anything about her work in the Administrative Services Division, I'm sorry.

Q. So you don't know for sure that she was tasked with creating any Policies at State Purchasing.

A. At State Purchasing I was told.

Q. Who told you that?

A. Valerie.



Q. So when Valerie reorganized the Compliance position she also reorganized those other positions as well.

A. I can't honestly say on behalf of the Buyers.

Like with the Buyers, I don't involve myself because it is not my area of expertise; mine is the operational/financial side.

I don't know. I can't honestly answer that question.

Q. So you don't know if there is a difference in the way that the job duties were assigned prior to that reorganization versus how they were assigned to Amber Sanchez.

A. As far as the Compliance?

Q. Yes.

A. Oh the Compliance, I mean me going into that position, we gave strict deadlines. I can't tell you what was there prior to; we were very deadline-oriented.

Q. And who managed that role before



Valerie Paulk?

A. The Deputy Director role?

Q. Yes.

A. I can't -- I don't know.

Q. And when you say "sales" in a Compliance position what do you mean?

A. So each vendor has to submit a bid or proposal in order to be considered on a Statewide Price Agreement. There are Terms and Conditions that fall within the Contract.

There's also fees associated with some, if not the majority of our Contracts. Based on the sales that they have within that Contract, they submit or have a fee associated with those sales.

Q. So the Compliance position isn't selling anything, it's just collecting the fees that are already due.

A. Yes.

Q. So how can you increase sales in a position if your job duty is just to collect fees?

Page 58

Purchasing and taking this position or under my position. I can only answer for myself with Amber being in the position.
Q. Do you remember what timeframe between Therese Montoya's retirement and Amber Sanchez' hire was?
A. I cannot recall.
Q. Could things have been in disarray because that position was unfilled?
A. Compliance?
Q. Yes.
A. It seemed as though it was Kim doing the Compliance, so I can't answer that question as you're asking it.
Q. You said: "It seemed as though it was Kim doing the compliance [work]."
A. That's what I gathered from Valerie, yes.
Q. Does that mean that she had the position, or does that mean she was trying to cover Therese's position?

Page 59

A. I don't -- I can't recall the dynamics between Therese and Kim. It was bizarre to me, but I don't know; they were just always together.
Q. What do you mean by "... bizarre..."?
A. I...
They were always together in the same office, so I don't know. I don't know the...
I just don't understand the dynamics. My employees are very self-sufficient in their positions. They know I am available and I don't understand...
You know, it is a whole different style of supervising, I gather, with Kim and Therese.
"Therese." "Therese."
Q. Would it make a difference if Kim didn't hold the Compliance position and was just doing the extra work of an open position?
MS. DOWNEY: Objection; form and foundation.

Page 60

THE WITNESS: (No audible response.)
Q. BY MS. BURKE: Go ahead and answer.
A. Can you clarify your question? I don't understand.
Q. You've given Testimony that Kim was doing an inadequate job as the Compliance employee; correct?
A. I'm saying that what was left for Amber to continue on or take on the position, it was sloppy.
I mean if you want me to be honest, it was sloppy and messy. We started a whole new foundation and a whole new spreadsheet based off of my expectations from Valerie to give to Amber. That's how I can answer that question.
Q. Is this spreadsheet one of those spreadsheets that's continually updated over time?
A. It's continually -- it's updated every single day with my staff.
I can only speak on behalf of

Page 61

my staff; I can't speak prior to Amber Sanchez.
Q. So the "... sloppy and messy..." spreadsheet, how long had that spreadsheet been in existence?
A. I don't -- I cannot answer that question.
We started, or I started a whole new spreadsheet. The only information I pulled off of that is the vendors that were on there and transferred it onto a new spreadsheet so that Amber could start a whole new spreadsheet.
Q. Did Kim create the spreadsheet that was "... sloppy and messy..."?
A. From what I gather, or what I was given by Valerie, she was the Compliance Officer prior to Amber, so I can only gather from what I was told.
Q. So you did believe that Kim had the official title of Compliance Officer.
A. I don't know her official job

Page 82

"Equivalent"; correct?
A. I've lost you.
Q. Looking at Exhibit 3, Amber Sanchez, in that Application, states that her highest education level is:
"High School Graduate [correct] or Equivalent"?
A. Oh, I think I lost my...
Q. Look at Exhibit 3 and turn to page 24. Down at the bottom, it says:
"Highest Education Level: High School Graduate or Equivalent"; correct?
A. Yes, ma'am.
Q. According to GSD's requirement for this position Amber Sanchez would have needed 8 years of direct experience for this position to meet the Minimum Qualifications with a High School education; correct?
A. To clarify, these positions are vetted through HR, so with her background and experience she had IT experience after reviewing her Application and her prior position.

Page 83

Q. She tells you here that she has 6 years of experience in her Interview; correct?
MS. DOWNEY: Objection; form.
You can answer.
THE WITNESS: Can you clarify your question?
Q. BY MS. BURKE: Yes.
Exhibit 2 says:
"What is your experience relative to the skills required of the IT Procurement Unit?"
She answers: "State Purchasing Department 6 years"; correct?
A. Yes.
Q. So you knew that she only had 6 years of experience in this position.
A. No. Based off of her Application she had more than 6 years. She had years of experience in her previous positions.
Q. You're saying previous to her

Page 84

time at State Purchasing she had Purchasing experience.
A. So I'm not following you, and I apologize.
Q. Okay. You wrote down on this spreadsheet, or on this Questionnaire that she had "... 6 years" of experience; correct?
A. I'm -- yes.
Q. But she needed 8 years of experience to meet the Minimum Qualifications of this position; correct?
MS. DOWNEY: Objection; foundation.
THE WITNESS: (No audible response.)
Q. BY MS. BURKE: Go ahead.
If you need foundation, we'll look again at Exhibit 1, page 2. It says:
"High School Diploma or Equivalent and 8 years of experience"; correct?
A. So I can't define 8 years of

Page 85

experience through SPO rules. I would have to defer back to HR because this is open to -- this is open. This doesn't say "8 years direct experience," so I would have to defer back to HR.
They vet the Applications and I don't, so I can't answer that question.
Q. Did HR participate in the Interview?
A. HR receives the Applications as they come in and they vet the Applications, so I would have to defer back to HR.
Q. You're saying in your role on the Hiring Panel you don't have any responsibility to ensure that the Applicants actually meet the Minimum Qualifications of a position?
MS. DOWNEY: Objection; form.
THE WITNESS: (No audible response.)
Q. BY MS. BURKE: Go ahead and answer.

Page 134

Q. I was going to say you can count with your fingers.
A. I do apologize.
Q. So how many years is that?
A. 8 years.
Q. So Ms. Hunt-Brown had 8 years of experience directly at State Purchasing, and a Master's Degree, which substituted or meant that she only needed 2 of those 8 years to qualify under the Minimum Qualifications for this position; correct?
A. You're talking or saying specifically to Kim?
Q. Yes.
A. Because I have to refer back to HR. I am...
I don't know what her degree is, the level of degree, her degree. I don't understand her degree, and I would refer back to HR. I don't -- again, I don't know how they vet the Applications.
Q. So is it your Testimony that a

Page 135

Master's Degree would somehow not be substituted with only 2 years of experience --
A. It could be --
Q. -- for this job?
A. It could be a Master's Degree in water; I don't know. I don't know the Degree or the requirements of the Degree, or the level of the Degree that -- that is here in front of us. I don't know.
Q. So you didn't get Kim's Transcripts with this Application.
A. I -- I can't remember. I can't recall. I can't recall.
Q. I'm representing to you right now that Kim has an MBA, which is a Master's in Business Administration. Under the Minimum Qualifications you only need a Bachelor's in Business Administration; correct? According to Exhibit 1.
A. I don't see what type of Master's Degree, so I can't answer the question.

Page 136

Q. So the Master's Degree would be in the same field as the Minimum Qualification where it says:
"Bachelor's Degree...."
You would substitute the words "Master's Degree in Business Administration" and the years of experience that would be substituted into the Minimum Qualification, and that would be 2 years; correct?
A. But....
But this goes back to your previous question on the level of experience versus a Master's Degree. Certain individuals can have the years of experience in lieu of a Master's Degree in a previous position that they held whether it's in private, the private sector, or the current position they hold within State Government.
So I can't answer the question as you're wanting me to answer it. I can only answer it based on the years of experience a person

Page 137

has outside, you know, from a private company that could qualify, or that can qualify or qualified the person to qualify for the position.
Q. Okay. So you're saying here that you can't say whether or not 8 years of direct experience at State Purchasing, when you only need 2 years of experience at State Purchasing Department -- sorry; let me start again so that I am clear:
You're saying that having 8 years of direct experience at the State Purchasing Department, when you only need 2 years, is not sufficient.
A. So we Interviewed these Applicants based on the fact that they qualified for the position.
Q. Yes.
Your job in an Interview is to ensure they qualify for the position; correct?
A. So if a person has experience outside of State Purchasing that is relative or related to the position,

they qualify. I -- they qualify.
Q. So now your Testimony is that you're sure that the their experience outside --
A. So what I'm saying is based on what I -- my experience. I gave you my example.
Q. Yes.
A. This is vetted through HR; that's all I can say. I'm...
I -- I can only say or I can only speak from experience. HR vets these Applications and they give them to us based on how they vet and ensure that they are qualified Applicants for the positions that are held within State Purchasing.
Q. Okay. But Amber Sanchez told you directly in her Interview that she had 6 years of experience; she didn't claim to have 8. She claimed to have 6 years of experience, which is not the 8 years she is required to have; correct?
A. I can't answer that question



100%. I can't answer that question because she has...
She could...
There...
I can only write down as much as I can remember while they are talking.
I will be honest with you, when Kim Interviewed, and I'm sure you will get to Kim, or we'll get to Kim, but I can only answer that in receiving the Applications from HR. I can only...
I can't put words in my own mouth; I rely on HR to vet these Applications, and I can only answer that. That's how I see these Applications coming to our Division.
Q. Okay. But HR may have made a mistake; correct?
A. I -- I don't know. I can't answer that question.
Q. And you may have made a mistake when she said "... 6 years" and the position required "... 8 years...";



correct?
A. I -- I can't...
I'm not making any...
I'm not...
That's based on assumption and I can't...
I wrote down what is there.
I don't -- I can't recall every...
I try to write...
I -- I don't know what you're asking me, but I'm not going to go into the weeds either.
These are all vetted through HR. They are given to us once they are vetted. And based on the qualifications, all of these individuals were qualified for the position.
Q. So that means that HR couldn't have made a mistake.
A. You would have to ask HR.
Q. If Amber only has, at most, 6 years of experience for this position, and HR ignores the fact that she needs 8, who carries the burden of



showing that Amber is qualified for the position?
A. I can't answer how Amber answered the question.
A lot of people get nervous in an Interview. I've been on several Interview Panels, and I have noticed that people will not include a lot of their work history, and I can just say that based on my experience.
I've been in several Interviews. I've sat on several Interview Panels, and when we're in the middle of an Interview, I can't tell you how many employees have forgotten a lot of the information that may or may not -- or should be there. They may or may not be nervous; I don't know.
I can't answer that question.
I would have...
You're asking me a question based on the requirements and the criteria, but it doesn't say, "direct experience," and I'm only basing it on

the top of the page, Ms. Sanchez lists 3 references. One of them, the second one, it says:

"Francine Martinez, Supervisor, State of New Mexico."

Is that you?

A. Yes, ma'am.

Q. So you were a reference for Ms. Sanchez and you sat on her Hiring Panel.

A. I sat on the Interview Panel, yes.

Q. So you helped to decide if she would get this job; correct?

A. Based on the knowledge and the experience, yes.

Based on the knowledge of the position.

Q. So she already knew that you would say that she should get this position when she put you down as a reference; correct?

A. Absolutely not. Absolutely not.

When I go into a position, my



employees are not -- my employees are my employees. I hold them to a high standard, as I did Amber. Amber had specific time -- a timeline from Valerie Paulk, and we met each deadline.

She is very deadline-driven, and my expectations of Amber were set extremely high. I viewed her as an Applicant, not as my employee when she walked into the position to Interview for the job.

Q. What is the purpose of a reference on a job Application?

A. It is to -- a reference is to...

There are certain questions that are asked; their work ethic, their...

I don't have one in front me, but again, I really can't answer.

But there are a slew of questions that you have to ask the previous employer for the position.

Q. Or whomever is listed as a reference; correct?



A. The questions that are asked.

Q. For references?

A. Yeah, there are specific questions that are asked.

Q. Okay. And so it's atypical to put a reference on an Application that's going to say bad things about you; correct?

A. I don't know how anybody answers, I can only speak for myself.

I mean you have to be honest when you ask -- when those questions are being asked to you.

Q. Right. But when you apply for a job and you put references on your Application, do you put the names of people who you know are going to say bad things about you?

A. I would put the people that I know that know my work ethic.

I really don't -- can't say that anybody would say bad; it depends.

It's based on work ethic.

Q. But you would put the best



people on that list; correct?

A. I -- I -- I can't say "Yes" to that because I held Amber to a high standard. I didn't -- I liked Amber because I respected her because of her work ethic. I respected the fact that every time I gave her a deadline, she met the deadline. She was self-sufficient and driven. She was not a skimmer; she would read things very thoroughly.

Based on my -- I -- maybe she respected the fact that I respected her; I can't tell you that. But when she walked into that Interview she walked in as a person applying for a position, I didn't view her as, "She's my employee." I never viewed her in that manner.

Q. So did you answer questions for this Application as her reference as well?

A. I can't recall. I cannot recall.

Q. She had to put at least 3

there.

Q. Okay. But you are a reference on Amber Sanchez' Application; correct?

A. Yes.

Q. And Amber Sanchez was the individual selected for this position; correct?

A. Amber Sanchez was, based on her answers to the questions. I can only go based on the answers to the questions. I am not basing it on --

Again, sorry to reiterate:

When an individual goes into those Interviews, for myself, I Interview and see them as a person going into the Interview that's qualified and has been vetted.

I know you -- your eyebrows, but these have already been vetted, so I see her as a person, I don't see her as my employee walking in.

My standards are very high, and I take -- I took her as my employee out of the picture entirely,



and she went in as a person that applied for the position.

Q. But you have talked extensively in this Deposition about how much respect you have for Ms. Sanchez.

A. As an employee, yes.

Q. So you already knew and you already had a very high opinion of Ms. Sanchez when she walked in that door.

A. I took all of the -- the opinion that I have given you based on all the questions you asked me about Amber, when I went into the Interview I went in as she was an employee that was going for an Interview for this position, not based on the knowledge that I have.

Of course I have -- I mean she was my employee, but I took....

When they go into the Interview -- I mean this is only me; I can only speak for myself -- I see them as a person that applied for the position that was vetted and qualified



and we're Interviewing them. I didn't see her as Amber Sanchez, my employee.

I took -- I have to take that out. I have to find the balance as a Supervisor.

Q. But you've Testified that you knew very little about Kim Hunt-Brown; correct?

A. I knew nothing about Kim other than she did Compliance.

Q. And that she had messy spreadsheets; correct?

A. With respect to the questions you were asking I had to -- that's the answers I gave based on those questions.

I don't know Kim. I don't know Kim. Just...

And I didn't put...

You're...

I didn't put any of the knowledge that I had of Amber into any of the thought process of her. Across from me she was Amber Sanchez who applied for a position. I didn't take



the knowledge that I already had of her work ethic and how she is into any consideration whatsoever.

Q. But you're Testifying here today that she got this job because of her answers in the Interview.

A. How she answered her questions.

Q. Not based on her Application; correct?

A. We look at the Applications. We look at the Applications, but it also entails the way they answer the questions; it is so important.

There's reasons why we ask these questions.

Q. But as you've already Testified, people get nervous in Interviews; correct?

A. They do.

Q. And so the Interview itself may not be the best snapshot of how that person is as an employee; correct?

A. But the importance of the questions, you are....

You have -- you have a short

Page 182

individuals based on the Applications we received and what HR was given -- gave to Michael.
MS. BURKE: This will be Exhibit 9.
(Deposition Exhibit 9 was marked for identification.)
THE WITNESS: (Witness reviews Deposition Exhibit 9.)
Q. BY MS. BURKE: Exhibit 9.
A. Thank you.
Q. This is State Personnel NMAC rules for "recruitment, assessment selection" for State Personnel Administration. This is NMAC 1.7.5.1.
On page 2, section 1.7.5.12, says, "Selection." And "A" says:
"In accordance with the purpose of the Personnel Act NMSA section 10-9-2, selection shall be based solely on qualification and ability."
Is that correct?
A. Yes, ma'am.

Page 183

Q. So on the Interview Panel you are tasked with selecting who to hire; correct?
A. We are on the Interview Panel with the Supervisor that oversees the position to -- to hire. To hire.
Q. So you're selecting the candidate to offer the position to; correct?
A. We have our opinion and ultimately give it to the Supervisor we -- in selecting the candidate.
Q. So is the answer "Yes" or "No" to my question?
A. "[I] am on the Interview Panel to select."
Q. Yes.
A. Well it's not -- it's to sit on the Panel with the Supervisor to select an Applicant for the position.
Q. Right. You're selecting the person who gets the job; correct?
A. I am not. It's -- we all have -- everyone, I believe, has an opinion and we all don't see the

Page 184

Interview, you know, the exact same way. We are not all programmed to see the same...
I mean it's my opinion, or what I have on paper that the Applicant has elaborated on the question.
Q. So did you think that Amber Sanchez should be given or hired for the position of IT Procurement Specialist?
A. Based on?
Q. You were on the Hiring Panel. Did you vote "Yes" or "No" on Amber Sanchez?
A. Did I vote "Yes" on hiring her to the position?
Q. Yes.
A. Yes, I did.
Q. So you selected her as the IT Procurement Specialist.
A. For that position?
Q. Yes.
A. Yes, I was on that Panel.
Q. And that was supposed to be

Page 185

based solely on her qualifications; correct?
A. Qualifications and ability.
Q. But she hadn't done the position yet, so you didn't know her ability to do the position; correct?
A. Qualifications and ability as far as her ability to do Procurements.
When she took on that IT piece of the Procurement to sit there for such a short period of time, the ability fell within question on the Interview.
Q. Okay. What about the. "... qualification"?
A. Can you define "... qualification..."?
Q. So you have Testified several times today that you didn't even look at how many years of service she had, or what her degree was; correct?
A. Because those are vetted through HR.
Q. But this says the:
"... selection shall be

Page 186

based sole on the
qualification....."
HR didn't make the selection
for this position, you did.
A. I did based on the questions and
answers and the responses that we
received.
Q. You have to base that on
qualifications for the position;
correct?
A. I based it on -- it is the whole
entirety.
The questions make a
difference. When they are asked, they
are responding to the question with
the answers that they are giving.
Never once have I ever looked
at a person for any other reason other
than the questions we ask.
Q. So you're testifying here today
that a person with a Master's Degree
in the related field required and --
what did we say -- 8 years of
experience directly related to the
position is less qualified than a

Page 187

person with a High School education
and only 6 years of experience.
MS. DOWNEY: Objection; form.
You can answer.
THE WITNESS: I know you look
exhausted, as I do, but to answer the
question...
You will have to clarify the
question.
Q. BY MS. BURKE: So what made
Amber more qualified for the position?
A. Based on the questions that were
asked and the answers that were given.
I recall...
I can't...
You have this one in front of
me 100%, but Kim's answer to Question
1 was "Little to none." "Little to
none."
I don't know how to -- those
are the 2 main questions. All of
these questions are important, but
when you ask "What is your experience
relative to the skills of the IT
Procurement," and someone says "Little

Page 188

to none," I don't.....
I don't know what you want to
hear from me.
Q. But you Testified here that
Amber Sanchez was allowed to do IT
Procurement as the Compliance
Specialist.
A. As her Supervisor. As her
Supervisor I allowed her.
Q. Right.
A. I allowed her.
Q. Right.
A. Because she had to; she had no
choice.
That IT Procurement, which is
one of our major Procurements in the
State was lacking the Terms and
Conditions of the Contract.
Q. What do you mean, "... she had
no choice"?
A. (No audible response.)
Q. Why didn't another IT specialist
do that?
A. I can't answer that question at
the time. I cannot answer that

Page 189

question.
Q. You don't manage the IT --
A. I do not.
Q. -- people; correct?
A. That would be Michael Saavedra.
Q. Didn't you say to Michael
Saavedra, "Your staff isn't finishing
their work and someone else needs to
do this?"
A. That's not how I operate. I am
not going to go tell Michael Saavedra
that.
Amber asked me, "Can I work
with Raelynn on this Procurement so
that I can" -- "where it misses the
Terms and Conditions. I need to
understand the entire Contract," so I
said, "Yes." Why would I -- why would
I tell her "No"?
Q. So you gave her the experience
she needed for this position when she
applied for there promotion.
A. I don't think this position was
open when she went to go search for
the information that was missing out

EXHIBIT 3

**Heather@hburkelaw.com**

| | |
|---|---|
| **From:** | Hunt-Brown, Kimberly, GSD |
| **Sent:** | Friday, September 6, 2024 7:31 AM |
| **To:** | LeBlanc, Vanessa, GSD |
| **Subject:** | I'm at my desk and working! |

Good morning and hope you're having fun on your day(s) off.

*Thank you,*

*Kimberly A Hunt-Brown*

Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
kimberly.hunt-brown@gsd.nm.gov

*See current procurement opportunities online at:*
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the **ePro**NM/Sci**Q**uest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

**Heather@hburkelaw.com**

---

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Friday, September 6, 2024 12:37 PM
**To:** LeBlanc, Vanessa, GSD
**Subject:** Going to lunch now...

Lunchtime, 30 minutes.

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

**Heather@hburkelaw.com**

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Friday, September 6, 2024 1:06 PM
**To:** LeBlanc, Vanessa, GSD
**Subject:** FW: Back from lunch now...

Thanks, ☺
*Kim*
*505-490-3152*

---

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Friday, September 6, 2024 12:37 PM
**To:** LeBlanc, Vanessa, GSD <Vanessa.LeBlanc@gsd.nm.gov>
**Subject:** Going to lunch now...

Lunchtime, 30 minutes.

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
kimberly.hunt-brown@gsd.nm.gov

**See current procurement opportunities online at:**
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

**For current procurement opportunities in the eProNM/SciQuest system, go to:**
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

**Heather@hburkelaw.com**

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Friday, September 6, 2024 3:39 PM
**To:** LeBlanc, Vanessa, GSD; Mendonca, Dorothy, GSD
**Subject:** Kim's Assignments COB 09062024.xlsx
**Attachments:** Kim's Assignments COB 09062024.xlsx

Hi Vanessa, I've got to get to my doctor's appointment, but here's the spreadsheet!

Thanks, ☺
*Kim*
*505-490-3152*

Cumbre Court Reporting
Exhibit 5
Date 07.09.2025
Eunice Moya

**GENERAL SERVICES DEPARTMENT**
*Agency Policy*

| Subject: | Number: GSD-003 |
|---|---|
| **Hours of Work and Overtime Policy** | Effective Date: 5/30/2017 |
| | Number of Pages: 11/13 |

**REVISION LOG**

| Revision Number | Date | Responsible Party | Comment |
|---|---|---|---|
| Revision 0 | 10/03/2013 | Michael Gallegos | New; replaced 350-2-42. |
| Revision 1 | 05/30/2017 | Angela Dawson | Updates policy to current requirements and processes. This revision supersedes and cancels all previous approved or draft versions of GSD-003, Overtime Compensation Policy, as well those portions of GSD Policy HR 12-01 (approved 01/20/2012) that specifically prescribe the hours used for a set work schedule for GSD employees. |
| | | | |
| | | | |

**Table of Contents**


1.0 Purpose ... 2
2.0 Scope/Applicability/Organizations Affected ... 2
3.0 References ... 2
4.0 Definitions ... 2
5.0 Background ... 3
6.0 Policy ... 3
7.0 Procedures ... 9
8.0 Attachments and Enclosures ... 11
9.0 Approval ... 11


Policy contains 11 pages of policy text plus one 2-page form attachment, for 13 total pages.

6.2.2 An employee may not change their approved AWS to a different AWS without prior written approval from the employee's immediate supervisor/manager and Division Director.

6.2.3 An AWS may not be approved if such schedule will result in increased overtime in order to complete work assignments.

6.2.4 An employee may not change or flex their approved NWS without prior approval from the employee's immediate supervisor/manager.

6.2.5 Except for formal accommodations made pursuant to an authorized medical recommendation or ADA process in the appropriate context, an AWS request will not be approved for a compressed work week.

6.3 FLSA non-exempt employees should work a schedule that does not exceed 40 hours per week.

6.3.1 Overtime is generally not permitted and must be requested in advance. A failure to request overtime in advance, may lead to disciplinary action, up to and including dismissal.

6.3.2 Employees are required to adhere to their authorized work schedules, including maintaining punctual attendance and commitment to a full day's work.

6.4 Eligibility for AWS

6.4.1 Individual employees may be permitted to work an AWS with the written consent of their supervisor/manager and Division Director.

6.4.2 An approval of an AWS will ultimately be at the discretion of GSD, but should include the following considerations:

6.4.2.1 GSD's operational and public service needs, safety concerns, and the need for supervisors/managers to be present when employees are on duty during the AWS

6.4.2.2 Budgetary impact, if additional staffing is needed to cover an employee's absence

6.4.2.3 Whether the employee has completed their one year probationary period

6.4.2.4 Length of employment with GSD

6.4.2.5 Successful job performance

6.4.2.6 Satisfactory attendance and timeliness

6.4.3 Certain positions may not be eligible for an AWS due to specific operational needs or the job duties assigned to the position.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT III: FMLA INTERFERENCE

COMES NOW, Plaintiff Kimberly Hunt-Brown, by and through her counsel of record, Heather Burke with her Motion for Partial Summary Judgment on Count III: FMLA Interference.

## I. Statement of Undisputed Material Facts

1. Plaintiff began working for Defendants on or around May 19, 2014.
2. She began working in her current position on August 12, 2017. [Declaration of Kimberly Hunt-Brown]

3. Plaintiff has Multiple Sclerosis and suffers from debilitating migraines. They are both disabilities and/or serious medical conditions under the NMHRA and FMLA qualifying conditions. [Ex 1]
4. Plaintiff's first 2023 FMLA physician certification form was signed on January 19, 2023 and submitted by Plaintiff on January 26, 2023 [Ex 1 2023 1st Certification] [Ex 2 email chain]
5. On January 27, 2023, Defendants rejected Plaintiff's physician certification stating that "more information was needed" and "All that was stated was chronic condition." [Ex 2 Email chain]
6. The FMLA does not require a diagnosis, and such information is to be provided only at the discretion of the medical provider. "Employers may not reject a certification because it lacks a diagnosis" [Ex 3 Cert guide page 31]
7. Ms. Hunt-Brown continued to designate her leave as FMLA when she had flare ups, while she sought clarification from her provider. [Declaration of Kimberly Hunt-Brown]
8. Plaintiff submitted another physician certification form filled out by her provider, signed on February 17, 2023. [Ex 4 email pg 5]
9. On February 23, 2023, Human Resource Analyst Kelly Howley rejected Plaintiff's certification form to her claiming that her provider determined the FMLA year, and that the provider had failed to include dates on a section which didn't apply to Plaintiff. [Ex 4 email pg 1]
10. Plaintiff's FMLA year is not determined by her medical provider, and is based on the date she first takes intermittent leave after giving notice of her need for leave. [Ex 5 FMLA policy]

11. On February 23, 2023, Defendant Moya and Ms. Howley told Plaintiff that she could no longer invoke the FMLA because her FMLA was "expired" [Ex 4 pgs 2 and 3]

12. On March 1, 2023, Plaintiff had a flare up of her medical conditions. At 8:03am her husband assisted her to text Defendants Paulk and Martinez saying "Waking with nausea and vertigo. Took meds. Plan to be in later and will let you know when I start working. FMLA" [Ex 6 March 1 texts pg 1]

13. Defendant Paulk enquired as to whether Plaintiff's FMLA had been "approved" [Ex 6 March 1 texts pg 1]

14. When Plaintiff's condition did not improve, and in fact worsened, Plaintiff's husband sent another text from plaintiff's phone saying "This is Joe, Kim's husband. She will not be in today at all." [Ex 6 March 1 texts pg 2]

15. Defendants refused to designate Plaintiff's leave on March 1 as FMLA qualifying, and marked the morning time as LWOP, and the afternoon time as AWOL. [Ex 7 designated AWOL]

16. GSD policy does not allow indirect notice of leave, except in exigent circumstances. [Ex 8 att leave policy pg 13]

17. Defendants Martinez and Paulk admit that they marked Plaintiff AWOL because her husband gave notice, and not her. Natalie Martinez Depo pgs 130-131] [Ex 10 Valerie Paulk Depo pg 145-146]

18. However, Plaintiff's husband had previously given notice of Plaintiff's need for leave, and Defendants did not mark Plaintiff AWOL on those occasions. [Ex 11 Jan 26 2022 chain]

19. On March 1, 2023, Plaintiff had paid leave available to take concurrent with her FMLA, but was marked LWOP and AWOL and not paid for that day. [Declaration of Kimberly Hunt-Brown] [Ex 25 Paystub]
20. GSD policy defines AWOL as "Employees who fail to appear for work and do not have authorized leave, or who appear for work but are in violation of an agency policy governing their readiness for work (e.g., violation of drug and alcohol policy, Code of Conduct), shall be considered to be absent without leave." [Ex 8 Attendance and Leave Policy 6.9.1]
21. Employees shall not be paid for periods of AWOL, and shall not accrue annual or sick leave during an AWOL period. [Ex 8 Attendance and Leave Policy 6.9.2]
22. GSD Employees will be subject to "disciplinary action up to and including dismissal" for being AWOL. [[Ex 8 Attendance and Leave Policy 6.5.7]
23. GSD Policy states "Any employee with a poor attendance record, excessive tardiness, numerous and frequent short-term absences, a history of one-, two- and three-day illnesses, or frequent emergencies which occur on the day before or after scheduled or approved days off or which precede or follow holidays, use of leave immediately upon accrual, thus maintaining zero or near-zero leave balances, may be subject to disciplinary action, up to and including dismissal." [Attendance and Leave 6.1.5]
24. On March 2, 2023, Defendant Moya directed Kelly Howley to change all of Plaintiff's FMLA designated absences to no longer be FMLA designated absences. [Ex 12 Moya email March 2]

25. On March 2, 2023, Plaintiff's attorney sent a letter by email to acting secretary Anna Silva, notifying them that they were interfering with Plaintiff's federal rights under the FMLA [Ex 13 Burke Letter March 2, 2023]
26. Defendants continued to deny Plaintiff FMLA leave until March 30, 2023 finally approved her 2023 FMLA year.
27. Defendant Moya did not communicate with Plaintiff or her counsel or otherwise seek agreement before unilaterally directing Kelly Howley to retroactively designate Plaintiff's absences as FMLA. [Declaration of Kimberly Hunt-Brown] [2023 Retroactive Change Log]
28. Plaintiff was discouraged from taking FMLA leave she otherwise would have taken due to Defendants denying her leave, making her seek approval each absence and marking her AWOL even when she gave notice. [Declaration of Kimberly Hunt-Brown]
29. Leave Without Pay (LWOP) is approved at management discretion and can be denied. [Ex 16 30b6 Depo pg 37 ln 17-18]
30. Defendants refused to reimburse Plaintiff for her damages and attorneys fees related to the 2023-24 FMLA interference. [Ex 17 GSD March 7 2023 Letter]
31. Defendants admit that they made a mistake in not timely certifying Plaintiff's FMLA year for 2023-2024. [Ex 18 Eunice Depo pg 57] [Ex 16 30b6 Depo pg 112 ln 6-11]
32. Plaintiff's application and certification forms for FMLA year 2024-25 were submitted on January 23, 2024. [Ex 19 2024 Approval]
33. GSD FMLA policy 6.3.2 2 states that "The next 12 month period would begin the first time FMLA leave is taken after completion of any previous 12-month period. [Ex 5 FMLA Policy]

34. Plaintiff had an FMLA qualifying absence on January 26, 2024. [Ex 19 2024 approval]

35. Defendants Morfin and Moya denied Plaintiff FMLA leave for her January 26, 2024 FMLA qualifying absence. [Ex 19 2024 approval]

36. In March 2024, Plaintiff's mother was dying in hospice care in Ohio. [Declaration of Kimberly Hunt-Brown]

37. The stress of her mother's impending death caused significant flare ups of Plaintiff's migraines. [Declaration of Kimberly Hunt-Brown]

38. On March 11, 2024, after Plaintiff had had 3 FMLA designated absences that month, Defendants Morfin and Moya told Plaintiff that she could have no more than 4 FMLA absences a month. [Declaration of Kimberly Hunt-Brown] [Ex 20 Donated Leave and Intermittent FMLA status pg 2]

39. Ms. Morfin and Defendant Moya stated that Plaintiff's medical provider's estimate of the number of migraine flare ups Plaintiff might experience in a month would be treated as a strict limitation. [Ex 20 Donated Leave and Intermittent FMLA status email pg 2]

40. Ms. Morfin and Defendant Moya stated that Plaintiff would need to reapply for FMLA with new certification if she wanted to take more than 4 FMLA instances in a month. [Ex 20 Donated Leave and Intermittent FMLA status pg 2]

41. Defendants Moya and Morfin stated that after 4 FMLA absences in a month, Plaintiff would have to seek "preapproval from your direct supervisor." [Ex 20 Donated Leave and Intermittent FMLA status pg 2]

42. Defendants FMLA policy 7.2.3.3 states that if Defendants require another FMLA certification, they must give no less than 15 days, if practicable, before they may deny any leave. [Ex 5 FMLA policy]

43. Plaintiff received 35.61 hours of donated leave on March 15, 2024. [Ex 21 Timesheets pg 1]

44. On March 22, 2024, Plaintiff informed Defendants that she was not able to be seen by her doctor until April 29, 2024 and therefore would not be able to obtain a new certification until that date. [Ex 20 Donated Leave and Intermittent FMLA status email pg 1]

45. Defendants Morfin, Martinez, Leblanc and Morfin began denying Plaintiff FMLA leave beginning on March 18, 2024 only 7 days after requesting recertification. [Declaration of Kimberly Hunt-Brown] [Ex 21 Timesheets pg 2, 3, 6, 8]

46. Defendants admit that they did not follow the FMLA or their policy when they failed to even give 15 days before denying FMLA leave. [Ex 16 30b6 Depo pgs 191- 192 ln 22 - 16]

47. Ms. Morfin and Defendant Moya also informed Plaintiff that she could only use donated leave with FMLA leave, and therefore only up to 4 times a month, and she had used up her 4 absences in March already. [Ex 22 March 25]

48. Any absences for the remainder of March 2024 would have to be preapproved by Plaintiff's direct supervisor. [Ex 22 March 25]

49. Defendants' Leave Donation policy does not require that donated leave can only be used or FMLA leave, only that those eligible for FMLA must use FMLA leave in conjunction with donated leave. [Ex 23 Leave donation policy]

50. Plaintiff was forced to seek Leave without Pay for each of her absences caused by her FMLA covered condition, and not allowed to use the paid leave she had available to her. [Declaration of Kimberly Hunt-Brown] [Ex 22 March 25]

51. Despite having actual notice of Plaintiff's notice of need for FMLA, Defendants denied Plaintiff FMLA leave on March 18, 20, 22, 26, April 19, 29, and 30. [Ex 21 Timesheets pg 2, 3, 6, 8] [Declaration of Kimberly Hunt-Brown]
52. Defendants even denied Plaintiff FMLA leave for the recertification appointment. [Declaration of Kimberly Hunt-Brown] [Ex 21 Timesheets pg, 8]
53. Plaintiff's new certification forms signed by her medical provider on April 29, 2024 estimated up to 31 times a month from 4-72 hours per episode, and stated "Due to the unpredictable nature of these illnesses, I cannot guess about the frequency of episodes. Chosen frequency to account for all possibilities." [Ex 24 recert pg 3-4]
54. Defendant Moya and Morfin did not retroactively designate Plaintiff's March and April FMLA absences, never communicated with Plaintiff about whether retroactive designation was appropriate nor was there discussion about remedying the harm they had caused Plaintiff by denying her FMLA leave. [Declaration of Kimberly Hunt-Brown]

## II. ARGUMENT

Summary Judgment is appropriate when there are no genuine disputes of material fact to necessitate trial. "Summary judgment generally is appropriate when a court determines that there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Slusser v. Vantage Builders, Inc.*, 576 F. Supp. 2d 1207, 1208 (D.N.M. 2008) "Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *United States v. Thrasher*, No. CV 08-172

MCA/WPL, 2009 U.S. Dist. LEXIS 94606, at *5-7 (D.N.M. Aug. 26, 2009)(citing FED. R. Civ. P. 56(c)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Lopez v. Delta Int'l Mach. Corp*., 312 F. Supp. 3d 1115, 1125 (D.N.M. 2018).

**A. Ms. Hunt-Brown Is Entitled to Summary Judgement As A Matter Of Law Of Her FMLA Interference Claims.**

A plaintiff on an FMLA interference claim must establish the following: (1) that he was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights. *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014) *Gambro v. Campbell Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007), citing *Jones v. Denver Pub. Schs*., 437 F.3d 1315, 1318 (10th Cir. 2005). The employer bears the burden of proof on the issue of whether the employer's actions were related to the exercise or attempted exercise of the employee's FMLA rights where the employee has shown some adverse action interfering with the right to use FMLA leave. *Dalpaz*, 760 F.3d at 1132; *Gambro*, 478 F.3d at 1287; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

Where an employer interferes with the employee's right to FMLA leave, the deprivation constitutes a violation of the FMLA regardless of employer intent. *Brown v. ScriptPro, Inc.*, 700F.3d 1222, 1226-27 (10th Cir. 2012); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955,960 (10th Cir. 2002). Under an interference theory, the employee must simply demonstrate an entitlement to the disputed leave. *Smith*, 298 F.3d at 960. The McDonnell-Douglas framework is not applicable to FMLA interference claims. *ScriptPro, Inc*., 700 F.3d at 1226-27. Consequently, a pretext analysis is not necessary in determining FMLA interference claims. Id.

at 1228.

The FMLA "provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002)

**1. The Application of the Law of FMLA Interference to the Undisputed Material Facts of This Case.**

To qualify for FMLA, an employee must have worked for the employer for 12 months and have worked 1250 hours in the past 12-month period "immediately preceding the commencement of the leave" 29 CFR § 825.110(a)(2). An employer is subject to extensive notice requirements under the FMLA. See 29 C.F.R. § 825.300. Among other things, the employer must give the employee notice of FMLA leave eligibility and rights, notice of how leave is designated and treated, any requirement for providing a certificate validating a health condition, and any fitness-for-duty certification required as a condition for return to work.

29 C.F.R. § 825.300(b)(1) requires "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days…. Employee eligibility is determined (and notice must be provided) at the commencement of the first instance of leave for each FMLA-qualifying reason in the applicable 12-month period."

Failure to follow the notice requirements may constitute an interference with an employee's FMLA rights, if the employee is prejudiced thereby. *Crites v. City of Haysville*, No.

16-1397-JWB, 2018 U.S. Dist. LEXIS 82318, at *23-24 (D. Kan. May 16, 2018). "Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently" *Id.*, at *27 (D. Kan. May 16, 2018) (citing *Vannoy v. Fed. Res. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016)). 29 CFR § 825.220 (b) Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.

29 C.F.R. § 825.301(d) Retroactive designation. If an employer does not designate leave as required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 **provided that the employer's failure to timely designate leave does not cause harm or injury to the employee**. In all cases where leave would qualify for FMLA protections, an employer and an employee can mutually agree that leave be retroactively designated as FMLA leave. (emphasis added)

29 C.F.R. § 825.301 (e) Remedies. If an employer's failure to timely designate leave in accordance with § 825.300 causes the employee to suffer harm, it may constitute an interference with, restraint of, or denial of the exercise of an employee's FMLA rights. An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered.

Here, there is no dispute that Plaintiff was entitled to FMLA, and that Defendants unreasonably interfered with her federal rights by refusing to timely certify her FMLA leave, and by denying her FMLA protected leave to which she was entitled. Defendants improperly

delayed certification of Plaintiff's FMLA for about 2.5 months in 2023, and denied Plaintiff protected leave while they refused to certify her application.

Similarly, as discussed herein, in March 2024, they suddenly and arbitrarily restricted the amount of intermittent leave that Plaintiff could take each month based on her provider's mere estimate and immediately denied any additional FMLA leave without allowing time for Plaintiff to obtain recertification from her providers. This is a clear violation of federal law, and Defendants own FMLA policy. That they then used their unlawful interference with FMLA to also deny Plaintiff the use of her available paid leave, makes the violation even worse, and resulted in clear loss of income.

**B. Defendants interfered with Plaintiff's FMLA when they failed to timely certify her application in 2023.**

Plaintiff had turned in all required FMLA paperwork on or before January 26, 2023 but Defendant Moya and her subordinate Kelly Howley repeatedly improperly rejected these certification forms, forcing Plaintiff to have to return to her provider several times. The last alleged deficiency involved a section of the form which did not even apply to Plaintiff's treatment and/or condition and instead asked about the patient being referred to another medical provider.

After unlawfully delaying certification, Defendant Moya instructed Ms. Howley to change Plaintiff's timesheet, removing all FMLA designated absences and replacing them with unprotected absences, and informed Plaintiff that she could no longer invoke FMLA. Even if the certification deficiencies Defendants alleged were actually legitimate, Defendant Moya had no reasonable belief that Plaintiff would be unable to qualify for FMLA, and should have continued

to designate the time while the certification wrinkles got ironed out, not telling Plaintiff that she could no longer "invoke" FMLA which clearly discourages her from taking leave. However, there was no legal basis to the alleged deficiencies. Plaintiff's provider is not required to state a diagnosis or name Plaintiff's medical conditions. And the second delay involved a section that wasn't even applicable to Plaintiff as she was not seeking treatment anywhere else. Plaintiff's medical provider does not determine when Plaintiff's FMLA year begins as this is determined from the first date leave is taken.

Defendants Martinez and Paulk interfered with Plaintiff's FMLA by refusing to designate her protected leave as FMLA time, and taking adverse action against her for leave which was FMLA qualifying leave. On March 1, Defendant Paulk and Martinez interfered with Plaintiff's FMLA by marking Plaintiff AWOL for leave that Plaintiff and her spouse gave notice was for her FMLA qualifying condition. Being marked AWOL is an adverse action, is unpaid and subjects the recipient to possible discipline, including possible termination. The fact that Defendants Moya, Martinez, and Paulk refused to properly designate Plaintiff's March 1, 2023 absence as FMLA protected set Plaintiff up for additional and unlawful notice requirements which Defendants then used to try to punish Plaintiff for taking leave.

Defendants unlawfully continued to deny Plaintiff her FMLA leave through the month of March 2023 even after receiving a letter from undersigned counsel on March 2, 2023, informing them that their failure to certify Plaintiff's FMLA entitlement was unlawful, and explaining exactly why. Defendants had actual knowledge that they were violating the FMLA and yet they continued to do so. Intentionally refusing to designate leave as FMLA is a violation of the FMLA and subject to liquidated damages.

Defendants then unilaterally retroactively designated Plaintiff's leave as FMLA, without her agreement or input. Defendants must have given appropriate notice of retroactive designation and can only retroactively designate leave if their failure to timely designate the leave didn't harm Plaintiff. Defendants knew that Plaintiff had been harmed by their failure as this had been detailed in the letter they received on March 2, 2023, and yet they unilaterally retroactively designated her leave anyway, and denied her reasonable request to be compensated for her damages.

### 1. Defendants Attendance and Leave Policy Directly Conflicts with the FMLA by Prohibiting Indirect Notice of Leave.

Defendants Attendance and Leave policy 7.3.1.3 states:

> Notification from an immediate family member or friend does not constitute proper notification unless, due to exigent circumstances, the employee is unable to contact the supervisor. In such instances, the employee must personally contact their supervisor/manager as soon as possible.

This policy is in direct conflict with 29 C.F.R. § 825.303 which allows:

> When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case. It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave. See § 825.303(c). Notice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally.

This provision contains no requirement that there be exigent circumstances, as Defendants' policy requires. The requirement is, itself, completely unclear and provides no guidance about what it believes would qualify. As in the instant case, this leaves it

open to abuse and misinterpretation. The policy does not treat notice for FMLA leave any differently than any other kind of leave, and even if it did, Defendants interference with Plaintiff's FMLA gave them the false confidence of believing she couldn't even invoke the protection of the FMLA.

Courts have found that when an employer's requirements directly conflicts with the FMLA, it renders the employer policy invalid.

> The regulations implementing the FMLA provide that when an employee's need for FMLA leave is unforeseeable (as [Plaintiff's] was), "[n]otice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally." Id. § 825.303(a). Because this regulation expressly condones indirect notification when the employee is unable to notify directly, [Defendants'] policy conflicts with the FMLA and is therefore invalid to the extent it requires direct notification even when the FMLA leave is unforeseen and direct notification is not an option.
>
> *Millea v. Metro-North R.R.*, 658 F.3d 154, 161-62 (2d Cir. 2011)

Here, Defendants Martinez and Paulk marked Plaintiff AWOL because they received notice of her need for FMLA leave from her husband, not Plaintiff directly, when Plaintiff's condition worsened on March 1, 2023. Plaintiff became incapacitated and so her husband sent a text message from Plaintiff's phone, identifying himself as the sender and stating that her condition had worsened and she would not be in at all. The record shows that Plaintiff's husband had given notice for her in the past with no issues, so the fact that Defendants claim to have been suddenly following their policy while they were also interfering with Plaintiff's FMLA certification reflects their clear intent to cause harm to Plaintiff, likely hoping to terminate her before she was officially approved for FMLA. Such differences in Defendants attendance policy means that while Defendants are failing to properly designate Plaintiff's leave as FMLA

qualifying, even if they substitute LWOP for those absences, they can, and did, impose more stringent notification requirements for LWOP absences than they are allowed by federal law for FMLA absences. This did harm Plaintiff, it prevented her from using paid leave she had available, and subjected her to further potential discipline by being marked AWOL. It does not, and did not, make Plaintiff whole when Defendants eventually retroactively designated Plaintiff's FMLA absences because Plaintiff was denied the many benefits and protections of FMLA at the time she took the leave.

Plaintiff was also forced to retain an attorney just to get her FMLA properly certified and even then, it took Defendants more than 3 additional weeks and at least two attorney communications to admit their mistake and certify Plaintiff for her 23-24 FMLA year. This caused economic damage to Plaintiff. Surprisingly, when Plaintiff sought to be reimbursed for the costs associated with enforcing her FMLA rights, Defendants claimed that the FMLA did not allow for attorney's fees and refused. Plaintiff had no choice but to file suit in an attempt to recover her damages. Unfortunately, Defendants again interfered with Plaintiff's FMLA rights the following year, which caused Plaintiff additional damages.

### B. Defendants interfered with Plaintiff's FMLA again in 2024, while already being sued in this Court for FMLA interference.

Courts have held that the estimate of expected leave on FMLA certification forms for intermittent leave should not operate as a limitation on the employee's right to take leave for their FMLA qualifying condition. In *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 843 (7th Cir. 2014), the Court stated:

> We reject the argument that the estimates in the certification act as limitations on the frequency and duration of episodes for which an employee may be entitled to intermittent leave under the FMLA. The certification requested, and Dr. Post provided, his "estimate" of the frequency of the flareups and duration of related incapacity. See 29 C.F.R. § 825.306(a)(7) (requiring a certification for intermittent leave to include "an **estimate** of the frequency and duration of the episodes of incapacity") (emphasis added).

The Court continued:

> As the district court correctly stated, an estimate, by definition is not exact and cannot be treated as a certain and precise schedule. If the certified frequency and duration were limits on the employee's entitlement to leave, there would be no need to request recertification when the employee's requested leave exceeded the frequency or duration stated in the certification; the employer could simply deny FMLA leave. (internal quote and citations omitted)

If an employer is concerned that an employee's use of FMLA is different than expected, they may request that the employee obtain a recertification from their medical provider. 29 C.F.R. § 825.308(c)(2) allows an employer may request recertification when: "Circumstances described by the previous certification have changed significantly (e.g., the duration or frequency of the absence, the nature or severity of the illness, complications)."

However, when recertification is requested, the employer must allow at least 15 calendar days after its request for the employee to provide the recertification, unless 15 days is not practicable under the circumstances despite the employee's good faith efforts. see 29 C.F.R. § 825.308(d) ("The employee must provide the requested recertification to the employer within the time frame requested by the employer (which must allow **at least 15 calendar days** after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts."(emphasis added))

If leave is not timely designated, an employer may retroactively designate leave, but only when their initial failure to designate that leave has not caused harm or injury to the employee. 29 C.F.R. § 825.301(d):

> Retroactive designation. If an employer does not designate leave as required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 **provided that the employer's failure to timely designate leave does not cause harm or injury to the employee**. In all cases where leave would qualify for FMLA protections, an employer and an employee can mutually agree that leave be retroactively designated as FMLA leave. (emphasis added)

GSD uses a 12 month FMLA year measured forward from the date an employee takes leave. Ex 5 FMLA Policy 6.3.2 "The 12-month period is measured forward from the date an employee uses any leave." When an employee has used FMLA in the previous year, "The next 12-month period would begin the first time FMLA leave is taken after completion of any previous 12-month period" Ex 5 FMLA Policy 6.3.2.2

Here Plaintiff's 2023 FMLA year ended on January 17, 2024, which was 365 days after the 2023 year started. Plaintiff submitted her 2024 application on January 23, 2024. She first took FMLA leave on January 26, 2024. Defendants Morfin and Moya unlawfully denied Plaintiff FMLA leave on January 26, 2024 based on their erroneous understanding of their own FMLA year. Next, on March 11, 2024, Defendants Morfin and Moya suddenly told Plaintiff that she had exhausted all her FMLA for that month and could not take leave in excess of her provider's estimate of "3-4" flare ups a month. At the time, Plaintiff's mother was dying in hospice care in Ohio, and the stress of this caused Plaintiff to experience more migraines than usual. There is nothing in the record to suggest that Defendants believed that Plaintiff was faking her condition and not really suffering from migraines.

However, even if Defendant' concern about Plaintiff's increased need for leave was legitimate, the law, and their own policy, required them to request recertification and allow at least 15 calendar days before they could take any other action or deny leave. Plaintiff quickly made an appointment with her provider for recertification, but was unable to be seen until April 29, 2024. Plaintiff immediately notified Defendants that she would not be able to provide a recertification until that time, despite her good faith efforts. To comply with federal law, Defendants should have continued to timely designate Plaintiff's absences as FMLA qualifying until Plaintiff was able to provide the recertification. There is nothing in the record to suggest that Defendants believed that Plaintiff would be unable to provide certification or that she wasn't really trying to do so. Instead, Defendants began denying Plaintiff's FMLA leave within 7 days of their request.

To make matters worse, Defendants Moya and Morfin imposed an arbitrary and baseless restriction on the use of Plaintiff's donated annual leave, claiming that she could only use that donated paid leave concurrent with the FMLA leave they were unlawfully denying her. There is nothing in the State Personnel Act, the NMAC or Defendants' own donated leave policy which requires that donated leave can only be used when FMLA leave is used. Even if it did, it was Defendants who were actively interfering with the proper designation of Plaintiff's leave as FMLA. They had no reason to believe that Plaintiff's absences were for any reason other than her qualifying conditions.

Defendants intentionally denied Plaintiff FMLA protected leave in January, March and April 2024. They had no legitimate legal basis to restrict or deny Plaintiff's use of FMLA, and failed to comply with the law or their own policy in order to give Plaintiff time to obtain a recertification. They had knowledge that Plaintiff's mother was dying and yet they acted with

complete disregard for Plaintiff's situation, making her life harder and more stressful instead of acting with compassion. Defendants admit that they did not comply with requirements when seeking recertification. There are no facts that suggest that Defendant Moya or Morfin believed Plaintiff was abusing FMLA and/or using it improperly. Defendants Morfin and Moya intentionally restricted and denied Plaintiff's FMLA rights, which constitutes interference as contemplated by the law, and is subject to liquidated damages.

### C. Defendants' unlawful interference prejudiced Plaintiff

Plaintiff was prejudiced by Defendant Paulk, Martinez, LeBlanc and Moya's unlawful interference with her rights under the FMLA. In 2023, it took 2.5 months and Plaintiff retaining an attorney for Defendants to properly certify her for her 2023/2024 FMLA year. During Defendants unlawful interference during those 2.5 months, Plaintiff was threatened with potential discipline by being marked AWOL and denied the use of available paid leave even after Defendants retroactively designated FMLA. During the 2.5 months Defendants refused to allow her to take FMLA protected leave, Plaintiff was discouraged from taking leave she otherwise would have taken, suffering through the work day despite her federal right to take leave because of her medical condition. She had to pay out of pocket for attorney's fees to get this accomplished and for which Defendants refused to reimburse her.

In 2024, when Defendants interfered with her FMLA rights for the second year in a row, Plaintiff was prejudiced by being denied the use of available donated paid leave she would have used in the months of March and April, but was forced to take unpaid leave for those absences instead. Plaintiff lost wages for those absences, and incurred more legal costs associated with

adding the new violations into the already existing lawsuit. Plaintiff has continued to accrue attorney's fees as a result of Defendants interference.

## III. Conclusion

In light of the foregoing record evidence, precedent, and arguments, Plaintiff Hunt-Brown respectfully requests that the Court grant her judgment on her on Count III-FMLA Interference, award her attorney's fees and costs associated with Count III, and for such further relief the Court deems just and appropriate under the circumstances.

Respectfully Submitted.



Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's e-file and serve system on this 15th day of August 2025.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**DECLARATION OF KIMBERLY HUNT-BROWN**

STATE OF NEW MEXICO )
)SS.
COUNTY OF SANTA FE )

1. My name is Kimberly Hunt-Brown. I am over 18, and I am competent to give the testimony stated herein.
2. The information provided herein is within my own personal knowledge.
3. I have worked for the General Services Department for over 11 years.
4. I started in my current position of Purchasing Agent (Procurement Specialist II) on August 12 2017.
5. I suffer from Multiple Sclerosis and severe, often debilitating, migraines.

6. In January through March 2023, my FMLA certification was repeatedly rejected by Defendants and I was denied FMLA protected leave.
7. I attempted to continue to designate my absences as FMLA covered, and to give notice of my need for leave despite the certification issues.
8. On March 1, 2023, I was marked AWOL by Defendants Paulk and Martinez for an absence that I had given notice was FMLA covered.
9. AWOL is an adverse action that can subject me to further discipline.
10. At the time of this absence on March 1, 2023, I had paid leave available that I intended to use for this absence, but was prevented from doing so by Defendants interference with my FMLA.
11. I have been prejudiced by Defendants' interference with my FMLA rights by loss of pay, accrual and use of benefits, expensive legal costs and did not take FMLA leave I otherwise would have taken for fear of adverse consequences and only took it when I absolutely had to.
12. I was not allowed to take FMLA protected time until after March 30, 2023 and getting this resolved required retaining an attorney before Defendant Moya finally certified my 2023 FMLA year.
13. No one at GSD asked me whether I wanted my leave retroactively designated or whether I had been harmed by their failure to timely designate my leave. GSD unilaterally retroactively designated my leave as they desired, inaccurately and without my input.
14. My migraines' duration and intensity are worsened by stress.

15. In March 2024, my mother was dying in hospice care in Ohio which was extremely stressful for me.

16. On March 11 2024, Defendants Moya and Morfin informed me that I was no longer allowed more than 4 FMLA absences a month.

17. Defendants Moya and Morfin began denying me FMLA leave on March 18.

18. Defendants Moya and Morfin told me that I could not use my available donated paid leave if I wasn't taking it as FMLA leave.

19. This forced me to take unpaid and unprotected leave for my FMLA qualifying absences while my mother was dying and after she passed.

20. I took FMLA Qualifying leave on March 18, 20, 22, 26, April 19, 29, and 30, but was forced to take Leave without Pay on all of these dates.

21. Being forced to take so much unpaid time off in March and April 2024 was a tremendous hardship, particularly in conjunction with my extra travel costs to attend my mother's funeral in April 2024.

22. I was also denied FMLA leave for the doctor's appointment on April 29, 2024 that I made to obtain recertification as required by my employers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2025.

**Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act**

**U.S. Department of Labor**
**Wage and Hour Division**

WAGE AND HOUR DIVISION

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR.**
**RETURN TO THE PATIENT.**

OMB Control Number: 1235-0003
Expires: 6/30/2023

The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. 29 U.S.C. §§ 2613, 2614(c)(3); 29 C.F.R. § 825.305. The employer must give the employee **at least 15 calendar days** to provide the certification. If the employee fails to provide complete and sufficient medical certification, his or her FMLA leave request may be denied. 29 C.F.R. § 825.313. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

## SECTION I – EMPLOYER

Either the employee or the employer may complete Section I. While use of this form is optional, this form asks the health care provider for the information necessary for a complete and sufficient medical certification, which is set out at 29 C.F.R. § 825.306. **You may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.** Additionally, you **may not** request a certification for FMLA leave to bond with a healthy newborn child or a child placed for adoption or foster care.

Employers must generally maintain records and documents relating to medical information, medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

(1) Employee name: Kimberly Hunt-Brown
*First* *Middle* *Last*

(2) Employer name: General Services Department Date: 1/17/2023 *(mm/dd/yyyy)*
*(List date certification requested)*

(3) The medical certification must be returned by 2/1/2023 *(mm/dd/yyyy)*
*(Must allow at least 15 calendar days from the date requested, unless it is not feasible despite the employee's diligent, good faith efforts.)*

(4) Employee's job title: Procurement Specialist II Job description (☐ is / ☐ is not) attached.
Employee's regular work schedule: ______
Statement of the employee's essential job functions: ______

*(The essential functions of the employee's position are determined with reference to the position the employee held at the time the employee notified the employer of the need for leave or the leave started, whichever is earlier.)*

## SECTION II - HEALTH CARE PROVIDER

Please provide your contact information, complete all relevant parts of this Section, and sign the form. Your patient has requested leave under the FMLA. The FMLA allows an employer to require that the employee submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to the serious health condition of the employee. For FMLA purposes, a "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves *inpatient care* or *continuing treatment by a health care provider*. For more information about the definitions of a serious health condition under the FMLA, see the chart on page 4.

You may, but are **not required** to, provide other appropriate medical facts including symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment. Please note that some state or local laws may not allow disclosure of private medical information about the patient's serious health condition, such as providing the diagnosis and/or course of treatment.

 

Employee Name: Kimberly Hunt-Brown

Health Care Provider's name: *(Print)* Anna Narue

Health Care Provider's business address: 184 Unser NE, Rio Rancho, NM 87124

Type of practice / Medical specialty: Family Practice

Telephone: (505) 896-0720 Fax: (505) 443-0314 E-mail: ____

**PART A: Medical Information**

Limit your response to the medical condition(s) for which the employee is seeking FMLA leave. Your answers should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. **After completing Part A, complete Part B to provide information about the amount of leave needed.** Note: For FMLA purposes, "incapacity" means the inability to work, attend school, or perform regular daily activities due to the condition, treatment of the condition, or recovery from the condition. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b).

(1) State the approximate date the condition started or will start: 5/1/86 *(mm/dd/yyyy)*

(2) Provide your **best estimate** of how long the condition lasted or will last: chronic lifelong

(3) Check the box(es) for the questions below, as applicable. For all box(es) checked, the amount of leave needed must be provided in Part B.

☐ **Inpatient Care**: The patient (☐ has been / ☐ is expected to be) admitted for an overnight stay in a hospital, hospice, or residential medical care facility on the following date(s): ____

☐ **Incapacity plus Treatment**: *(e.g. outpatient surgery, strep throat)*
Due to the condition, the patient (☐ has been / ☐ is expected to be) incapacitated for *more than* three consecutive, full calendar days from ____ *(mm/dd/yyyy)* to ____ *(mm/dd/yyyy)*.

The patient (☐ was / ☐ will be) seen on the following date(s): ____

The condition (☐ has / ☐ has not) also resulted in a course of continuing treatment under the supervision of a health care provider *(e.g. prescription medication (other than over-the-counter) or therapy requiring special equipment)*

☐ **Pregnancy**: The condition is pregnancy. List the expected delivery date: ____ *(mm/dd/yyyy)*.

☑ **Chronic Conditions**: *(e.g. asthma, migraine headaches)* Due to the condition, it is medically necessary for the patient to have treatment visits at least twice per year.

☑ **Permanent or Long Term Conditions**: *(e.g. Alzheimer's, terminal stages of cancer)* Due to the condition, incapacity is permanent or long term and requires the continuing supervision of a health care provider (even if active treatment is not being provided).

☐ **Conditions requiring Multiple Treatments**: *(e.g. chemotherapy treatments, restorative surgery)* Due to the condition, it is medically necessary for the patient to receive multiple treatments.

☐ **None of the above**: If none of the above condition(s) were checked, (i.e., inpatient care, pregnancy) no additional information is needed. Go to page 4 to sign and date the form.

**Employee Name:** Kimberly Hewitt-Brown

(4) If needed, briefly describe other appropriate medical facts related to the condition(s) for which the employee seeks FMLA leave. *(e.g., use of nebulizer, dialysis)*

leave for intermittent "flare-ups" of chronic condition

## PART B: Amount of Leave Needed

For the medical condition(s) checked in Part A, complete all that apply. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.

(5) Due to the condition, the patient (☐ had / ☐ will have) **planned medical treatment(s)** (scheduled medical visits) *(e.g. psychotherapy, prenatal appointments)* on the following date(s): __________

__________

(6) Due to the condition, the patient (☐ was / ☐ will be) **referred to other health care provider(s)** for evaluation or treatment(s).

State the nature of such treatments: *(e.g. cardiologist, physical therapy)* __________

Provide your **best estimate** of the beginning date ________ *(mm/dd/yyyy)* and end date ________ *(mm/dd/yyyy)* for the treatment(s).

Provide your **best estimate** of the duration of the treatment(s), including any period(s) of recovery *(e.g. 3 days/week)*

__________

(7) Due to the condition, it is medically necessary for the employee to work a **reduced schedule.**

Provide your **best estimate** of the reduced schedule the employee is able to work. From ________ *(mm/dd/yyyy)* to ________ *(mm/dd/yyyy)* the employee is able to work: *(e.g., 5 hours/day, up to 25 hours a week)*

__________

(8) Due to the condition, the patient (☐ was / ☐ will be) **incapacitated for a continuous period of time,** including any time for treatment(s) and/or recovery.

Provide your **best estimate** of the beginning date ________ *(mm/dd/yyyy)* and end date ________ *(mm/dd/yyyy)* for the period of incapacity.

(9) Due to the condition, it (☐ was / ☑ is / ☑ will be) medically necessary for the employee to be absent from work on an **intermittent basis** (periodically), including for any episodes of incapacity i.e., episodic flare-ups. Provide your **best estimate** of how often (frequency) and how long (duration) the episodes of incapacity will likely last.

Over the next 6 months, episodes of incapacity are estimated to occur 3 to 4 times per (☐ day / ☐ week / ☑ month) and are likely to last approximately 4-72 (☑ hours / ☐ days) per episode.

 

**Employee Name:** Kimberlly Hurtt-Brown

**PART C: Essential Job Functions**

If provided, the information in Section I question #4 may be used to answer this question. If the employer fails to provide a statement of the employee's essential functions or a job description, answer these questions based upon the employee's own description of the essential job functions. An employee who must be absent from work to receive medical treatment(s), such as scheduled medical visits, for a serious health condition is considered to be *not able* to perform the essential job functions of the position during the absence for treatment(s).

(10) Due to the condition, the employee (☐ was not able // ☑ is not able // ☐ will not be able) to perform *one or more* of the essential job function(s). Identify at least one essential job function the employee is not able to perform: walking, sitting, standing, commuting to work during a flare-up.

**Signature of Health Care Provider** [signature] CNP **Date** 1/19/23 *(mm/dd/yyyy)*

| **Definitions of a Serious Health Condition** *(See 29 C.F.R. §§ 825.113-.115)* |
|---|
| **Inpatient Care** |
| • An overnight stay in a hospital, hospice, or residential medical care facility.<br>• Inpatient care includes any period of incapacity or any subsequent treatment in connection with the overnight stay. |
| **Continuing Treatment by a Health Care Provider (any one or more of the following)** |
| **Incapacity Plus Treatment:** A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves either:<br>○ Two or more in-person visits to a health care provider for treatment within 30 days of the first day of incapacity unless extenuating circumstances exist. The first visit must be within seven days of the first day of incapacity; or,<br>○ At least one in-person visit to a health care provider for treatment within seven days of the first day of incapacity, which results in a regimen of continuing treatment under the supervision of the health care provider. For example, the health provider might prescribe a course of prescription medication or therapy requiring special equipment. |
| **Pregnancy:** Any period of incapacity due to pregnancy or for prenatal care. |
| **Chronic Conditions:** Any period of incapacity due to or treatment for a chronic serious health condition, such as diabetes, asthma, migraine headaches. A chronic serious health condition is one which requires visits to a health care provider (or nurse supervised by the provider) at least twice a year and recurs over an extended period of time. A chronic condition may cause episodic rather than a continuing period of incapacity. |
| **Permanent or Long-term Conditions:** A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective, but which requires the continuing supervision of a health care provider, such as Alzheimer's disease or the terminal stages of cancer. |
| **Conditions Requiring Multiple Treatments:** Restorative surgery after an accident or other injury; or, a condition that would likely result in a period of incapacity of more than three consecutive, full calendar days if the patient did not receive the treatment. |

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 15 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., N.W., Washington, D.C. 20210.

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.**

**Heather@hburkelaw.com**

**From:** Howley, Kelly, GSD
**Sent:** Friday, January 27, 2023 4:16 PM
**To:** Hunt-Brown, Kimberly, GSD
**Subject:** RE: FMLA/ADA Paperwork
**Attachments:** Physician's Certification-Kimberly Hunt-Brown.pdf; FMLA Notice of Eligibility-Kimberly Hunt-Brown.pdf

Good afternoon Kimberly,

More information is needed on your Physician's Certification. The physician's certification needs more information in regards to your medical condition. All that was stated was "chronic condition". Please let me know if you have any questions.

Have a nice weekend,

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, January 26, 2023 8:50 AM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** FW: FMLA/ADA Paperwork

Good Morning Kelly,
I was able to pick this up yesterday from my doctor, so I think we've got everything that is needed now for the FMLA request? Let me know if I'm missing something still. I included the most recent FMLA Application from my file as well, although I don't know if you'd need to update the date and hours on the final form.

*Thank you,*

*Kimberly A Hunt-Brown*

Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

---

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Wednesday, January 18, 2023 9:02 AM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** RE: FMLA/ADA Paperwork

Okay, I sent the updated form to her again, and hopefully she can get it done quickly. I've an appointment with my neurologist tomorrow, so I'm hoping I can stop by her office after my appointment and pick it up from her.

Have a super day!

Thanks, ☺
Kim
505-490-3152

---

**From:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Sent:** Tuesday, January 17, 2023 5:54 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Subject:** RE: FMLA/ADA Paperwork

Hi Kimberly,

This is the certification for ADA. Please find the Physician's certification form for FMLA. You can just send the FMLA application to me and I will route for signatures. Any ADA documentation needs to be sent to Eunice Moya. Please let me know if you have any questions.

Have a nice evening,

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Tuesday, January 17, 2023 5:47 PM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** FMLA/ADA Paperwork

Hi Kelly, I got the following back from my physician. Is the attached form okay for the FMLA paperwork as well as for the ADA paperwork? (I think maybe my doctor got confused because I sent her 2 different messages with similar-looking forms, or did she fill out the correct one and I'm confused?)

Also, am I supposed to route the employee application for FMLA leave through Natalie before I send it to you, or send it to you and you'll do that?

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

- If a family member is the patient, whether the family member needs care, and an estimate of the frequency and duration of the leave required to care for the family member;
- Whether the employee's need for leave is continuous or intermittent, and
- Appropriate medical facts about the condition.

## Appropriate Medical Facts

At the health care provider's discretion, the medical facts may include information on symptoms, doctor's visits, or a diagnosis. Whether a diagnosis is included in the certification form is left to the discretion of the health care provider and an employer may not reject a complete and sufficient certification because it lacks a diagnosis.

## Additional Information for Intermittent or Reduced Schedule Leave

For intermittent or reduced schedule leave, the employer may require certain additional information in the certification:

| **Planned** Medical Treatment for the Employee's Own or Family Member's Serious Health Condition | **Unforeseeable** Leave for the Employee's Own Serious Health Condition, Including Pregnancy | **Unforeseeable** Leave for the Family Member's Serious Health Condition |
|---|---|---|
| • Information that establishes the medical necessity of intermittent or reduced schedule leave<br><br>• An estimate of the **dates** and duration of such treatment and periods of recovery | • Information that establishes the medical necessity of intermittent or reduced schedule leave<br><br>• An estimate of the **frequency** and duration of the episodes of incapacity due to the serious health condition | • A statement that the leave schedule is medically necessary for the care of the family member, which can include assisting in the family member's recovery<br><br>• An estimate of the **frequency** and duration of leave |

**Heather@hburkelaw.com**

| | |
|---|---|
| **From:** | Howley, Kelly, GSD |
| **Sent:** | Thursday, February 23, 2023 1:22 PM |
| **To:** | Hunt-Brown, Kimberly, GSD; Moya, Eunice, GSD |
| **Subject:** | RE: FMLA Leave Form (Physician's form - Signed) |
| **Attachments:** | FMLA Notice of Eligibility- Kimberly Hunt-Brown.docx; 2023-2 KHB FMLA - signed AN 02-17-2023.pdf |

Hi Kimberly,

It starts on the date that your physician adds on the Physician's Certification. Your physician did not log the start and end dates on the form.

(6) Due to the condition, the patient (☐ was / ☐ will be) **referred to other health care provider(s)** for evaluation or treatment(s).

State the nature of such treatments: *(e.g. cardiologist, physical therapy)* ____________________

Provide your **best estimate** of the beginning date ______________ *(mm/dd/yyyy)* and end date ______________ *(mm/dd/yyyy)* for the treatment(s).

Provide your **best estimate** of the duration of the treatment(s), including any period(s) of recovery *(e.g. 3 days/week)*

____________________

(7) Due to the condition, it is medically necessary for the employee to work a **reduced schedule**.

I am returning the Physician's Certification, so that you may have your physician include the dates, not to exceed 12 months. Please let me know if you have any questions.

Thank you,

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 12:35 PM
**To:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Oh, okay. So they only run a year at a time? But we're going to start this new one when – now? Or beginning when the old one expired? I think when the old one expired was the original plan, and I'm okay with that.

Thanks, ☺
Kim
505-490-3152

---

**From:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 12:24 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>; Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Zero. Your FMLA expired on 12/13/2022.

Eunice Moya
Human Resource Manager
General Services Department (GSD)
p: 505.476.1859
c: 505.412.5828
e: Eunice.Moya@GSD.nm.gov

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 12:23 PM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Yes, so how many hours are remaining from my old request? I didn't use all the hours available, correct?

Thanks, ☺
Kim

505-490-3152

**From:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 12:04 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Hi Kimberly,

As of 12/13/2022, your FMLA has been expired, so you are not able to invoke FMLA until your new request has been approved. I am processing your new request today and I will notify you once it has been approved. Please let me know if you have any questions.

Have a wonderful day,

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 12:01 PM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Thank you! So am I under FMLA now, since December like we had said when we talked on the phone, or am I not under FMLA? Valerie said in a meeting today that “HR” had told her that I am not under FMLA and can’t invoke it, so I’m really confused… ☹ cc’ing Eunice also, so she is aware that you have the final form and that we should be all set now?

Thanks, ☺
Kim
505-490-3152

**From:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 9:29 AM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Good morning,

Rec'd and thank you.

Have a wonderful day,

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, February 23, 2023 9:18 AM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

No need to apologize, since I'm the one who evidently didn't attach it! Here it is – really.

Thanks, ☺
*Kim*
*505-490-3152*

**From:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Sent:** Wednesday, February 22, 2023 4:20 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Subject:** RE: FMLA Leave Form (Physician's form - Signed)

Hi Kimberly,

I'm sorry, I don't see an attachment. Will you please resend? Thank you.

Kelly Howley
Human Resources Analyst
GSD Human Resources Bureau
Cell: 505/469-7663
Kelly.Howley1@state.nm.us

NEW MEXICO
GENERAL SERVICES DEPARTMENT

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Friday, February 17, 2023 5:29 PM
**To:** Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** FMLA Leave Form (Physician's form - Signed)
**Importance:** High

Hi Kelly, the provider got the form back to me today. Sorry it took so long – she's been really busy! Let me know if you need anything else, but I think you have the other forms already in the file for me?

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

| GENERAL SERVICES DEPARTMENT<br>Agency Policy | Number:<br>GSD-016 |
|---|---|
| Subject:<br>**Family and Medical Leave Policy** | Effective Date:<br>10/24/2016<br>Number of Pages:<br>8/30 |

## REVISION LOG

| Revision Number | Approval Date | Responsible Party/Author | Comments |
|---|---|---|---|
| Rev. 0 | 11/17/1999 | Michael R Jaramillo | New Policy. |
| Rev. 1 | 10/21/2016 | Angela Dawson | Revised document to bring compliant with current requirements of the FMLA and to update old processes; supersedes and replaces all previous copies of GSD 350-2.33, Family and Medical Leave. |
| | | | |
| | | | |


1.0 Purpose .......... 2
2.0 Scope .......... 2
3.0 References .......... 2
4.0 Definitions .......... 2
5.0 Background .......... 2
6.0 Policy .......... 2
7.0 Procedures .......... 5
8.0 Attachments and Enclosures .......... 8
9.0 Approval .......... 8


Policy has 8 pages of policy text and 22 pages of attachments/enclosures (30 total pages).

**6.2 Leave Policy**

6.2.1 If eligible under the FMLA, an employee may take up to 12 or 26 weeks of family or medical leave, whichever is applicable (as explained below), within the relevant 12-month period defined below.

6.2.2 While the employee is on FML, GSD will maintain the employee's group health insurance coverage at the same level and under the same circumstances as when the employee was actively working, as explained more fully under the section titled "Medical and Other Benefits".

6.2.3 Upon returning from approved FML, an employee has the right to be restored to the same job or an equivalent position, subject to the terms, limitations and exceptions provided by law.

**6.3 Leave Entitlement**

6.3.1 Under this policy, an eligible employee may take up to 12 weeks of FML within a 12-month period for circumstances (a) through (e) below:

a. The birth of a son or daughter, and in order to care for such son or daughter (leave to be completed within one year of the child's birth)

b. The placement of a son or daughter with the employee for adoption or foster care, and in order to care for the newly placed son or daughter (leave to be completed within one year of the child's placement)

c. To care for a spouse, son, daughter or parent with a serious health condition

d. For the employee to care for their own serious health condition, which renders them unable to perform any of the essential functions of their position

e. A qualifying exigency of a spouse, son, daughter or parent who is a military member on covered active duty or who is called to covered active duty status (or who has been notified of an impending call or order to covered active duty)

6.3.2 The 12-month period is measured forward from the date an employee uses any leave under this policy.

6.3.2.1 An eligible employee is entitled to up to 12 weeks (480 hours) of leave during the year beginning on the first date FMLA leave is taken.

6.3.2.2 The next 12-month period would begin the first time FMLA leave is taken after completion of any previous 12-month period.

7.2.3.1 GSD may also require an employee to submit a medical recertification if information is received that casts doubt on the reason given for absence.

7.2.3.2 If the employee seeks an extension of his or her leave, GSD will require the employee to submit a medical recertification.

7.2.3.3 If the employee fails to provide the required recertification within 15 calendar days, if such a timeframe is practicable, a delay to the approval of further leave may result until the recertification is provided.

7.2.4 GSD, at its expense, may require an employee to get a second opinion from a second health care provider, which GSD will select.

7.2.4.1 If there is a conflict between the original certification and the second opinion, GSD, at its expense, may require the opinion of a third, mutually agreed upon, health care provider. **This third opinion will be considered final.**

7.2.4.2 If an employee refuses to release relevant medical records to the health care provider designated to provide either a second or third opinion, GSD may deny FML to that employee.

7.3 Reporting While on Leave

7.3.1 GSD may require an employee taking leave because of their own serious health condition or to care for a covered relation, to report periodically on the employee's status of the condition and the employee's intent to return to work.

7.3.2 Additionally, an employee must give notice as soon as practicable, within two business days if feasible, if the dates of leave change, or are extended, or initially were unknown.

7.4 Intermittent Leave

7.4.1 If medically necessary, FML occasioned by a serious health condition may be taken intermittently (in separate blocks of time due to a serious health condition).

7.4.2 FML may also be taken intermittently for a qualifying exigency relating to covered military service.

7.4.3 If leave is unpaid, GSD will reduce an employee's salary based on the amount of time not worked.

7.4.4 In addition, while on intermittent leave, GSD may temporarily transfer an employee to an available alternative position that better accommodates the employee's leave schedule and has equivalent pay and benefits.

8:09

Mass text 2

Waking with nausea and vertigo. Took meds. Plan to be in later and will let you know when I start working. FMLA.

MMS 8:03 AM

Valerie Paulk SPD Deputy Director

Kim was your FMLA approved

MMS 8:06 AM

Valerie Paulk SPD Deputy Director

Just don

8:10

**Mass text** 2

Valerie Paulk SPD Deputy Director

Just confirmed that your FMLA has not been approved. It will have to be regular sick leave

MMS 8:12 AM

This is Joe, Kim's husband. She will not be in today at all.

MMS 11:32

Valerie Paulk SPD Deputy Director

Ok. Tha

8:10

**Mass text** 2

Valerie Paulk SPD Deputy Director

Ok. Thank you!

MMS 11:33 AM

Natalie Martinez Office

Thank you Joe hope she gets to feeling better

MMS 11:48 AM

Thursday, March 2

Valerie Paulk SPD Deputy Director

Kim, Just want to come firm you are working

MMS 9:49 AM

**Heather@hburkelaw.com**

**From:** Martine , Natalie, GSD
**Sent:** Thursday, March 2, 2023 1:20 PM
**To:** Paul , alerie, GSD; Hunt-Brown, Kimberly, GSD
**Subject:** RE: Timesheet

d r r 15 r r r

M r
r r M r
r
r r r
5 5 5
r r r

***Note new email address:*** M r 1 d

---

**From:** Paulk, Valerie, GSD <valerie.paulk@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 1:07 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Cc:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Subject:** Re: Timesheet

I modified it.

Valerie Paulk
Deputy Director
State Purchasing Division
(505) 629-2813

On Mar 2, 2023, at 1:01 PM, Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov> wrote:

I went into SHARE but someone else already modified the record – not me, though. I put a note in saying that, but it's been updated, possibly by Kelly. I'm seeing a note now from Eunice that might be saying that.

Thanks,
*Kim*
*505-490-3152*

---

**From:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 12:31 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Cc:** Paulk, Valerie, GSD <valerie.paulk@gsd.nm.gov>
**Subject:** RE: Timesheet

r r r d r rd
113
113 5

d r r r r d

M r
r r M r
r
r r r
5 5 5
r r r

***Note new email address:*** M r 1 d

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 12:16 PM
**To:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Subject:** RE: Timesheet

Yes, but you still said you'd put it in writing. And since it's leave without pay, I'd like that in writing, please.

I entered time last week through the end of this pay period as directed by you and Valerie.

Thanks,
*Kim*
*505-490-3152*

---

**From:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 12:13 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>; Paulk, Valerie, GSD <valerie.paulk@gsd.nm.gov>
**Subject:** RE: Timesheet

d d r d r d r
r d r d

M r
r r M r
r
r r r
5 5 5
r r r

***Note new email address:*** M r 1 d

---

**From:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 12:12 PM
**To:** Paulk, Valerie, GSD <valerie.paulk@gsd.nm.gov>

**Cc:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Subject:** RE: Timesheet

Hi!

Natalie said she'd send me a written explanation of which time codes she needs me to use but I haven't gotten that yet. Once I've got that, I'll happily do the timesheet.

Thanks,
*Kim*
*505-490-3152*

---

**From:** Paulk, Valerie, GSD <valerie.paulk@gsd.nm.gov>
**Sent:** Thursday, March 2, 2023 11:35 AM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Cc:** Martinez, Natalie, GSD <Natalie.Martinez1@gsd.nm.gov>
**Subject:** Timesheet

Good morning,

Please update you time sheet before noon, time runs as the top of every hour. Thank you.

*Valerie Paulk*
General Services Department
State Purchasing Division
Deputy Director
Acting State Purchasing Agent
Phone: (505) 827-2335
Cell: (505) 629-2813
valerie.paulk@gsd.nm.gov ***Please note new email address***

| **GENERAL SERVICES DEPARTMENT**<br>*Agency Policy* | Number:<br>**GSD-030** |
|---|---|
| Subject:<br>**Attendance and Leave Policy** | Effective Date:<br>**5/30/2017**<br>Number of Pages:<br>**14/17** |

**REVISION LOG**

| Revision Number | Date | Responsible Party | Comment |
|---|---|---|---|
| Revision 0 | 05/30/2017 | Angela Dawson | New; supersedes and replaces and cancels all previous approved or draft versions of GSD policy documents written to prescribe requirements and processes for the various types of employee leave and employee attendance expectations; also supersedes and cancels those portions of GSD Policy HR 12-01 (approved 01/20/2012) that apply to attendance and leave for GSD employees. |
| | | | |
| | | | |
| | | | |

## Table of Contents


1.0 Purpose ........ 2

2.0 Scope/Applicability/Organizations Affected ........ 2

3.0 References ........ 2

4.0 Definitions ........ 2

5.0 Background ........ 3

6.0 Policy ........ 3

7.0 Procedures ........ 11

8.0 Attachments and Enclosures ........ 14

9.0 Approval ........ 14


Policy contains 14 pages of policy text plus three 1-page form attachments, for 17 total pages.

6.1.5 Any employee with a poor attendance record, excessive tardiness, numerous and frequent short-term absences, a history of one-, two- and three-day illnesses, or frequent emergencies which occur on the day before or after scheduled or approved days off or which precede or follow holidays, use of leave immediately upon accrual, thus maintaining zero or near-zero leave balances, may be subject to disciplinary action, up to and including dismissal.

6.2 Lunch Periods

6.2.1 Full-time employees may take up to a one hour, non-paid lunch period.

6.2.2 Lunch periods must be for at least 30 minutes, and may not be taken at the beginning or end of the work day, without prior supervisor/manager approval.

6.2.3 Employees must not work during their lunch period without prior approval from their immediate supervisor/manager.

6.2.4 Supervisors/managers may schedule lunch periods for employees that they supervise.

6.2.5 Lunch periods cannot be combined, split, accumulated, or transferred to other days and must be taken between 11:00 a.m. and 2:00 p.m.

6.2.6 Discussing work during a lunch period does not constitute work, or work time, and will not be paid.

6.3 Discretionary Rest Breaks

6.3.1 Employees may be granted a 15 minute rest break in the morning and a second 15 minute rest break in the afternoon.

6.3.2 Rest breaks may not be taken within one hour of the beginning or end of the workday, or within one hour before or after the lunch period.

6.3.3 Rest breaks must not be combined with any type of leave.

6.3.4 Supervisors/managers may schedule both rest breaks for employees they supervise.

6.3.5 Rest breaks cannot be combined, split, accumulated, or transferred to other days or be used to cover an employee's late arrival (tardy) or early departure from work.

6.3.6 Employees who smoke are subject to the same limits for 15 minute rest breaks as are non-smoking employees.

6.3.7 Periods in excess of fifteen minutes are not considered breaks, and shall result in the employee being required to use annual leave, compensatory time off, or leave without pay.

6.4 Breaks for Breastfeeding Mothers

6.4.1 Reasonable break periods will be provided for mothers to use a breast pump in the workplace for up to one year after a child's birth.

6.4.2 Nursing mothers are not entitled to payment for nursing mother break time which exceeds the established employee break time identified in the Discretionary Rest Breaks section above. For time that may be needed beyond agreed-upon break times, nursing mothers who are employees may use sick or annual leave.

6.4.3 Attachment 1 contains a sample of the Request for Private Location to Breastfeed/Nurse form that must be completed by a GSD employee who is a nursing mother to ensure sufficient flexible break times and privacy for the employee to use a breast pump or nurse a child. The nursing mother's supervisor/manager will also complete and sign the form. The most current version of the form should be obtained from GSD's SharePoint portal under the Forms Library.

6.5 Annual Leave

6.5.1 Employees, except those on absence without leave, leave without pay, unpaid Family Medical Leave Act (FMLA), or suspension, shall accrue annual leave at the rate of:

- 3.08 hours per pay period, if less than three years of cumulative employment
- 3.69 hours per pay period, if three years or more but less than seven years of cumulative employment
- 4.61 hours per pay period, if seven years or more but less than eleven years of cumulative employment
- 5.54 hours per pay period, if eleven years or more but less than fifteen years of cumulative employment
- 6.15 hours per pay period, if fifteen years or more of cumulative employment

6.5.2 Employees working less than an 80-hour pay period will accrue leave on a prorated basis.

6.5.3 Annual leave may not be used until it is accrued in SHARE and visibly posted to an employee's available leave balance.

6.5.4 An employee who wishes to use annual leave must obtain prior approval from their supervisor/manager as far as in advance as possible.

6.5.5 Employees who have accrued compensatory time must use it prior to using annual leave.

6.5.6 An employee calling in and requesting annual leave for the day without having submitted a prior request may have the request denied, and may be placed on AWOL if they do not report to work, except for circumstances beyond the employee's control or in an emergency.

6.5.7 An employee who is absent from duty after being denied annual leave by their supervisor/manager will be placed on AWOL, and will be subject to disciplinary action.

6.5.8 Some divisions or bureaus may restrict the use of annual leave during certain times of the year (e.g., the budget preparation cycle). Affected employees must be notified at least 30 days in advance of any restriction.

6.5.9 Employees shall be permitted to carry forward their annual leave balance up to a maximum of 240 hours of annual leave after the last pay period beginning in December.

6.5.10 Employees separating from classified service, except by a Reduction in Force (RIF), shall be paid for accrued annual leave as of the date of separation, up to a maximum of 240 hours at their current hourly rate.

6.5.11 Employees separating from the classified service as the result of a RIF shall be paid for all accrued annual leave as of the date of separation, at their current hourly rate.

## 6.6 Sick Leave

6.6.1 Employees, except those on full-time educational leave with pay, absence without leave, leave without pay, unpaid FMLA, or suspension, shall accrue sick leave at the rate of 3.69 hours per pay period.

6.6.2 Employees working less than an 80 hour pay period will accrue leave on a prorated basis.

6.6.3 Sick leave shall not be used before it is accrued in SHARE and visibly posted to an employee's available leave balance.

6.6.4 Employees requesting sick leave for purposes of attending medical appointments should obtain approval from their supervisor/manager as far in advance of the appointment as possible.

6.6.5 Employees may use sick leave for personal medical treatment or illness or for medical treatment or illness of a relation by blood or marriage within the third degree.

6.6.6 There is no limit to the amount of sick leave that may be accrued.

6.6.7 Employees may be required to provide healthcare provider certification for the use of sick leave if the request is for three or more consecutive workdays. Sick leave absences in excess of three consecutive workdays will be evaluated to determine eligibility for Family Medical Leave Act (FMLA) coverage.

6.6.8 Supervisors/managers who suspect abuse of sick leave may request that the employee provide a doctor's certification.

6.6.8.1 An employee must provide acceptable medical certification within 15 calendar days of the request.

6.9 Absent Without Leave (AWOL)

6.9.1 Employees who fail to appear for work and do not have authorized leave, or who appear for work but are in violation of an agency policy governing their readiness for work (e.g., violation of drug and alcohol policy, Code of Conduct), shall be considered to be absent without leave.

6.9.2 Employees shall not be paid for periods of AWOL, and shall not accrue annual or sick leave during an AWOL period.

6.10 Administrative Leave

6.10.1 The Secretary may authorize an employee paid administrative leave up to five consecutive workdays when it is in the best interest of the Department.

6.10.1.1 Administrative leave in excess of five consecutive days shall have written approval of the State Personnel Director.

6.10.1.2 The Secretary may authorize up to 160 consecutive hours of Administrative Leave during a disciplinary action or investigation.

6.10.2 Employees who are registered voters may absent themselves from work for up to two hours for the purpose of voting between the time of the opening and the closing of the polls.

6.10.2.1 The supervisor may specify the hours during the period in which the voter may be absent.

6.10.2.2 This paid leave is not available to employees whose workday begins more than two hours after the opening of the polls or ends more than three hours before the closing of the polls.

6.10.2.3 Employees who take voting leave must actually vote; failure to do so will result in disciplinary action.

6.10.3 Employees shall be entitled to administrative leave with pay when appearing in obedience to a subpoena as a witness before a grand jury or court or before a federal or state agency. Fees received as a witness, excluding reimbursement for travel and per diem, shall be remitted to GSD.

6.10.4 Employees shall be entitled to administrative leave with pay for serving on a grand or petit jury. Fees received as a juror, excluding reimbursement for travel and per diem, shall be remitted to GSD.

6.10.5 In accordance with the Governor's inclement weather policy, the Governor and Cabinet Secretary may authorize paid administrative leave during the closure, late reporting, or early release of employees due to inclement weather.

## 7.3 Call-In/Tardy/Early Departure

### 7.3.1 Employee's Responsibilities

7.3.1.1 Employees who are unable to report to work must notify their supervisor/manager at the earliest opportunity, but **no later than 30 minutes after the employee's scheduled start time**.

7.3.1.2 Employees must state the reason for their absence, and must notify their supervisor/manager if the absence, tardy, or early departure is due to a documented/approved leave of absence (e.g., Military Leave, FMLA) in order to ensure FMLA-protected leave, and to track leave utilization and absenteeism. Employees must also advise the supervisor/manager of the anticipated date of return.

7.3.1.3 Notification from an immediate family member or friend does not constitute proper notification unless, due to exigent circumstances, the employee is unable to contact the supervisor. In such instances, the employee must personally contact their supervisor/manager as soon as possible.

7.3.1.4 Employees who leave work due to personal emergency or illness/ injury prior to the end of the scheduled shift must inform their immediate supervisor/manager of the early departure, state the reason why, and timely record the absence in SharePoint and SHARE according to GSD's Hours of Work and Overtime Policy.

a. Employees who do not have access to SharePoint and SHARE must record their absence on GSD's Leave Request Form.

b. Employees must provide notification as soon as possible.

### 7.3.2 Employer's Responsibility

7.3.2.1 It is the responsibility of each supervisor/manager to actively address attendance issues in a timely and consistent manner.

7.3.2.2 Supervisors/managers must monitor leave balances of all employees under their supervision prior to approving leave, and should immediately communicate with HRB about any situation where an employee is absent without approved leave or without sufficient leave to cover the balance.

7.3.2.3 Supervisors/managers must contact HRB when an employee is on sick leave for more than three consecutive workdays in order to ensure compliance with federal regulations, and to ensure employees receive proper notification of their rights under the Family and Medical Leave Act.

7.3.2.4 Supervisors/managers are required to verify accurate time reporting in SHARE and to reconcile the timesheet with employee leave requests.

## 8.0 Attachments and Enclosures

Attachment 1: Request for Private Location to Breastfeed/Nurse (Sample)

Attachment 2: Request for Leave Without Pay (LWOP) (Sample)

Attachment 3: Domestic Violence Leave Request Form (Sample)

## 9.0 Approval

**Approved by:** Zella Kay Cox
Zella Kay Cox, Administrative Services Director, GSD
05/24/17
**Date**

**Approved by:** [signature]
Alexis Johnson, General Counsel, GSD
5/25/17
Date

**Approved by:** E L Burckle
**Edwynn L. Burckle, Secretary, GSD**
5/30/17
**Date**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF NATALIE MARTINEZ
March 12, 2025
9:09 a.m.
119 East Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(423P) RAB

**A. Yes.**
Q. And so you're telling her here because she didn't give you advanced notice for her need for FMLA leave, she can't use annual leave for it, correct?
**A. No, that's not what I said.**
Q. What are you saying?
**A. Ask your question again.**
Q. Okay. So you're telling her here that she had to have given you advanced notice before March 1st to use annual leave on March 1st, correct?
**A. Yes.**
Q. Okay. And why do you make her use leave without pay from 8:00 a.m. to 11:30 a.m.?
**A. I don't know.**
Q. Why is she marked from 11:30 a.m. to 5:00 p.m. as AWOL?
**A. Because it was my understanding that if we didn't hear directly from her, then it would be as if we didn't hear from her at all.**
Q. So the fact that her husband took the time to give you notice that she couldn't make it in that day wasn't enough to relieve her of being marked away without leave?
**A. From me, no, because as I mentioned, I was**



**given direction from Valerie.**
Q. To mark her AWOL?
**A. Yes.**
Q. And it's not because you didn't know she was sick, correct?
**A. Right.**
Q. You --
**A. So being that she was sick, she would have used sick leave, and if she knew she didn't have sick leave, she should have requested annual leave, because annual leave needs to be preapproved.**
Q. You said earlier today you understand the nature of her condition that's protected by the Family Medical Leave Act is that she doesn't always know that she's going to need leave, correct?
**A. Well, she knew as of the date and time of this text message that she needed annual leave, I would assume.**
Q. Well, she tells you that she's invoking FMLA in this text, correct?
**A. Yes.**
Q. Which is consistent with the directions you gave her about how she's supposed to give you notice about FMLA leave usage, correct?
**A. Yes.**



Q. So at the point that she told you that, she was anticipating using her FMLA, correct?
**A. Yes.**
Q. But she wasn't able to use her FMLA; was she?
**A. It doesn't appear so, no.**
Q. And instead she was marked AWOL for some of that leave, correct?
**A. Yes.**
Q. And she wasn't allowed to use paid leave as she requested, correct?
**A. Correct.**
Q. Is being marked AWOL a negative thing?
**A. I don't know. That could be a -- an opinion.**
Q. Do employees like being marked AWOL, in your experience?
**A. I don't know that I've had that conversation with other employees.**
Q. Can you discipline an employee for being marked AWOL?
**A. I don't know. Never had to.**
Q. You've never heard of anyone being disciplined for being marked AWOL?
**A. No.**



Q. So in the attendance and leave policy in Exhibit Number 1, at the top of page eight it says: Employees who fail to appear for work and do not have authorized leave or who appear for work but are in violation of agency policy governing their readiness for work shall be considered to be absent without leave.
Correct?
**A. Yes.**
Q. It says: Employees shall not be paid for periods of AWOL and shall not accrue annual or sick leave during an AWOL period.
Correct?
**A. Yes.**
Q. And this is different than leave without pay how?
**A. So it's my understanding that leave without pay has to be prior approved.**
Q. Okay. So looking at page six, the top of the page, 6.5.7 says: An employee who is absent from duty after being denied annual leave by their supervisor/manager will be placed on AWOL and will be subject to disciplinary action.
Does that mean that an employee that's marked AWOL will be subject to disciplinary action?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF VALERIE PAULK
March 14, 2025
9:06 a.m.
119 E. Marcy Street, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(365P) RAB

**A. I don't recall.**
Q. Was it about as frequently as you sent to Ms. Hunt-Brown or less frequently?
**A. I honestly do not recall.**
Q. Can you give any example of another employee that you sent emails like this to?
**A. I don't know. I do recall sending one to maybe Raelynn, Theresa --**
Q. Mandibles?
**A. Uh-huh.**
Q. We'll come back to this.
MS. BURKE: Do we have other copies of the texts? I thought I handed you all --
MR. BROWN: There were three of them.
MS. BURKE: There was only the three pages or three different pages -- three different groups? Because I'm not seeing it unless it's -- unless I'm crazy, which is possible.
Oh, it's right there. That's fine. We've confirmed.
(Exhibit 15 marked.)
Q. (By Ms. Burke) Exhibit 15. Exhibit 15 is a text chain. There isn't a date at the top. The date on the third page tells us the next day was March 2nd.



The first text: Took meds. Plan to be in later. Will let you know when I start working FMLA.
You ask: Kim, was your FMLA approved? And then six minutes later you say: Just confirmed that your FMLA is not approved. It will have to be regular sick leave.
The next text says: This is Joe, Kim's husband. She will not be in today at all.
And you respond: Okay. Thank you.
And Natalie Martinez's office says: Thank you, Joe. Hope she gets to feeling better.
And the next day you say: Kim, just want to confirm that you are working.
Do you remember this text chain?
**A. I do. I just don't know if some of the dates are missing.**
Q. The first date is. But the next day, based on your texts confirming she's working, was March 2nd. And that was March 1st, is what we understand to be the date these texts were exchanged from everybody. We haven't received them from you guys, so we only have this.
**A. What I'm saying is, this -- okay. Yes, I do remember.**
Q. Okay. Can you explain to me what was



going on here?
**A. Kim called in. I was confirming that her FMLA was approved. Then I checked with HR. HR said no. That's why I responded to her, letting her know I checked with HR so she would know her FMLA had not been approved.**
**And the other texts are responding to the text sent by her husband.**
**(Exhibit 16 marked.)**
Q. Exhibit 16. Exhibit 16 is just forwarded emails, but the first in the chain appears to be the last page, which is marked KHB 51. It's Valerie Paulk to Kimberly Hunt-Brown, cc'ing Natalie Martinez.
And you say: Good morning. Please update your time sheet before noon. Time runs at the top of every hour. Thank you.
Why did you send that email?
**A. Because she needed to update her time sheet. She was probably off and had not entered her time.**
Q. And Ms. Hunt-Brown responds: Natalie said she'd send me a written explanation of which time codes she needed me to use, but I haven't gotten that yet. Once I've got that, I'll happily do the



time sheet.
Do you know what codes she was waiting on?
**A. I don't, because I don't know.**
Q. So then there's some discussion about whether it needed to be put in writing. So Ms. Martinez sends Ms. Hunt-Brown an email at 12:31 p.m. on March 2nd, cc'ing you.
It says: As stated in our meeting this morning, you are to use the following codes for yesterday. 8:00 a.m. to 11:30 a.m., leave without pay, approved; and 11:30 to 5:00 p.m., AWOL.
Why was Ms. Hunt-Brown marked AWOL for March 1st?
**A. I believe it goes back to the text message, because in the policy it states that the employee needs to communicate with the employee -- I mean with the supervisor, and in this particular situation, it was Kim's husband. And I believe Natalie confirmed with HR what she should do, and HR explained that it needs to be the employee that would send the message.**
Q. So this wasn't your decision to mark her AWOL?
**A. It was the supervisor's decision.**
Q. The supervisor being Natalie Martinez?

**A. We probably confirmed with HR before she did that. I can't remember the exact conversation, but I do know that HR said it needed to be the employee that reached out to the supervisor.**
Q. Even if Ms. Hunt-Brown was unable to give notice as --
**A. I think it says --**
MS. DOWNEY: Objection. Form and foundation.
**A. I believe in the policy it says exigent circumstances, and I don't know if nausea and vertigo are exigent circumstances or not.**
Q. Are those part of Ms. Hunt-Brown's FMLA-covered conditions?
**A. I don't know what her -- I never knew what her condition was. I never saw what the condition was on FMLA paperwork.**
Q. Even though it states it on the FMLA paperwork, you didn't know?
**A. We get the -- if I'm not mistaken, I think towards the end they started doing that. At the very beginning, I don't believe it did. I don't know that it actually states the medical condition or if it just states a condition. I don't know what it states.**



Q. If it's your decision to decide whether it's exigent circumstances, wouldn't it be helpful to know if it's part of their condition?
**A. That's probably why we reached out to HR, so that they could tell us whether or not we -- she could have put her on AWOL.**
Q. So Ms. Hunt-Brown had noticed you that she was taking FMLA time, and -- and you reached out to HR, and they told you that she didn't have FMLA time; is that correct?
MS. DOWNEY: Objection.
Q. Is that what that says here --
MS. DOWNEY: Foundation.
Q. -- in Exhibit 15?
**A. It says: I confirmed that the FMLA had not been approved, which at that time it had not been approved, so she would not have had FMLA, and she was calling in FMLA.**
Q. What is your understanding of how the employer -- does the employer actually approve FMLA?
MS. DOWNEY: Objection. Form.
Go ahead.
**A. Does the employer?**
Q. Yes.
**A. Meaning, like, HR?**



Q. Well, in this case if that's who does it, yes.
**A. So it's my understanding that the employee submits their packet to HR. HR works with the employee, and if they need additional information from the medical provider, they would do that without the supervisor -- supervisor's input, and then they would notify us once the -- so me signing -- me and Natalie signing the FMLA is just a formality, because they've already approved the FMLA.**
Q. By approve, you mean certify?
**A. I --**
Q. Let's step back. Just in general you understand the Family Medical Leave Act is a federal right, correct?
**A. Correct.**
Q. So when an employer gets paperwork that documents an employee's serious health condition, they are certifying that that employee has that condition and qualifies for the federal right, correct?
**A. I don't know what their process is or what they verify or certify.**
Q. Okay. Let's see in their policy, which



is -- page six, 7.2, certification for need for leave. So it says: GSD will require completion of the most current version of the following federal certification forms as appropriate to the situation.
Is that correct?
**A. That's what it stated here, GSD. So I worked for GSD, but I was not in HR.**
Q. Okay. So who -- who did you talk to that told you that Ms. Hunt-Brown had not been approved for FMLA?
**A. It was either Eunice or Kelly.**
Q. And don't remember which?
**A. No.**
Q. Did they explain to you why they didn't -- why she was allegedly not approved?
**A. No. They were still pending information.**
Q. But based on -- exhibit number, which I didn't write down. I think it was early on. Maybe 4, is my guess, the application for FMLA leave.
Ms. Hunt-Brown had applied for FMLA as of December 16, 2022, correct?
**A. That's what the date is on it, yes.**
Q. And you signed this on the 30th of May, 2022? Or 2023, I'm sorry.
**A. March 30th?**

**Heather@hburkelaw.com**

**From:** Martine , Natalie, GSD
**Sent:** ednesday, anuary 2 , 2022 2:3 PM
**To:** Hunt-Brown, Kimberly, GSD
**Subject:** RE: Leave Re uest from Kimberly Hunt-Brown

d r d

M r
r
r r r
r
r r r
5 5 5
r r r

---

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@state.nm.us>
Wednesday, January 26, 2022 1:08 PM
Martinez, Natalie, GSD <Natalie.Martinez1@state.nm.us>
RE: Leave Request from Kimberly Hunt-Brown

Will do. Sorry about that – Joe was sending in the messages and I forgot to tell him to include Valerie.

Thanks so much, ☺
*Kimberly*
505-490-3152

---

Martinez, Natalie, GSD <Natalie.Martinez1@state.nm.us>
Wednesday, January 26, 2022 11:59 AM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@state.nm.us>
FW: Leave Request from Kimberly Hunt-Brown

r d r r d r r

M r
r
r r r
r
r r r
5 5 5
r r r

Paulk, Valerie, GSD <valerie.paulk@state.nm.us>
Wednesday, January 26, 2022 11:19 AM
Martinez, Natalie, GSD <Natalie.Martinez1@state.nm.us>
RE: Leave Request from Kimberly Hunt-Brown

Did not know she was out yesterday!

Valerie Paulk
Deputy Director
State Purchasing Division
(505) 827-2335
(505) 629-2813

---

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@state.nm.us>
Wednesday, January 26, 2022 11:17 AM
Martinez, Natalie, GSD <Natalie.Martinez1@state.nm.us>
Paulk, Valerie, GSD <valerie.paulk@state.nm.us>; Paulk, Valerie, GSD <valerie.paulk@state.nm.us>
Leave Request from Kimberly Hunt-Brown

Greetings,

Please approve the following leave request.

| Leave Type | Begin | End |
|---|---|---|
| FMLA Medical Leave Sick (FMLSK) | 01/25/2022 08:00 AM | 01/25/2022 05:00 PM |

**Open Leave Request**

Please click on the above link to review the leave request.

State of New Mexico - General Services Department
Electronic Leave Request

**Heather@hburkelaw.com**

---

**From:** Moya, Eunice, GSD Eunice.Moya gsd.nm.gov
**Sent:** Thursday, March 2, 2023 12: PM
**To:** Hunt-Brown, Kimberly, GSD; Howley, Kelly, GSD
**Subject:** RE: Timesheet modification messages

Your FMLA expired on 12/10/2022, therefore I asked Kelly to update your timesheet changing time that was coded FMLA.

**M**
Human Resource Manager
General Services Department (GSD)
p: 505.476.1859
c: 505.412.5828
e: Eunice.Moya@GSD.nm.gov

---

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Thursday, March 2, 2023 12:52 PM
Howley, Kelly, GSD <Kelly.Howley1@gsd.nm.gov>; Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
Timesheet modification messages

Kelly: can you please explain what is happening here?



Reply Reply All Forward IM
Thu 3/2/2023 10:39 AM
Howley, Kelly, GSD
Another user modified your time via timesheet
To Hunt-Brown, Kimberly, GSD
Follow up. Completed on Thursday, March 2, 2023.

This message is to notify you that another user, Kelly Howley, has modified your Time[s] beginning 12/10/2022.

NOTE: This is a system-generated email. Do not reply to this email.

Reply Reply All Forward IM

Thu 3/2/2023 10:41 AM

Howley, Kelly, GSD

**Another user modified your time via timesheet**

To Hunt-Brown, Kimberly, GSD

Follow up. Completed on Thursday, March 2, 2023.

This message is to notify you that another user, Kelly Howley, has modified your Time
beginning 01/21/2023.

**NOTE**: This is a system-generated email. Do not reply to this email.

Reply Reply All Forward IM

Thu 3/2/2023 10:51 AM

Howley, Kelly, GSD

**Another user modified your time via timesheet**

To Hunt-Brown, Kimberly, GSD

This message is to notify you that another user, Kelly Howley, has modified your Times
beginning 01/21/2023.

**NOTE**: This is a system-generated email. Do not reply to this email.

Reply Reply All Forward IM

Thu 3/2/2023 10:51 AM

Howley, Kelly, GSD

**Another user modified your time via timesheet**

To Hunt-Brown, Kimberly, GSD

This message is to notify you that another user, Kelly Howley, has modified your Time
beginning 02/04/2023.

NOTE: This is a system-generated email. Do not reply to this email.

Reply Reply All Forward IM

Thu 3/2/2023 10:53 AM

Howley, Kelly, GSD

**Another user modified your time via timesheet**

To Hunt-Brown, Kimberly, GSD

This message is to notify you that another user, Kelly Howley, has modified your Time
beginning 02/04/2023.

NOTE: This is a system-generated email. Do not reply to this email.

What is going on, please?

*Kim r - r*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

BURKE LAW

**Heather C. Burke, Esq.**
**Burke Law**
1000 Cordova Pl. #24
Santa Fe, NM 87505
Heather@HBurkeLaw.com
(505) 428-9424

Anna Silva
Acting GSD Cabinet Secretary
1100 St. Francis Dr.
Santa Fe, NM 87505
Anna.Silva2@gsd.nm.gov
CC: Valerie Paulk
Valerie.Paulk@gsd.nm.gov
VIA EMAIL ONLY

March 2, 2023

Dear Ms. Silva,

I hope that this letter finds you well. I am addressing this letter to you, as I understand that you are currently acting as GSD Cabinet Secretary. I am writing to you on behalf of my client, Kimberly Hunt-Brown, who is employed with the State Purchasing Department. Ms. Hunt-Brown suffers from Multiple Sclerosis and chronic disabling migraines, both of which are FMLA qualifying medical conditions, and has previously been approved for intermittent FMLA for these conditions. Ms. Hunt-Brown's last FMLA qualifying period ended in December 2022. Unfortunately, she experienced issues getting her certification forms signed because her medical provider was out of the office for a period of time due to having Covid. As you are likely aware, there is no cure for M.S. or for disabling migraines. There is no reasonable belief that Ms. Hunt-Brown would not continue to qualify for FMLA protected leave, even if her certification paperwork was delayed by circumstances beyond her control.

Unfortunately, even after Ms. Hunt-Brown submitted her paperwork to HR, they have repeatedly, and illegally, delayed re-certifying her for FMLA. This delay has become increasingly transparent, as the most recent claim of incomplete paperwork suggests that Ms. Hunt-Brown's provider needs to fill out the dates that she will be seeing another provider, which no one is claiming she will be doing. The entire section is inapplicable to her and, even if it were not, should not be used to delay her qualifying for protected leave. Again, there is absolutely no doubt that Ms. Hunt-Brown qualifies for FMLA protection.

In addition to this clear FMLA interference, GSD has increasingly harassed Ms. Hunt-Brown, alleging that she is not timely completing her work assignments. Despite the fact that Ms. Hunt-Brown's medical condition results in FMLA protected absences from work, State Purchasing has taken no steps to arrange coverage for her work when she is out of the office. They have directly told her that they don't believe it's "fair" that others should have to fill in for her because of her absences. As a result, Ms. Hunt-Brown is held to the impossible standard of performing full time job duties in less than full time work hours. She is being treated as though she is deficient because she has struggled to meet this impossible requirement, and has been threatened with discipline and even with removal of her telework accommodation. As you might imagine, these are violations of the FMLA, the ADA, and the New Mexico Human Rights Act.

Not only has GSD illegally interfered with Ms. Hunt-Brown's certification for FMLA, they have illegally denied her protected leave that she is entitled to as a matter of law. Even if there are legitimate minor paperwork issues needing to be corrected, GSD cannot refuse Ms. Hunt-Brown her federal right to protected leave. Yet they have done exactly that. They have told her that she cannot use any FMLA leave while they illegally stall her certification. Yesterday, likely directly because of the inordinate amount of stress that GSD is putting Ms. Hunt-Brown through, she had a flare up and could not work. GSD denied Ms. Hunt-Brown FMLA protected leave, told her she didn't have enough sick leave, marked her leave without pay for some of the leave, and then, incredibly marked her AWOL for the afternoon. Ms. Hunt-Brown was not AWOL because her husband sent not one, but two texts on her behalf to GSD because she was incapacitated. The first one was sent in the morning when they weren't sure the duration of her absence, and the second one in the afternoon updating them that she had not improved and would not be in at all.

Ms. Hunt-Brown has annual leave available she could use for that time, but GSD will not allow it to be used, and is forcing her to take unpaid time. GSD is clearly punishing Ms. Hunt-Brown by concocting fake barriers and justification for adverse actions against her. This is not only clearly and indisputably illegal, but is further damaging her health. This is unacceptable. GSD must comply with all state and federal laws. It does not have authority to deny Ms. Hunt-Brown her federal rights, and cannot discriminate against and harass her because of her disabling medical condition.

GSD must immediately certify Ms. Hunt-Brown's FMLA for the next year. They must properly designate her FMLA leave, with the required designation notice. They must

immediately cease and desist in their discrimination, harassment and retaliation because of Ms. Hunt-Brown's disabling health conditions. State Purchasing must immediately develop, communicate and implement a plan for coverage of Ms. Hunt-Brown's work duties anytime she is out of the office, OR they must cease and desist harassing Ms. Hunt-Brown because it takes her longer to complete this work due to her absences. In addition, GSD must reimburse Ms. Hunt-Brown for the inconvenience they have caused her, including the cost of her legal representation, which currently amounts to **$9950.00**

We look forward to the prompt and amicable resolution of these issues, and GSD's continued commitment to providing a safe and healthy work environment free of harassment and discrimination for all of its employees.

**Please respond to this letter by close of business, March 10, 2023.**

Sincerely,

Heather C. Burke
Attorney at Law

MICHELLE LUJAN GRISHAM
GOVERNOR

DUFFY RODRIGUEZ
ACTING CABINET SECRETARY

MICHAEL B. LUJAN
CFO & DIRECTOR
ADMINISTRATIVE SERVICES DIVISION

# State of New Mexico
## General Services Department

ADMINISTRATIVE SERVICES DIVISION
(505) 476-1857

FACILITIES MANAGEMENT DIVISION
(505) 827-2141

PURCHASING DIVISION
(505) 827-0472

RISK MANAGEMENT DIVISION
(505) 827-2036

STATE PRINTING & GRAPHIC SERVICES BUREAU
(505) 476-1950

TRANSPORTATION SERVICES DIVISION
(505) 827-1958

## EMPLOYEE APPLICATION FOR FMLA LEAVE

Name: Kimberly A Hunt-Brown Date: 12/16/2022

Address: [redacted]

Home Phone: [redacted] Cell Phone #: [redacted]

Job Title: SPD Procurement Specialist II Employee ID #: 341822

Hire Date: 5/19/2014 Hours worked 12 months previous to Leave: 1696.00

(*Important: hire date and hours worked to be completed and verified by Payroll and/or HR*)

Supervisor Signature: Natalie Martinez Date: 3/30/2023

The Family and Medical Leave Act (FMLA) of 1993 entitles eligible employees to take unpaid, job-protected leave for specified family and medical reasons with continuation of group health insurance coverage. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Under the Family and Medical Leave Act (FMLA), eligible employees are entitled to up to 12 weeks of unpaid, job protected leave for certain family and medical reasons in a 12 month period, OR up to 26 weeks in a 12 month period to care for covered service member with serious injury or illness who is the spouse, son, daughter, parent or next of kin to the employee.

*Part-time employees must meet criteria be eligible for FMLA.* FMLA may be paid, unpaid, or a combination of paid and unpaid, depending on the circumstances and as specified in FMLA, state law and agency policy.

Employees seeking to use FMLA leave are required to provide 30-day advance notice of the need to take FMLA leave when the need is foreseeable and such notice is practicable. When 30 days' notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions; the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

DocuSign Envelope ID: BC236D45-7F70-421F-97A0-0C358096CB0F

Employees must meet two lengths of service requirements to be FMLA eligible:

1. Have worked for a total of at least 12 months (52 weeks)
2. Have worked at least 1250 hours during the 12 month period immediately before the date the leave would begin

-1-

**Please indicate the reason for your FMLA Leave (medical certification must be provided 15 days after date of application)**

X Your own serious health condition (medical certification attached)
___ Birth of a child and to care for that child (medical certification attached)
___ Placement in your home of a child for adoption or foster care (court order attached)
___ Care of a spouse, domestic partner, child, or parent with serious health condition (medical certification attached)

Name of family member for whom you will provide care: ____________
Relationship of family member to you: ____________
If family member is your son or daughter, date of birth: ____________
Describe care you will provide to your family member and estimate leave needed to provide care: ____________

___ Family member (spouse, child or parent) in military – qualifying exigency

Name of covered military member on active duty or call to active duty status in support of a contingency operation: ____________
Relationship of covered military member to you: ____________
Period of covered military member's active duty: ____________
Please check one of the following:
___ A copy of the covered military member's active duty orders is attached.
___ Other documentation from the military certifying that the covered military member is on active duty (or has been notified of an impending call to active duty) in support of a contingency operation is attached.
___ I have previously provided my employer with sufficient written documentation confirming the covered military member's active duty or call to active duty status in support of a contingency operation.

___ Family member (spouse, child, parent or next of kin) in military - caregiver, serious injury or illness of service member

Name of Covered Servicemember (for whom employee is requesting leave to care): ____________
Relationship of Employee to Covered Servicemember Requesting Leave to Care: ____________
Describe the Care to Be Provided to the Covered Servicemember and an Estimate of the Leave Needed to Provide the Care ____________
*Leave requests based on a serious health condition for a military family member must be documented by a United States or Department of Defense (DOD) authorized health care provider or an authorized DOD representative if the provider is unable to make certain military-related determinations as outlined in the FMLA.

**Date of Leave Requested (please indicate leave requested)**

___ I request leave from ____________ to ____________
X I request intermittent leave according to the following Schedule
I have a chronic condition that will flare up at times, normally only lasting a day or so at a time; it is a relapsing and remitting condition, meaning it normally gets back to 100% with time and sometimes therapy solutions. So there is no schedule and it is unpredictable in nature, meaning we don't know what triggers the condition to flare up. Generally I will wake up with a flare up either in progress or beginning. Depending upon the specific flare up, I can sometimes take medicine to mitigate the condition within a few hours, although sometimes it will take longer.

I request reduced schedule leave according to the following Schedule

The total amount of leave that I request is: ____________

I agree to return to work on ____________. The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. If

1100 ST. FRANCIS DRIVE, P.O. BOX 6850 SANTA FE, NM 87502 (505) 827-2000 FAX (505) 827-2896
WWW.GENERALSERVICES.STATE.NM.US/ADMINSERVICES

DocuSign Envelope ID: BC236D15-7F70-421F-97A0-0C888098CB0F

Circumstances change such that you will not be able to return to work on that date, you agree to inform Your supervisor as soon as practicable.

I hereby acknowledge that failure to return to work at the conclusion of my leave will be deemed a resignation from employment, unless the agency approves a leave extension and records such approval in writing.

While on paid leave, agency will continue to make payroll deductions to collect the employee's share of group insurance premiums. **While on unpaid leave you are responsible to make financial arrangements with HR to pay for your coverage and to prevent cancellation of your group insurance.** Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work. **You may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave** if you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered service member's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstances beyond your control.

You may be required to provide a return to work certificate from your provider prior to being restored to employment. Certification must address any work restrictions; indicate whether restrictions are permanent or temporary and the expected date you will return to full duty from the restrictions.

Employee Signature: Kimberly Albert-Brown Date: 04/05/2023

***APPROVALS***

**YOUR FMLA IS APPROVED:**

Division Director/Designee: Valerie Paulk Date: 3/30/2023

HR Bureau Chief/Designee: Eunice Moya Date: 3/30/2023

Cabinet Secretary: Robert Doucette Date: 3/30/2023

**YOUR FMLA IS NOT APPROVED:**
**Reason (please give explanation):** ____________________

____________________

Division Director/Designee: ____________________ Date: __________

HR Bureau Chief/Designee: ____________________ Date: __________

Cabinet Secretary: ____________________ Date: __________



1100 ST. FRANCIS DRIVE. P.O. BOX 6850 SANTA FE, NM 87502 · (505) 827-2000 · FAX (505) 827-2896

Kimberly Hunt-Brown

| Date | Reported Hours | Type of Leave Taken | Corrected Hours | FML Corrected |
|---|---|---|---|---|
| 1/23/2023 | 8 | Sick leave | 8 | FML Sick Leave |
| 1/24/2023 | 4 | Annual Leave | 4 | FML Annual Leave |
| 2/1/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/2/2023 | 4 | Annual Leave | 4 | FML Annual Leave |
| 2/3/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/9/2023 | 3.25 | Sick leave | 3.25 | FML Sick Leave |
| 2/10/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/16/2023 | 2.5 | Annual Leave | 2.5 | FML Annual Leave |
| 2/22/2023 | 1 | Annual Leave | 1 | FML Annual Leave |
| 2/22/2023 | 5 | Sick leave | 5 | FML Sick Leave |
| 3/1/2023 | 4.5 | AWOL | 4.5 | FML Unpaid |
| 3/1/2023 | 3.5 | LWOP | 3.5 | FML Unpaid |
| 3/7/2023 | 1 | Sick leave | 1 | FML Sick Leave |
| 3/15/2023 | 1.5 | LWOP | 1.5 | FML Unpaid |
| 3/15/2023 | 2.5 | Sick leave | 2.5 | FML Sick Leave |

CUMBRE

531 Harkle Road, Suite A
Santa Fe, NM 87505

505-984-2244
www.cumbrecourtreporting.com

Leave Act?
A. Could you, please, ask me the question again?
Q. Is GSD's prohibition on family members or friends giving notice consistent with the Family Medical Leave Act?
A. I don't know.
Q. And as we discussed a few minutes ago, the GSD's Family Medical Leave Policy doesn't say one way or the other whether or not an employee's family member is allowed to give notice for them; correct?
A. There's no procedures when an employee is invoking. I don't see it on the policy.
Q. Now, you said a few minutes ago that you do internal HR training on the FMLA and you're considering doing more training than that internal training; is that correct?
A. Yes.
Q. What does that mean?
A. We're going to -- we reached out to Workforce Solutions to have an individual come in and provide training to HR staff.
Q. Just the HR staff?
A. Supervisors and managers.
Q. Supervisors, managers, and HR staff?
A. Yes.



Q. And when is that going to take place?
A. Gloria Quintana is working on the details.
Q. Does that mean that there's no set time for that yet?
A. We've reached out. We're just trying to get on the calendar of the individual.
Q. So Workforce Solutions is the entity in the State that does FMLA training?
A. They're one of the resources.
Q. What are the other resources?
A. Probably -- I don't know. Probably private trainers.
Q. Has GSD explored getting private training?
A. We reached out to this individual because they provided a training at one of the SHRM conferences that a couple of my staff members attended.
THE COURT REPORTER: You said, "SHRM"?
THE WITNESS: SHRM, S-H-R-M.
BY MS. BURKE:
Q. And did you hear back from that person?
A. Gloria's working directly with the individual, so I would have to follow up with her. I know that we were trying to get on their schedule. They agreed to come to our location and provide on-site training. It was just a matter of ironing out the dates and time, date and time.



Q. So is that expected to happen in the near future?
A. Yes.
Q. Does anything in the Attendance and Leave Policy -- that's Exhibit 3 -- point managers to any specific resources if they have questions about whether or not leave should be designated as FMLA?
A. Yes, they are directed to go to HR.
Q. Where?
A. 7.3.23.
Q. I'm sorry. What was that number?
A. 7.3.23.
Q. Is that telling the employer just to contact HR via after an employee is absent for more than three consecutive days?
A. Yes.
Q. Does it tell them to contact HR for any other reason regarding the FMLA?
A. I do not believe so.
Q. What is the difference between Leave Without Pay and FMLA leave?
A. So Leave Without Pay is -- let me see. On Family Medical Leave Unpaid?
Q. Is Family Medical Leave paid or unpaid at GSD?
A. So Family Medical Leave would be paid if an employee uses their own personal leave, and it's unpaid if



they don't have time on the books.
Q. Okay. So if it's unpaid leave, what's the difference between that and Leave Without Pay?
A. So the difference is Leave Without Pay is not based on Family Medical Leave, a medical emergency. It's based on something outside of Family Medical Leave or if an employee isn't eligible for Family Medical Leave; they don't meet the criteria for Family Medical Leave.
The difference being is that an employee is responsible for their portion of the insurance benefits if they're on Family Medical Leave Unpaid. They don't have enough time to cover their hours, to cover their absence. The State would still continue to cover their portion of the insurance benefit. If it's Leave Without Pay and they don't have any time reported, the employee is responsible for 100 percent of the insurance premiums.
Q. Can Leave Without Pay be denied?
A. Yes.
Q. What are the reasons Leave Without Pay could be denied?
MR. LOMAN: Object to form and foundation.
BY MS. BURKE:
Q. Go ahead and answer.
A. It would be based on operational needs.
Q. What do you mean?

condition."
Correct?
(Exhibit 18 was marked for identification.)
A. Yes.
Q. So if somebody later changed this back to FMLA Unpaid on Exhibit 17, would it leave the Absent Without Leave designation there even if there's no hours?
A. That's a good question. I would have to see the full pay period of the time sheet, before and after, before I could answer that question correctly because I don't know how it shows.
Q. Okay. And then Exhibit 17 it shows Ms. Hunt-Brown is otherwise Teleworking that week; correct?
A. Yes.
Q. Exhibit 19 are the associated text messages giving notice of the need for FMLA on that day. The date for some reason got cut off from this top one, but on the second one down you can see March 2nd or the last page is the next day.
(Exhibit 19 was marked for identification.)
MR. LOMAN: I'm going to object to form and scope on this.
MS. BURKE: Okay.
//



BY MS. BURKE:
Q. We discussed the Attendance and Leave Policy's prohibition of family members giving notice; correct?
A. Uh-huh.
Q. We can see on the second page it says, "This is Joe, Kim's husband"; correct?
A. Yes.
Q. So why would the notice in Exhibit 19 -- or would the notice in Exhibit 19 be a violation of the Attendance and Leave Policy's notice?
MR. LOMAN: Same objection.
THE WITNESS: I don't know what the situation was at that time. So if she was not -- at the beginning it says she was nauseous with vertigo. "Took meds." I don't know if she was sleeping because of the meds. I don't know.
BY MS. BURKE:
Q. But she did give notice of her need for FMLA; correct?
A. Yes.
Q. Earlier we talked about whether or not somebody who was exercising their need for FMLA would be marked AWOL under the notice policy. Why would somebody trying to take FMLA be marked AWOL?
MR. LOMAN: Same objection.



THE WITNESS: According to this text message Valerie asked her if the FML was approved.
"Just confirmed that your FMLA has not been approved. It will have to be regular sick leave."
BY MS. BURKE:
Q. And was Ms. Hunt-Brown's FMLA leave not approved because of a mistake made by the HR Department?
A. Yes, it was.
Q. So she should have been approved for FMLA at that time; correct?
A. Yes.
Q. Exhibit 20 is Defendant GSD's Responses to Plaintiff's Third Interrogatories and Third Requests For Production. On the last page of this exhibit, there's a verification signed by Eunice Moya; correct?
(Exhibit 20 was marked for identification.)
A. Yes.
Q. Are you familiar with these responses?
A. Yes.
Q. In the answers and response to Interrogatory Number 9, Defendant's list several Bates numbers. Exhibit 21 is Bates Numbers 502 through 505, which is one of the Bates numbers listed in Exhibit 20. Where on this document does it state that Ms. Hunt-Brown has an essential in-person function for her job?



(Exhibit 21 was marked for identification.)
A. What was your question?
Q. Where on Exhibit 21 does it state that in-person attendance in Santa Fe is an essential function of Ms. Hunt-Brown's position?
A. It doesn't say that.
Q. Nowhere in Exhibit 21?
A. No.
Q. Exhibit 22 is GSD's Code of Conduct. This is referred to in the response to Interrogatory Number 9 as Bates Number 612 through 624. Where in this Code of Conduct does it State that Ms. Hunt-Brown's position has an essential function of in-person attendance at the Santa Fe office?
(Exhibit 22 was marked for identification.)
A. 7.2.1. "Employee shall report to work on time, each scheduled workday or otherwise comply with the Department's policies and procedure regarding timekeeping..."
"Employees shall report to work able to perform essential job functions and meet applicable qualitative and quantitative standards for their jobs. Reporting to work unable to perform these essential functions..."
Q. And that was seven point --
A. 7.2.1 and 7.2.2.

Page 190

that now, preexisting employees wouldn't have to sign acknowledgement of those policies?
A. No.
Q. Even if those policies existed when they started?
A. No.
Q. So how does GSD make sure that all the employees know about their FMLA rights whether they're a manager or a non-manager?
A. Just through the posters like I mentioned earlier, posters. If they have questions, they go to the supervisors. The supervisor directs them to us or most of time they come directly to HR too.
Q. And HR hasn't had formal training in FMLA either yet; correct?
A. Formal training. So me sitting down with them, Gloria sitting down with them doing one-on-one doesn't count as formal training?
Q. Well, is it documented?
A. No.
Q. How do you tell that that one-on-one training is effective?
A. So it's a process. Even though I sit down with you today and we go over the process -- we go over the process; okay? This is how we -- X, Y, and Z, Family Medical Leave. And then when a request comes in for that

Page 191

assigned division, then we sit down with them again, and we go step-by-step in processing.
I just don't train them the one time and say, "Go ahead and start processing." It's a continuous training with them. It's not just the one-on-one that we have to sit down with them multiple times until they're comfortable to administer it on their own.
Q. How do you know if any of your HR staff is not applying the FMLA correctly?
A. When the request is submitted, they're processing the paperwork, and either Gloria or I are confirming that the paperwork is -- we're acknowledging the paperwork and moving it on to the secretary for secretary approval.
Q. The secretary approves the FMLA certification once it submitted; correct?
A. The application.
Q. That's the internal form, not the DOL form?
A. Yes.
Q. But the certification is the one that comes from the doctor; correct?
A. Yeah. That's not sent out.
Q. So in this circumstance like we talked about earlier when Jennifer Morfin began denying Ms. Hunt-Brown FMLA in March of 2024, how did GSD make sure that Jennifer Morfin was following the FMLA Policy?

Page 192

A. So when she was administering it, she asked me if that was correct; and my interpretation of the policy at that time, I felt we were in line with policy. And so I approved the e-mails to be sent out.
Q. Okay. So she went to you for oversight, but then you both, together, misread the FMLA Policy that said that there needed to be at least 15 days?
A. Yes.
Q. And how is GSD -- is GSD taking any steps to try and prevent that from happening again?
A. Yes.
Q. How so?
A. So we are looking -- Gloria's also looking for training for us as a whole.
Q. For the FMLA training?
A. For FML, yes. And for ADA.
Q. Are there any audits or anything that GSD runs to try and make sure that all of the policy -- the personnel policies are being followed appropriately?
A. Can you give me an example?
Q. Yeah. Like for FMLA, is there any process to do, let's say, a spot check in the certification process or something?
A. Oh, yes. So those are actually done every pay period.

Page 193

Q. For what?
A. To ensure that the requests are being followed, that they're in compliance to ensure that there's no -- that an employee who was out on continuous leave is back. So we keep track of the hours. We keep track of the hours, and that's done every pay period.
Q. And is there any spot check to make sure that managers are sending their employees to HR if they need time off for either their own medical condition or family member's medical condition?
A. No.
Q. So how does GSD know that managers are informing their employees of their rights?
A. I don't know.
Q. GSD doesn't know if their managers are?
A. Yeah, I don't know. Like I said earlier, they refer all of their employees anytime there's workers comp, ADA, FMLA. Anything that is questionable, they call us up sometimes.
If they're out in the field, the supervisor will say, "So-and-so is a right here. They have questions." They'll hand the phone over, and we communicate with them like that.
Q. Okay. Now, from February 2023 through September 25th of 2024, have any complaints been made about denial

**MICHELLE LUJAN GRISHAM**
GOVERNOR

**ROBERT DOUCETTE, JR.**
CABINET SECRETARY DESIGNEE

# State of New Mexico
General Services Department

ADMINISTRATIVE SERVICES DIVISION
(505) 476-1857

FACILITIES MANAGEMENT DIVISION
(505) 827-2141

PURCHASING DIVISION
(505) 827-0472

RISK MANAGEMENT DIVISION
(505) 827-2036

STATE PRINTING & GRAPHIC SERVICES BUREAU
(505) 476-1950

TRANSPORTATION SERVICES DIVISION
(505) 827-1958

March 7, 2023

VIA EMAIL ONLY

Heather C. Burke, Esq.
Burke Law
1000 Cordova Pl. #24
Santa Fe, NM  87505

Re:  Kimberly Hunt Brown

Dear Ms. Burke,

I am responding to your March 2, 2023 letter to Acting Cabinet Secretary Silva on behalf of the General Services Department.  Thank you for the opportunity to help resolve the issues regarding Ms. Hunt-Brown's FMLA status.  As you pointed out, Ms. Hunt-Brown's FMLA qualifying period ended in December, 2022.  It is my understanding Human Resources has communicated to Ms. Hunt-Brown the need for an updated provider's medical certification.  As you requested, the Department will retroactively adjust the time entries to reflect the updated record promptly upon receipt of the authorization.  We look forward to obtaining an updated provider's medical certification to resolve this matter.

With regard to communications needed to resolve this issue, I will assume you prefer that all communications are routed through you, as you are representing Ms. Hunt-Brown.

With regard to your request for reimbursement, we are aware of no statutory basis for payment.  Thus, we must respectfully refuse your request.

Thank you for your cooperation.

Sincerely,

Randall J. Cherry

Randall J. Cherry
General Counsel
New Mexico General Services Department

Cc: Eunice Moya, Human Resource Manager

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF EUNICE MOYA
March 7, 2025
9:04 a.m.
119 E. Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(421P) RAB

**be.**
Q. What documents would show you that?
**A. It would show me -- if I had 2022 in front of me and the email that's sent out to the employee from my staff --**
Q. For the rolling year prior to that?
**A. Right.**
Q. So you're saying you would know why the 2024 started in February if you saw the rolling year for 2023; is that correct?
**A. Correct. Correct. Because on the email that's sent out to the employees, it says you've been approved for your family medical leave from this date through this date. That's what I'm -- I really don't know off the top of my head.**
**(Exhibit 14 marked.)**
Q. Exhibit 14 is a letter sent by myself to Anna Silva and Valerie Paulk on March 2nd, 2023.
Have you seen this letter before, Ms. Moya?
**A. Yes.**
Q. In your own words, why did you send this letter?
MR. LOMAN: Object to form and foundation.
Q. Okay. What is your understanding of the



reason I sent this letter?
MR. LOMAN: Same objection.
Q. Go ahead and answer.
**A. Because the -- through administrative oversight through one of my HR consultants.**
Q. Okay. Was Ms. Hunt-Brown having a hard time getting her previous year of FMLA approved?
**A. Through administrative oversight.**
Q. What does that mean?
**A. It means that it was an error on the HR consultants.**
Q. And what was the error?
**A. From what I recall, the -- she was reading the -- she was not reading the medical certification correctly.**
Q. When you learned of this letter, did you step in and make sure Ms. Hunt-Brown's leave was immediately approved?
**A. Yes. When I found out about it, I met with the HR consultant, and I asked her to provide me with the documentation that Ms. Hunt-Brown provided, and in reviewing the application is when I noticed that the medical certification was completed correctly.**
**And I did speak with Randall Cherry, who**



**was our general counsel at that time, and I acknowledged our oversight.**
**(Exhibit 15 marked.)**
Q. Exhibit 15. Exhibit 15 is an email from Eunice Moya to Kimberly Hunt-Brown on March 2nd, stating: Your FMLA expired on 12/10/2022; therefore, I asked Kelly to update your time sheets, changing the time that was coded FMLA.
Why did you tell Kelly to change the time on Ms. Hunt-Brown's time sheets?
**A. Because she had not been approved for family medical leave.**
Q. So you instructed Ms. Howley to change her time without looking in to see why Ms. Hunt-Brown's leave hadn't been approved yet?
**A. Yes, my staff administered the family medical leave, and at that point I believe that procedures were being followed, and so based on the information that I was being told, I instructed Kelly to change the sheet.**
Q. Did you send that email before or after receiving my letter?
**A. I would say before.**
Q. And what steps did you take after receiving the letter to address the changes to



Ms. Hunt-Brown's time that had taken place?
**A. Like I said, I asked the consultant for the FML packet, and when I looked at it, that's when I noticed that the medical certification was completed correctly and that we should not have delayed the process.**
Q. At that point we went back and retroactively updated the time sheet to reflect family medical leave, annual or sick or unpaid or whatever type of leave was originally coded.
(Exhibit 16 marked.)
Q. Exhibit 16 is an email that starts -- the top part of it is an email from me to Eunice Moya, copying Randall Cherry. It starts from Ms. Hunt-Brown to both Kelly Howley and Eunice Moya.
The middle email in that chain is from Eunice Moya to Heather Burke, dated March 29th, 2023. And you state that on February 23rd, 2023, you requested an updated physician statement. To date, our office hadn't received an updated physician statement.
Is March 29th close to March 2nd?
**A. So I -- I -- what I believe happened in -- was that I think that -- let me -- so I don't even know when Randall shared this letter with me, and at**

**From:** Hunt-Brown, Kimberly, GSD Kimberly.Hunt-Brown gsd.nm.gov
**Sent:** Thursday, February 1, 202 :3 AM
**To:** Morfin, ennifer, GSD
**c:** Moya, Eunice, GSD
**Subject:** RE: ntermittent FMLA Approval

Hello ennifer, and thank you for replying. I spoke with Eunice again yesterday afternoon and confirmed with her my understanding of the situation as it now stands, as you have stated below. With my supervisor s approval, I also revised and resubmitted my timesheet for this time period to remove the 8 hours of FMLA annual leave time originally submitted for 01/26/2024 and now reflect 8 hours of earned annual leave.

Thanks,
*Kim*
*505-490-3152*

---

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Thursday, February 1, 2024 8:26 AM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
RE: Intermittent FMLA Approval

Good morning Ms. Hunt-Brown,
In follow up to the phone conversation with HR Director Eunice Moya, your intermittent FMLA for 2023-2024 exhausted effective on anuary 19, 2024. On anuary 23, 2024, you submitted a request for Intermittent FMLA for 2024/2025 via email to Human Resources Manager essica Garcia. Based on the 2024/2025 FMLA application you provided, the documentation from your medical provider indicates a start date for February 2024 to February 2025. As discussed, your supervisor approved your eight hours of annual leave for anuary 26, 2024, which will not be covered under FMLA.

Respectfully,
ennifer Morfin

---

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Monday, anuary 29, 2024 8:29 AM
Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Martine , Natalie, GSD <Natalie.Martine 1@gsd.nm.gov>
RE: Intermittent FMLA Approval

Thank you, ennifer. One question: is there a reason that this is not picking up immediately following my last FMLA year? In other words, why isn t this new FMLA request running from 01/25/2024 01/24/2025, not to exceed 480 hours? I was out Friday under a FMLA illness .

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division

505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

---

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Friday, anuary 26, 2024 9:19 AM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Martine , Natalie, GSD <Natalie.Martine 1@gsd.nm.gov>
Intermittent FMLA Approval

d r M r

r d r r M r 2 1 2 24 2 1 2 25 d 4 r

d r d

r d r M
3 2 d
3 1 d d r M
1 M d

d r r d d r r r
M d r d r r r d
d r d r r d
5 5 33

M M d d d d r d d
r r r r d d

M M r d r r M M
r

M M r r r d r r M
r

M M d r d r d r r
r

M M d r d r M M
r

M M d r d r M
r

M M r r d r
r

M M r d r

M M r d r

M M d r d r

M M d r d r

M M d d d

**enni er M r in**
Employee Labor Relations
General Services Department
1100 St. Francis Dr., 3rd Floor
Santa Fe, NM 87505
Email: jennifer.morfin@gsd.nm.gov
Direct Line: 505-670-6933

Confidentiality Notice: This email, including attachment, is intended for the sole purpose of the intended recipient s and may contain confidential and privileged information. Any unauthori ed review, use, disclosure or distribution is prohibited unless specifically provided for under the New Mexico Inspection of Public Records Act. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

[redacted]

**From:** Hunt-Brown, Kimberly, GSD
**Sent:** Friday, March 22, 2024 11:47 AM
**To:** Morfin, Jennifer, GSD <jennifer.morfin@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** RE: Donated Leave and Intermittent FMLA status
**Importance:** High

Hello Jennifer, I wanted to let you know that I do have an appointment scheduled with my doctor, but the first available appointment was April 29. Is my FMLA going to continue to be authorized as described below? Specifically, will I continue to be denied FMLA leave for the remainder of March for my protected medical conditions, then in April again have "up to four (4) days a month of FMLA" leave to use for that month? I want to be certain that I'm clear on how this is working, because never before has HR interpreted the paperwork in this manner. Please let me know as soon as possible?

I apologize I didn't get back to you earlier on this – with everything also concomitantly going on with my mother's health, I'm a bit scattered right now.

Thanks, ☺

*Kim*

*505-490-3152*

---

**From:** Morfin, Jennifer, GSD <jennifer.morfin@gsd.nm.gov>
**Sent:** Monday, March 11, 2024 5:04 PM
**To:** Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
**Cc:** Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
**Subject:** Donated Leave and Intermittent FMLA status

Good afternoon Ms. Hunt-Brown,

Your request for donated annual leave has been approved and will be sent out to GSD staff to solicit annual leave donations on your behalf. Please note that donated leave may only be used when your annual leave, sick leave and personal leave days have been exhausted, and specific to your FML medical certification form. Annual leave donations received will not be able to be utilized until the pay period beginning March 16, 2024.

Polite reminder, Per your 2024 Intermittent FMLA paperwork and per your medical provider you are authorized up to four (4) days a month of FMLA use. I have attached the FMLA paperwork from your provider and your FMLA application for your reference. Any use of FMLA leave utilized beyond the four (4) days a month would need be used as personal leave; annual leave, sick leave, leave without pay etc. You will be required to obtain prior authorization from your supervisor for such leave requests. Should you believe that you may need to exceed the days a month for FMLA use you will need to submit a new FMLA application with supporting documentation from your provider with updated information.

For your convenience I have attached all related polices.

Your leave available for Pay Period Ending (PPE) 3/1/2024 is as follows:

- Annual: .94
- Comp: 0
- Sick: .05

- Personal Days: 0

Respectfully,

**Jennifer N. Morfin**

Employee Labor Relations Specialist

General Services Department

1100 St. Francis Dr., 3rd Floor Suite 3064

Santa Fe, NM 87505

Email: jennifer.morfin@gsd.nm.gov

Direct Line: 505-670-6933

Confidentiality Notice: This email, including attachment, is intended for the sole purpose of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited unless specifically provided for under the New Mexico Inspection of Public Records Act. If you are not the intended recipient, please contact the sender and destroy all copies of this message.