UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

KIMBERLY HUNT-BROWN,

Plaintiff-Appellant,

v. No. 26-2042

NEW MEXICO GENERAL SERVICES DEPARTMENT, VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ, In their official and individual capacities,

Defendants-Appellees.

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Sarah M. Davenport
District Court No. 1:23-cv-00782-SMD-KK

APPELLEES' SUPPLEMENTAL APPENDIX VOL. 2 OF 2

CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) the ECF submission is an exact copy of any hard copies that were filed (if any); (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program. I further certify that the information on this form is true and correct to the best of my ability and belief formed after the reasonable inquiry.

CERTIFICATE OF COMPLIANCE

The undesigned counsel certifies that this Response Brief of Supplemental-Appendix complies with 10th Cir. R. 25.5 and all privacy redactions required have

been made. The undersigned counsel certifies that paper copies submitted are or will be exact copies of the electronic version.

Respectfully Submitted,

JACKSON LOMAN DOWNEY & STEVENS-BLOCK, PC

/s/ Eric Loman
*Eric Loman*
Eric Loman
201 Third Street, NW, Suite 1500
Albuquerque, New Mexico 87102
(505) 767-0577
eric@jacksonlomanlaw.com

| Pg. # | Filer | Date of Filing | Doc. # | Title |
|---|---|---|---|---|
| 1-22 | Defendant | 8/15/2025 | 98 | Defendant's Motion for Summary Judgment. |
| 23-57 | Defendant | 8/15/2025 | 98-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 58-76 | Defendant | 8/15/2025 | 98-2 | Exhibit B - Deposition Transcript of Eunice Moya 7/9/2025 30(B)(6) Deposition. |
| 77-80 | Defendant | 8/15/2025 | 98-3 | Exhibit C - Affidavit of Jennifer Conn. |
| 81-83 | Defendant | 8/15/2025 | 98-4 | Exhibit D - Affidavit of Francine Martinez. |
| 84-96 | Defendant | 8/15/2026 | 98-5 | Exhibit E - Deposition Transcript of Michael J. Saavedra. |
| 97-108 | Defendant | 8/15/2026 | 98-6 | Exhibit F - Deposition Transcript of Francine Martinez. |
| 109-112 | Defendant | 8/15/2026 | 98-7 | Exhibit G – Emails. |
| 113-114 | Defendant | 8/15/2026 | 98-8 | Exhibit H – GSD Hours of Work and Overtime Policy. |
| 115-136 | Plaintiff | 8/15/2025 | 99 | Plaintiff's Motion for Partial Summary Judgment on Count III: FMLA Interference. |
| 137-139 | Plaintiff | 8/15/2025 | 99-1 | Declaration of Kimberly Hunt-Brown. |
| 140-143 | Plaintiff | 8/15/2025 | 99-2 | Exhibit 1 - Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act. |
| 144-146 | Plaintiff | 8/15/2025 | 99-3 | Exhibit 2 - Email. |
| 147 | Plaintiff | 8/15/2025 | 99-4 | Exhibit 3 - Employer's Guild to the Family and Medical Leave Act - Appropriate Medical Facts. |
| 148-152 | Plaintiff | 8/15/2025 | 99-5 | Exhibit 4 - Email. |
| 153-155 | Plaintiff | 8/15/2025 | 99-6 | Exhibit 5 - General Services Department Family and Medical Leave Policy. |
| 156-158 | Plaintiff | 8/15/2025 | 99-7 | Exhibit 6 - Text Message. |
| 159-161 | Plaintiff | 8/15/2025 | 99-8 | Exhibit 7 - Email. |
| 162-168 | Plaintiff | 8/15/2025 | 99-9 | Exhibit 8 - General Services Department Attendance and Leave Policy. |
| 169-170 | Plaintiff | 8/15/2025 | 99-10 | Exhibit 9 - Deposition Transcript of Natalie Martinez. |
| 171-173 | Plaintiff | 8/15/2025 | 99-11 | Exhibit 10 - Deposition Transcript of Valerie Polk. |
| 174-175 | Plaintiff | 8/15/2025 | 99-12 | Exhibit 11 - Email. |

| | | | | |
|---|---|---|---|---|
| 176-179 | Plaintiff | 8/15/2025 | 99-13 | Exhibit 12 - Email. |
| 180-182 | Plaintiff | 8/15/2025 | 99-14 | Exhibit 13 - Demand Letter to General Services Department. |
| 183-185 | Plaintiff | 8/15/2025 | 99-15 | Exhibit 14 - Employment Application for FMLA Leave. |
| 186 | Plaintiff | 8/15/2025 | 99-16 | Exhibit 15 - Sick and Annual Leave Sheet. |
| 187-190 | Plaintiff | 8/15/2025 | 99-17 | Exhibit 16 - Deposition Transcript of Eunice Moya 7/09/2025 30(B)(6) Deposition. |
| 191 | Plaintiff | 8/15/2025 | 99-18 | Exhibit 17 - General Services Department Response to Demand Letter. |
| 192-193 | Plaintiff | 8/15/2025 | 99-19 | Exhibit 18 - Deposition Transcript of Eunice Moya. |
| 194-196 | Plaintiff | 8/15/2025 | 99-20 | Exhibit 19 - Email. |
| 197-199 | Plaintiff | 8/15/2025 | 99-21 | Exhibit 20 - Email. |
| 200-207 | Plaintiff | 8/15/2025 | 99-22 | Exhibit 21 - Payable Time Summary. |
| 208-211 | Plaintiff | 8/15/2025 | 99-23 | Exhibit 22 - Email. |
| 212-213 | Plaintiff | 8/15/2025 | 99-24 | Exhibit 23 - General Services Department Donation of Annual Leave Policy. |
| 214-217 | Plaintiff | 8/15/2025 | 99-25 | Exhibit 24 - Certificate of Health Care Provider for Employee's Serous Health Condition under Family and Medical Leave Act. |
| 218-219 | Plaintiff | 8/15/2025 | 99-26 | Exhibit 25 - Pay Stubs. |
| 220-229 | Defendant | 9/2/2025 | 104 | Defendants' Response to Plaintiff's Motion for Summary Judgment on Count III: FMLA Interference (Doc. 99) |
| 230-239 | Defendant | 9/2/2025 | 104-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 240-271 | Plaintiff | 9/2/2025 | 105 | Plaintiff's Response in Opposition to Defendants Motion for Summary Judgment. (Doc. 98) |
| 272-276 | Plaintiff | 9/2/2025 | 105-1 | Declaration of Kimberly Hunt-Brown. |
| 277-278 | Plaintiff | 9/2/2025 | 105-2 | Exhibit 1 - Deposition Transcript Excerpt. |
| 279 | Plaintiff | 9/2/2025 | 105-3 | Exhibit 2 - Sick and Annual Leave Sheet. |
| 280 | Plaintiff | 9/2/2025 | 105-4 | Exhibit 3 - Family Medical Leave Policy Insert. |
| 281-282 | Plaintiff | 9/2/2025 | 105-5 | Exhibit 4 - Email. |
| 283-284 | Plaintiff | 9/2/2025 | 105-6 | Exhibit 5 - Affidavit of Jose Puentes. |
| 285 | Plaintiff | 9/2/2025 | 105-7 | Exhibit 6 - Michael Saavedra Interview Notes of Amber Sanchez. |

| | | | | |
|---|---|---|---|---|
| 286 | Plaintiff | 9/2/2025 | 105-8 | Exhibit 7 - Francine Martinez Interview Notes of Amber Sanchez. |
| 287 | Plaintiff | 9/2/2025 | 105-9 | Exhibit 8 - Rey A. Maestas Interview Notes of Amber Sanchez. |
| 288 | Plaintiff | 9/2/2025 | 105-10 | Exhibit 9 - Deposition Transcript Excerpt of Vanessa LeBlanc. |
| 289 | Plaintiff | 9/2/2025 | 105-11 | Exhibit 10 - Deposition Transcript Excerpt of Francine Martinez. |
| 290-297 | Plaintiff | 9/2/2025 | 105-12 | Exhibit 11 - Employment Application of Andric Fisher. |
| 298-300 | Plaintiff | 9/2/2025 | 105-13 | Exhibit 12 - New Mexico Register, General Government Administration, Recruitment, Assessment, Selection Rules. |
| 301 | Plaintiff | 9/2/2025 | 105-14 | Exhibit 13 - Employment Application of Unknown Applicant. |
| 302-310 | Plaintiff | 9/2/2025 | 105-15 | Exhibit 14 - Employment Application of Unknown Applicant. |
| 311-321 | Plaintiff | 9/2/2025 | 105-16 | Exhibit 15 - Employment Application of Amber Sanchez. |
| 322 | Plaintiff | 9/2/2025 | 105-17 | Exhibit 16 - Defendant's Answer to Plaintiff's Interrogatory No. 8. |
| 323-325 | Plaintiff | 9/2/2025 | 105-18 | Exhibit 17 - SPD IT Procurement Specialist II (GSD #49191) Job Post. |
| 326-330 | Plaintiff | 9/2/2025 | 105-19 | Exhibit 18 - Regional Finance Branch Manager Job Description. |
| 331 | Plaintiff | 9/2/2025 | 105-20 | Exhibit 19 - Deposition Transcript Excerpt of Eunice Moya 07/09/2025 30(B)(6) Deposition. |
| 332-346 | Defendant | 9/12/2025 | 107 | Defendants' Reply in Support of Motion for Summary Judgment. (Doc. 98) |
| 347-353 | Defendant | 9/12/2025 | 107-1 | Exhibit A - Deposition Transcript of Kimberly Hunt-Brown. |
| 354-360 | Defendant | 9/12/2025 | 107-2 | Exhibit B - Deposition Transcript of Eunice Moya 7/09/2025 30(B)(6) Deposition. |
| 361-364 | Defendant | 9/12/2025 | 107-3 | Exhibit C - Deposition Transcript of Vanessa LeBlanc. |
| 365-366 | Defendant | 9/12/2025 | 107-4 | Exhibit D - Deposition Transcript of Eunice Moya. |
| 367-377 | Plaintiff | 9/12/2025 | 108 | Plaintiff's Reply in Support of Her Partial Motion for Summary Judgment on Count III: FMLA Interference. (Doc. 99) |

| | | | | |
|---|---|---|---|---|
| 378 | Plaintiff | 9/12/2025 | 108-1 | Exhibit 26 - SHARE Timekeeping System Time Reporting Comment. |
| 379 | Plaintiff | 9/12/2025 | 108-2 | Exhibit 27 - Plaintiff's Timesheet/Leave Modifications. |
| 380-399 | District Court | 2/6/2026 | 146 | Order Granting Defendants' Motion for Summary Judgment in Part Plaintiff's Motions for Partial Summary Judgment and for Sanctions. |
| 400-401 | Plaintiff | 4/8/2026 | 154 | Notice of Appeal. |
| 402-418 | District Court | 07/17/2026 | - | US District Court, District Court of NM Court Docket |

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

**Employee ID** 341822

SPD Procurement Specialist II

**Employment Record** 0

Actions

**Start Date** 03/09/2024

Previous Week Next Week

**End Date** 03/15/2024

**Payable Time From 03/09/2024 To 03/15/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 3/9 | Sun 3/10 | Mon 3/11 | Tue 3/12 | Wed 3/13 | Thu 3/14 | Fri 3/15 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ANNLR | Donated Annual Received | 35.61 | Hours | | | | | | | 35.61 | |
| FMLAN | FMLA-Paid Annual | 0.75 | Hours | | | 0.75 | | | | | |
| FMLSK | Family Medical Leave Sick | 0.25 | Hours | | | 0.25 | | | | | |
| FMLUP | Family Medical Leave Unpaid | 23.00 | Hours | | | 7.00 | | 8.00 | | 8.00 | |
| REGHR | Regular Hours Worked | 16.00 | Hours | | | | 8.00 | | 8.00 | | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

Employee ID 341822

Employment Record 0

Actions

Start Date 03/16/2024

End Date 03/22/2024

Previous Week Next Week

**Payable Time From 03/16/2024 To 03/22/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 3/16 | Sun 3/17 | Mon 3/18 | Tue 3/19 | Wed 3/20 | Thu 3/21 | Fri 3/22 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LWOPA | Leave without Pay - Authorized | 14.00 | Hours | | | 8.00 | | 4.00 | | 2.00 | |
| REGHR | Regular Hours Worked | 26.00 | Hours | | | | 8.00 | 4.00 | 8.00 | 6.00 | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 03/23/2024

**End Date** 03/29/2024

Previous Week Next Week

**Payable Time From 03/23/2024 To 03/29/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 3/23 | Sun 3/24 | Mon 3/25 | Tue 3/26 | Wed 3/27 | Thu 3/28 | Fri 3/29 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADMLV | Administration Leave Taken | 4.00 | Hours | | | | | | | 4.00 | |
| LWOPA | Leave without Pay - Authorized | 8.00 | Hours | | | | 8.00 | | | | |
| REGHR | Regular Hours Worked | 25.50 | Hours | | | 5.50 | | 8.00 | 8.00 | 4.00 | |
| SICKT | Sick Leave Taken | 2.50 | Hours | | | 2.50 | | | | | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 03/30/2024

**End Date** 04/05/2024

Previous Week Next Week

**Payable Time From 03/30/2024 To 04/05/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 3/30 | Sun 3/31 | Mon 4/1 | Tue 4/2 | Wed 4/3 | Thu 4/4 | Fri 4/5 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BRVLV | Bereavement Leave | 40.00 | Hours | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 04/06/2024

**End Date** 04/12/2024

Previous Week    Next Week

**Payable Time From 04/06/2024 To 04/12/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 4/6 | Sun 4/7 | Mon 4/8 | Tue 4/9 | Wed 4/10 | Thu 4/11 | Fri 4/12 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ANLDT | Donated Annual Taken | 17.75 | Hours | | | | 1.75 | | 8.00 | 8.00 | |
| ANNLV | Annual Leave Taken | 0.25 | Hours | | | 0.25 | | | | | |
| FMLAN | FMLA-Paid Annual | 6.25 | Hours | | | | 6.25 | | | | |
| REGHR | Regular Hours Worked | 12.50 | Hours | | | 4.50 | | 8.00 | | | |
| SICKT | Sick Leave Taken | 3.25 | Hours | | | 3.25 | | | | | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 04/13/2024

**End Date** 04/19/2024

Previous Week Next Week

**Payable Time From 04/13/2024 To 04/19/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 4/13 | Sun 4/14 | Mon 4/15 | Tue 4/16 | Wed 4/17 | Thu 4/18 | Fri 4/19 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FMLAN | FMLA-Paid Annual | 4.00 | Hours | | | | | 4.00 | | | |
| FMLSK | Family Medical Leave Sick | 4.00 | Hours | | | | | 4.00 | | | |
| LWOPA | Leave without Pay - Authorized | 8.00 | Hours | | | | | | | 8.00 | |
| REGHR | Regular Hours Worked | 24.00 | Hours | | | 8.00 | 8.00 | | 8.00 | | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 04/20/2024

**End Date** 04/26/2024

Previous Week Next Week

**Payable Time From 04/20/2024 To 04/26/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 4/20 | Sun 4/21 | Mon 4/22 | Tue 4/23 | Wed 4/24 | Thu 4/25 | Fri 4/26 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REGHR | Regular Hours Worked | 40.00 | Hours | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | |

Detail Page

New Window | Help | Personalize Page

# Payable Time Summary

**Kimberly Hunt-Brown**

SPD Procurement Specialist II

**Employee ID** 341822

**Employment Record** 0

Actions

**Start Date** 04/27/2024

**End Date** 05/03/2024

Previous Week Next Week

**Payable Time From 04/27/2024 To 05/03/2024**

| Time Reporting Code | Description | Total Quantity | Type | Sat 4/27 | Sun 4/28 | Mon 4/29 | Tue 4/30 | Wed 5/1 | Thu 5/2 | Fri 5/3 | Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LWOPA | Leave without Pay - Authorized | 13.50 | Hours | | | 5.50 | 8.00 | | | | |
| REGHR | Regular Hours Worked | 23.50 | Hours | | | 2.50 | | 8.00 | 8.00 | 5.00 | |
| SICKT | Sick Leave Taken | 3.00 | Hours | | | | | | | 3.00 | |

Detail Page

**Heather@hburkelaw.com**

**From:** Morfin, ennifer, GSD ennifer.morfin gsd.nm.gov
**Sent:** Monday, March 2 , 202 3: 0 PM
**To:** Hunt-Brown, Kimberly, GSD
**c:** Moya, Eunice, GSD; LeBlanc, anessa, GSD
**Subject:** RE: Donated Leave and ntermittent FMLA status

Good afternoon Ms. Hunt -Brown,

For clarification, your approved donated leave is available to use as of March 16, 2024 and is to be used in con unction with your approved intermittent FMLA leave use only. For the month of March 2024 you have reached your four 4 days of intermittent FMLA as per your medical providers certification WH-380 as of March 13, 2024. Since you ve utili ed your allotted four 4 days of FMLA leave for March 2024, your approved donated leave may be used in the following month s when you request intermittent FMLA use.

Please note any requests for leave for the remainder of March 2024 will need preapproval from your direct supervisor; personal leave; annual leave, sick leave, leave without pay, per GSD leave policy.

I hope you find this information helpful.

Respectfully,
ennifer Morfin

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Monday, March 25, 2024 8:35 AM
Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; LeBlanc, anessa, GSD < anessa.LeBlanc@gsd.nm.gov>
RE: Donated Leave and Intermittent FMLA status

So I can use it beginning now, since we re currently in the pay period that began March 16, 2024.

Can I use the leave for a doctor s appointment for a sleep study appointment that was made at the request of my neurologist and is related to the FMLA medical condition?

Thanks,
*Kim*
*505-490-3152*

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Monday, March 25, 2024 8:27 AM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; LeBlanc, anessa, GSD < anessa.LeBlanc@gsd.nm.gov>
RE: Donated Leave and Intermittent FMLA status

Good morning Ms. Hunt-Brown,

In response to your email below, your approved donated leave may only be used when your annual leave, sick leave and personal leave days have been exhausted, and specific to your FML medical certification form. Annual leave donations received will not be able to be utilized until the pay period beginning March 16, 2024.

Respectfully,
Jennifer Morfin

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Friday, March 22, 2024 3:55 PM
Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; LeBlanc, anessa, GSD < anessa.LeBlanc@gsd.nm.gov>
RE: Donated Leave and Intermittent FMLA status
High

Thank you ennifer, can I use donated annual leave for any reason?

Thanks,
*Kim*
*505-490-3152*

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Friday, March 22, 2024 2:52 PM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; LeBlanc, anessa, GSD < anessa.LeBlanc@gsd.nm.gov>
RE: Donated Leave and Intermittent FMLA status

Good afternoon Ms. Hunt-Brown,

In response to your email inquiry below, per your 2024 Intermittent FMLA paperwork and per your medical provider you are authori ed up to four 4 days a month of FMLA use. Any use of FMLA leave utili ed beyond the four 4 days a month would need be used as personal leave; annual leave, sick leave, leave without pay. You will be required to obtain prior authori ation from your supervisor for such leave requests. For the month of March 2024 since you have exhausted your four days, you would need request personal leave; annual leave, sick leave, leave without pay per GSD leave policy. If your doctor s appointments for the month of April exceed the four 4 days, you would need to request personal leave; annual leave, sick leave, leave without pay per GSD leave policy.

If your medical provider believes that you will need additional leave in excess of the four 4 days initially requested HR will retroactively ad ust your timesheet based on the updated medical certification form.

Please let me know if you have any questions or need additional information. Thank you.

Separately, there may be resources available to with regards to your family member. Let me know if you would like more information.

Respectfully,
ennifer Morfin

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Friday, March 22, 2024 11:47 AM

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
RE: Donated Leave and Intermittent FMLA status
High

Hello ennifer, I wanted to let you know that I do have an appointment scheduled with my doctor, but the first available appointment was April 29. Is my FMLA going to continue to be authori ed as described below? Specifically, will I continue to be denied FMLA leave for the remainder of March for my protected medical conditions, then in April again have up to four 4 days a month of FMLA leave to use for that month? I want to be certain that I m clear on how this is working, because never before has HR interpreted the paperwork in this manner. Please let me know as soon as possible?

I apologi e I didn t get back to you earlier on this with everything also concomitantly going on with my mother s health, I m a bit scattered right now.

Thanks,
*Kim*
*505-490-3152*

Morfin, ennifer, GSD < ennifer.morfin@gsd.nm.gov>
Monday, March 11, 2024 5:04 PM
Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>
Donated Leave and Intermittent FMLA status

Good afternoon Ms. Hunt-Brown,

Your request for donated annual leave has been approved and will be sent out to GSD staff to solicit annual leave donations on your behalf. Please note that donated leave may only be used when your annual leave, sick leave and personal leave days have been exhausted, and specific to your FML medical certification form. Annual leave donations received will not be able to be utili ed until the pay period beginning March 16, 2024.

Polite reminder, Per your 2024 Intermittent FMLA paperwork and per your medical provider you are authori ed up to four 4 days a month of FMLA use. I have attached the FMLA paperwork from your provider and your FMLA application for your reference. Any use of FMLA leave utili ed beyond the four 4 days a month would need be used as personal leave; annual leave, sick leave, leave without pay etc. You will be required to obtain prior authori ation from your supervisor for such leave requests. Should you believe that you may need to exceed the days a month for FMLA use you will need to submit a new FMLA application with supporting documentation from your provider with updated information.

For your convenience I have attached all related polices.

Your leave available for Pay Period Ending PPE 3/1/2024 is as follows:

Annual: .94
Comp: 0
Sick: .05
Personal Days: 0

Respectfully,

**Jennifer N. Morfin**
Employee Labor Relations Specialist
General Services Department
1100 St. Francis Dr., 3rd Floor Suite 3064
Santa Fe, NM 87505
Email: jennifer.morfin@gsd.nm.gov
Direct Line: 505-670-6933

Confidentiality Notice: This email, including attachment, is intended for the sole purpose of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited unless specifically provided for under the New Mexico Inspection of Public Records Act. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

| | | |
|---|---|---|
| **GENERAL SERVICES DEPARTMENT**<br>ADMINISTRATIVE MANUAL Origin: Administrative Services | Number<br>350-2.35 | |
| | Eff. Date<br>5/01/02 | Control Log<br>No. |
| Subject:<br>Donation of Annual Leave | 1st Issued<br>2/16/98 | No. Of Pages<br>4 |

1.0 PURPOSE

This establishes a policy for the request, approval and ongoing administration of annual leave donated by GSD employees to other GSD employees who are experiencing a medical emergency. It also establishes consistent and equitable guidelines on the general circumstances under which the department intends to grant approval for employees to solicit donations of annual leave.

2.0 SCOPE-ORGANIZATIONS AFFECTED

The employees, supervisors and managers of all GSD divisions are affected by this policy.

3.0 REFERENCES

State Personnel Board Rules 1 NMAC 7.7.9 allows employees to donate annual leave to another employee in the same agency for a medical emergency. These donations require the approval of the Cabinet Secretary.

4.0 BACKGROUND

The General Services Department supports all state and federal regulations that allow flexible uses of leave to help employees balance their professional careers with personal emergencies. The intent of this policy is to communicate the implementation of these rules within the General Services Department.

5.0 DEFINITIONS

The following definitions apply to annual leave donations.

*Annual Leave Donor*

> A GSD employee who has authorized, in writing, the transfer of a specific number of annual leave hours to another GSD employee who has been approved to receive such annual leave.

*Relation by blood or marriage within the third degree*

Includes spouse, parent, mother-in-law, father-in-law, step-parent, children, son-in-law, daughter-in-law, step-child, brother, step-brother, brother-in-law, sister, step-sister, sister-in-law, grandparent, grandchild, uncle, aunt, nephew, niece, great-grandchild, and great grandparent.

*Recipient of Donated Annual Leave*

The individual employee who has requested, and has received written approval to solicit actual donations of annual leave hours from other GSD employees.

*Primary Health Care Provider*

A health care professional licensed in the state of New Mexico, or another state if the employee is receiving care for a medical emergency in another state.

*Medical Emergency*

An unexpected, sudden and/or severe injury or illness that results in the employee or a relation by blood or marriage within the third degree requiring a level of care and treatment beyond what he or she could provide without assistance. Note: A condition expected to be chronic and of indefinite duration would not ordinarily qualify for an emergency under this definition.

*Unable to Work*

This term means that the employee requesting annual leave donations is unable to meet his or her job duties because the employee or a relation by blood or marriage within the third degree is directly experiencing a medical emergency.

6.0 POLICY

This policy will comply with all applicable State Personnel Board rules.

6.1 The General Services Department may grant annual leave donations to an employee who is experiencing a personal medical emergency or a relation by blood or marriage within the third degree is experiencing a personal medical emergency not to exceed 480 hours, unless an extension is requested and approved by the immediate supervisor, Division Director, Human Resources Bureau, and Cabinet Secretary. Such request shall be commensurate with the medical condition and prognosis documented by the primary health care provider, which must include an estimated date when the employee may be fit for duty or return to work.

6.2 Employees eligible to take Family and Medical Leave under the Family Medical Leave Act (FMLA) must do so in conjunction with approved annual leave donations.

# Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act

U.S. Department of Labor
Wage and Hour Division

WAGE AND HOUR DIVISION

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.**

OMB Control Number: 1235-0003
Expires: 6/30/2025

The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. 29 U.S.C. §§ 2613, 2614(c)(3); 29 C.F.R. § 825.305. The employer must give the employee at least 15 calendar days to provide the certification. If the employee fails to provide complete and sufficient medical certification, his or her FMLA leave request may be denied. 29 C.F.R. § 825.313. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

## SECTION I - EMPLOYER

Either the employee or the employer may complete Section I. While use of this form is optional, this form asks the health care provider for the information necessary for a complete and sufficient medical certification, which is set out at 29 C.F.R. § 825.306. **You may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.** Additionally, you may not request a certification for FMLA leave to bond with a healthy newborn child or a child placed for adoption or foster care.

Employers must generally maintain records and documents relating to medical information, medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

(1) Employee name: Kimberly (First) ____ (Middle) Hunt-Brown (Last)

(2) Employer name: General Services Department Date: 1/11/24 (mm/dd/yyyy) (List date certification requested)

(3) The medical certification must be returned by 1/17/24 (mm/dd/yyyy)
(Must allow at least 15 calendar days from the date requested, unless it is not feasible despite the employee's diligent, good faith efforts.)

(4) Employee's job title: Procurement Specialist II Job description ☐ is / ☒ is not attached.

Employee's regular work schedule: ____

Statement of the employee's essential job functions:

(The essential functions of the employee's position are determined with reference to the position the employee held at the time the employee notified the employer of the need for leave or the leave started, whichever is earlier.)

## SECTION II - HEALTH CARE PROVIDER

Please provide your contact information, complete all relevant parts of this Section, and sign the form. Your patient has requested leave under the FMLA. The FMLA allows an employer to require that the employee submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to the serious health condition of the employee. For FMLA purposes, a "serious health condition" means an illness, injury, impairment, or **physical or mental condition that involves inpatient care or continuing treatment by a health care provider.** For more information about the definitions of a serious health condition under the FMLA, see the chart on page 4.

You also may, but are **not required** to, provide other appropriate medical facts including symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment. Please note that some state or local laws may not allow disclosure of private medical information about the patient's serious health condition, such as providing the diagnosis and/or course of treatment.

Employee Name: Kimberly Hunt Brown

Health Care Provider's name: (Print) Anna Nance, CNP

Health Care Provider's business address: 1[illegible] Unser NE, Rio Rancho, NM 87124

Type of practice / Medical specialty: Family Practice

Telephone: 505-896-0928 Fax 505-443-8314 E-mail: anna.nance@[illegible].org

**PART A: Medical Information**

Limit your response to the medical condition(s) for which the employee is seeking FMLA leave. Your answers should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. **After completing Part A, complete Part B to provide information about the amount of leave needed.** Note: For FMLA purposes, "incapacity" means the inability to work, attend school, or perform regular daily activities due to the condition, treatment of the condition, or recovery from the condition. **Do** not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b).

(1) State the approximate date the condition started or will start: 5/1/1986 (mm/dd/yyyy)

(2) Provide **your best estimate** of how long the condition lasted or will last: lifelong [illegible]

(3) Check the box(es) for the questions below, as applicable. For all box(es) checked, the amount of leave needed must be provided in Part B.

☐ **Inpatient Care**: The patient (☐ has been / ☐ is expected to be) admitted for an overnight stay in a hospital, hospice, or residential medical care facility on the following date(s): ______

☐ **Incapacity plus Treatment**: (e.g. outpatient surgery, strep throat)

Due to the condition, the patient (☐ has been / ☐ is expected to be) incapacitated for more than three consecutive, full calendar days from: ______ (mm/dd/yyyy) to ______ (mm/dd/yyyy).

The patient (☐ was / ☐ will be) seen on the following date(s): ______

The condition (☐ has / ☐ has not) also resulted in a course of continuing treatment under the supervision of a health care provider (e.g. prescription medication (other than over-the-counter) or therapy requiring special equipment).

☐ **Pregnancy**: The condition is pregnancy. List the expected delivery date: ______ (mm/dd/yyyy).

☑ **Chronic Conditions**: (e.g. asthma, migraine headaches) Due to the condition, it is medically necessary for the patient to have treatment visits at least twice per year.

☑ **Permanent or Long Term Conditions**: (e.g. Alzheimer's, terminal stages of cancer) Due to the condition, incapacity is permanent or long term and requires the continuing supervision of a health care provider (even if active treatment is not being provided).

☐ **Conditions requiring Multiple Treatments**: (e.g. chemotherapy treatments, restorative surgery) Due to the condition, it is medically necessary for the patient to receive multiple treatments.

☐ **None of the above**: If none of the above condition(s) were checked, (i.e., inpatient care, pregnancy) no additional information is needed. Go to page 4 to sign and date the form.

**Employee Name:** Kimberly Hunt-Brown

(4) If needed, briefly describe other appropriate medical facts related to the condition(s) for which the employee seeks FMLA leave. (e.g., use of nebulizer, dialysis)

Intermittent leave for "flare-ups" of chronic conditions: MS, migraines.

**PART B: Amount of Leave Needed**

For the medical condition(s) checked in Part A, complete all that apply. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.

(5) Due to the condition, the patient ( ☐ had / ☐ will have) **planned medical treatment(s)** (scheduled medical visits) (e.g.psychotherapy, prenatal appointments) on the following date(s): ______

(6) Due to the condition, the patient ( ☐ was / ☐ will be) **referred to other health care provider(s)** for evaluation or treatment(s).

State the nature of such treatments: (e.g. cardiologist, physical therapy) ______

Provide your **best estimate** of the beginning date ______ (mm/dd/yyyy) and end date ______ (mm/dd/yyyy) for the treatment(s)

Provide your **best estimate** of the duration of the treatment(s), including any period(s) of recovery (e.g. 3 days/week)

(7) Due to the condition, it is medically necessary for the employee to work a **reduced schedule.**

Provide your **best estimate** of the reduced schedule the employee is able to work. From ______ (mm/dd/yyyy) to ______ (mm/dd/yyyy) the employee is able to work: (e.g., 5 hours/day; up to 25 hours a week)

(8) Due to the condition, the patient ( ☐ was / ☐ will be) **incapacitated for a continuous period of time**, including any time for treatment(s) and/or recovery.

Provide your **best estimate** of the beginning date ______ (mm/dd/yyyy) and end date ______ (mm/dd/yyyy) for the period of incapacity.

(9) Due to the condition, it ( ☐ was / ☒ is / ☒ will be) medically necessary for the employee to be absent from work on an intermittent basis (periodically), including for any episodes of incapacity i.e., episodic flare-ups. Provide your **best estimate** of how often (frequency) and how long (duration) the episodes of incapacity will likely last.

Over the next 6 months, episodes of incapacity are estimated to occur up to 31 times per ( ☐ day ☐ week ☒ month) and are likely to last approximately 4-72 ( ☒ hours ☐ days) per episode.

– Due to the unpredictable nature of these illnesses, I cannot guess about the frequency of episodes. Chosen frequency to account for all possibilities.
AW

Employee Name: Kimberly Hunt-Brown

**PART C: Essential Job Functions**

If provided, the information in Section I question #4 may be used to answer this question. If the employer fails to provide a statement of the employee's essential functions or a job description, answer these questions based upon the employee's own description of the essential job functions. An employee who must be absent from work to receive medical treatment(s), such as scheduled medical visits, for a serious health condition is considered to be not able to perform the essential job functions of the position during the absence for treatment(s).

(10) Due to the condition, the employee ( ☐ was not able ☒ is not able ☒ will not be able) to perform one or more of the essential job function(s). Identify at least one essential job function the employee is not able to perform:

walking, sitting, standing, driving during flare-up of chronic issue

Signature of Health Care Provider [signature], CNP Date 4/22/24 (mm/dd/yyyy)

| **Definitions of a Serious Health Condition** (See 29 C.F.R. §§ 825.113-.115) |
|---|
| **Inpatient Care** |
| • An overnight stay in a hospital, hospice, or residential medical care facility.<br>• Inpatient care includes any period of incapacity or any subsequent treatment in connection with the overnight stay. |
| **Continuing Treatment by a Health Care Provider (any one or more of the following)** |
| **Incapacity Plus Treatment:** A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves either:<br>o Two or more in-person visits to a health care provider for treatment within 30 days of the first day of incapacity unless extenuating circumstances exist. The first visit must be within seven days of the first day of incapacity; or,<br>o At least one in-person visit to a health care provider for treatment within seven days of the first day of incapacity, which results in a regimen of continuing treatment under the supervision of the health care provider. For example, the health provider might prescribe a course of prescription medication or therapy requiring special equipment. |
| **Pregnancy:** Any period of incapacity due to pregnancy or for prenatal care. |
| **Chronic Conditions:** Any period of incapacity due to or treatment for a chronic serious health condition, such as diabetes, asthma, migraine headaches. A chronic serious health condition is one which requires visits to a health care provider (or nurse supervised by the provider) at least twice a year and recurs over an extended period of time. A chronic condition may cause episodic rather than a continuing period of incapacity. |
| **Permanent or Long-term Conditions:** A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective, but which requires the continuing supervision of a health care provider, such as Alzheimer's disease or the terminal stages of cancer. |
| **Conditions Requiring Multiple Treatments:** Restorative surgery after an accident or other injury; or, a condition that would likely result in a period of incapacity of more than three consecutive, full calendar days if the patient did not receive the treatment. |

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 15 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.**

350-(GSD/SPD)

| | | |
|---|---|---|
| State of New Mexico<br>Department of Finance and Administration, 407 Galisteo Street<br>Santa Fe, NM 87501 | Pay Group: CLS-Classified<br>Pay Begin Date: 02/04/2023<br>Pay End Date: 02/17/2023 | Business Unit: 35000<br>Advice #: 000000009502565<br>Advice Date: 02/24/2023 |

Kimberly A. Hunt-Brown
[redacted]

| | |
|---|---|
| Employee ID: | 341822 |
| Department: | 1510000000-SPD Capital Construction |
| Location: | SF-Joseph M. Montoya |
| Job Title: | SPD Procurement Specialist II |
| Pay Rate: | $2,816.86 Biweekly |

| TAX DATA: | Federal | NM State |
|---|---|---|
| Tax Status: | Married | Married |
| Allowances: | 0 | N/A |
| Addl. Percent: | N/A | |
| Addl. Amount: | | |

**HOURS AND EARNINGS**

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| FMLA-Paid Annual | 35.210731 | 10.50 | 369.72 | 22.50 | 792.25 |
| FMLA - Paid Sick | 35.210731 | 3.25 | 114.43 | 11.25 | 396.12 |
| Telework | 35.210731 | 66.25 | 2,332.71 | 242.25 | 8,529.79 |
| Annual Leave Used | | | 0.00 | 12.00 | 422.53 |
| State Holiday - Not Worked | | | 0.00 | 24.00 | 845.07 |
| Sick Leave Used | | | 0.00 | 8.00 | 281.69 |
| TOTAL: | | 80.00 | 2816.86 | 320.00 | 11267.45 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 209.63 | 838.52 |
| Fed MED/EE | 38.74 | 154.98 |
| Fed OASDI/EE | 165.67 | 662.69 |
| NM Withholding | 74.76 | 299.04 |
| TOTAL: | 488.80 | 1,955.23 |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical Pre Tax | 99.19 | 396.76 |
| Dental Pre Tax | 5.97 | 23.88 |
| Vision Pre Tax | 1.11 | 4.44 |
| Flex Spending | 38.46 | 153.84 |
| PERA Retirement | 293.52 | 1,174.08 |
| TOTAL: | 438.25 | 1,753.08 |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| GSD/RMD Admin Fee | 0.26 | 1.00 |
| Supplemental Term Life | 59.19 | 236.76 |
| Disability | 4.56 | 18.24 |
| Retiree Health Care | 28.17 | 112.68 |
| Workers Compensation Employee | 0.00 | 2.00 |
| TOTAL: | 92.17 | 370.68 |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|
| Medical Pre Tax | 148.79 | 595.16 |
| Dental Pre Tax | 8.95 | 35.80 |
| Vision Pre Tax | 1.66 | 6.64 |
| GSD/RMD Admin Fee | 0.38 | 1.52 |
| Basic Life Insurance | 2.04 | 8.16 |
| PERA Retirement | 527.88 | 2,111.52 |
| Retiree Health Care | 56.34 | 225.36 |
| Workers Compensation State Shr | 0.00 | 2.30 |

*TAXABLE

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 2,816.86 | 2,378.61 | 488.80 | 530.42 | 1,797.64 |
| YTD | 11,267.45 | 9,514.45 | 1,955.23 | 2,123.68 | 7,188.54 |

| BALANCES | YTD | BALANCES | YTD |
|---|---|---|---|
| Annual Leave: | 23.68 | Comptime | 0.00 |
| Sick Leave: | 5.27 | Holiday Comp Time: | 0.00 |
| Personal Leave Day: | 16.00 | Holiday Accrual | 0.00 |
| Overtime at 1.5: | 0.00 | Adm Comp Time: | 0.00 |

**NET PAY DISTRIBUTION**

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #000000009502565 | Checking | XXXXX[redacted] | 1,797.64 |
| TOTAL: | | | 1,797.64 |

MESSAGE:

# NON-NEGOTIABLE

350-(GSD/SPD)

| | | | | | |
|---|---|---|---|---|---|
| State of New Mexico<br>Department of Finance and Administration, 407 Galisteo Street<br>Santa Fe, NM 87501 | Pay Group: | CLS-Classified | | Business Unit: | 35000 |
| | Pay Begin Date: | 02/18/2023 | | Advice #: | 00000000009524583 |
| | Pay End Date: | 03/03/2023 | | Advice Date: | 03/10/2023 |

| | | | TAX DATA: | Federal | NM State |
|---|---|---|---|---|---|
| Kimberly A. Hunt-Brown | Employee ID: | 341822 | Tax Status: | Married | Married |
| [redacted] | Department: | 1510000000-SPD Capital Construction | Allowances: | 0 | N/A |
| | Location: | SF-Joseph M. Montoya | Addl. Percent: | N/A | |
| | Job Title: | SPD Procurement Specialist II | Addl. Amount: | | |
| | Pay Rate: | $2,816.86 Biweekly | | | |

**HOURS AND EARNINGS**

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| FMLA - Paid Sick | 35.210731 | -19.25 | -677.81 | -8.00 | -281.69 |
| Sick Leave Used | 35.210731 | 24.25 | 853.86 | 32.25 | 1,135.55 |
| Annual Leave Used | 35.210731 | 23.50 | 827.46 | 35.50 | 1,249.99 |
| FMLA-Paid Annual | 35.210731 | -22.50 | -792.25 | | 0.00 |
| Telework | 35.210731 | 66.00 | 2,323.90 | 308.25 | 10,853.69 |
| Absent Without Leave | 35.210731 | 4.50 | 158.45 | 4.50 | 158.45 |
| Leave Without Pay | 35.210731 | 3.50 | 123.24 | 3.50 | 123.24 |
| State Holiday - Not Worked | | | 0.00 | 24.00 | 845.07 |
| TOTAL: | | 80.00 | 2,535.16 | 400.00 | 13,802.61 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 169.92 | 1,008.44 |
| Fed MED/EE | 34.66 | 189.64 |
| Fed OASDI/EE | 148.21 | 810.90 |
| NM Withholding | 62.39 | 361.43 |
| TOTAL: | 415.18 | 2,370.41 |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical Pre Tax | 99.19 | 495.95 |
| Dental Pre Tax | 5.97 | 29.85 |
| Vision Pre Tax | 1.11 | 5.55 |
| Flex Spending | 38.46 | 192.30 |
| PERA Retirement | 264.16 | 1,438.24 |
| TOTAL: | 408.89 | 2,161.89 |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| GSD/RMD Admin Fee | 0.25 | 1.25 |
| Supplemental Term Life | 59.19 | 295.95 |
| Disability | 4.56 | 22.80 |
| Retiree Health Care | 25.35 | 138.03 |
| Workers Compensation Employee | 0.00 | 2.00 |
| TOTAL: | 89.35 | 460.03 |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|
| Medical Pre Tax | 148.79 | 743.95 |
| Dental Pre Tax | 8.95 | 44.75 |
| Vision Pre Tax | 1.66 | 8.30 |
| GSD/RMD Admin Fee | 0.38 | 1.90 |
| Basic Life Insurance | 2.04 | 10.20 |
| PERA Retirement | 475.09 | 2,986.61 |
| Retiree Health Care | 50.70 | 276.06 |
| Workers Compensation State Shr | 0.00 | 2.30 |

*TAXABLE

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 2,535.16 | 2,126.27 | 415.18 | 498.24 | 1,621.74 |
| YTD | 13,802.61 | 11,640.72 | 2,370.41 | 2,621.92 | 8,810.28 |

| BALANCES | YTD | BALANCES | YTD |
|---|---|---|---|
| Annual Leave: | 26.83 | Comptime | 0.00 |
| Sick Leave: | 3.87 | Holiday Comp Time: | 0.00 |
| Personal Leave Day: | 16.00 | Holiday Accrual | 0.00 |
| Overtime at 1.5: | 0.00 | Adm Comp Time: | 0.00 |

**NET PAY DISTRIBUTION**

| Payment Type | Account Type | Account Number | Amount |
|---|---|---|---|
| Advice #00000000009524583 | Checking | XXXXXX[redacted] | 1,621.74 |
| TOTAL: | | | 1,621.74 |

MESSAGE:

# NON-NEGOTIABLE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**

**Plaintiff,**

**v.** **Case No. 1:23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ In their individual and official capacities,**

**Defendants.**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT III: FMLA INTERFERENCE (Doc. 99)**

Defendants, by and through their counsel, Jackson Loman Downey & Stevens-Block, P.C. (Eric Loman and Sarah Downey) state the following in response to Plaintiff's Motion for Summary Judgment on Count III: FMLA Interference (Doc. 99)

**Introduction**

Plaintiff is a procurement agent in General Service Department's ("GSD") State Purchasing Division ("SPD"). The individually named Defendants are GSD managers and coworkers who have interacted with Plaintiff in different capacities.

Since 2017, Plaintiff has been taking intermittent leave pursuant to the Family Medical Leave Act ("FMLA"). Plaintiff occasionally reports a flare up of symptoms related to multiple sclerosis or chronic migraines. It is not uncommon for Plaintiff to take one or more days off per week related to her FMLA-approved condition.

Pursuant to FMLA and GSD policy, Plaintiff is required to apply and recertify for FMLA leave annually. Plaintiff claims that in 2023 and 2024 Defendants interfered with her FMLA benefits by delaying her FMLA approval, although in both years her FMLA was ultimately

approved, and she was permitted to take off as many days as requested with no consequence. There has been no adverse employment action because of the delays in recertifying Plaintiff's FMLA leave. Plaintiff's Motion should be denied.

**Legal Standard**

Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law and the material facts are undisputed. See Fed. R. Civ. P. 56(a). The purpose of summary judgment is to terminate claims that are factually unsupported. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986).

**Response to Statement of Undisputed Material Facts**

Preliminary Statement on Plaintiff's Sham Affidavit

Plaintiff's Statement of Undisputed Material Facts ("UMF") relies partially on an affidavit she prepared for purposes of the instant Motion. However, that affidavit contradicts her deposition testimony as described below. The "general rule is that affidavits that conflict with or contradict a party's prior deposition testimony should be disregarded in determining whether a genuine issue of fact exists…" Moya v. City of Tucumcari, No. Civ 03-0247 BB/KBM, 204 WL 2126335, at * 3 (D.N.M. Apr. 21, 2004). When "deciding whether an affidavit is an attempt to create a sham issue of fact, the relevant factors are whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002).

1. Defendants dispute Paragraph 19 of Plaintiff's UMF, which is partially supported by her sham affidavit. In her deposition, Plaintiff acknowledged that while she was not paid for the afternoon of March 1, 2023 (when she was marked AWOL), had that day been coded as FMLA, it would have also been unpaid. See Deposition of Kimberly Hunt-Brown, attached as Exhibit A, p. 80:11-16. Further, Plaintiff testified in her deposition that she had no lost wages damages as a result of the delay in recertifying her FMLA leave in 2023. Ex. A, p. 74:2-25. Finally, whatever sick leave Plaintiff had accrued as of March 1, 2023, would have been used the next time Plaintiff called in sick. That accrued leave did not go away, although it might have been used at a later time. Plaintiff acknowledges at times she had no accrued sick leave because it had all been used. See, e.g., Ex. A, 68:14-69:3 (while she was waiting for her 2023 FMLA to be recertified, Plaintiff would call in and use sick leave if she had any accrued, and if not it was coded as leave without pay) and p. 142:5-19 (Plaintiff noting she had no accrued sick leave in September 2024).

2. Defendants dispute Paragraph 21 of Plaintiff's UMF as it is misleading. While it is true Plaintiff would not accrue annual or sick leave during time recorded as AWOL, she similarly would not accrue annual or sick leave had that day been recorded as FMLA leave. See 1.7.7.12(F) NMAC ("Employees shall not accrue annual and sick leave while on unpaid FMLA leave."). Further, it is undisputed Plaintiff's FMLA leave was retroactively applied to March 1, 2023, designating that absence as FMLA leave. See Plaintiff's UMF, ¶ 27.

3. Defendants dispute Plaintiff's UMF ¶ 27 to the extent it states there was no communication with Plaintiff regarding the retroactive application of her FMLA. Contrary to what is stated in her sham affidavit, Plaintiff testified she recalls seeing the email sent to her counsel explaining her FMLA for 2023 was approved and would be retroactively applied to the days she invoked FMLA. Ex. A, p. 70:17-71:15 and Ex. 6 thereto.

4. Defendants dispute Paragraph 28 of Plaintiff's UMF, which is supported solely by Plaintiff's sham affidavit testimony. Plaintiff was never discouraged or prohibited from taking a sick day for her FMLA-qualifying medical condition when she needed it. In her deposition, Plaintiff testified that during the period she was waiting to have her FMLA recertified for the year, she continued having migraines and flare-ups. When that would happen, she would take the day off and record it on her timesheet as either sick leave (if she had any sick leave accrued) or as Leave Without Pay-Authorized. Ex. A, p. 68:9 – 69:3. Further, Plaintiff's UMF ¶ 28 contradicts her own statement that she "continued to designate her leave as FMLA when she had had flare ups, while she sought clarification from her provider." See Plaintiff's UMF, ¶ 7.

5. Defendants dispute Paragraphs 47, 49 and 50. Plaintiff did receive approximately one week of donated leave in 2024, and she used all of it. Ex. A, p. 134:4-8; 138:10-21.

6. Defendants dispute Paragraph 54 of Plaintiff's UMF. Although GSD intended to retroactively apply Plaintiff's FMLA leave for March and April 2024, it did not happen immediately as a result of an oversight. In 2025, GSD realized those days had not been adjusted and did so. Plaintiff's time records currently reflect her FMLA leave for March and April 2024, and this retroactive application had no effect on her pay or benefits. See Affidavit of Gloria Quintana, attached as Exhibit B, ¶¶ 3, 4.

**Additional Undisputed Material Facts**

Defendants respectfully refer the Court to Paragraphs 13-22 of Defendants' Statement of Undisputed Material Facts in their Motion for Summary Judgment, filed August 15, 2025 (Doc. 98). Those undisputed facts relate specifically to Plaintiff's claim for FMLA interference. Defendants refer to and incorporate those undisputed facts herein.

## Points and Authority

Plaintiff is not entitled to summary judgment on her claim for FMLA interference because the undisputed facts do not support such a claim. On the contrary, the undisputed facts show there has been no adverse employment action taken, nor was any action retaliatory for Plaintiff's application for FMLA leave. Plaintiff has been permitted to take all the days off she has requested with no consequence.

### I. There Has Been No Adverse Employment Action.

Following Tenth Circuit law, this District has recently found to "succeed on an FMLA interference claim, an employee must show that (1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." See, Rodriguez-Ortega v. Rich, *et al*, 1:21-cv-1129 JCH/KK (D.N.M.)(September 26, 2024), p. 16 (citing *Tadlock v. Marshall County HMA, LLC*, 603 F. App'x 693, 709 (10th Cir. Feb. 25, 2015)).

A plaintiff can meet the second element- requiring adverse action- by showing "that he was prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave," or by "discouraging an employee from using FMLA leave." See, Rodriguez-Ortega, p. 16-17 (citing *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).

In Rodriguez-Ortega, the plaintiff was approved for intermittent FMLA leave, but was eventually terminated because, among other things, he did not follow the employer's call-in procedures and was marked Absent Without Leave ("AWOL") on some days. *Id.*, pp. 3-4, 7-8, 13. The plaintiff claimed his employer interfered with his FMLA rights by marking him AWOL and ultimately terminating him. The Court granted summary judgment for the defendant, finding the

employer correctly followed its "policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA.*" Id., p. 22 (citing *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008-09 (10th Cir. 2011)(emphasis in original)). The Court found the defendant ultimately provided Mr. Rodriguez-Ortega the forms to apply for FMLA leave and approved him for intermittent FMLA leave. *Id.*, p. 24. The decision to mark Mr. Rodriguez-Ortega as AWOL for a few days was not to interfere with his FMLA rights, but to enforce the employer's leave notification policies. *Id.*, p. 24-25. Judge Herrera granted summary judgment, dismissing Mr. Rodriguez-Ortega's FMLA interference claim.

In the context of FMLA interference, the Eleventh Circuit has also held an employee who was classified as AWOL for two days (as well as issued a memorandum warning of potential consequences from her absences) had no claim because "plaintiff did not suffer any repercussions from either of these actions. In such circumstances, courts have generally found no adverse employment action." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (citing *Green v. Runyon,* 131 F.3d 151 (10th Cir. 1997), an unpublished Tenth Circuit case in which the Court held "as a matter of law, a threatened letter of warning was not an adverse employment action.").

The case now before the Court is even weaker than the one Judge Herrera dismissed last year. Unlike Mr. Rodriguez-Ortega, Plaintiff has not been terminated, nor disciplined in any way by Defendants. Plaintiff cannot meet the second element of her claim because there has been no adverse employment action.

The undisputed facts are that Plaintiff submitted her application for FMLA renewal for 2023 and GSD's H.R. department told her additional information was needed from her medical provider. There was then a delay of several weeks because Plaintiff's provider had an extended

illness. By the end of March 2023, Plaintiff's FMLA was certified and approved by GSD. During the meantime, she continued calling in sick for her FMLA-qualified condition as needed, and those days were initially coded as authorized leave without pay, rather than unpaid FMLA. Even if GSD H.R. was mistaken and Plaintiff's initial certification was sufficient, she was not prohibited from taking off the days she needed for her medical condition. Her FMLA was approved weeks later and retroactively applied.

In 2024, GSD initially interpreted the certification from Plaintiff's provider as to limit her to four days per month of FMLA leave. When Plaintiff took more than 4 days per month, she was asked to get another certification from her provider and continued calling in sick as needed for her FMLA-qualifying condition. Again, her FMLA for 2024 was ultimately approved and she was permitted to take up to 31 days per month of FMLA leave, as needed and requested by her. GSD has retroactively applied FMLA to that period of 2024, which resulted in no change to Plaintiff's pay or benefits. Further, Plaintiff was able to and did use all the donated leave donated to her by a coworker. Plaintiff's Motion should be denied.

**II. No Adverse Action Was Related To Plaintiff's FMLA Applications.**

The evidence does not support the third element of Plaintiff's claim: that some adverse action was "related to the exercise or attempted exercise of" her FMLA rights. *Tadlock*, *supra.* Even if Plaintiff could show an adverse action here, there is no evidence that such action was taken as a result of her application for FMLA leave.

a. Plaintiff's single afternoon of AWOL designation is not a violation of FMLA.

Plaintiff argues being designated as AWOL on the afternoon of March 1, 2023, was an adverse action because an employee who is AWOL might be subject to discipline. However, Plaintiff was never subjected to or threatened with any discipline in this case. Further, Plaintiff's

own statement of facts indicate her supervisor marked her as AWOL that afternoon because of her interpretation of GSD's leave notice policy, not to punish Plaintiff for applying for FMLA. Finally, it is undisputed that afternoon was retroactively changed from AWOL to FMLA leave when Plaintiff's FMLA leave was approved in March 2023. Even if being marked AWOL with no consequence was an adverse action, Plaintiff cannot show any relation between that action and her FMLA application.

b. GSD's Annual Recertification Requirement Is Reasonable.

Plaintiff's Motion alleges numerous facts and makes argument to the effect that GSD's requirement of requiring annual certification of FMLA benefits is a violation of law.[1]

FMLA expressly permits employers to require recertification of FMLA qualifying medical conditions "on a reasonable basis." See 29 U.S.C. § 2613(e) ("The employer may require that the eligible employee obtain subsequent recertifications on a reasonable basis."). The federal regulation on FMLA recertifications provides:

> "In all cases, an employer may request a recertification of a medical condition every six months in connection with an absence by the employee. Accordingly, **even if the medical certification indicates that the employee will need intermittent or reduced schedule leave for a period in excess of six months (e.g., for a lifetime condition), the employer would be permitted to request recertification every six months in connection with an absence**." (emphasis added)

See 29 C.F.R. § 825.308(b). Other courts have dismissed claims for FMLA interference where an employee claims they were required to recertify with greater frequency than the instant case. *See, e.g., Smith v. City of Niles*, 1:10-cv-463 (S.D. Mich)(September 29, 2011) 2011 WL 13186008, *7 (dismissing FMLA interference claim where employee was required to recertify in February 2009, October 2009, and March 2010) *Andrews v. CSX Transp., Inc.*, No. 3:06-CV-704-J-32HTS, 2009

[1] In her deposition, Plaintiff agreed GSD's requirement to recertify annually is not a violation of FMLA. Ex. A, p. 64:4-14.

WL 5176462, at *15 (M.D. Fla. Dec. 22, 2009)) (employer did "not abuse the recertification requirement by asking Simmons to obtain medical recertification more than once in a one-year period.").

Plaintiff's Motion focuses on when Plaintiff's FMLA year should begin. While that may have some consequence in a case where an employee is alleged to have exceeded the 480 hours of FMLA leave permitted per year, this is not at issue here. The parties agree Plaintiff has not exceeded 480 hours of FMLA leave in any year. However, regardless of how many FMLA hours Plaintiff takes in any year, GSD is permitted to require annual recertification.

**Conclusion**

In both 2023 and 2024, GSD ultimately approved Plaintiff's requests for intermittent FMLA leave and allowed her to take as many days off for her qualifying medical condition as she requested. Plaintiff has never been disciplined as a result of some days being coded "Leave Without Pay- Authorized" or AWOL rather than FMLA Leave. Plaintiff has never called in sick and been told she was required to report to work that day or face some consequence. Plaintiff has not lost any pay as a result of some days being coded as one kind of unpaid leave rather than another. Despite what Plaintiff claims in the sham affidavit attached to her Motion, her own deposition testimony was that she was never discouraged from calling in sick or taking time off when needed for her medical condition. She continues taking intermittent FMLA leave as requested to this day. The Tenth Circuit has held the "FMLA only protects an employee's right to request and take leave while ill." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002). Plaintiff has continually requested leave and been permitted to take leave whenever she has requested it. Plaintiff's Motion should be denied.

**WHEREFORE** Defendants respectfully request Plaintiff's Motion for Summary Judgment (Doc. 99) be denied.

Respectfully submitted,

**JACKSON LOMAN DOWNEY**
**& STEVENS-BLOCK, P.C.**

***/s/ by Eric Loman***
Eric Loman
Sarah Downey
Counsel for Defendants
201 Third St. N.W., Ste. 1500
Albuquerque, NM 87102
(505) 767-0577
eric@jacksonlomanlaw.com
sarah@jacksonlomanlaw.com

I certify the foregoing was filed via the Court's CM/ECF system on September 2, 2025, which causes all counsel of record to be served electronically.

***/s/ by Eric Loman***
Eric Loman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs

NEW MEXICO GENERAL SERVICES DEPARTMENT,
and VALERIE PAULK, EUNICE MOYA, JENNIFER
MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ
In their individual and official capacities,

Defendants.

DEPOSITION OF KIMBERLY HUNT-BROWN
MARCH 5, 2025
9:14 A.M.
201 THIRD STREET, NORTHWEST, SUITE 1500
ALBUQUERQUE, NEW MEXICO 87102

PURSUANT TO THE NEW MEXICO FEDERAL RULES OF CIVIL PROCEDURE this deposition was:

TAKEN BY: ERIC LOMAN, ESQ.
ATTORNEY FOR DEFENDANTS

REPORTED BY: KIM KAY SHOLLENBARGER
NEW MEXICO CCR#236
ALBUQUERQUE COURT REPORTING SERVICE, LLC
3150 CARLISLE BOULEVARD, NORTHEAST, SUITE 104
ALBUQUERQUE, NEW MEXICO 87110

Page 62

A. Yes.
Q. I'm going to read what I think this handwriting says and if you disagree, if you think it says something else, I want you to tell me, okay.
A. Yes.
Q. Under mental impairment it says, "work from home due to high risk of complications from flu and COVID." Do you see that?
A. Yes, yes.
Q. Going down towards the bottom there's more handwriting and it looks to me like it says, "needs to work from home due to compromised immune system."
A. Yes, yes.
Q. Going on to the next page, she checks the box for slight limitation, capable of light work, 35 to 55 percent. What does that mean?
A. You know, I don't know.
Q. If you aren't having one of your flare-ups, if you're not having a migraine, if you're having a good day, do you have any physical limitations that affect your ability to do your job?
A. No.
Q. Going down to the bottom, I think it says, requesting to continue work from home. Is that what you see?
A. Yes.

Page 63

Q. You can put that aside. And you were approved to continue teleworking for several more months, right, after this?
A. Correct.
Q. Until August, I believe; is that right?
A. Yes, early August.
Q. And we'll get to that, but from January on for several months you were still working from home, right?
A. Correct.
Q. Do you know if any other GSD employees also sent in a request for an accommodation to keep working remotely?
A. At that time, I did not.
Q. We recently produced some of that information in discovery, have you reviewed that?
A. I have not yet.
Q. You said you were not aware at the time. So are you aware now that other people also requested extensions to keep working at home in '23?
A. Yes.
Q. How are you aware of that?
A. Office talk.
Q. Fair enough. Do you know of anybody who was denied that accommodation who asked for it?
A. Not certain. Not certain.
Q. Do you know if anybody had a longer extension than

Page 64

you did to keep working from home?
A. I believe that Eunice told me that I was the one who had the longest extension.
Q. That's my understanding as well. So going forward through the Spring of 2023, so you understand that you need to recertify your FMLA benefits every year, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And you understand that that's provided in the law?
A. Yes.
Q. You're not claiming that it's illegal for them to ask you to recertify annually, are you?
A. Correct.
Q. In the beginning of 2023 or maybe even towards the end of 2022, I don't think I have that document here, you applied to have your FMLA, intermittent FMLA recertified for the year 2023, right?
A. Correct.
Q. So we're on Exhibit 4. At that time, that year, do you recall working with Kelly Howley?
A. Yes.
Q. Kelly Howley worked in the HR office at GSD?
A. She did.
Q. And I understand there was an issue, a delay getting

Page 65

your FMLA certified for that year. Would you agree with that?
A. There was.
Q. Tell me what you recall -- well, just tell me, what do you recall about that, why did you understand that there was a delay?
MS. BURKE: Object to the form of the question.
MR. LOMAN: You can answer.
A. I actually didn't understand why there were delays in having my FMLA recertified, because I was submitting exactly as I had submitted before in previous years. Yet, I was being told, for whatever reason, that there were additional requirements that had to be met.
Q. What is your recollection of that? First let me ask, who was the one that told you that there were some additional requirements?
A. This was Kelly Howley that I was corresponding with, she was the one who was designated at that time by Eunice. Eunice is the head of the HR department of GSD and at the time Kelly Howley was the one who was handling FMLA and ADA paperwork
Q. I will hand you Exhibit 4. This is a string of emails. Feel free to skim through these. Do you remember having this back and forth with Kelly?
A. Yes.

Page 66

Q. You'll notice at the bottom there are numbers GSD36, GSD37, and so on. Do you see that?
A. Yes.
Q. I'm going to refer to those page numbers.
A. Okay.
Q. If you flip to the last page, which is 39, and I understand that this is not the entire communication between you and Kelly. Like I said, I've got an awful lot of paper here and I'm just trying to draw attention to certain things. So on February 17, 2023, you emailed Kelly and said, "hi, Kelly, the provider got the form back to me today, sorry it took so long, she's been really busy," et cetera. Do you see that?
A. Yes.
Q. My understanding was that your provider around that time had been out of the office for awhile, she may have gotten sick herself. Do you recall that?
A. She had COVID.
Q. Was that Anna Nance?
A. Yes.
Q. Do you remember approximately how long she was out of the office, as far as you know?
A. I do not recall that.
Q. Was it a period of weeks?
A. Yes.

Page 67

Q. Was it more than weeks? Was it a month?
A. Possibly around a month.
Q. And that was right around the same time that you were trying to get your FMLA approved, right?
A. Yes, of course.
Q. It's not Kelly Howley's fault that your doctor got sick, right?
A. It was not.
Q. So you have this back and forth with Kelly. On February 23rd, it looks like you sent her a document. I assume that was the doctor's form, looks like you meant to attach it the day before, but didn't attach it. Do you remember that, or do you see that in the emails?
A. I see it in the email. Do I remember not attaching it.
Q. It happens to all of us, right?
A. Right.
Q. You sent the email without the attachment, not a big deal. But you sent it to her the next day.
A. Yes.
Q. Kelly says, "good morning, received, and thank you, have a wonderful day." Did you have any face-to-face interaction with Kelly Howley during this period?
A. I have never met the woman.
Q. She's being very polite here, have a nice day, thank

Page 68

you so much, right, those sort of things?
A. She was very sweet to me through the entire interaction.
Q. So you ask her a question about your FMLA, this is on page 37, and there's some confusion. You say, "I'm really confused about your FMLA." And then moving on to the first page, she explains that your FMLA expired on December 13, 2022, so you can't invoke FMLA until your new request is approved. And then Eunice chimes in later that day. So during this time period that we're trying to get your FMLA recertified for the year, you were still having flare-ups and migraines as they come, right?
A. Yes.
Q. And when those would happen, my understanding is you would take a day and during this period that your FMLA was not yet recertified it would be recorded as absence without leave, as an unexcused absence essentially, right?
A. It would be recorded as either absent without leave, it would be recorded as sick leave, it would be recorded however I needed to record it.
Q. Do you remember if you took any of your accrued sick leave or annual leave during this period?
A. Specifically, I don't recall if I took -- I believe that had I had any accrued leave at the time, that I would have taken it, had I been able to.

Page 69

Q. But if you didn't have any sick leave to take it would have been coded as a leave without pay?
A. As a leave without pay, yes.
Q. Moving forward, you got your form back from your medical provider, right?
A. Yes.
Q. You sent that to HR.
A. Uh-huh.
Q. We'll call this Exhibit 5. On March 30, 2023, your intermittent FMLA was approved for that year, right?
A. Yes, yes, GSD approve it.
Q. Right. My understanding is, the next thing that happened was GSD retroactively applied your FMLA leave so that those absences you had that were coded as leave without pay, they went back and changed those to FMLA leave, right?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer.
A. I don't recall specifically if those were changed to FMLA on my timesheet.
Q. Let's talk about it. We're on Exhibit 6. Around this time you retained Heather Burke as your attorney, right?
A. Yes.
Q. Do you remember approximately -- let me just be clear. I am not asking you to tell me any conversations you've had with her. I'm only asking for a date, a time, a

Page 70

time frame. Do you recall approximately when you retained Ms. Burke?
A. I don't.
Q. Well, let me put it this way, if your FMLA was approved March 30th, do you remember if you retained her shortly before then?
A. I remember that I had talked with her. I had called her and had conversations with her, had conversations with her earlier, because I had concerns that something was happening, because I did not like the way that this whole FMLA thing was going, because I had never had an issue with my FMLA before and it, to me, seemed really sketchy.
Q. So sometime would have been March of '23, February '23 that you first reached out to her then, does that sound about right?
A. Again, I don't recall.
Q. By this point she was certainly involved, because Exhibit 6 is an email from Eunice Moya to Heather Burke, right? So this is Exhibit 6. My understanding is Ms. Moya was communicating directly with Ms. Burke because she was representing you at that point. Does that sound correct?
A. Yes.
Q. And you're not copied on this email, but have you seen this email before?
A. Yes.

Page 71

Q. Was it shared with you?
A. It was shared with me.
Q. The paragraph that begins, in good faith. Do you see that?
A. Yes.
Q. It says, "Ms. Hunt-Brown's FMLA has been retroactively approved to January 19, 2023," when the physician signed the first time, which was the first time your doctor signed the certification form. Do you understand that?
A. Yes, yes.
Q. And going on she says, "your timesheet will be updated to reflect FMLA for the dates she invoked FMLA." And then it goes on from there. Do you see that?
A. Yes. Yeah. I do remember this.
Q. I just want to know where we agree and where we have disputes, okay. Do you agree that as of this point -- well, let me start over. Do you agree now that once your FMLA was approved for that year they went back and retroactively applied it to all the days that you had called in sick?
A. Yes.
Q. This FMLA leave is unpaid leave, right?
A. It is under the law unpaid leave, yes.
Q. So when we retroactively apply it, we're going back into the time records and changing it from one kind of unpaid

Page 72

leave to a different kind of unpaid leave, right?
MS. BURKE: Objection, form and foundation.
A. Unless there's another way that -- within GSD system that FMLA leave can be applied as a type of paid leave that is still FMLA, because there are paid FMLA leave within GSD system. Donated leave, as an example, is a paid leave.
Q. So going back to March 30, 2023, when Eunice says that she would retroactively apply all those absences and change them all to FMLA leave, right?
A. Uh-huh.
Q. Do you recall, was there a discussion about whether it would be FMLA paid or FMLA unpaid?
A. I don't recall a discussion as to whether it was going to be paid or unpaid, no, I do not recall that discussion.
Q. As you sit here today do you believe that you were entitled to have any of those days change to some form of paid leave?
A. I would want to see specifically which days those are within Share and how they were applied in terms of whether or not -- in terms of whether or not it was applied properly. I don't understand the question.
Q. My question is, we agree now that as of March 30, 2023, GSD retroactively applied FMLA, right?
A. Yes.

Page 73

Q. And all those days in the month leading up to that that had been booked as leave without pay, they changed those in the system to reflect that they were FMLA absences, right?
A. We agree that that was what to happen, yes.
Q. Yes. Do you have any reason to believe that it did not happen?
A. No.
Q. So the next question is, when they went back and changed those to FMLA leave, those days.
A. Yes.
Q. Are you claiming that those should have been something other than FMLA unpaid leave?
A. No. I was just pointing out that there is a possibility that FMLA unpaid leave within GSD system can also be paid leave if it is donated leave. I don't recall if I had donated leave that I was not being allowed to take at that time, because I was not under FMLA leave at that time.
Q. Would there be any email or anything from you where you're asking about using donated leave during this time period?
A. Possibly there would be. I recall that there was a situation that came up where I was being told I could not use my donated leave.
Q. When was that?
A. It seems like it was either in the beginning of '23

Page 74

or '24.
Q. Just want to make sure we're on the same page here. As you sit here today, is it your recollection, is it your understanding that around March 30, 2023, they went back and changed your leave without pay to FMLA unpaid leave?
A. Yes, it is my understanding.
Q. Are you claiming that you have any lost wage damages as a result of that, the active application of your FMLA or the delay in getting your FMLA certified for that year?
A. Possibly not for '23, but possibly for '24.
Q. Well, we'll talk about what happened in 2024, but can we agree that in 2023 you didn't have any lost wages as a result of this issue with the certification of your FMLA leave?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: Go ahead.
A. Can we tentatively agree on that?
Q. Well, only if we can tentatively agree that you will come back for another deposition if you change your mind down the road.
A. Can I do a sidebar or something?
Q. No.
A. No, okay, all right, all right. Yeah.
Q. Can you answer that question?
A. All right, I'll agree to it.

Page 75

MR. LOMAN: We've been going for awhile and it's 11:52. I would like to give you a break and I would like to give Ms. Shollenbarger a break. So do you want to come back at 12:30? Does that work for you, Heather?
MS. BURKE: Let's do an hour, just because I don't know where to go for lunch around here and how long it will take. You probably know better than us.
MR. LOMAN: There is a deli downstairs by the elevators. There's also a restaurant in the hotel, on the hotel side around the corner. If you venture out of the building there's a number of -- there's sandwich shop right here on the plaza called Friends, across the street there's -- and Central is a block away. I'm fine coming back at 12:50. We have a lot to get through today.
MS. BURKE: Right.
MR. LOMAN: I don't want to extend this into a second day if we don't have to.
MS. BURKE: No, of course not.
MR. LOMAN: If that works for you, we'll come back at 12:50.
MS. BURKE: Okay.
(Recess at 11:50 a.m. to 12:59 p.m.)
Q. Are you ready, Ms. Hunt-Brown?
A. Yes. One second, if you will. Are we going to continue on from where we were or are we going into a new

Page 76

direction or something?
Q. I just keep asking you questions.
A. Okay, so before we continue on, I need to -- I wanted to go back in and take a moment to correct the record or --
Q. Okay, sure, go ahead.
A. Is that what you call it, correct the record. Okay, so on the last thing that we were talking about, about the time and everything in 2023.
Q. The retroactive --
A. The retroactive --
Q. -- changing of the --
A. Yes.
Q. Okay.
A. We were talking specifically about the unpaid leave.
Q. Uh-huh, yes.
A. I don't want to say, "yes, all of the unpaid leave has been changed and corrected." There was a leave without pay that happened in 2023 and that was a damage, that should not have been corrected, that was not corrected. That was, was part of this whole thing.
Q. It should not have been corrected?
A. No, no, that was very specifically held out.
Q. What do you mean it should not have been corrected?
A. That was not to have -- that was specific

Page 77

instruction was to not correct that, because that was a -- that was a damage.
Q. Specific instruction by whom?
A. By myself.
Q. You instructed GSD not to change one of the days from leave without pay?
A. From leave without pay, yes.
Q. Why?
A. The damage.
Q. I don't understand what you're telling me.
A. Because that is something that they should not have done to me. Leave without pay is not the same -- I'm sorry, excuse me. The AWOL, the AWOL should not have been changed, because it's not the same. Them, them taking an AWOL away from me and just changing it to leave without pay is not the same.
Q. I'm not following you, so let me ask some follow-up questions. GSD offered to change a day from AWOL to FMLA; is that correct?
A. Yes, I believe that is correct.
Q. And you instructed them not to?
A. Yes, I believe that is correct. There is email about that instance and I don't want to -- I don't want -- I'm reluctant to speak to any great depth about it, other than to say that I did not want them to simply change the

Page 78

AWOL to an unpaid FMLA, because with them giving me AWOL, they actually affected a lot more.
Q. How are you damaged by that?
A. How was I damaged by the AWOL?
Q. Yes.
A. Well, AWOL is a lot more punitive, for one thing. It's a disciplinary type charge, if you will. So it's a much more negative type charge, because it assumes that I was just -- I was not reporting properly and I was, in fact, reporting as well as I could.
Q. And they offered to change that, so we're clear, and you instructed them not to change it. You instructed them to leave it as AWOL, is that what you're telling me?
A. Yes. Because there was no further offer of any other additional reparation being made, other than just changing it from AWOL.
Q. What other reparation did you want?
A. I wanted basically restoration of the time that I lost with the AWOL, of the, of any kind of retirement benefit or any type of, any type of, any of type of employee type benefit that I would have had.
Q. Wouldn't that have happened if they changed it from AWOL to something else?
A. Would that have been retroactive? I was not given that impression at the time. They did not agree to do that.

Page 79

Q. Ms. Hunt-Brown, you just said that they offered to change that from AWOL to FMLA, you instructed them not to. That's what you just told me.
A. Uh-huh.
Q. So I'm having a hard time following you here.
A. And again, I said I'm not comfortable with saying -- I need to see the emails chain that went back and forth about that, because it's been long enough that I simply cannot remember what all happened with that.
Q. So, okay, when I asked you how you were damaged, you said it's because it looks punitive on your record, is that what you're telling me?
A. It is.
Q. And they offered to change that from AWOL to FMLA leave, right? Wouldn't that have fixed the damage?
A. I don't know that it would have fixed the damage.
Q. What damage would it not have fixed?
A. I don't know that I can speak to that. Again, as I said, I don't recall right now the totality of the events that was happening right there, because I don't have the emails in front of me.
Q. Well, I would like to know what you do remember.
A. What I remember is that there was an AWOL. I was very upset about the AWOL and the circumstances that surrounded it, and for whatever reason at the time I said,

Page 80

"no, I don't want that changed, I want it -- I don't want you to just switch it to an unpaid FMLA."
Q. Was that your idea or were you acting on someone else's advice?
A. I do not recall.
Q. So you didn't lose any pay as a result of that, right?
A. I did.
Q. Well, FMLA is unpaid, right?
A. So is AWOL.
Q. Right. So if they had called it FMLA from the beginning it still would have been unpaid leave, right?
A. Yes.
Q. So whether we call it AWOL or FMLA unpaid, you're not getting paid that day, do we agree on that?
A. Yes.
Q. This is will be Exhibit 7. Do you recall signing this document? It looks like an electronic signature to me, but you can tell me.
A. It is electronic, yeah.
Q. This is an authorization to disclose medical information, right?
A. Uh-huh.
Q. Do you remember signing this on December 15, 2022?
A. Specifically, no, but...

Page 81

Q. Did anyone tell you that you are required to sign this document? Do you remember discussing this release with anybody?
A. I remember at one point being told that yes, this was required, that GSD would require this document.
Q. Who told you that?
A. I believe it was someone from HR, that they needed this as part of my FMLA paperwork.
Q. Are you sure it wasn't part of your ADA request?
A. Or possibly part of my ADA. I had both FMLA and ADA going at the same time.
Q. So let's try to figure this out. So I'm handing you Exhibit 8. Exhibit 8 is your FMLA application.
A. Uh-huh.
Q. Dated December 16, 2022. Do you see that?
A. Uh-huh.
Q. Attached also as part of this exhibit are a bunch of emails between you and Kelly Howley and we talked about how you were working with Kelly to get your FMLA approved for this year, right?
A. Right.
Q. You see the page numbers on the bottom.
A. I do.
Q. Go to GSD82, the last one. Are you there?
A. Yes.

Page 134

A. That is her job.
Q. Yes.
A. As HR, yes.
Q. Did anyone donate annual leave to you?
A. One of my colleagues donated a week of his leave, which came in, yes.
Q. And you were able to use that in 2024?
A. I was, eventually.
Q. That was nice of him. Who was that?
A. That was a colleague. My colleague was Clark Fountain.
Q. Going down, she says, "polite reminder, you are authorized up to four days a month of FMLA," and she's attached paperwork so you can get it renewed. This looks to me like it was a follow-up. Not the first time you had discussed this with Jennifer. Had you discussed this issue before with her, that she was interpreting your provider's form you were only approved up to four days?
A. I believe, I don't know for certain at what point the, at what point the actual interpretation that she had came into play. There's an email string, I know, out there somewhere, that -- between us.
Q. Between you and Jennifer?
A. Between myself and Jennifer, yeah, where I was saying, what is going on with this, I don't understand.

Page 135

Because we never had a definition of FMLA like this before, where you take a physician's estimate and say, well, this is how much you get per month.
Q. But that's how Jennifer was interpreting it at that time, right?
A. That's how she was doing it, yeah. So, yeah, that's a restatement of that and I don't know at what point -- I don't know if I had corresponded. Obviously I must have.
Q. So then I'll give you Exhibit 15. If you flip to the last page, it looks like your provider signed this on April 27th, I think. It could be a 29. Of 2024, right?
A. Yes.
Q. If you will flip to page -- if you see the small page numbers at the bottom -- KHB 751.
A. Yes.
Q. And I am going to read this handwriting and I want you to tell me if I'm reading something incorrectly, okay.
A. Handwriting at the top or the bottom?
Q. I'll start at the top. It says, "intermittent leave for flare-ups of chronic conditions, MS, migraines," right?
A. Yes, MS, migraines, yes.
Q. At the bottom she says, "over the next six months, episodes of capacity are estimated to occur up to 31 times per month," right?
A. Yes.

Page 136

Q. "And each episode can last from 4 to 72 hours," is what she says, right?
A. Yes.
Q. "Due to the unpredictable nature of these illnesses, I cannot guess about the frequency of episodes."
A. Yes.
Q. Does that say chosen frequency?
A. Yes.
Q. "Chosen frequency to account for all possibilities." Signed Anna Nance, right?
A. Yes.
Q. Ms. Nance filled out this form at your request, right?
A. Yes.
Q. And you submitted it back to Jennifer, right? Jennifer Morfin.
A. Yes.
Q. I will hand you Exhibit 16. On Exhibit 16 on May 3rd, Ms. Morfin emails back to you and says you're approved for intermittent leave up to 31 times per month, right?
A. That is what she says.
Q. Do you dispute that's what happened, that you are now approved to take up to 31 days a month of intermittent leave?
A. That is what her email says.

Page 137

Q. You're agreeing with me, right?
A. I'm agreeing that that is what her email says.
Q. Well, do you think that her email is not true? Do you think that something else is the case other than what's in her email? I don't understand why you're answering the question quite that way.
A. I'm answering the question based on what came after that email.
Q. What came after that email?
A. What came after that email is that she artificially restricted my FMLA leave by applying the physician's estimate that she had previously applied that artificial estimate, which is why the physician changed it.
Q. Right. But here we are May 3rd. On May 3rd you're approved to take up to 31 days per month of FMLA leave, right?
A. Right. So, yes, at this point and since then I have not had a problem with FMLA leave.
Q. Meaning you request it and they approve it, right?
A. I request it and they approve.
Q. Prior to this May 3rd email had you taken time off and had it coded as leave without pay during that year 2024?
A. Yes.
Q. Did GSD retroactively apply the FMLA leave to change all those leave without pay days to FMLA days?

Page 138

A. I would have to go back and look at my Share record to make sure that that all got changed.
Q. Was it your understanding that that's what they were going to do?
A. It is my understanding that that was going to happen, yes.
Q. And you don't know that it did not happen. I mean, as far as you know it happened, right?
A. As far as I know it happened, yes, yes.
Q. When did you use your seven days of donated leave?
A. Once the FMLA was returned back to a standard interpretation and I could actually take it so that it was FMLA leave, because that is the restriction that is imposed on donated leave according to HR, then I was able to go ahead and use that donated leave.
Q. I'm asking you, when did you use that donated leave?
A. Over a period of time. I would have to look at Share.
Q. A day here, a day there?
A. Oh, yeah. It wasn't all at once. I didn't go on vacation, you know.
Q. Are you aware that in your most recent Complaint you have made a claim under the New Mexico Minimal Wage Act?
A. Yes.
Q. And that is related to an incident that occurred in

Page 139

September of 2024, right?
A. On or about that time, yes.
Q. We'll mark this as Exhibit 18. This is a series of emails. Tell me what happened here, what happened on September 5th and 6th?
A. Give me just a moment to review the string, please. So I had a doctor's appointment and I had forgotten to go ahead and email Vanessa about that doctor's appointment to put in that leave ship through the Leave Management System and I think there had been an issue the previous week with my time, which was part of the problem with why I had not put in that leave slip.
Q. I'm sorry, say that again.
A. There had been an issue the previous week with my time reporting related to FMLA absences and such, and I was waiting to hear from Eunice on how I should code that and I didn't hear back from her. And Vanessa and I had a conversation about it and by the time Vanessa had left and by the time -- by the time Vanessa had left, I hadn't heard anything from Eunice, which is what I am conveying to her. I hadn't heard back from Eunice about my time.
Q. You're at the bottom of page --
A. I'm sorry, at the bottom of page 842, yes. The appointment I had was in Rio Rancho at five o'clock, so I had to leave no later than 3:30 on that day, from the office. I

Page 140

had worked an entire day.
Q. 4:19 p.m. on September 5th, right, you see that email. You email Vanessa and asked her if you could flex your time for the next day, right?
A. Yes, yes.
Q. And typically the way it would work is, if you needed to -- if you or anybody in the office needed to adjust your schedule for a day for an appointment or whatever, you would need to get approval from your supervisor first, right?
A. Yes. If we have an appointment, if we have a doctor's appointment or something like that, typically we turn in a leave slip by five o'clock and normally that's fine.
Q. But it needs to be preapproved by your supervisor; is that right?
A. Most circumstances, yes.
Q. When did you make this appointment, this doctor's appointment? Had it been on your calendar for some time?
A. I assume it had been.
Q. In other words, it wasn't an emergency appointment that you just made that day, right?
A. I don't think so. I don't think it was like a toothache or something that I had to -- no, it wasn't an emergency appointment.
Q. And you note that you forgot to put in a leave slip

Page 141

earlier for it, but you let her know about the appointment and sent this email at 4:19 p.m. on Thursday, right?
A. Uh-huh.
Q. Yes?
A. Yes, I'm sorry.
Q. And you were physically in the office this day?
A. I was, yes.
Q. Are you aware that Vanessa had already left the office that day at that point?
A. She had.
Q. And you knew that when you sent the email that she was gone for the day?
A. She normally leaves at 3:30, yes.
Q. And then she was out of the office for a couple of days after that, it looks like, right? Going on to the next email.
A. She was out and had no access to email through 9/9, whenever that was. Monday.
Q. Here on September 11th Vanessa says, "because you did not receive prior approval you'll have to claim leave from 3:45 to 5 p.m," and that's for September 6th, right?
A. Which page are you on?
Q. 842.
A. Oh, yes.
Q. She reminds you -- she says, "if she is out of the

Page 142

office you need to get prior approval from Natalie and if Natalie is unavailable, from Dorothy," right? And that's going straight up the chain of command in your office?
A. That is the chain of command, yes.
Q. Going up to page 841, there's some back and forth here between everybody, but at the top of this page on September 11th, at 2:07 Vanessa says, "you have enough sick leave to cover this, it was a doctor's appointment you can use sick leave." Why are you shaking your head?
A. She was incorrect about that.
Q. You did not have any sick leave?
A. I did not have any sick leave. This was part of the -- when I said something about speaking with Eunice and coding time for the previous week or the previous -- about my time, haven't heard back from Eunice about my time, that was part of that problem that we were trying to fix and that sort of switched away my leave time that we thought -- that she thought that I had that she was seeing in the system. So, no, I did not have sick leave time.
Q. So what hours did you actually work that day?
A. I believe, and I would have to check my Share records to be sure, but I believe I probably worked until 3:30.
Q. Did you get in early that day? Did you go in early that day?

Page 143

A. No.
Q. So you started at 8 a.m.?
A. 8. I would have possibly -- again, I'll have to check Share to be sure. It looks like I probably shortened my lunch to 30 minutes and then left at 3:30, so that would have allowed me -- 4:30, 5, that would have allowed me an hour and a half to get to the doctor's appointment.
Q. So you start your day at 8 a.m., right?
A. Yes.
Q. And instead of an hour for lunch you take a 30-minute lunch?
A. Yes.
Q. So let's say you work from 8 to 12, right, that's four hours?
A. Yes.
Q. And you worked from 12:30 to 3:30.
A. Yes.
Q. That's three hours. That's seven hours.
A. Seven-and-a-half -- 9, 10, 11, 12 -- 1, 2, 3 -- I would have to look at Share. I would have to look at the Share record, that's all I can tell you. You're asking me about something that happened what, a year ago.
Q. I'm asking you about the claim that you are making in this lawsuit, right?
A. Right.

Page 144

Q. So I'm trying to understand what is the basis for this claim.
A. The basis for the claim is that I worked time and didn't get paid for it.
Q. Are we talking about 30 minutes then? Are you saying that you should have been paid for seven hours that day, but you only got six-and-a-half?
A. Again, let me check the Share records and I can give you a good answer on that.
Q. It's your recollection that you got to work at your regular time that day, took a short lunch, and left at 3:30?
A. Got to work at the regular time, took a short lunch, and I left early. And I believe I may have flexed earlier during the week to make up for some of that time that I left early, that generally is what we do when we work flex time. If we know that we're having a doctor's appointment we generally work earlier in the week.
Q. Did you get pre-approval to flex another day to make up for the time you missed on this day?
A. She and I may have discussed that. Vanessa and I may have discussed that. I see on page 840 where I am saying, Vanessa knew I had the doctor's appointment and that we had evidently talked about the snafu from the previous Friday because of the car accident.
Q. You say that Vanessa knew you had the doctor's

Page 145

appointment, but she didn't know that --
A. That was the car accident.
Q. Vanessa didn't know you had a doctor's appointment, right, because she was already gone for the day. She didn't learn about this until she came back next week, right?
A. She knew I had the doctor's appointment on Friday because we -- my husband and I had someone hit us when we were coming home from work the previous week, on Thursday, so somebody hit us in the car and I was off that previous Friday. So that was part of the snafu with the time that I had email been Eunice about where we were trying to get that sorted out. Vanessa knew that I had a doctor's appointment, because I had already scheduled that doctor's appointment for something else and they were going to check me at the time on that doctor's appointment, they were going to check me over for the car accident as well.
Q. So it is your testimony now that you told Vanessa verbally about this doctor's appointment and got approval for it verbally?
A. What I'm saying is, Vanessa knew about it. It's in the email chain.
Q. Well, you say that she knew about it. I don't see anywhere in here where she says that she knew about it ahead of time. Would you turn to page 841. Do you see page 841?
A. Yes.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**
**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782-SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**AFFIDAVIT OF GLORIA QUINTANA**

I, Gloria Quintana, being first on my oath duly sworn, state that the following is true and correct to the best of my knowledge:

1. My name is Gloria Quintana. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am employed by New Mexico General Services Department ("GSD") as a Human Resources Compliance Manager.

3. In July 2025, GSD took steps to retroactively apply FMLA leave to Kimberly Hunt-Brown's timesheets for the period of January to May 2024. As a result, Ms. Hunt-Brown's records for several days in that time period were changed from Leave Without Pay-Authorized to FMLA-unpaid leave.

4. This change had no effect on Ms. Hunt-Brown's pay or benefits because Leave Without Pay-Authorized and FMLA-unpaid are both unpaid leave.

______________________________
Gloria Quintana

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**

**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**

**VANESSA LEBLANC, AND NATALIE MARTINEZ,**

**In their individual and official capacities**

**Defendants.**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Kimberly Hunt-Brown, by and through her counsel of record, Heather Burke with her Response in Opposition to Defendants' Motion for Summary Judgment.

**Defendants' Alleged Material Facts**

1. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. It is both irrelevant and denied.
2. Not material. Dispute – the evidence cited does not prove that Martinez started in Spring 2020, only that she started after Terese Montoya left.
3. Admit, Plaintiff was put on an unofficial performance improvement plan because she was not getting her work duties done as quickly as her comparators who were not taking FMLA leave.

4. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Plaintiff admits that Defendant Martinez took a leave of absence but disputes that this was the only time she was supervised and/or managed by Paulk. [Plaintiff's 3rd Declaration]
5. Admit
6. Not material. Admit, sometimes they were helpful.
7. Not material. Admit.
8. Not material. Admit.
9. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE – Plaintiff is on an informal Performance Improvement Plan. [Ex 1 Vanessa LeBlanc Depo pg 36 ln 19 – pg 38 ln 13] [Plaintiff's 3rd Declaration]
10. DISPUTE Plaintiff was placed on an informal Performance Improvement Plan, and, unlike her coworkers, is required to meet with her supervisor on a weekly basis, unlike her coworkers. [Ex 1 Vanessa LeBlanc Depo pg 36 ln 19 – pg 38 ln 13] [Plaintiff's 3rd Declaration]
11. Dispute. Plaintiff is also suing Eunice Moya, NMGSD, and Jennifer Morfin.
12. DISPUTE. Plaintiff has been marked AWOL and Plaintiff has been denied promotion multiple times, and has lost pay as a result of Defendants' actions. [Plaintiff's 3rd Declaration]
13. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff worked

with both Kelly Howley and her supervisor, Eunice Moya, on her recertification. [Plaintiff's 3rd Declaration] [Doc. 99 Ex 4]

14. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff's FMLA certification was unlawfully rejected and delayed when Defendant Moya and Kelly improperly required a specific medical diagnosis on the certification, which is unlawful. Even after Plaintiff resubmitted her certification, it was again unlawfully denied. [Doc. 99 Ex 4] This was completely the fault of GSD, and they admit that they shouldn't have denied her certification. [Doc. 99 Ex 3] [Doc. 99 Ex 18]

15. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff was told she could no longer "invoke" FMLA and had to use LWOP. Moya directed Howley to change her time from FMLA to unprotected. Plaintiff was marked LWOP and AWOL and denied the use of her paid leave on March 1, 2023. These codes were not entered by Plaintiff but by Defendant Paulk, who testified it was on advice of HR. [Plaintiff's 3rd Declaration] [Doc 99 Ex 4 pgs 2 and 3]

16. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff retained a lawyer, who sent a letter on March 2 after Plaintiff's certification had been rejected several times. [Plaintiff's 3rd Declaration] After continuing to unlawfully deny Plaintiff's leave Defendants finally admitted that Plaintiff's certification had been correct since January 17. [Doc. 99 Ex 18] Without asking Plaintiff, they retroactively

designated her leave, in violation of the law since Plaintiff was harmed by their failure to designate her leave. 29 C.F.R. § 825.301(d)

17. DISPUTE. Plaintiff had paid leave available for her March 1 absence, but was marked LWOP and AWOL because her husband gave notice. Even after retroactive designation, she was prevented from using paid leave on several dates. [Ex 2] Plaintiff was prejudiced by Defendants violations. [Plaintiff's 3rd Declaration]

18. Admit

19. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Defendants do not cite to evidence in support of this fact. Plaintiff cannot testify as to Defendant's belief. Defendants arbitrarily began using Plaintiff's provider's estimate as a strict limitation without any legal basis and when they had never done so before, including in February 2024. Plaintiff was DENIED FMLA leave for her qualifying absences, and denied the use of available paid leave. [Doc. 99 Ex 22]

20. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Defendant Morfin told Plaintiff she had to "submit a new FMLA application" for more leave. [Doc. 99 Ex. 20 pg 2] Defendant Morfin's email stating "polite reminder" was the first time Plaintiff was told she could take no more than 4 FMLA absences in a month. [Plaintiff's 3rd Declaration]

21. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. At the end of April, after Plaintiff had been able to see her provider to get a recertification, Defendants

finally stopped unlawfully denying her FMLA leave. DISPUTE Plaintiff was forced to take LWOP and denied the use of her donated paid leave while simultaneously being denied FMLA. [Doc. 99 Ex 21] [Plaintiff's 3rd Declaration]

22. DISPUTE. FMLA can be paid or unpaid, depending on the substitution of other available leave, used in conjunction with FMLA. [Ex 3 FMLA Policy] LWOP, as the name suggests, is always unpaid.
23. Not material, admit.
24. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff was approved on a "trial basis" for a period between February 2 and August, when her need for accommodation would be reevaluated. She did not apply for another full time telework accommodation. [Plaintiff's 3rd Declaration]
25. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Not material and contains factual information not known to Plaintiff and not supported otherwise. Plaintiff has no knowledge of other people's accommodations, and yet they cite to her testimony as though she does.
26. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff was granted an accommodation to telework, not an "extension." [Plaintiff's 3rd Declaration] This is false and the cited testimony doesn't support it. Plaintiff never submitted a new request to continue teleworking for COVID sensitivity. [Plaintiff's 3rd Declaration]

27. DISPUTE. Plaintiff notified Defendant Moya via email on July 28, 2023 that she was seeking a new part time accommodation for her migraines. Defendants denied the accommodation the interactive process meeting was supposedly for on July 28, before the meeting took place on July 31. [Ex 4 ADA meeting email]
28. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff claims that she should be reasonably accommodated by being allowed to telework for a period of the day after her migraine resolves, but the side effects of her medication prevent her from safely operating a motor vehicle. [Plaintiff's 3rd Declaration]
29. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit
30. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit that Plaintiff submitted ADA paperwork seeking reasonable accommodation for her migraines on August 4, 2023. DISPUTE that the interactive process meeting was about her migraine accommodation. [Plaintiff's 3rd Declaration]
31. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Defendant Moya called Plaintiff to tell her that her accommodation was being denied and a vague suggestion about darkening Plaintiff's office lights, which doesn't help Plaintiff perform her work duties, and isn't responsive to her actual request. [Plaintiff's 3rd Declaration]

32. DISPUTE. Defendants have refused to produce evidence showing how many employees are teleworking. Defendant Moya lied in her own deposition when she said she didn't know anyone teleworking. [Doc. 100 Ex 1 pg 80] She was allowed to telework as an accommodation while recovering from knee surgery but did not disclose this material fact in her deposition. [Doc 100 Ex 6 pg 200-201] Defendant LeBlanc has been allowed to telework for child care issues. [Doc. 100 Ex 9 pg 97] Jose Puentes, former Risk Management attorney worked from home but was required to characterize it as "off site training" or "Remote Office Work Site" [Ex 5 Jose Puentes Affidavit]

33. DISPUTE – Defendants have never communicated that working in person was an essential function of Plaintiff's position, or all GSD positions, and they allow some employees to telework, both as an accommodation and for other reasons. [Plaintiff's 3rd Declaration] [Doc 100 Ex 6 pg 200-201] [Doc. 100 Ex 9 pg 97] [Ex 5 Jose Puentes Affidavit]

34. DISPUTE – The exhibit being discussed in Defendants' citation was the denial of full time telework accommodation which Plaintiff did not seek. It is not related to her request to telework occasionally, and that denial did not include any communication about working in Santa Fe. Plaintiff worked remotely both for Covid and as an accommodation for over 3 years she worked for Defendants. Defendants do not include any hard evidence of any "requirement" for Plaintiff to work only in Santa Fe. [Plaintiff's 3rd Declaration]

35. DISPUTE. This is pretextual and evidence of shifting explanations. Defendant employees worked for years from home, and some continue to be allowed to telework. There is no extrinsic evidence of any concern about supervision and others have

worked from home with no issue. [Doc 100 Ex 6 pg 200-201] [Doc. 100 Ex 9 pg 97] [Ex 5 Jose Puentes Affidavit] [Plaintiff's 3rd Declaration]

36. Admit. Plaintiff worked for 3 years in her home office with no issue.
37. Admit but not material or relevant to GSD's duty to accommodate its disabled employees.
38. DISPUTE - it does not specify physically in person
39. This fact is improperly compound, includes multiple facts, is impossible to properly answer and in violation of D.N.M.LR.56.1. DISPUTE none of the specify that these requirements are physically in person in a specific location.
40. Admit. Plaintiff is under no obligation to disclose her disability when applying or interviewing for a new position, and it's legally problematic that Defendants ask potential employees about their need for accommodations before offering them a job as it might encourage an applicant to disclose a disability pre-offer.
41. Admit
42. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit she applied.
43. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE – Plaintiff is extremely familiar with the procurement process. [Plaintiff's 3rd Declaration]
44. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit.

45. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE Plaintiff has a higher education than Defendant LeBlanc. [Plaintiff's 3rd Declaration]
46. Admit
47. This fact is improperly compound, includes multiple facts is impossible to properly answer and in violation of D.N.M.LR.56.1 Admit
48. This fact is improperly compound, includes multiple facts is impossible to properly answer and in violation of D.N.M.LR.56.1 Admit
49. Admit
50. This fact is improperly compound, includes multiple facts, is impossible to properly answer and in violation of D.N.M.LR.56.1 This is supported by a self-serving affidavit.
51. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Dispute – Mr. Fisher had no state procurement experience at all. [Plaintiff's 3rd Declaration]
52. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE Amber Sanchez did not meet the minimum qualifications for the position, which required a high school diploma and 8 years of experience with government contracts/purchasing. In her interview, she stated she had 6 years of procurement experience. Amber Sanchez interview panel notes. [Ex 6] [Ex 7] [Ex 8]
53. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Francine Martinez was Amber Sanchez's reference, and therefore had a conflict of interest. [Sanchez app]

DISPUTE Plaintiff was actively prevented from getting IT procurement experience while Francine Martinez gave Amber Sanchez IT procurements to work on, even though she was not even a buyer. [Ex 9 ] [Ex 10]

54. Not material -Admit
55. DISPUTE. This supposed fact is not only not material, but cites to inadmissible evidence purporting to know what was in Plaintiff's mind. Plaintiff applied for each position because she was interested in them. [Plaintiff's 3rd Declaration]
56. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE – The interviewers knew that Plaintiff had been granted telework accommodation after they returned to the office in 2023. [Plaintiff's 3rd Declaration]
57. DISPUTE – Defendants chose two less qualified, younger candidates over Plaintiff and other older applicants.
58. DISPUTE – Defendants have repeatedly hired younger candidates for their IT Procurement positions, passing over older, more educated and experienced applicants.
59. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material. DISPUTE Plaintiff discussed flexing her time with her manager in a weekly meeting, and believed she had permission. [Defendants Exhibit A pg 139 ln 17-21] Admit that she forgot to put in the leave slip until the day before.
60. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material.

61. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material. DISPUTE, Defendants misrepresented FLSA requirements to Plaintiff which do not exist, telling her that she FLSA prohibits her from working after a certain time each day or else they would have to pay her OT.

62. Admit that Defendants told Plaintiff that they would not pay her for the time she had worked for this reason.

63. Admit.

**Plaintiff's Additional Material Facts**

Plaintiff incorporates by reference herein her undisputed material facts from her two Motions for Partial Summary Judgment [Docs 99 and 100]

A. Defendants admitted that they made a mistake in not timely certifying Plaintiff's FMLA in 2023. [Doc. 99 Ex 18] [Doc. 99 Ex 16 pg 112]

B. Defendants admitted that they mistakenly did not allow at least 15 days before denying Plaintiff's FMLA leave in 2024. [Doc. 99 Ex 16 pg 192]

C. "Whether a diagnosis is included in the certification form is left to the discretion of the health care provider and an employer may not reject a complete and sufficient certification because it lacks a diagnosis." [Doc. 99 Ex 3]

D. Plaintiff gave notice of her need for FMLA leave on March 1 2023 at 8:03am. [Doc 99 Ex 6 March 1 texts pg 1]

E. Defendants marked Plaintiff AWOL and denied her paid leave on March 1. [Doc. 99 Ex 7 designated AWOL]

F. GSD Employees will be subject to "disciplinary action up to and including dismissal" for being AWOL. [ Doc. 99 Ex 8 Attendance and Leave Policy 6.5.7]

G. GSD Policy states "Any employee with a poor attendance record, excessive tardiness, numerous and frequent short-term absences, a history of one-, two- and three-day illnesses, or frequent emergencies which occur on the day before or after scheduled or approved days off or which precede or follow holidays, use of leave immediately upon accrual, thus maintaining zero or near-zero leave balances, may be subject to disciplinary action, up to and including dismissal." [Doc. 99 Ex 8. Attendance and Leave 6.1.5]

H. Plaintiff was denied FMLA leave on 15 different days from January through March 2023. [Ex 2]

I. Plaintiff was denied FMLA leave on 8 different days in March and April 2024. [Doc. 99 Ex 21]

J. Plaintiff had to retain an attorney who had to send several letters to Defendants before Defendants finally admitted that Plaintiff's certification had been complete when she first submitted it in January 2023, and certified her FMLA on March 30, 2023. [Plaintiff's 3rd Declaration]

K. After being marked AWOL Plaintiff was afraid to try to take FMLA leave and did not take leave she otherwise would have taken. [Plaintiff's 3rd Declaration]

L. Plaintiff was prejudiced by Defendants' interference in 2023. [Plaintiff's 3rd Declaration]

M. Plaintiff was working from home during all of the FMLA interference in 2023, and was not found to be not in attendance or to not be reporting to work, outside of her denied FMLA covered absences. [Plaintiff's 3rd Declaration]

N. Eunice Moya, HR Director, oversaw Kelly Howley and Defendant Morfin's work and communications with Plaintiff, and made the ultimate decisions in all of Plaintiff's FMLA allegations. [Plaintiff's 3rd Declaration]

O. Plaintiff's mother was dying in hospice in March 2024. [Plaintiff's 3rd Declaration]

P. Defendants' response to Plaintiff's Interrogatory #8 states "GSD states that since August 2023, no employee has been authorized for regular telework" [Ex 16]

Q. Jose Puentes was employed at GSD as an attorney in the Risk Management Division. He worked from home regularly throughout 2023 and 2024, but was required to characterize it as "off site training" or "Remote Office Work Site" [Jose Puentes Affidavit]

R. Both the CWA and the AFSCME collective bargaining agreements require Defendants to provide alternative worksite accommodations even for a temporary medical condition.

S. Defendant Moya testified that there was no individualized assessment when considering Plaintiff's request for accommodation to telework on an occasional basis. [Doc 100 Ex 1 pg 90 ln 1-17]

T. GSD's non-mandatory telework policy does not purport to modify the essential functions of all GSD positions and did not apply to requests for reasonable accommodation. [Doc. 100 Ex 7]

U. Plaintiff applied multiple times for open IT procurement positions because she was qualified and interested in them [Plaintiff's 3rd Declaration]

V. Plaintiff was actively prevented from gaining IT procurement experience, and was honest about the fact that she did not have direct IT procurement experience in her interviews. [Plaintiff's 3rd Declaration] [Ex 9]

W. Defendant Martinez gave instructions that Plaintiff was not allowed to work on any IT procurements, and was prevented from gaining experience in IT procurements. [Ex 9]

X. Andric Fisher had no degree, no state procurement experience, was not a NM resident, and was younger than the other applicants. [Ex 11 Fisher app]

Y. NM State is required to give NM residents preference in hiring for state positions. [Ex 12 NMAC 1.7.5.11] [NMSA 1978 § 10-9-13(c)]

Z. IT Procurement Position # 2972 and 49191 both required a minimum of a Bachelor's Degree and 4 years of experience with government contracts with an emphasis in IT.

AA. Tami Concha applied for position #2972, was interviewed, and was not selected. She is 53 or 54. [Plaintiff's 3rd Declaration]

BB. James Ortega applied for Position 2972 and 49191 and was interviewed for both. [Ex 13 and 14]

CC. His listed work experience begins at Xerox in 1990, making it substantially likely that he is over 50 years of age. [Ex 14 GSD009520]

DD. James Ortega had an associates degree and had worked in State procurement since 2012, giving him 12 years of direct experience. [Ex 14 GSD009516-21]

EE. One of his previous titles was "Purchasing Supervisor IT Procurement" [Ex 14 GSD009518]

FF. In addition to Plaintiff, two other SPD employees were also interviewed for #49191: James Ortega and Amber Sanchez.

GG. Plaintiff was 62 at the time of the application and interview.

HH. Ms. Sanchez was approximately 37 when she applied for, was interviewed and hired for IT Procurement Specialist II #49191

II. Ms. Sanchez has a high school diploma. [Ex 15]

JJ. Plaintiff has an MBA and had 7 years of experience. [Plaintiff's 3rd Declaration]

KK. In the substitution table for position #49191, if an applicant had a Master's degree, they only needed 2 years' experience. If an applicant had an associate's degree, they needed 6 years of experience. If an applicant had a high school diploma, they would need 8 years of experience to meet the minimum qualifications. [Ex 17]

LL. Ms. Sanchez had worked for almost 6 years at state purchasing, 2 years as a buyer and 4 years as a compliance officer.

MM. Ms. Sanchez misrepresented that she met the minimum qualifications for the 49191 position and had 7 to nine years with the ITB/RFP Process, over 10 years of experience with the NM Procurement Code and processing IT contracts. [Ex 15]

NN. Prior to her state career, Ms. Sanchez worked as a branch manager for a private personal loan company called Regional Finance. [Ex 15]

OO. The Branch Manager Job description at Regional Finance doesn't include any state procurement job duties, work with the state procurement code, or IT contract procurements. It is a private corporation. [Ex 18]

PP. Francine Martinez was one of 3 references for Amber Sanchez on the 49191 application and also was on her hiring panel which creates an appearance of impropriety and bias. [Ex 15]

QQ. Plaintiff worked as a compliance officer at State Purchasing and did not claim all the IT procurement experience that Ms. Sanchez claimed to have gotten. [Plaintiff's 3rd Declaration]

RR. Compliance officers are not buyers, and do not do procurements as part of their duties. [Plaintiff's 3rd Declaration]

SS. Although Ms. Sanchez was a compliance officer and not a buyer, Francine Martinez assigned her work on an IT procurement, which gave her direct experience in IT procurements. [Ex 10]

TT. Francine Martinez decided that Ms. Sanchez should be hired for the #49191 position over Plaintiff. [Defendants' Ex. D]

UU. When hired as an IT Procurement Specialist, she went from $68,319.95 to $97,952.40 a year, which is a 43% raise, requiring special approval from SPO for anything over 15%. [Ex 19]

VV. SPO did not compare Ms. Sanchez's qualifications against the other applicants when approving [Ex 20]

WW. Plaintiff earned $175.90 less during the pay period from 2/18/23-03/03/23 than the previous pay period because of having to take an unexpected unpaid day off. [Doc 99 Ex 25]

## I. FMLA Interference

A plaintiff on an FMLA interference claim must establish the following: (1) that he was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights. *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014)

*Gambro v. Campbell Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007), citing *Jones v. Denver Pub. Schs*., 437 F.3d 1315, 1318 (10th Cir. 2005). The employer bears the burden of proof on the issue of whether the employer's actions were related to the exercise or attempted exercise of the employee's FMLA rights where the employee has shown some adverse action interfering with the right to use FMLA leave. *Dalpaz*, 760 F.3d at 1132; *Gambro*, 478 F.3d at 1287; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

Where an employer interferes with the employee's right to FMLA leave, the deprivation constitutes a violation of the FMLA regardless of employer intent. *Brown v. ScriptPro, Inc.*, 700F.3d 1222, 1226-27 (10th Cir. 2012); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955,960 (10th Cir. 2002). Under an interference theory, the employee must simply demonstrate an entitlement to the disputed leave. *Smith*, 298 F.3d at 960. The McDonnell-Douglas framework is not applicable to FMLA interference claims. *ScriptPro, Inc*., 700 F.3d at 1226-27. Consequently, a pretext analysis is not necessary in determining FMLA interference claims. Id. at 1228.

As an initial matter, Defendants rely heavily on *Rodriguez-Ortega v. Rich, et al*, 1:21-cv-1129 JCH/KK (D.N.M.)(September 26, 2024). That case is one of undersigned counsel's other cases. Problematically, the FMLA decisions in that case are currently pending appeal in the 10th Circuit[1]. In that case, the Court misapprehended the fact that Defendants had actual notice that Plaintiff was incapacitated in the hospital by his FMLA qualifying conditions on the very first day he was absent and they marked him AWOL, and that Plaintiff was protected by the FMLA even if he hadn't been able to give notice right away. Since the case is currently under review and may be reversed, this Court should exercise caution in relying upon it. Even notwithstanding

[1] Oral argument has just been set for November 20, 2025

the potential problems with citation to that case, it just doesn't apply here. In *Rodriguez-Ortega*, there was a question of whether the notice of absence was timely and/or whether the Plaintiff in that case had to comply with employer notice requirements even when he was hospitalized for emergency treatment.

Here, the entire issue in 2023 is that Defendants were unlawfully rejecting Plaintiff's FMLA certification, and denying her the right to FMLA protected leave. In 2024, they began to artificially limit the number of times Plaintiff was allowed to take FMLA, and immediately began denying leave in excess of that number. On both occasions she was very literally told that she could not invoke FMLA for the leave in question. Instead, she was forced to take LWOP, even when she had paid leave available. LWOP is at the discretion of her managers, who could, and did, deny her that approved unpaid leave and marked her AWOL instead.

There is no dispute that Plaintiff timely gave notice of her need for leave for every absence, nor was Plaintiff hospitalized at any point. Summary Judgment should be granted to Plaintiff on her FMLA claims as there is no legitimate dispute that Defendants refused to authorize FMLA leave because of their own ignorance of the certification process. Defendants admit that they made mistakes with Plaintiff's FMLA administration, which interfered with Plaintiff's FMLA rights, and she was materially prejudiced by that interference costing her pay and resulting in the expense of retaining legal counsel.

Specifically on March 1, 2023, she sent the initial text message at 8:03am which is in compliance with employer notice requirements. When it was clear she would not be in at all and was incapacitated, her husband gave notice. The FMLA explicitly allows indirect notice. Defendants were interfering with Plaintiff's FMLA and refused to allow her to designate the absence as FMLA protected. They also refused to let her used paid leave that day, forcing her to

take LWOP and marking AWOL. Being forced to take an unpaid absence instead of a paid absence is an adverse action. Being marked AWOL, which Defendants own policy stated will be subject to additional discipline, is also an adverse action. Plaintiff had 26.83 hours of annual leave available to her that day. She had 16 hours of personal leave available to her that day. She had 3.87 hours of sick time. But she was forced to take LWOP and AWOL instead of using her paid leave.

Defendants contend that the "undisputed facts" are that Plaintiff submitted her renewal and GSD HR told her the documents needed more information. But what Defendants fail to mention to the Court is that they were wrong. The documents were not missing information, and Defendants were interfering with Plaintiff's FMLA by imposing unlawful and imaginary additional requirements on her certifications. Plaintiff had to take time off of work to get a 2nd certification, and likely pay another copay, to get another certification that she never needed. Defendants have admitted that they made a mistake in not immediately recertifying Plaintiff's leave in 2023. It's disingenuous for them to try to argue now that they did nothing wrong.

As they admit, it took them until the end of March 2023, to finally certify Plaintiff's 2023 FMLA year. That's 2.5 months after Plaintiff submitted her application. Defendants appear to argue that Plaintiff can't meet the second element required for an interference claim, but this is just patently false. "In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or **denied initial permission to take leave**." *Campbell v. Gambro Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007)(emphasis added). There is absolutely no legitimate dispute that Plaintiff was repeatedly denied initial permission to take FMLA leave. She was explicitly told that she couldn't "invoke" FMLA leave because her

FMLA year expired in December, while Defendants spent months unlawfully rejecting her medical certification.

There can be no dispute that Plaintiff being denied her right to take FMLA protected leave is related to the exercise of her FMLA rights. There can also be no dispute that being marked AWOL and denied the use of available paid leave was related to the exercise of Plaintiff's FMLA rights because Defendants eventually retroactively designated that day as unpaid FMLA, still denying Plaintiff paid leave for that day.

In 2024, Defendants interference was even worse, and they have admitted that they messed up. They were already on notice to be careful with Plaintiff's FMLA because she was already suing them in federal court. But that didn't seem to encourage them to comply with the law at all. First, Defendants incorrectly applied their own policy and refused to grant Plaintiff FMLA leave on January 26, 2024, unlawfully claiming that the provider's estimated dates controlled when Plaintiff's FMLA year began, rather than it beginning on the first date she took protected leave. But then, a month later, they arbitrarily decided that Plaintiff's medical provider's estimate was a guarantee and represented a hard limitation of Plaintiff's right to leave. Plaintiff's provider had used the same estimate in past years, and it had never been enforced as a limitation. In fact, Plaintiff took FMLA leave 5 times in February 2024, and Defendants didn't say anything about it.

But suddenly, on March 11, 2024, Defendants Moya and Morfin told Plaintiff she couldn't take more than 4 days each month. Defendant Morfin's email states that Plaintiff would have to "reapply" for FMLA, which is not accurate. But even interpreting that as a request for recertification, Defendants must allow at least 15 days for Plaintiff to obtain a recertification if practicable. If, despite Plaintiff's good faith attempts, she cannot obtain the recertification in 15

days, Defendants must give her longer. Yet, Defendants began denying Plaintiff FMLA leave only 7 days after arguably asking for recertification. Even after Plaintiff gave them notice that she couldn't get an appointment with her provider until the end of April, Defendants continued to deny her leave. This constituted illegal interference with Plaintiff's federal rights.

If that wasn't bad enough, they also invented the requirement that Plaintiff couldn't use donated paid leave she had available UNLESS she was using FMLA for that absence. So Defendants not only denied Plaintiff her federally protected leave, but they punished her for taking leave at all by forcing those absences to be unpaid. And this was all while Plaintiff's mother was actively dying in hospice, a fact known to Defendants. After her mother passed at the end of March/early April, Plaintiff was granted a week of unpaid bereavement leave. Yet when she returned, Defendants went right back to denying her FMLA leave and refusing to let her use donated leave. Like in 2023, Plaintiff was very literally denied permission for FMLA leave. She was discouraged from taking more than 4 FMLA instances a month by having to take unpaid time for those absences. It is patently false that Defendants claim that Plaintiff has lost no pay.

The only similarity between *Rodriguez-Ortega* and this case is the fact that neither GSD nor DOH requires or provides any training for their HR employees regarding how to administer the FMLA, and both HR departments just make up rules and requirements as they go. As argued in her own MSJ, Defendants clearly interfered with Plaintiff's FMLA and it is appropriate to grant summary judgment in Plaintiff's favor on this claim. Defendants repeatedly denied Plaintiff FMLA leave, and forced her to take unpaid leave when she otherwise had paid leave available to her. She had a right to 480 hours of protected FMLA leave, Defendants repeatedly

denied that leave and prohibited her use of available paid leave, and Defendants unlawful denial of her leave was indisputably related to the fact she was trying to take FMLA leave.

## II. Telework is a Reasonable Accommodation for Plaintiff's position

In many instances, teleworking is often a reasonable accommodation. See *Ali v. Regan*, 467 U.S. App. D.C. 539, 554, 111 F.4th 1264, 1279 (2024) (remote work may well be a reasonable accommodation in many cases) This turns on whether the employee can perform the essential functions with that accommodation. *Id. at* 1280. ("[L]ike many accommodation judgments, the reasonableness of a telework accommodation turns on whether it will enable a specific employee 'to perform the essential functions of [her] position' in a specific workplace.]

Notably, Defendants heading describes their misapprehension of their legal duty, and the law surrounding it. They say "Plaintiff is not entitled to work from home." This case is not about entitlement, it's about reasonable accommodation. Defendants have a clear duty to accommodate their disabled employees. Plaintiff IS entitled to reasonable accommodation of her disability, and the fact here is that Defendants not only refused to allow her to telework on an occasional basis, but they have continued to refuse to even work towards finding any other potential accommodations.

The question is ONLY whether telework is reasonable to assist Plaintiff in the performance of her job duties. The answer is yes. The fact that Defendants frame it as an issue of entitlement suggests that they view Plaintiff's request as undeserved and a benefit far above her lowly position. This is highly problematic.

But Defendants cannot, and do not, argue that Plaintiff's individual job requires in person work. Instead, without analysis, they claim that every single position at GSD must be done in person only, and they attempt to deceive Plaintiff and this Court by claiming that no one ever teleworks. There is significant evidence that that is not true, as two of the named Defendants have themselves been allowed to telework. Critically, Defendants have refused to produce records showing how many of their employees are working from remote locations such as their homes. However, the number of employees who have been found to be teleworking contrary to Defendants' claims that no one does, has continued to grow. Interestingly, even while employees have admitted that they have worked from home they have recorded their time as either normal worked time instead of coding it as telework, and/or calendared it vaguely as remote offsite work. This suggests that Defendants are trying to obscure who is teleworking, where they are working from, and how often they are working remotely.

Defendants appear to believe that they can unilaterally prohibit telework as an accommodation based on their (newly expressed) decision that everyone must work in person. This is completely contrary to the law, and their own policy, which promises to evaluate requests for accommodation on a case by case basis. They cannot do that if they insist on refusing to even consider a certain accommodation, not because it is an undue burden, but simply because they believe they can just not allow it. While certain positions may legitimately not be able to telework, Plaintiff's is not one of them.

**A. <u>100% in person work is not an essential function of Plaintiff's position.</u>**

The Tenth Circuit has held "Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job." *Mason v. Avaya Communs., Inc*., 357 F.3d 1114, 1119 (10th Cir. 2004)(quoting 29 C.F.R. § 1630.2(n)(3)).

While the employer's say so is one of the elements, it is not the only element and can be disproven. "To be sure, physical presence in the office does not become an essential function of Brown's job simply because the Agency says so. For instance, Brown could show that the Agency's view was not 'job-related, uniformly enforced, [or] consistent with business necessity.'" *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021)(quoting *Mason*)

Here, Defendants are not arguing that Plaintiff's specific job has the essential function of in person attendance. They are, instead, arguing that they have suddenly decided that ALL positions at GSD have a non-modifiable in person requirement and that as a result they have no duty to offer telework to any employee for any reason. However, Defendants cannot possibly meet the required elements to prove that all GSD employee positions have the non-modifiable essential function of physical in person work. They also cannot meet them for Plaintiff's specific position.

The Court should already take the first element with a grain of salt if it is considered at all, as these shifting explanations are evidence of pretext. Plaintiff had been teleworking full

time for over 3 years when Defendants denied her request to telework on an occasional and intermittent basis. The first two years the teleworking was in response to the Covid pandemic, but beginning in January 2023, Plaintiff was granted a reasonable accommodation to telework full time due to being high risk for Covid. However, at the end of July 2023, Defendants decided that Plaintiff's accommodation was being cancelled and she would have to return to the office because of the recission of the non-mandatory telework policy.

The record shows that their <u>entire reason</u> for denying accommodation was that they no longer had a non-mandatory telework policy and therefore were unable to grant the accommodation, not that Plaintiff's job specifically required her to work in person and that it could not be performed remotely for any amount of time at all. There is nothing anywhere in Plaintiff's personnel file or her job description that identifies that physical attendance as an essential function of her specific job. As discussed herein, there are numerous inconsistencies about this claim and Defendants cannot show it is job-related, uniformly enforced, [or] consistent with business necessity. In fact, the clear record shows that it's not uniformly enforced and both disabled and non-disabled employees are allowed to telework, even if they record the time as something other than telework. Defendants' claim that no one teleworks and that all GSD employees have the same essential function of in person attendance is simply not true. The fact that Defendants are arguing that ALL GSD employees have that same essential function demonstrates that there is no nexus between the individual job requirements or the business needs and what each job's duties actually are. Defendants simply want to use this argument to escape their legal duty to accommodate their disabled employees.

2) As far as the second element, the job posting for Plaintiff's current position stated that the conditions of her employment are "Working Conditions for individual positions in this

classification will vary based on each agency's utilization, essential functions, and the recruitment needs at the time a vacancy is posted. **All requirements are subject to possible modification to reasonably accommodate individuals with disabilities.**"(emphasis added) Even IF Defendants could show that working in person was an essential function, they committed in writing to make ALL requirements, including all essential functions, subject to possible modification as a reasonable accommodation when they hired Plaintiff for this position. They cannot now argue that working in person is somehow sacrosanct and impossible to modify. In addition, there is no mention anywhere in Plaintiff's job description of working in person in Santa Fe being an essential function, nor is there any record of this explicitly being communicated to her as a reason for denying her intermittent accommodation.

3) Working in person is not really a "function" of Plaintiff's job. Plaintiff is not public facing and does not greet the public in her office. Plaintiff does not meet with clients in person, and they do not come to her office, and there is no work she performs that can only be performed in her Santa Fe office. Plaintiff is not asking to telework full time. She will continue to come to work in person most of the time even when she is granted reasonable accommodation. Defendants' failure to accommodate Plaintiff actively prevents her from performing ANY functions of her position as she is forced to be absent from work using FMLA leave when she could otherwise work.

4) There are no consequences of not requiring Plaintiff to work in person 100% of the time. There are no critical functions of Plaintiff's position that she performs as a direct result of being in person. Even when she's in the office, her meetings with her supervisor are done remotely through Teams. But there are, and have been, consequences from failing to accommodate her. While she is not being accommodated, Plaintiff is forced to be absent from

work and her work does not get finished on time. It is much better for Defendants and the public if Plaintiff is allowed to work as much as possible so that agency needs are met as efficiently as possible. Defendants testified that there is a big shortage of CPOs in the State of New Mexico, so they should be doing what they can to retain Plaintiff, and to enable her to work as much as she is able, instead of forcing her to take leave when she could otherwise work.

5) Plaintiff herself teleworked after the Covid pandemic as a reasonable accommodation. She was granted full time telework as an accommodation on a "trial" basis after everyone else returned to work and was not part of the non-mandatory telework policy which had already been rescinded. She was granted this accommodation because her disabilities placed her at higher risk, but never in that accommodations process did Defendants express any concern or otherwise communicate any belief that Plaintiff's job required in person work as an essential function. While teleworking during Covid may not be evidence of the ability for a position to be performed remotely, doing so <u>after</u> the Covid emergency passed likely is. It demonstrates that all of Plaintiff's job duties can be performed remotely on a full-time basis, even while others are working in office, and that Defendants can, and have, accommodated employees including Plaintiff via telework. And, Defendant Paulk testified to the fact that all of Plaintiff's job duties can be performed remotely.

**<u>Job-related, uniformly enforced and consistent with business necessity</u>**

In *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021), the Court deferred to the employer's judgment about a position requiring physical presence as an essential function because Plaintiff in that case could not show that it was not. In contrast, here, Defendants are claiming that all positions at GSD require physical presence. While some positions, like janitorial staff,

undeniably require in person work as an essential function of that position. But others, such as Plaintiff's position, do not require in person work to be able to perform the essential functions of that position. Plaintiff can show that requiring her physical presence 100% of the time is not job related, that they do not uniformly enforce that requirement and that it's not consistent with business necessity to require her to be in person 100% of the time. Defendants don't even require their other employees to be in the office 5 days a week or at the same time due to their Alternate Work Schedule policy. Some employees work only 4 days a week, so they aren't doing their job from anywhere one day a week, and are completely absent.

Most importantly, Defendant Moya lied to cover up her own teleworking accommodation, and

Plaintiff has obtained testimony from Defendants regarding other employees being allowed to telework, such as Defendant LeBlanc has been allowed to telework when she has child care issues. Defendants have even paid other SPD employees' overtime in the past year or so to telework from home to catch up on work assignments, including other Purchasing Agents, but singled Plaintiff out and didn't allow her to earn any overtime when she requested to do so. Defendant Paulk testified under oath that Plaintiff could perform all of her job duties from home. Perhaps most importantly, Defendant Moya lied in her deposition claiming she didn't know anyone who had teleworked when she herself had been granted the reasonable accommodation of telework while recovering from knee surgery only a few months earlier. She intentionally tried to obstruct evidence of the fact that Defendants DO allow telework even while she keeps testifying that they don't. Another litigant who recently filed a lawsuit against GSD alleging civil rights violations during his employment states in his complaint that he worked from home after November 2023. Defendants claim that no one is allowed to telework is simply not true, and it's likely there are many other GSD who have or do telework.

Plaintiff is not seeking a full time telework accommodation, only asking to work from home a few hours each month. Even if there were aspects of her job that must be performed physically in the office, she could easily perform those during the bulk of the time she was physically in the office. Plaintiff knows of nothing that requires her physical presence in the Santa Fe office to perform, and certainly not 100% of the time. There simply is no business necessity attached to refusing to allow Plaintiff to telework as needed on an occasional basis.

## III. Plaintiff's Age Discrimination Claims

A failure to promote claim is extremely fact intensive and therefore not well suited for summary judgment. What is clear from the evidence is that on two separate occasions, Defendants promoted the younger candidate over older candidates with more education and/or experience, even when state law required them to give state residents preference, or the candidate didn't even legitimately meet the minimum qualifications. For job #2975, Defendants hired Andric Fisher, an external candidate with absolutely no NM state employment or procurement experience, when he wasn't a NM resident, over several older internal candidates with more education and/or state procurement experience and who were long time residents. They ended up terminating him for sleeping on the job because he was not a good fit.

In Job # 49191, Defendants interviewed 3 internal candidates: One approximately 37 years old with only a high school education and less than 6 years' experience, one over 50 with an associate's degree and about 12 years state procurement experience, and Plaintiff, who was 62, holds an MBA and had 7 years of state procurement experience. Ms. Sanchez did not have the minimum years of experience in government contracts to substitute for the minimum requirements for the position, and stated in her interview that she had 6 years of procurement

experience. The minimum she needed was 8. Defendant GSD testified that they counted her years working at a private personal loan company, even though a private loan company does not work with the state procurement code at all, and therefore Ms. Sanchez could not have obtained the required years of experience there. The record also shows that Ms. Sanchez's manager, who was also her reference and one of the three hiring panel members, assigned her IT procurement tasks in her unrelated compliance position, thereby giving her an unfair advantage. Conversely, the record shows that Plaintiff's managers expressly forbade her from being assigned any IT procurements and gaining any IT procurement experience.

Hiring Ms. Sanchez also cost taxpayers exponentially more than if one of the other two candidates had been promoted. Hiring Ms. Sanchez to the IT Procurement position was such a huge promotion that Defendants had to get special permission from SPO to hire/pay Ms. Sanchez such a 43% increase over her previous compensation, or $29, 632.45 more than her previous position[2]. Ms. Sanchez was not objectively better qualified than either of the other two candidates, and in fact her education, skills and experience were far inferior to both. Defendants intentionally promoted the younger, less qualified candidate over Plaintiff.

## IV. <u>Plaintiff's Unpaid Wage Claim</u>

Defendants take issue with the calculation of unpaid time, but they do not appear to take any issue with Plaintiff's argument that she worked time that she was never paid for. Before amending this claim, Plaintiff requested that Defendants compensate her for her worked time, but they refused to do so, which necessitated her seeking compensation through the instant lawsuit. It is legally irrelevant whether Plaintiff had prior approval to flex her time. Defendants

[2] She got another raise almost immediately to $106, 371.20 and currently earns $110, 626.05

must pay their employees for work performed for their benefit. The only relevant, and completely undisputed fact, is that Plaintiff physically worked in service of Defendants for at least 7.5 hours on September 6, 2024. However, her timesheet inaccurately reflects that Plaintiff worked only 6.75 physical hours, and that she had to use 1.25 hours of sick time. The hours an employee physically works each year must be accurately recorded, as such hours are important for federal statutory rights such as FMLA qualification, when an employee must have physically worked 1280 hours in the preceding year to qualify for FMLA benefits. Plaintiff should have been given full credit for the 7.5 hours of physical time she worked, and made to take only 30 minutes of sick time that day. Instead, she effectively had to pay to work 45 minutes of time, after having already physically worked that time, and did not receive compensation for it. It is a violation of NM law to refuse to pay an employee for time they worked in service of their employer. Plaintiff should be compensated for .75 hours of time, and be reimbursed .75 hours of paid sick time.

**Conclusion**

For the reasons argued herein, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment, award costs for the briefing of this response, and for whatever other relief this Court finds proper.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24

Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's e-file and serve system on this 2nd day of September 2025.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**THIRD DECLARATION OF KIMBERLY HUNT-BROWN**

STATE OF NEW MEXICO )
)SS.
COUNTY OF SANTA FE )

1. My name is Kimberly Hunt-Brown. I am over 18, and I am competent to give the testimony stated herein.
2. The information provided herein is within my own personal knowledge.
3. I have worked for the General Services Department for over 11 years.
4. I hold an MBA degree.
5. I started in my current position of Purchasing Agent (Procurement Specialist II) on August 12 2017.

6. I am extremely familiar with the state procurement process and code.

7. I suffer from Multiple Sclerosis and severe, often debilitating, migraines.

8. On the days where my migraine medication is successful in aborting my migraine, I still experience side effects such as sensitivity to light, sound, movement and depth perception which make it unsafe for me to operate a motor vehicle, but I am otherwise able to sit at a desk and work on a computer.

9. Everyone at State Purchasing knew that I continued to work from home as an accommodation after February 2023, and therefore knew I had a disability.

10. I was marked AWOL, denied the use of available paid time, and denied promotions because of my FMLA protected absences.

11. In 2023, my FMLA recertification was denied for 2.5 months by Kelly Howley and Eunice Moya.

12. Eunice Moya supervised both Kelly Howley and Jennifer Morfin, and was copied on their FMLA communications with me.

13. During that time, I was told I did not have the right to invoke FMLA protection.

14. On or around March 1, 2023, I had 26.83 hours of annual leave, 3.87 hours of sick leave and 16 hours of personal leave available for my FMLA covered absence.

15. Instead, Defendants Moya, Paulk and Martinez would not allow me to used paid time, marked me LWOP and AWOL.

16. Because my FMLA protected absences cause me to fall behind in my work, I have been placed on an informal Performance Improvement Plan which requires me to meet with my supervisor every week.

17. Because I was denied FMLA leave, and marked AWOL for trying to take it, I did not take leave I otherwise would have taken.

18. I had to retain an attorney just to get my FMLA approved in 2023.

19. The email from Jennifer Morfin claiming to be a "polite reminder" was the first time Defendants had ever suggested that I was limited in the number of times I could take FMLA leave in a month.

20. I was not allowed to use available donated leave for absences which I was also denied FMLA leave for.

21. My mother was dying in hospice care in Ohio in March 2024.

22. When I applied to work at State Purchasing, and when I accepted my current position, nothing in the job description or any of my hiring paperwork stated that 100% in person work was required of my position.

23. I was approved to continue working from home on a full time basis in February as a "trial period" for my accommodation. My understanding was that if there had been no issues during that time, I would be allowed to continue if needed.

24. I did not submit any request to continue full time teleworking because of Covid sensitivity in July or August of 2023 as I did not feel I needed to telework full time any longer.

25. During the nearly 3 years I was teleworking full time there was no question that I was in attendance of my job, and in compliance with the code of conduct.

26. The alleged interactive process meeting on July 31 was not interactive and was about a full time telework accommodation I was not seeking, and I had already been told that it was being denied before the meeting. I raised the issue of my request for

intermittent telework for my migraine, but no interactive process took place for that request.

27. Before the meeting, I informed Defendant Moya that I was requesting an intermittent telework accommodation for my migraines.
28. Defendants never worked with me in an attempt to find any alternate accommodations after my request to telework occasionally was denied.
29. Even while working in person in Santa Fe, my supervisors communicate through email, and hold our meetings remotely. I am rarely, if ever, physically supervised.
30. Valerie Paulk supervised me throughout the time we worked together, not just when Natalie Martinez took her leave of absence.
31. I applied multiple times for open IT Procurement Positions because I am qualified for them and they are a promotion from my current position.
32. I know that my coworkers Tami Concha and James Ortega both applied for #2972 and neither were offered the position.
33. I have personal knowledge that Tami Concha is 53 or 54 years old.
34. Andric Fisher had no state procurement experience when he was hired as an IT Procurement Specialist for #2972.
35. I know that Amber Sanchez, James Ortega and myself all applied for #49191.
36. I have been prevented from working on IT procurements by my managers.
37. I was honest in my interview that I had not had the chance to work on any IT procurements, but that I knew they were not much different from the procurements I had been doing for years.

38. Compliance officers are not buyers and do not work on procurements as part of their normal duties. It is very unusual that Amber Sanchez was given IT procurement experience while she worked as a compliance officer.

39. I was 63 at the time I interviewed for these positions.

40. Private loan companies, such as Regional Finance, do not work with the procurement code, and have no contracts with the state.

41. I have requested the VPN logs so that I can discover exactly who is working remotely at GSD, but Defendants have both stated that there are too many records, and also that they do not exist at all. I require these records to show that telework is a reasonable accommodation, as it is already clear that they allow others to telework while misrepresenting to this Court that they don't.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2025.

Q. So this difference is just whether or not it's protected by FMLA?
**A. I would say whether it's coded as FMLA or not on the time sheet.**
Q. Okay. And at the bottom of this chain, technically the beginning of it, she's notifying you that she has an upcoming medical appointment the following Monday afternoon, correct?
**A. Uh-huh. Yes.**
Q. Have you taken any FMLA training?
**A. Not that I remember.**
Q. There's no, like, SPO coursework on it for managers?
**A. I don't know off the top of my head.**
Q. Okay. But not since you've become a manager?
**A. I don't believe so.**
**(Exhibit 7 marked.)**
Q. Exhibit 7. Exhibit 7 is an email from Kimberly Hunt-Brown to Vanessa LeBlanc on May 29th, 2024, and the beginning of that chain is earlier that day at 12:12 p.m., and it appears to be an auto-leave request.
You respond to that at 12:24, saying: Hi, Kim, according to my log your FMLA for the month of



May has been exhausted as of May 28th.
Can you explain your -- your log there to me?
**A. So again, I was directed by HR that she could only use four days of FMLA a month.**
Q. Okay.
**A. So if my calculations were correct, she had exceeded those four days, I believe, but I would need to look further into it.**
Q. Okay. So you were doing it as of four eight-hour days?
**A. Correct.**
Q. So you were saying even though she had taken four, like, different days, those didn't count as a day until it was eight hours?
**A. Correct.**
Q. And you hadn't received any notice that Ms. Hunt-Brown's leave had been fully approved without restriction?
**A. Her -- like her time sheet leave?**
Q. For her FMLA leave.
**A. No, I had not.**
Q. And so when Ms. Hunt-Brown told you time-recorded FMLA is no longer exhausted, what did you do in response to that?



**A. I don't remember.**
Q. Did you reach out to HR to check?
**A. Possibly, but I don't remember.**
Q. Okay. But after that did -- was she able to take FMLA leave as needed?
**A. I don't remember when that happened, but I did receive an updated FMLA, I guess allowable time from HR.**
**(Exhibit 8 marked.)**
Q. Exhibit 8. Exhibit 8 is employee evaluation, fiscal year '24. The discussion date about a third of the way down says May 3rd, 2024.
Are you familiar with this document, Ms. LeBlanc?
**A. Yes.**
Q. What is the purpose of this document?
**A. I believe this was a closing evaluation, or actually an interim, I'm sorry.**
Q. What is an interim application?
**A. It is, I believe, where we meet every three months to go over the employee's performance.**
Q. Okay. And do you meet with all of your employees for that amount of time?
**A. No.**
Q. Why not?



**A. There's no need to.**
Q. What do you mean, there's no need to?
**A. I -- I have not had a reason to meet with any of those employees on an interim schedule.**
Q. Isn't an interim evaluation just part of the state personnel review process?
**A. I would -- I believe so.**
Q. So they don't need to have evaluations?
**A. They don't require interim evaluations. They only require opening and closing.**
Q. Okay. And what makes Ms. Hunt-Brown require an interim?
**A. Because she's on -- I wouldn't say a work plan, but she's required to meet with me on a weekly basis, so I was instructed by my supervisors to have interim evaluations with her.**
Q. Okay. So Ms. Hunt-Brown is essentially on a performance improvement plan?
**A. I don't know if she's officially on one. That's just what I've been instructed by my supervisors.**
Q. So unofficially, though, what would be the difference if an employee was on a performance improvement plan? Would they have interim evaluations?

38

A. **I'm not too sure.**
Q. Have you ever put an employee on an interim --
A. **No.**
Q. -- on a performance improvement plan?
A. **No.**
Q. Have you ever been on a performance improvement plan?
A. **No.**
Q. So Ms. Hunt-Brown is treated differently than your other employees by having an interim evaluation?
A. **I guess so.**
Q. So at the bottom of this first page, it says one of the major goals for the next year is for Kim to complete her assignments, at minimum, in the timeframe listed above so that eventually weekly meetings are not required. Weekly workload review meetings are scheduled because her assignments are often pending buyer review for several days without any movement. Is that correct?
A. **Yes.**
Q. And does that several days take into account when Ms. Hunt-Brown has taken FMLA?
A. **Say that again.**

39

Q. Does that several days with no movement take into account if Ms. Hunt-Brown has taken any time off for FMLA?
A. **Yes.**
Q. So the several days would be in addition to that time?
A. **Yes.**
Q. And that's true for your other employees, that they have less time to get their stuff done?
A. **They don't -- I don't -- I don't get what you're saying.**
Q. Okay. So if -- how long does a buyer -- a pending buyer review typically take?
A. **Buyer review should be done within the first three days of assignment.**
Q. And how would -- how does that get affected if Ms. Hunt-Brown is out on FMLA?
A. **It -- her assignment will just stay pending buyer review.**
Q. For more than several days?
A. **Yes.**
Q. So when Ms. Hunt-Brown is having an interim evaluation because her reviews are pending for more than several days, that could be because she hasn't been in the office as much, right?

40

A. **Not necessarily. She could be in the office for three days in a row, and her assignment could still be pending buyer review.**
Q. But wouldn't that be because she was working on other assignments that were then knocked back because she was out?
A. **I'm not too sure.**
Q. I mean, how is Ms. Hunt-Brown supposed to prioritize her work if she's constantly having to play catch-up?
A. **That's why we have those weekly meetings, so I can prioritize her work for her.**
Q. Okay. But that's because she is having these assignments that continually are being delayed in completion, correct?
A. **I guess so.**
Q. So it says: Kim often struggles with completing her assignments in a timely manner, and her assignments are frequently reassigned due to the urgency of completion.
Is this saying that her assignments are reassigned because she's falling behind?
A. **I would say so.**
Q. Okay. And there's no discussion in this document anywhere about any accommodation for

41

Ms. Hunt-Brown's FMLA time, correct?
A. **I don't believe it's required on this form.**
Q. Okay. Would that be part of the discussion, though?
A. **I don't believe her FMLA has ever came up in discussion during these evaluations.**
Q. Do you think that they should come up?
A. **I don't know.**
Q. I mean, if somebody's out of the office regularly for leave, they can't do the same amount of work as somebody who's in the office full-time, correct?
A. **I guess so.**
MS. BURKE: Let's take a quick break. Five -- like ten minutes.
(Recess was taken from 9:53 to 10:00.)
(Exhibit 9 marked.)
Q. (By Ms. Burke) Exhibit 9 is the evaluation dated March 21st, 2024. It doesn't say whether it is an interim or final evaluation.
A. **At the top here it says final.**
Q. Thank you, ma'am. So was this the closing of the previous year?
A. **Yes.**

Kimberly Hunt-Brown

| Date | Reported Hours | Type of Leave Taken | Corrected Hours | FML Corrected |
|---|---|---|---|---|
| 1/23/2023 | 8 | Sick leave | 8 | FML Sick Leave |
| 1/24/2023 | 4 | Annual Leave | 4 | FML Annual Leave |
| 2/1/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/2/2023 | 4 | Annual Leave | 4 | FML Annual Leave |
| 2/3/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/9/2023 | 3.25 | Sick leave | 3.25 | FML Sick Leave |
| 2/10/2023 | 8 | Annual Leave | 8 | FML Annual Leave |
| 2/16/2023 | 2.5 | Annual Leave | 2.5 | FML Annual Leave |
| 2/22/2023 | 1 | Annual Leave | 1 | FML Annual Leave |
| 2/22/2023 | 5 | Sick leave | 5 | FML Sick Leave |
| 3/1/2023 | 4.5 | AWOL | 4.5 | FML Unpaid |
| 3/1/2023 | 3.5 | LWOP | 3.5 | FML Unpaid |
| 3/7/2023 | 1 | Sick leave | 1 | FML Sick Leave |
| 3/15/2023 | 1.5 | LWOP | 1.5 | FML Unpaid |
| 3/15/2023 | 2.5 | Sick leave | 2.5 | FML Sick Leave |

6.3.3 An eligible employee may take up to 26 weeks of unpaid FML in a single 12-month period, beginning on the first day FML is utilized to care for a spouse, son, daughter or next of kin who is a covered service member and who has a serious injury or illness related to active duty service, as defined by the FMLA's regulations (known as military caregiver leave).

6.3.2.3 For military caregiver leave, GSD will measure the 12-month period as a rolling 12-month period measured forward.

6.3.2.4 FML leave already taken for other FML circumstances will be deducted from the total of the 26 weeks available.

6.4 Both Spouses Employed by GSD

6.4.1 Spouses who are both employed by GSD and eligible for FML may be limited to a combined total of 12 weeks of leave during the 12-month period if leave is requested:

- For the birth of a son or daughter, and in order to care for such son or daughter
- For the placement of a son or daughter with the employee for adoption or foster care, and in order to care for the newly placed son or daughter
- To care for an employee's parent with a serious health condition

6.4.2 Spouses who are both employed by GSD and eligible for FML may be limited to a combined total of 26 weeks in a single 12-month period if the leave is for either:

- Military caregiver leave
- A combination of military caregiver leave and leave for other FMLA-qualifying reasons

6.5 Substitution of Leave

6.5.1 Employees who elect to substitute any of their accrued leave must exhaust available leave balances in the following order: compensatory time, sick leave, annual leave, and personal leave day.

6.5.2 Employees shall not accrue annual and sick leave while on unpaid FML.

6.5.3 The substitution of paid leave time for unpaid FML time does not extend the 12 or 26 weeks (whichever is applicable) of the FML period. In no case can the substitution of paid leave time for unpaid leave time result in the employee's receipt of more than 100% of their salary.

6.5.4 Disability leave for the birth of a child and for an employee's serious health condition, including workers' compensation leave (to the extent that it qualifies), will be designated as FML and will run concurrently with FML.

---

**From:** Moya, Eunice, GSD Eunice.Moya gsd.nm.gov
**Sent:** Friday, uly 2 , 2023 10:23 AM
**To:** Hunt-Brown, Kimberly, GSD; Mendonca, Dorothy, GSD
**Subject:** RE: Friday 07 2 2023 1:30 ADA nteractive meeting
**Attachments:** ADA- Accomodation Re uest Form.pdf; ADA Physician's Statement.pdf; Medical nformation Release Form - Physican Release.docx; SPD Procurement Spec .pdf; LAR F AT N: Sent on behalf of the State Personnel ffice - ANN N EMENT -- LAR F AT N F STATE EMPL EE RET RN T FF E

Good morning, Kimberly-

The purpose of today's meeting was to have an interactive discussion regarding reasonable accommodations within your office space at the Joseph Montoya Building. On January 30, 2023, you were provided a trial period beginning on February 2, 2023 and ending August 2, 2023. GSD is unable to accommodate your telework schedule due to the rescission of the Non-Mandatory Telework Policy. You accepted a position located in Santa Fe, NM, therefore, you will be required to report to your office located at 1100 S. St. Francis Dr. on Thursday, August 3, 2023.

Dorothy and I are available to meet Monday, Tuesday or Wednesday. Please let me know as soon as your attorney is available.

As requested, I've included the ADA forms. Thank you.

**U BE**
**U E U BE E**
**E E E BE E T E T**

**B**
**E U BE**

---

Hunt-Brown, Kimberly, GSD <Kimberly.Hunt-Brown@gsd.nm.gov>
Friday, July 28, 2023 8:13 AM
Moya, Eunice, GSD <Eunice.Moya@gsd.nm.gov>; Mendonca, Dorothy, GSD <dorothy.mendonca@gsd.nm.gov>
Friday 07/28/2023 1:30 ADA Interactive meeting
High

Hello Eunice,

My attorney has requested to attend this meeting with me but is not available on such short notice. Could you please provide some dates and times next week so we can set up the meeting so she can attend also?

Also, could you please provide a new set of ADA paperwork that I can submit to my provider specifically related to my one health condition (the chronic migraines) for which we wish to submit a revised form?

*Thank you,*

*Kimberly A Hunt-Brown*
Kimberly A Hunt-Brown, MBA, CPO Certified
Procurement Specialist II
New Mexico State Purchasing Division
505-490-3152
1100 Saint Francis Drive
Room 2016
Santa Fe, NM 87505
**Please note my new email address:** kimberly.hunt-brown@gsd.nm.gov

See current procurement opportunities online at:
https://www.generalservices.state.nm.us/statepurchasing/active-procurements.aspx

For current procurement opportunities in the eProNM/SciQuest system, go to:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=StateOfNewMexico

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**
**Defendants.**

## AFFIDAVIT OF JOSE PUENTES

1. My name is Jose Puentes. I am over 18, and I am competent to give the testimony stated herein.
2. The information provided herein is within my own personal knowledge.
3. I worked at GSD for about 5 years, beginning in 2019.
4. During my employment at GSD, I regularly worked from home.
5. Working from home was not a term used, and it was characterized on calendars and elsewhere as either "off site training" or "Remote Office Work Site."
6. I did work from home under these characterizations for periods after August 2023, and during the 2024 calendar year.

I declare under penalty of perjury that the foregoing is true and correct.

________________________________
Jose Puentes

**STATE OF NEW MEXICO )**
**)SS.**
COUNTY OF ~~SANTA FE~~ Bernalillo ) (KT)

**Signed, sworn to and acknowledged before me this 2nd day of ~~August~~ September (KT), 2025 by Jose Puentes.**

[signature]
NOTARY PUBLIC

State of New Mexico
Notary Public
Kristina Tice
Commission Number 1116177
Expiration Date 10-20-2028

CONFIDENTIAL

Cumbre Court Reporting
Exhibit 29
Date 07.09.2025
Eunice Moya

**Applicant Name :** [redacted]

**Reviewer Name:** Michael Saavedra

**Position: IT Procurement Specialist #49191**

Questions:

1. What is your experience relative to the skills required of the IT procurement unit?
   6yrs w/SPO – buyer B – moved up to buyer A & now Fin Coord. ITBs, ESAs, Sole Source, NASPOs, RFPs. IT Prof. Services. 90-mods, – assisted w/ [illegible] from DoIT identified a typing error – fee section. Training of vendors, exp. transition & other – led w/vendors, reads contracts w/fees, dealing w/NASPOs. T&Cs.

2. What experience do you have working with the Department of Information Technology?
   Amended price agreements from DoIT. worked w/their template. Any components – approved through DoIT. Routed through IT for signature

3. If you have multiple high profile procurements and you are getting calls from upper management asking the status, how do you prioritize your projects?
   List person. or utilize email outlook calendar. Very caught up & busy at [illegible] to get behind. Looks at steps & pushes along. Push assignments along for the timeline to be met.

4. Explain the process you go through when handling an RFP.
   Receive assignment. Quals based rather than cost only. Min. 10 days adv., prepro. conf, Q&A, close, open. eval., open pub then changed to "material". based on responses to prop., oral pres, bafo, finalize award, protest. Before review scope of work, seq. of events,.

GSD. 009546

CONFIDENTIAL

Cumbre Court Reporting
Exhibit 30
Date 07.09.2025
Eunice Moya

**Applicant Name :** Amber Sanchez [redacted]

**Reviewer Name:** Jeraldine Martinez

**Position: IT Procurement Specialist #49191**

Questions:

1. What is your experience relative to the skills required of the IT procurement unit?

SPD 6 yrs, Buyer B – 2018, moved into Buyer A
lots of experience GSAs, ITBs, NASPO's
lot of IT professional service NASPO – main lead (95)
DoIT – dept facilitate. Open offerors – hard copies
Roselyn – identify issue resulted in amendments (fee structure) train vendors ITBs expired, and the new one
utilize old one professional service contract. Read through
all contracts that contain a fee. How to utilize any report
and users NASPO how they are used T&Cs explain to vendors

2. What experience do you have working with the Department of Information Technology?

working on contracts used by DoIT
network, data – electronic data base – go through w/DoIT
computer network, systems –
compatible system, cyber security
all approval & signatures – RFP – continue to route &
through them

3. If you have multiple high profile procurements and you are getting calls from upper management asking the status, how do you prioritize your projects?

physically write log / Outlook calendar
prioritize work got done through the day
Gov initiatives are priority
agency side – follow up
push assignments along – to make sure timeline is met.

4. Explain the process you go through when handling an RFP.

receive an assignment
qualification base vs.
min 10 days
convene pre proposal – Q&A
RFP – closed
RFP – evaluated
RFP – not open public
evaluated RFP – based on RFP
select finalist
execute – signs

(5 days for protest
review scope of work
match solicitation
sequence of events – match time frame.
ensure time – frame meets request.

GSD. 009552

CONFIDENTIAL

Cumbre Court Reporting
Exhibit 31
Date 07.09.2025
Eunice Moya

**Applicant Name :** [redacted]

**Reviewer Name:** Ray A. Maestas

**Position: IT Procurement Specialist #49191**

Questions:

1. What is your experience relative to the skills required of the IT procurement unit?
6 years with SPD and was a Buyer and now a financial coordinator. Has a lot of involvement in many different realms within the IT procurements.
Has experience training
Has IT professional service Contract experience.
Has experience working with the end users.

2. What experience do you have working with the Department of Information Technology?
worked with and issue contracts based on DoIT's template the criteria set up by DoIT and familiar with IT procurements

3. If you have multiple high profile procurements and you are getting calls from upper management asking the status, how do you prioritize your projects? List person, and utilize outlook calendar, very much on top of work assignments. Always following up.

4. Explain the process you go through when handling an RFP. Receive assignment, issue the RFP, advertise, open proposals Pre-proposal conference,
Applicant explained the full process excellent.

**A. I believe so.**
Q. So looking at your job history in this application, it looks like you became an IT procurement specialist in October of 2017, correct?
**A. Yes.**
Q. When you became an IT procurement specialist, did you have any IT experience?
**A. I did.**
Q. What IT experience did you have?
**A. I'm not too sure what's captured in this application. I would have to read it through, but I did do IT professional service agreements when I was a -- a buyer A.**
Q. Why did you do IT procurements as a buyer A?
**A. I was a matrixed buyer, and I was housed at facilities management division, and because I was an -- while I was a matrix buyer, I was considered an agency buyer. I did all of their professional service agreements and -- the professional service procurements and processed the resulting agreements for that agency or that division.**
Q. So how did you start doing that?
**A. I don't remember. That was so long ago.**
Q. You got transferred over to FMD, or you



were still part of SPD?
**A. I was still part of SPD. I was what's referred to as a matrixed buyer.**
Q. Did you apply for that position?
**A. I believe I was a buyer O. I believe I was a buyer B, and then I applied for the buyer O, and while I was a buyer O, I was moved to FMD. But I would need to look more into that.**
Q. Okay. So more -- so other buyers besides IT buyers do IT buying?
**A. No. So this was a unique case because I was a matrixed buyer. I was considered an agency buyer for facilities management division as well as a state purchasing buyer.**
Q. So how did you get trained to do those IT buys?
**A. I was trained by my supervisor at the time, Jim Thalmann, I believe was his last name. I'm not too sure.**
Q. And that was a decision -- why didn't they send an IT buyer to be a matrix buyer?
**A. I couldn't tell you that information.**
Q. You were trained to be an IT before you were an IT buyer?
**A. I wouldn't say I was necessarily trained**



**to be an IT buyer. I was trained on how to process IT procurements.**
Q. Do all buyers get trained on that?
**A. I don't believe so.**
Q. Do you think that training made it easier for you to apply for an IT buyer?
**A. I would assume so.**
Q. That decision was a decision of your supervisors to move you to the matrix buyer, correct?
**A. Yes.**
Q. So your supervisors had you -- I mean, they allowed you to be trained in IT buying, correct?
**A. Correct.**
Q. Do you assign any of your current buyers to do any IT buying?
**A. No.**
Q. Why not?
**A. I'm told not to.**
Q. Who told you not to?
**A. My supervisors.**
Q. Natalie Martinez?
**A. Yes.**
Q. Why did she tell you not to?



**A. Because my buyers are not IT buyers.**
Q. So your buyers now can't get IT experience or IT buying experience?
**A. They're not allowed to do IT assignments.**
Q. Okay. So would that help them apply for an IT buyer position if they were allowed to do IT assignments?
**A. I assume it would.**
Q. What would -- why would GSD not want to cross-train their buyers?
MR. LOMAN: Object to form. Foundation.
Q. Go ahead and answer.
**A. That, I'm not too sure.**
Q. At the time you were moved over to FMD, you didn't have, like, actual IT experience, correct?
**A. I don't believe so.**
Q. You've never taken any IT certification courses? You're not --
**A. No, I don't believe that's even required of our buyers now.**
Q. Okay. So looking at Exhibit 13, the minimum qualification on page two, says an IT -- or a bachelor's degree of business administration or IT-related field.

Page 186

based sole on the qualification...."

HR didn't make the selection for this position, you did.

A. I did based on the questions and answers and the responses that we received.

Q. You have to base that on qualifications for the position; correct?

A. I based it on -- it is the whole entirety.

The questions make a difference. When they are asked, they are responding to the question with the answers that they are giving.

Never once have I ever looked at a person for any other reason other than the questions we ask.

Q. So you're testifying here today that a person with a Master's Degree in the related field required and -- what did we say -- 8 years of experience directly related to the position is less qualified than a

Page 187

person with a High School education and only 6 years of experience.

MS. DOWNEY: Objection; form.

You can answer.

THE WITNESS: I know you look exhausted, as I do, but to answer the question...

You will have to clarify the question.

Q. BY MS. BURKE: So what made Amber more qualified for the position?

A. Based on the questions that were asked and the answers that were given.

I recall...

I can't...

You have this one in front of me 100%, but Kim's answer to Question 1 was "Little to none." "Little to none."

I don't know how to -- those are the 2 main questions. All of these questions are important, but when you ask "What is your experience relative to the skills of the IT Procurement," and someone says "Little

Page 188

to none," I don't...

I don't know what you want to hear from me.

Q. But you Testified here that Amber Sanchez was allowed to do IT Procurement as the Compliance Specialist.

A. As her Supervisor. As her Supervisor I allowed her.

Q. Right.

A. I allowed her.

Q. Right.

A. Because she had to; she had no choice.

That IT Procurement, which is one of our major Procurements in the State was lacking the Terms and Conditions of the Contract.

Q. What do you mean, "... she had no choice"?

A. (No audible response.)

Q. Why didn't another IT specialist do that?

A. I can't answer that question at the time. I cannot answer that

Page 189

question.

Q. You don't manage the IT --

A. I do not.

Q. -- people; correct?

A. That would be Michael Saavedra.

Q. Didn't you say to Michael Saavedra, "Your staff isn't finishing their work and someone else needs to do this?"

A. That's not how I operate. I am not going to go tell Michael Saavedra that.

Amber asked me, "Can I work with Raelynn on this Procurement so that I can" -- "where it misses the Terms and Conditions. I need to understand the entire Contract," so I said, "Yes." Why would I -- why would I tell her "No"?

Q. So you gave her the experience she needed for this position when she applied for there promotion.

A. I don't think this position was open when she went to go search for the information that was missing out

CONFIDENTIAL

**Application Report**

**Job Opening ID:** 142364 — **Job Posting Title:** GSD IT Procurement Specialist (GSD #2972)

## General Information

| | |
|---|---|
| **Name** | [redacted] |
| **Applicant ID** | 509335 |
| **Applicant Type** | External Applicant |
| **Applicant Status** | 010 Active |

## Contact Information

| | |
|---|---|
| **Name Prefix** | |
| **First Name** | [redacted] |
| **Middle Name** | |
| **Last Name** | [redacted] |
| **Name Suffix** | |
| **Address** | [redacted] Bernalillo |
| **Preferred Contact** | Not Specified |

## Phone Numbers

| Phone Type | Telephone | Extension | Country Code | Preferred |
|---|---|---|---|---|
| Home | [redacted] | | | Yes |

## Email Addresses

| Email Type | Email Address | Preferred |
|---|---|---|
| Home | [redacted] | Yes |

## Work Experience

| | | | |
|---|---|---|---|
| **Start Date** | 07/01/2016 | | |
| **End Date** | 02/02/2024 | | |
| **Employer** | Red Lake Hospital | | |
| **Ending Job Title** | IT Supervisor | | |
| **Supervisor** | [redacted] | | |
| **Ok to Contact?** | Yes | | |
| **Email** | [redacted] | | |
| **Phone** | [redacted] | **Country Code** | |
| **Ending Pay Rate** | 0.00 USD Month | | |

CONFIDENTIAL


| | |
|---|---|
| **Description** | ¿ Responsible for system administration, strategic and tactical planning, evaluation, coordination of the information and technology systems for the Red Lake Hospital network and customer support within the Hospital and affiliate satellite site Ponemah Health Center.<br>¿ Lead the Information Technology department in planning and implementing enterprise information systems to support both distributed and centralized clinical and business operation. Through this, I achieved a modernized and cost beneficial enterprise-wide IT operation.<br>¿ Designated Contract Officer Representative to oversee submittal of acquisition requests in compliance with federal acquisition rules for IT facility needs.<br>¿ Proficient in preparing contract specifications for computer hardware/software procurement and service agreements, involving completion of business needs statements and business case statements with 5-year lifecycle cost estimators.<br>¿ As IT Supervisor overseeing IT-related projects and completing the Capital Planning Investment Control process for the Red Lake Hospital Phase 1 and 2 Modernization project with the coordination of all stakeholders; involving consulting and monitoring technical progress to track progress and establish work schedules of contractors.<br>¿ Maintained developed systems to evaluate performance related to contract deliverables and cost; identified potential problem areas to initiate remedial actions.<br>¿ Maintained my Contracting Officer Representative (COR) Level 2 certification for managing contracts up to Ten million dollars.<br>¿ With my COR 2 certification I¿ve managed and maintained multiple contracts with RPMS and E.H.R developers Cimarron and Medsphere for interfacing and existing programing RPMS package module support.<br>¿ Coordinated Red Lake Hospital expansion of a new building for the Emergency Room department through a facility 638 construction contract; which enabled me to leverage and procure the needed network infrastructure for a new intermediate distribution frame IDF and equipment for supported wireless implementation.<br>¿ Successfully interfaced Red Lake Hospital Resource Patient Management System with a contracted clearinghouse to scrub and submit all hospital claims to payers for processing to increase Third Party revenue.<br>¿ Overseen and completed the technical implementation of the Bar Code Medication Administration (BCMA) point of care application for validation of medication administration that supports ¿real-time¿ recording of medications given to patients. BCMA uses the electronic medication administration record with bar code scanning verifying the patient identity, as well as insuring that the patient receives the right medication, in the right dose, via the right route at the right time. |

¿ Assisted Biomed and Radiology with procurement and technical procurement and implementation of a Fuji Picture Archiving Communication System (PACs), Fuji portable x-ray unit and a 3D Hologic Mammography unit.

| | | | |
|---|---|---|---|
| **Start Date** | 10/01/2008 | | |
| **End Date** | 07/01/2016 | | |
| **Employer** | Fort Yuma Indian Health Center | | |
| **Ending Job Title** | Information Tech Specialist | | |
| **Supervisor** | [redacted] | | |
| **Ok to Contact?** | Yes | | |
| **Email** | | | |
| **Phone** | [redacted] | **Country Code** | |
| **Ending Pay Rate** | 0.00 USD Month | | |

CONFIDENTIAL


**Description**

¿ As an employee with Fort Yuma Health Center I.T Department, I performed an intricate role in the national Project Leadership Team Committee overseeing the construction of a new health care facility. With a 6-million-dollar budget, I collaborated with Area Office IT Staff to design a network infrastructure for the new facility and provided position description qualifications, equipment specifications for contracted services.
¿ With my Contracting Officer Representative Level 1 certification I've managed and maintained multiple contracts considered comparative cost versus suitability of types of equipment and materials selected to accommodate system modifications and/or upgrades with feasibility studies and cost analysis for procurement.
¿ Made occasional field inspections as necessary to include oral communication briefing field managers on specific project status. Allowing for coordination of work assignments with other elements in the Health Center concerning the appropriate technical approach for the specific projects, as well as, the nontechnical approach involved in preparing the nontechnical portion of the solicitation for bids or proposals.
¿ I provided moderately technical or complex information about products and services. Communicated and coordinated with staff in preparation of contract specifications for the purchase of hardware, software, and service agreements.
¿ Facilitated in problem resolutions for multi-users and personal computer systems running the Electronic Health Record (EHR), Clinical Applications and office automation programs. Daily clinical application maintenance use includes VISTA imaging programs VistaRad, Vista Capture and Vista Display.
¿ Monitored the telecommunications components and the reset of controls for teleprocessing connections on Linux and Windows¿s environments. Including isolating and identifying the sources and nature of system software, hardware/telecommunication problems acquiring assistance from Tier 2 support of vendor representatives for significant equipment or software malfunctions.
¿ Executed and maintained the migration and installation of Cisco Unified Communications Manager VOIP system.
¿ Regularly assist in determining the Information System needs of the Health Center programs and aid in evaluating alternative methods of meeting those needs, within the constraints of Indian Health Service policies and Indian Health Manual.
¿ Sustained Health Information Management (HIM) privacy and security compliance, through the National Institute of Standards and Technology (NIST) and Federal Information Security Act (FISMA) standards.
¿ Project Managed the Implementation and Integration for an all-digital Dental initiative.
¿ Provided Instrumental coordination in establishing technical execution for Personal Health Record (PHR) accessibility to the

CONFIDENTIAL


Fort Yuma patient population.

| | |
|---|---|
| **Start Date** | 09/01/2003 |
| **End Date** | 09/01/2008 |
| **Employer** | Colorado River Service Unit |
| **Ending Job Title** | Computer Tech |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | [redacted] |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ During my employment at the Colorado River Service Unit, my responsibilities included monitoring the technical progresses of contractors on the local level, and in the performance of acceptance tests of contracted services.<br>¿ Provided Customer service, Help desk installations, daily operations, network maintenance/security, and physical/software inventory.<br>¿ Field inspections and software/equipment upgrades of all five satellite sites consisting of Colorado River Service Unit that includes Chemehuevi Health Center, Peach Springs Health Center, Supai Health Center and Sherman Health Center.<br>¿ Assisted, managed, and maintained all RPMS and network access requests for CRSU and all Satellite sites.<br>¿ Worked with UNIX AIX in testing Resource Patient Management System environment for knowledge base Windows comparison.<br>¿ Worked with and maintained the existing PBX communication infrastructure. |

## Education Level

**Highest Education Level** Some College

## References

| Reference | Title | Employer | Phone | Country Code |
|---|---|---|---|---|
| [redacted] | CRSU Service Unit CEO -Retired | Retired | [redacted] | |
| [redacted] | Bemidji Area Director -Retired | Retired | [redacted] | |

CONFIDENTIAL


## Questionnaire

### Agency Level:

**Question:** How many years of experience do you have conducting the Invitation to Bid (ITB) or Request for Proposals (RFP) process?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have with the SHARE purchasing and contract modules?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | ✔ |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | |

**Question:** How many years of experience do you have with the New Mexico Procurement Code, state statutes and regulations?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | ✔ |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |

CONFIDENTIAL


| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Ten or more years | ✔ | |

**Question:** How many years of experience do you have processing contracts for Information Technology (IT) services and/or software?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have determining the best sources considering cost, quality of goods and services, delivery time, and compliance with the New Mexico Procurement Code?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | ✔ |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | |

**Question:** Are you a resident of the State of New Mexico?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Resident greater than or equal to 1 year | | |
| Resident greater than or equal to 2 years | | |
| Resident greater than or equal to 3 years | | |
| Resident greater than or equal to 4 years | | |

CONFIDENTIAL


| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Resident greater than or equal to 5 years | ✔ | |
| Not a Resident | | ✔ |

### Online Screening:

**Question:** Do you meet the minimum qualifications of Bachelor's Degree in Business Administration or IT related field and four (4) years experience with government contracts with an emphasis on IT? Substitutions may apply. Please refer to Substitution Table on the Job Posting.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes | ✔ | ✔ |
| No | | |

### Additional Questions:

**Question:** Are you a United States Veteran who has been discharged or released from active duty from the Armed Forces under honorable conditions or are you currently serving in the National Guard. (Veterans/National Guard Member MUST ATTACH the appropriate documentation at the time of application to qualify for additional preference points). Veterans: You MUST ATTACH a copy of your DD 214 Form (Long Form). National Guard members MUST ATTACH an official statement from applicable branch of the Armed Forces showing you are a current member of the National Guard, or a NGB 22 Form at the time of application.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am an Honorable Veteran. | ✔ | |
| No | | ✔ |

**Question:** Are you a United States Honorably Discharged Veteran with a service-connected disability? YOU MUST ATTACH the appropriate disability documents as issued by the Department of Veteran's Affairs at the time of application to qualify for additional preference points.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am a Disabled Veteran. | ✔ | |
| No | | ✔ |

**TITLE 1 GENERAL GOVERNMENT ADMINISTRATION**
**CHAPTER 7 STATE PERSONNEL ADMINISTRATION**
**PART 5 RECRUITMENT, ASSESSMENT, SELECTION**

**1.7.5.1 ISSUING AGENCY:** State Personnel Board.
[1.7.5.1 NMAC - Rp, 1.7.5.1 NMAC, 1/14/2025]

**1.7.5.2 SCOPE:** All state agencies in the classified service.
[1.7.5.2 NMAC - Rp, 1.7.5.2 NMAC, 1/14/2025]

**1.7.5.3 STATUTORY AUTHORITY:** Subsection A of Section 10-9-10, Subsection A of Section 10-9-12, Subsection C of Section 10-9-13, Subsection F of Section 10-9-13, Subsection I of Section 10-9-13, Section 10-9-13.2, Subsection B of Section 10-9-18, Section 10-9-22, Section 10-9-23; Section 20-4-9, NMSA 1978; Sections 24-2B-1 to 24-2B-8, NMSA 1978; and Sections 28-2-1 to 28-2-6, Section 28-10-12, NMSA 1978.
[1.7.5.3 NMAC - Rp, 1.7.5.3 NMAC, 1/14/2025]

**1.7.5.4 DURATION:** Permanent.
[1.7.5.4 NMAC - Rp, 1.7.5.4 NMAC, 1/14/2025]

**1.7.5.5 EFFECTIVE DATE:** January 14, 2025 unless a later date is cited at the end of a section.
[1.7.5.5 NMAC - Rp, 1.7.5.5 NMAC, 1/14/2025]

**1.7.5.6 OBJECTIVE:** The objective of Part 5 of Chapter 7 is: to provide a system for the recruitment, examination and selection of applicants for employment in the classified service.
[1.7.5.6 NMAC - Rp, 1.7.5.6 NMAC, 1/14/2025]

**1.7.5.7 DEFINITIONS:**

**A.** **"Doublefill"** is when two employees are paid to work in the same position.

**B.** **"Open for recruitment"** means soliciting applications from the general public and state employees for vacant positions.

**C.** **"Overfill"** is when an employee is assigned to a position with a higher pay band than the position's budgeted pay band.

**D.** **"Recruitment Waiver"** means a candidate for hire is identified through a non-competitive process in lieu of the position being posted and advertised.

**E.** **"Underfill"** is when a candidate is hired for a position that they are not fully qualified for, but who can gain the necessary skills and experience through on the job training. Once the candidate has met the minimum experience requirements, they will be promoted to the position's actual pay band.
[1.7.5.7 NMAC - Rp, 1.7.5.7 NMAC, 1/14/2025]

**1.7.5.8 VACANT POSITIONS:**

**A.** All budgeted vacant positions to be filled shall be open for recruitment unless a recruitment waiver is authorized by the state personnel office (SPO) director.

**B.** Positions in the classified service shall be filled at the assigned classification. An underfill may be approved by the SPO director. An authorized underfill may not exceed one year unless extended by the SPO director.

**C.** The SPO director may approve a position to be doublefilled for up to one year.

**D.** Agencies may allow part-time employees to share the same position.
[1.7.5.8 NMAC - Rp, 1.7.5.8 NMAC, 1/14/2025]

**1.7.5.9 RECRUITMENT:**

**A.** The recruitment process shall be established by the state personnel office in accordance with established professional techniques and relevant federal and state laws, regulations, and guidelines.

**B.** The SPO director shall establish a means to effectively advertise and recruit for vacant positions within the classified service.

**C.** Any qualified applicant shall have the opportunity to compete for vacant positions open for recruitment without regard to race, color, religion, national origin, ancestry, sex, sexual orientation, age, or mental or physical disability unless based on a bona fide occupational requirement.

**D.** Agencies shall be sensitive to creating diversity in the workplace.

**E.** Applications shall be submitted in accordance with the SPO director-established recruitment criteria, received within the prescribed time limits and be for positions open for recruitment.
[1.7.5.9 NMAC - Rp, 1.7.5.9 NMAC, 1/14/2025]

**1.7.5.10 APPLICATIONS:**

**A.** The SPO director shall establish application procedures which include, among other things, criteria that will ensure compliance with federal and/or state law. Information on gender, ethnicity, and age of applicants shall be utilized only for affirmative action and other non-discriminatory purposes.

**B.** The agency shall reject an application and not accept any application from the applicant if the applicant:

**(1)** has made any false statement or produced any false document in support of the application; or

**(2)** has directly or indirectly given, paid, offered, solicited, or accepted any money or other valuable consideration or secured or furnished any special or secret information for the purpose of affecting the rights or prospects of any person with respect to employment in the classified service.

[1.7.5.10 NMAC - Rp, 1.7.5.10 NMAC, 1/14/2025]

**1.7.5.11 ASSESSMENT OF QUALIFICATIONS:**

**A.** Assessments shall measure critical or important knowledge, skills, and abilities necessary for successful job performance.

**B.** Except as provided in Subsection C of 1.7.5.11 NMAC no agency shall administer any test to an applicant or employee without the test and the test administration having been approved by the SPO director unless otherwise authorized by statute.

**C.** An agency may request a description or demonstration of the skill or ability needed to perform an essential job function in accordance with the *Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 Note 29C.F.R. Part 1630.14(a)* Pre-employment inquiry*)*.

**D.** **Preference Points:**

**(1)** In accordance with the provisions of Section 10-9-13.2 NMSA 1978 and Section 20-4-9 NMSA 1978, veterans honorably discharged from the United States armed forces and applicants currently serving in the national guard shall have five points added to their final passing numerical scores on applications. Veterans honorably discharged from the United States armed forces with a service-connected disability shall have 10 points added to their final passing numerical scores on applications. A veteran with or without a service-connected disability has his/her name placed on the employment list in accordance with numerical rating of other veterans and non-veterans.

**(2)** In accordance with the provisions of Section 10-9-13, NMSA 1978, applicants who meet minimum qualifications shall have two preference points added for each year of residency in New Mexico, not to exceed 10 points.

[1.7.5.11 NMAC - Rp, 1.7.5.11 NMAC, 1/14/2025]

**1.7.5.12 SELECTION:**

**A.** In accordance with the purpose of the *Personnel Act NMSA, Section 10-9-2,* selection shall be based solely on qualification and ability. Selection for any positions in the classified service shall be justified in writing and made from employment lists.

**B.** All employers subject to the Criminal Offender Employment Act. Sections 28-2-1 to 28-2-6 NMSA 1978, may take into consideration a conviction, but the conviction will not operate as an automatic bar to obtain public employment. Employer may only take into consideration a conviction after the applicant has been selected as a finalist for the position.

**C.** Agencies shall follow all established procedures approved by the SPO director unless otherwise provided by law.

**D.** Agencies shall be sensitive to creating diversity in the workplace.

**E.** Employment lists shall include names of ranked candidates who have made application and met the established requirements plus any candidates certified by the New Mexico department of education, division of vocational rehabilitation, the commission for the deaf and hard of hearing, or the commission for the blind, in accordance with the provisions of Section 28-10-12, NMSA 1978.

**(1)** Agencies shall certify the names of former employees who are currently receiving temporary total or permanent partial workers' compensation benefits, resultant from an injury sustained while employed in the classified service and who apply for a position in accordance with the provisions of 1.7.10.12 NMAC.

**(2)** Agencies shall certify only the name(s) of former employees who are currently eligible for reemployment from a reduction in force per 1.7.10.10 NMAC.

**F.** **Temporary promotions:** Employees may be temporarily promoted for a period not to exceed 12 months to a temporary or effectively vacant position for which the agency certifies that the employee holds the qualifications and abilities necessary for successful job performance. At the end of the temporary promotion period, employees shall return to their former position without right of appeal.

**G.** **Intra-agency transfers:** An agency may transfer an employee without the employee's consent to a position in the same classification within the same geographic location as the employing agency, which is 35 miles from the boundaries of the community where the employee is employed if the established requirements state that willingness to accept a change of geographic location is a condition of employment.

**H.** **Exempt to career service:** Employment in the exempt service shall not count towards the probationary period required by Subsection A of 1.7.2.8 NMAC.

**I.** **Emergency appointments/Hires:** Emergency appointments/hires shall be made in accordance with 1.7.2.12 NMAC.

**J.** **Reduction:** Employees may request a classification reduction to a position for which the agency certifies that the employee holds the qualifications and abilities necessary for successful job performance.

**K.** **Physical examinations:** Agencies may require physical examinations of candidates who have been selected for a position contingent upon their meeting the prescribed physical health standards. The costs of such physical examinations shall be borne by the agency.

[1.7.5.12 NMAC - Rp, 1.7.5.12 NMAC, 1/14/2025]

**HISTORY OF 1.7.5 NMAC:**

**Pre-NMAC History:**

Material in this part was derived from that previously filed with the commission of public records - state records center and archives as:

SPB Rule 4, Applications and Tests, filed 5/22/1980;
SPB Rule 4, Applications and Tests, filed 6/3/1981;
SPB Rule 4, Applications and Tests, filed 10/21/1982;
SPB Rule 4, Applications and Tests, filed 6/28/1983;
SPB Rule 4, Applications and Tests, filed 10/17/1986;
SPB-4, Tests, filed 4/4/1990;
SPB-4, Tests, filed 10/19/1990;
SPB 7, Recruitment, Applications, Tests, filed 12/15/1992;
SPB 7, Recruitment, Applications, Tests, filed 3/18/1994.

**History of Repealed Material:**
1 NMAC 7.5, Pay, filed 6/13/1997.

**Other History:**
1 NMAC 7.6, Recruitment, Applications, Tests, filed 1/12/1996 replaced SPB 7, filed 3/18/1994;
1 NMAC 7.6, Recruitment, Applications, Tests, filed 5/2/1996;
1 NMAC 7.5, Recruitment, Applications, Selection, filed 6/13/1997 replaced 1 NMAC 7.6, filed 5/2/1996;
1 NMAC 7.5, Recruitment, Assessment, Selection, filed 6/13/1997 replaced by 1.7.5 NMAC, Recruitment, Assessment, Selection, effective 7/7/2001.
1.7.5 NMAC, Recruitment, Assessment, Selection, filed 6/14/2001, replaced by 1.7.5 NMAC, Recruitment, Assessment, Selection, effective 1/14/2025.

CONFIDENTIAL
Internal

**Application Report**

**Job Opening ID:** 142364 **Job Posting Title:** GSD IT Procurement Specialist (GSD #2972)

## General Information

**Name** [redacted]
**Applicant ID** 327753
**Applicant Type** Employee
**Applicant Status** 010 Active

## Contact Information

**Name Prefix** [redacted]
[redacted]
**Preferred Contact** Phone

## Phone Numbers

| Phone Type | Telephone | Extension | Country Code | Preferred |
|---|---|---|---|---|
| Home | [redacted] | | | [redacted] |
| [redacted] | [redacted] | | | [redacted] |

## [redacted]

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | Yes |

## Work Experience

**Start Date** 10/20/2022
**End Date**
**Employer** GSD/SPD
**Ending Job Title** SPD Procurement Specialist II
**Supervisor** Michael Saavedra
**Ok to Contact?** Yes
**Email** Michael.Saavedra@gsd.nm.gov
**Phone** 505/372-8489 **Country Code**
**Ending Pay Rate** 0.00 USD Month

CONFIDENTIAL

**Application Report**

**Job Opening ID:** 145350 | **Job Posting Title:** SPD IT Procurement Specialist II (GSD #49191)

## General Information

**Name** [redacted]a
**Applicant ID** 327753
**Applicant Type** Employee
**Applicant Status** 010 Active

## Contact Information

**Name Prefix** Mr.
**First Name** [redacted]
[redacted]
**Preferred Contact** Phone

## Phone Numbers

| Phone Type | Telephone | Extension | Country Code | Preferred |
|---|---|---|---|---|
| Home | [redacted] | | | [redacted] |
| [redacted] | [redacted] | | | Yes |

## Email Addresses

| Email Type | Email Address | Preferred |
|---|---|---|
| Business | [redacted] | Yes |

## Work Experience

**Start Date** 10/20/2022
**End Date**
**Employer** GSD/SPD
**Ending Job Title** SPD Procurement Specialist II
**Supervisor** [redacted]
**Ok to Contact?** Yes
**Email** [redacted]
**Phone** [redacted] **Country Code**
**Ending Pay Rate** 0.00 USD Month

CONFIDENTIAL


| | |
|---|---|
| **Description** | Working to establish appropriate methods for the procurement of services and commodities for New Mexico State Agencies, as well as local public bodies. Through the use of Invitations to Bid (ITBs), Requests for Proposals (RFPs), NASPO agreements, GSA agreements and Sole Source agreements we help to provide the tools necessary for the procurement of various commodities, to include Construction, Materials acquisition, Professional Services, Information Technology (IT) services and Sole Source Procurements. Responsible for delivering timely procurement methods for our customers to assure goods and services are available for agency needs. Prepare and present training on the Procurement Code to purchasing customers in State Agencies and provide guidance regarding the Procurement Code to purchasing professionals, vendors and staff. Determine validity and respond to purchasing complaints by state agencies and/or protests filed by aggrieved bidders or offerors and providing reports to management as requested. |

| | |
|---|---|
| **Start Date** | 06/20/2015 |
| **End Date** | 10/14/2022 |
| **Employer** | NMDOT |
| **Ending Job Title** | Purchasing Agent Supervisor |
| **Supervisor** | Christina Baca |
| **Ok to Contact?** | Yes |
| **Email** | Christina.Baca2@state.nm.us |
| **Phone** | 505/469-8800 **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Supervising a staff of 3 to 5 people responsible for the audit and approval of purchasing activities for the NMDOT as dictated by the New Mexico Procurement Code and guided by the MAPs. Providing guidance, resources, facilitation, training, and expertise in the implementation and/or pursuit of Invitations to Bid, Requests for Proposals, Price Agreements, Contracts, Emergency Procurements and Sole Source Procurements for commodities associated with vertical and horizontal Construction, Road Maintenance, Professional Services, Information Technologies (IT) (Hardware, Software, Infrastructure), PPE, Office Supplies, Personnel Supplies, Public and Personnel Transportation, and Medium and Heavy Equipment. Acting as a liaison, arbiter and/or, guide for communications between vendors, program personnel, management, and inter-agency personnel. |

| | |
|---|---|
| **Start Date** | 06/01/2015 |
| **End Date** | 11/01/2017 |
| **Employer** | NMDOT |

CONFIDENTIAL

**Application Report**

**Job Opening ID:** 145350 **Job Posting Title:** SPD IT Procurement Specialist II (GSD #49191)

| | |
|---|---|
| **Ending Job Title** | Purchasing Supervisor IT Procu |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Supervising a staff of 2 people responsible for the establishment and administration of Information Technology (IT) procurements for the NMDOT. To include development of Price Agreements (Through SPD, GSA, and NASPO), Requests for Proposals, Sole Source agreements as well audit and approval of purchasing activities for the NMDOT. Providing guidance, resources, facilitation, training, and expertise in the implementation and/or pursuit of required procurement methodologies. Acting as a liaison, arbiter and/or, guide for communications between vendors, program personnel, management, and inter-agency personnel. |

| | |
|---|---|
| **Start Date** | 09/15/2012 |
| **End Date** | 06/20/2015 |
| **Employer** | NMDOT |
| **Ending Job Title** | Purchasing Agent-A |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | [redacted] |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Audit and approval of purchasing activities including researching, evaluating, and auditing acquisition resources, products, and service information. Provide technical support, guidance, and training in procurement for the NMDOT. Providing guidance, resources, facilitation, training, and expertise in the implementation and/or pursuit of Invitations to Bid, Requests for Proposals, Price Agreements, Contracts, Emergency Procurements and Sole Source Procurements for commodities associated with vertical and horizontal Construction, Road Maintenance, Professional Services, Information Technologies (IT) (Hardware, Software, Infrastructure), PPE, Office Supplies, Personnel Supplies, Public and Personnel Transportation, and Medium and Heavy Equipment and any other commodities required to support and maintain the Public Transportation systems for the State of New Mexico. |

| | |
|---|---|
| **Start Date** | 08/01/2009 |
| **End Date** | 10/15/2012 |

CONFIDENTIAL


| | |
|---|---|
| **Employer** | Best Buy LLC |
| **Ending Job Title** | Store Operations Manager |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Managing a staff of 30 employees in the oversight of store inventory to include review and approval of purchasing activities, researching, evaluating and auditing acquisition resources, products and service information. Providing technical support, guidance and training in procurement and inventory management. Conduct and oversee weekly, monthly, and yearly inventory audits Management of In-Home delivery team, oversight of facility operational budgets. Management of In-Home delivery team, oversight of facility operational budgets, procurement of facility supplies and services, oversight of facility security and loss prevention.1-3-2015 promoted to Purchasing Management of In-Home delivery team, oversight of facility operational budgets, procurement of facility supplies and services, oversight of facility security and loss prevention. |

| | |
|---|---|
| **Start Date** | 04/01/2008 |
| **End Date** | 11/25/2009 |
| **Employer** | NM DOH |
| **Ending Job Title** | Office Clerk, Gen-A |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | No |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ Providing high quality printing and copying solutions for the staff of the New Mexico Department of Health as well as the New Mexico Environment Department. Duties to include: inventory maintenance, procurement of printing systems, materials and supplies, researching, evaluating and auditing products and service information for the printing and publishing requirements. |

| | |
|---|---|
| **Start Date** | 05/01/2007 |
| **End Date** | 04/29/2008 |
| **Employer** | Checker Auto Parts |
| **Ending Job Title** | Store Managaer |
| **Supervisor** | [redacted] |

CONFIDENTIAL


| | |
|---|---|
| **Ok to Contact?** | No |
| **Email** | [redacted] |
| **Phone** | **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ Managing a store staff of 10 to15 employees, including assistant managers, full-time, and part-time employees. Duties include hiring, staff development, budget management, store presentation, inventory management, and procurement of store inventory and specialty items. Small contract negotiation and administration with local repair shops and suppliers |

| | |
|---|---|
| **Start Date** | 05/01/2004 |
| **End Date** | 05/20/2007 |
| **Employer** | Best Buy LLC. |
| **Ending Job Title** | Store Services Manager |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | No |
| **Email** | [redacted] |
| **Phone** | **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Management of over 30 employees in the following departments: The Geek Squad, consisting of Hardware and Software repair and installation, Information Technology (IT) network installation, repair, procurement, and maintenance; Full-Service Home Theater Installation to include IT network integration; Mobile Audio/Video Installation; and Home Delivery Service. Overseeing all services provided by Best Buy Store #375. Responsible for meeting sales goals, payroll, budget management, inventory maintenance, staff development, sales event coordination, customer problem resolution, review and approve purchasing activities in each department, auditing of procurement compliance to include researching, evaluating, and auditing acquisition resources, provide technical support, guidance and training in the procurement of goods and services for Best Buy clientele. |

| | |
|---|---|
| **Start Date** | 11/20/1990 |
| **End Date** | 05/20/2005 |
| **Employer** | Xerox Corp. |
| **Ending Job Title** | Customer Service Engineer/Spec |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | [redacted] |
| **Phone** | **Country Code** |

CONFIDENTIAL


| | |
|---|---|
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | Managing a territory of high-volume copiers and printers which included repair and maintenance of the equipment, software installation, advanced troubleshooting of hardware, software, and firmware, Information Technology (IT) system/network integration, customer training, inventory maintenance, parts expense control, machine reliability and customer satisfaction. Six years as an area product specialist on several equipment platforms. |

## Education Level

**Highest Education Level** Associate Degree

## References

| Reference | Title | Employer | Phone | Country Code |
|---|---|---|---|---|
| [redacted] | DoIT IT Network Specialist 3 A | NM DoIT | [redacted] | |
| [redacted] | Workers Compensation Advocate | Workers Compensation AdmiNMDOT | [redacted] | |
| [redacted] | Ruidoso City Manger | City of Ruidoso | [redacted] | |

## Questionnaire

**Agency Level:**

**Question:** How many years of experience do you have conducting the Invitation to Bid (ITB) or Request for Proposals (RFP) process?

| Possible Answer | Correct Answer | Selected Answer |
|---|---|---|
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have with the SHARE purchasing and contract

modules?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have with the New Mexico Procurement Code, state statutes and regulations?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have processing contracts for Information Technology (IT) services and/or software?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | ✔ |
| Ten or more years | ✔ | |

**Question:** How many years of experience do you have determining the best sources considering cost, quality of goods and services, delivery time, and compliance with the New Mexico Procurement Code?

CONFIDENTIAL


| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** Are you a resident of the State of New Mexico?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Resident greater than or equal to 1 year | | |
| Resident greater than or equal to 2 years | | |
| Resident greater than or equal to 3 years | | |
| Resident greater than or equal to 4 years | | |
| Resident greater than or equal to 5 years | ✔ | ✔ |
| Not a Resident | | |

## Online Screening:

**Question:** Do you meet the minimum qualifications of Bachelor's Degree in Business Administration or IT related field and four (4) years experience with government contracts with an emphasis on IT? Substitutions may apply. Please refer to Substitution Table on the Job Posting.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes | ✔ | ✔ |
| No | | |

## Additional Questions:

**Question:** Are you a United States Veteran who has been discharged or released from active duty from the Armed Forces under honorable conditions or are you currently serving in the National Guard. (Veterans/National Guard Member MUST ATTACH the appropriate documentation at the time of application to qualify for additional preference points). Veterans: You MUST ATTACH a copy of your DD 214 Form (Long Form). National Guard members MUST ATTACH an official statement from applicable

CONFIDENTIAL


branch of the Armed Forces showing you are a current member of the National Guard, or a NGB 22 Form at the time of application.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am an Honorable Veteran. | ✔ | |
| No | | ✔ |

**Question:** Are you a United States Honorably Discharged Veteran with a service-connected disability? YOU MUST ATTACH the appropriate disability documents as issued by the Department of Veteran's Affairs at the time of application to qualify for additional preference points.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am a Disabled Veteran. | ✔ | |
| No | | ✔ |

CONFIDENTIAL

**Application Report**

**Job Opening ID:** 145350

**Job Posting Title:** SPD IT Procurement Specialist II (GSD #49191)

## General Information

| | |
|---|---|
| **Name** | [redacted] |
| **Applicant ID** | 339290 |
| **Applicant Type** | Employee |
| **Applicant Status** | 010 Active |

## Contact Information

| | |
|---|---|
| **Name Prefix** | |
| **First Name** | [redacted] |
| **Middle Name** | [redacted] |
| **Last Name** | [redacted] |
| **Name Suffix** | |
| **Address** | [redacted] SANTA FE |
| **Preferred Contact** | Phone |

## Phone Numbers

| Phone Type | Telephone | Extension | Country Code | Preferred |
|---|---|---|---|---|
| Business | [redacted] | | | No |
| Cellular | [redacted] | | | Yes |

## Email Addresses

| Email Type | Email Address | Preferred |
|---|---|---|
| Business | [redacted] | Yes |
| Home | [redacted] | No |

## Work Experience

| | |
|---|---|
| **Start Date** | 10/17/2020 |
| **End Date** | |
| **Employer** | STATE OF NM |
| **Ending Job Title** | FINANCIAL COORDINATOR |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | [redacted] |
| **Phone** | [redacted] **Country Code** |

CONFIDENTIAL


| | |
|---|---|
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ Manage the daily operations of collecting the State Purchasing Special Revenue fees fund.<br>¿ Manually record all report data to the Divisions main records log in an excel document that is easily accessible to management.<br>¿ Verify that fees (monies) are received and recorded timely on internal logs and with ASD Accounts Receivable team.<br>¿ Review IT related NASPO¿s and GSA agreements for compliance of quarterly sales reporting by vendors on all contracts and price agreements containing a fee.<br>¿ Communicated to vendors the Terms and Conditions of our reporting requirements, on the new award of the IT Professional Services price agreement.<br>¿ Work with buyer on the IT Professional Service and other IT related procurements, to identify amendments and compliance status.<br>¿ Conduct compliance reviews for the SPD Buyers in order to consider contract extensions or amendments.<br>¿ Recognize and implement the appropriate methodology to be employed for IT and general service procurements<br>¿ Process all incoming invoices by preparing vouchers for payment, prepare Operating Transfers and run SHARE activity reports.<br>¿ Various SHARE request for the Division such as opening purchase orders, closing out purchase orders, purchase order increases, travel reimbursements, and accruals.<br>¿ Work closely with other State Agencies and Departments to reconcile vendors fees collected, in order to ensure fees are applied appropriately.<br>¿ Records Liaison for the Division. Completes record retention to submit to State Records and Achieves by organizing records and obtaining approval to destruct.<br>¿ Report to management, the quarterly performance measures related to the revenue collected and reported each quarter for LFC and audit purposes.<br>¿ Complete Work Orders through FMD<br>¿ Assist Front Desk Receptionist and Front Desk Secretaries Office with administrative duties when needed.<br>¿ Email weekly advertising to newspapers, proof, maintain correspondences and approve advertisements. Maintain log and update advertisement status is Procurement Tracker.<br>¿ Offer technical support to vendors on how to complete the quarterly excel sales report and email submission. To ensure vendor compliance every quarter. |

| | |
|---|---|
| **Start Date** | 11/17/2018 |
| **End Date** | 10/16/2020 |
| **Employer** | State of New Mexico |

CONFIDENTIAL


| | |
|---|---|
| **Ending Job Title** | Purchasing Agency- A |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | [redacted] |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ Determine the appropriate method of procurement based on what needs to be procured (IT, Professional, or General) which results in either an Invitation to Bid (ITB), Request for Proposals (RFP) or Professional Service Contract (PSC).<br>¿ Provide technical guidance and support to agencies, vendors and local public bodies related to the procurement code and its process.<br>¿ Validate IT procurements are prepared using NM DoIT templates and correct approval processes are followed.<br>¿ Provide assistance to agencies with technical and strategic procurement methods that come to State Purchasing Division.<br>¿ Prepare, schedule and lead/participate in meetings with vendors and agencies such as Industry Meetings, Request for Information and Pre-Bid/ Pre-Proposal conferences, to ensure equal opportunity to all vendors.<br>¿ Research market trends and pricing to determine competiveness of IT related goods and services.<br>¿ Processing of Request for Proposals, Invitation to Bids, Statewide Price Agreements, Department Price Agreements, Contracts, Purchase Orders, Multiple Signature and Single Signature Amendments, Amendment extensions, Amendment general changes, Sole Source, GSA, ITB¿s and Supplemental ITB¿s, NASPO and Co-Operative agreements<br>¿ Select which vendors to award based on their response to the procurement solicitation, and finalize the award through its execution.<br>¿ Servicing of price agreements and contracts such as amendments and extensions, including collecting reports from vendors and requesting status of fees for extensions.<br>¿ Assist in determining the validity of protests and assist in responding to complaints and IPRA requests as needed.<br>¿ Ensure the execution of notices, advertising, bid tabulations, evaluation committee reports and contract preparation, and awards are issued timely.<br>¿ Proficient in the following systems: Procurement Tracker (PT2), eProNM/SciQuest, GSD Website, File Trail, SHARE, Excel, MS Word, Outlook, W-9 submissions, DocuSign, and GoToMeeting, Teams Meeting<br>¿ Provide customer service to vendors and agencies by phone and email correspondence<br>¿ Attend and participate in conferences for National procurements (NASPO)<br>¿ Conduct Bid Opening in person and via GoToMeeting |

CONFIDENTIAL


| | |
|---|---|
| **Start Date** | 10/15/2018 |
| **End Date** | 11/16/2018 |
| **Employer** | ATA Services |
| **Ending Job Title** | Purchasing Agent- O |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |
| **Description** | ¿ Review accounting reports, contracts, and agreements for compliance with state and federal regulations.<br>¿ Assist agency personnel in determining agency procurement needs.<br>¿ Responsible for processing all activities on procurement assignments for State Purchasing Division<br>¿ Specialized technical contract management support services in the review of professional and technical service contracts.<br>¿ Conduct Bid Opening<br>¿ Provide excellent customer service, answer phones, assist customers via email and telephone<br>¿ Assist State Agencies and Local Public Bodies in compliance with the Procurement Code<br>¿ Attend Conferences and Expo¿s<br>¿ Conduct market research for competitive pricing and vendor participation.<br>¿ Purchases in the following Commodities; Automotive, Furniture, Food, Uniforms, Metals, Fuel, Janitorial, Farming<br>¿ Assist buyers with complex and technical tasks such as Evaluation Committee Reports, Bid Tabs, entering 300 commodity codes into SciQuest and Procurement Tracker, and preparing hard files. |

| | |
|---|---|
| **Start Date** | 12/30/2013 |
| **End Date** | 10/12/2018 |
| **Employer** | Regional Finance |
| **Ending Job Title** | Branch Manager |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |

CONFIDENTIAL


| | |
|---|---|
| **Description** | ¿ Responsible for all procurement of goods & services to include IT related for the department, some at low cost and others were price and value based factors which included; Office supplies, Janitorial services, Court process servers, Attorney services, water services, and computer monitors.<br>¿ Oversee all contracts for the department, including auditing contracts for compliance of State and Federal regulations, records maintenance and retention/ destruction of IT hard files and electronic/media files.<br>¿ Assist customers in electronic application submission, and resolve any IT related issues.<br>¿ Prepared, analyzed and maintained budget and corresponding financial records of procurement, vendor services and accounting reports.<br>¿ Verify all monies collected from daily transactions (cash/electronic/check) are recorded accurately on accounts and validated timely at the bank.<br>¿ Reconcile daily and monthly branch transactions to queries/ reports I run daily to closeout<br>¿ Manage control systems for a large variety of accounts which involve legal issues, insurance claims and records maintenance for 850 accounts.<br>¿ Determine what action to take on defaulted accounts. Prepare civil summons and file with Magistrate court. Attend hearings as Respondent representative for company.<br>¿ Maintain court documents and file the appropriate documents timely, per the courts required time frames.<br>¿ Ensure compliance and passing rates for State, Federal and Company lending and insurance regulations<br>¿ Open branch, cut petty cash to prepare operating transfer fund from bank into cash drawers each day and drop off branch deposit before cut-off time at bank for validation slip, in order to prepare the daily reports.<br>¿ Audit and reconcile GL codes for vouchers paid and checks cut to assure payables are current<br>¿ Submit payables to main office monthly for processing<br>¿ Audit quarterly and monthly payables to bank vouchers for inconsistencies and non-payments<br>¿ Once procured, as the Branch Manager I submitted all invoices for fees such as attorney fees, court and process server fees, water services, janitorial services, building maintenance and refunds to Home Office for payment processing.<br>¿ IT Technical system support and training to staff.<br>¿ Technical contract support such as approving loans from $600 up to $12,000 with personal collateral, preparation of loan files and closing documents to have a uniformed structure, negotiate terms, rate and amount of structured loans and review contracts for compliance and completeness.<br>¿ Proactively interact and train staff members to directly influence and impact results to achieve month end delinquency and production goals to company standards. |

CONFIDENTIAL


¿ Provide excellent customer service to build long term business relations and communicated monthly with customers by phone and email correspondences.

| | |
|---|---|
| **Start Date** | 06/20/2005 |
| **End Date** | 12/20/2013 |
| **Employer** | OneMain Financial |
| **Ending Job Title** | Branch Manager |
| **Supervisor** | [redacted] |
| **Ok to Contact?** | Yes |
| **Email** | |
| **Phone** | [redacted] **Country Code** |
| **Ending Pay Rate** | 0.00 USD Month |

**Description** ¿ Made critical decisions of loan underwriting based on creditworthiness from credit bureau reports and personal data. Negotiated terms, interest rates, loan amounts from $1k to $150k and loan security.
¿ Responsible for overseeing 2,500 contracts of mortgage and personal loans for the department with receivables of $21 million
¿ IT Technical system support and training to staff.
¿ Implemented solutions to resolve challenges of delinquent accounts by loss mitigation and utilized programs for HARP and budget restructures. Also reduced loss by processing foreclosures, settlements, repossessions and legal suites
¿ Prepared legal document packets to submit for foreclosures and garnishments for civil litigation
¿ Run daily queries and utilize reports for trends in delinquency.
¿ Utilize daily and monthly reports to create action plan for reduction of loss
¿ Loan Budget Restructures based on Debt-to-Income (DTI) and Payment-to-Income (PTI) formulations
¿ Conducted internal branch audit each month to verify compliance with policy and procedures of state and federal regulations for MLA and consumer finance which include analysis of mortgage contracts, secured and signature contracts, money transactions and application data to assure quality performance of portfolio.
¿ Analyze strength and weakness of employees and prepare a monthly assessment of the previous months results. I would be responsible for effectively communicating the assessment with my staff and develop an organized plan of resolution to improve results.
¿ Processed all invoices and reconciled all outstanding vouchers for the department for; janitorial services, pest control, water services, legal fees and court services.
¿ Made all purchases for the department for toner, paper supplies, Janitorial supplies, breakroom supplies, marketing material & brochures.
¿ Audit and reconcile GL codes for vouchers paid and checks cut to assure payables are current
¿ Submit payables to main office monthly for processing
¿ Audit quarterly and monthly payables to bank vouchers for inconsistencies and non-payments
¿ Mortgage Loan Originator (MLO) through NMLS. I would originate, services and collect all branch real estate loans

## Education Level

**Highest Education Level** HS Graduate or Equivalent

## References

CONFIDENTIAL


| Reference | Title | Employer | Phone | Country Code |
|---|---|---|---|---|
| [redacted] | Friend | Courts | [redacted] | |
| [redacted] | Supervisor | SoNM | [redacted] | |
| [redacted] | Co-worker | SONM | [redacted] | |

## Questionnaire

### Agency Level:

**Question:** How many years of experience do you have conducting the Invitation to Bid (ITB) or Request for Proposals (RFP) process?

| Possible Answer | Correct Answer | Selected Answer |
|---|---|---|
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | ✔ |
| Ten or more years | ✔ | |

**Question:** How many years of experience do you have with the SHARE purchasing and contract modules?

| Possible Answer | Correct Answer | Selected Answer |
|---|---|---|
| None | | |
| One to three years | | |
| Four to six years | | ✔ |
| Seven to nine years | | |
| Ten or more years | ✔ | |

**Question:** How many years of experience do you have with the New Mexico Procurement Code, state statutes and regulations?

CONFIDENTIAL


| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have processing contracts for Information Technology (IT) services and/or software?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** How many years of experience do you have determining the best sources considering cost, quality of goods and services, delivery time, and compliance with the New Mexico Procurement Code?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| None | | |
| One to three years | | |
| Four to six years | | |
| Seven to nine years | | |
| Ten or more years | ✔ | ✔ |

**Question:** Are you a resident of the State of New Mexico?

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Resident greater than or equal to 1 year | | |
| Resident greater than or equal to 2 years | | |
| Resident greater than or equal to 3 years | | |
| Resident greater than or equal to 4 years | | |
| Resident greater than or equal to 5 years | ✔ | ✔ |
| Not a Resident | | |

### Online Screening:

**Question:** Do you meet the minimum qualifications of Bachelor's Degree in Business Administration or IT related field and four (4) years experience with government contracts with an emphasis on IT? Substitutions may apply. Please refer to Substitution Table on the Job Posting.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes | ✔ | ✔ |
| No | | |

### Additional Questions:

**Question:** Are you a United States Veteran who has been discharged or released from active duty from the Armed Forces under honorable conditions or are you currently serving in the National Guard. (Veterans/National Guard Member MUST ATTACH the appropriate documentation at the time of application to qualify for additional preference points). Veterans: You MUST ATTACH a copy of your DD 214 Form (Long Form). National Guard members MUST ATTACH an official statement from applicable branch of the Armed Forces showing you are a current member of the National Guard, or a NGB 22 Form at the time of application.

| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am an Honorable Veteran. | ✔ | |
| No | | ✔ |

**Question:** Are you a United States Honorably Discharged Veteran with a service-connected disability? YOU MUST ATTACH the appropriate disability documents as issued by the Department of Veteran's Affairs at the time of application to qualify for additional preference points.

CONFIDENTIAL


| Answers | | |
|---|---|---|
| **Possible Answer** | **Correct Answer** | **Selected Answer** |
| Yes I am a Disabled Veteran. | ✔ | |
| No | | ✔ |

**INTERROGATORY NO. 8:** List each and every employee, including name, job title and date of hire, from June 2022 to present who works remotely for all or any part of their workweek. For each, state how many hours they work remotely each week.

**ANSWER:** GSD objects to this Interrogatory to the extent it refers to a time period when most State employees worked remotely as a result of COVID-19 and the Governor's orders related to the pandemic. GSD objects to this Interrogatory as such information has no relevance to the claims in this case, nor is it reasonably calculated to lead to admissible evidence.

In addition to what is stated in response to Interrogatory No. 7, GSD states that since August 2023, no employee has been authorized for regular telework, although some supervisor-level employees sometimes work after-hours and weekends in addition to their regular work hours and might work remotely at such times.

Following a medical procedure in November 2024, Eunice Moya worked remotely for a period of approximately four weeks at the request of the Cabinet Secretary. Ms. Moya utilized her accrued leave during that period.

**RESPONSES TO PLAINTIFF'S SECOND REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 10:** Any and all emails or text messages between any GSD SPD employee and any or all of the Defendants about their work schedules or work attendance, including but not limited to emails about getting to and/or starting work for the day, emails about leaving and/or stopping work for the day, and emails about overtime.

**RESPONSE:** GSD objects to this Request as it has no reasonable limitation in scope or time. As stated, this Request would seek all communications since time immemorial. GSD has no efficient way of searching for these communications, which are likely common and often informal between employees and supervisors. These communications would be irrelevant to the claims in this case

EXHIBIT

17

exhibitsticker.com

# Job Description

| | |
|---|---|
| Job Title | SPD IT Procurement Specialist II (GSD #49191) |
| Job ID | 145350 |
| Posting End Date | 07/18/2024 |
| Location | Santa Fe |
| Full/Part Time | Full-Time |
| Regular/Temporary | Regular - PERM for State |
| Agency | General Services Department |
| Job Posting Type | Continuous Job Opening |

*For more Job Requirements & Classification Description:* Click Here

Return to Previous Page Switch to Internal View

**Salary**

*$36.09 - $57.75 Hourly*

*$75,072 - $120,115 Annually*

*This position is a Pay Band 85*

**Posting Details**

This posting will be used for ongoing recruitment and may close at any time. Applicant lists may be screened more than once.

The General Services Department is the agency that holds the responsibility of furnishing essential resources and services that support state government operations in New Mexico. GSD's professional staff provides multiple lines of insurance coverage and group health benefits; litigation defense, loss prevention and alternative dispute resolution services; facility planning and design services and construction management; building and landscape maintenance services; vehicle leasing and air transportation services; technical support for agencies in the procurement process; printing and graphic art products; and financial and accounting services. Our customers include state agencies, local public bodies, public schools, institutions of higher education and their employees.

**Why does the job exist?**

This position provides continuity of services to State Agencies and Local Public Bodies for procurements including general construction, routine commodities and general services. This position will assist with Bid Opening and conduct high level meetings as needed and manage a large volume of procurements within SPD, which directly impacts the running of state government and involves close coordination with, and providing guidance to multiple agencies. Any interruption of services could severely impact the entire state.

**How does it get done?**

- Processing construction related Invitation for Bid and Request for Proposals documentation including, but not limited to, bid tabulations, evaluation committee reports, resulting contracts/price agreements, amendments and extensions.

- Award General Service Agreements (GSA), NASPO and/or other cooperative contracts, and sole source procurements as requested to include close communication with prospective vendors.

- Identify appropriate commodity codes for solicitations; help determine validity of protests, assist in responding to purchasing complaints by state agencies/vendors and IPRA requests as needed.

- Instruct compliance with the Procurement Code and GSD Rules and Regulations to purchasing professionals in state agencies and local public bodies.

- Update progress on all assignments in procurement tracker, update solicitations in the online procurement system and meet all metrics within specified time frames.

- Execute related tasks: notice of participation; newspaper advertising of solicitation; create and/or review solicitation documents, bid tabulations and evaluations; review RFP documents and evaluation committee reports; assist with contract preparation and subsequent awards.

- Assist other buyers, complete special projects as assigned and meet all deadlines in a timely and professional manner.

- Provide high level of customer service to, but not limited to State Agencies, Local Public Bodies and the Supplier community.

GSD 009789

**Who are the customers?**

All Executive Branch State Agencies

**Ideal Candidate**

- Experience in governmental or private purchasing practices and procedures.
- Experience with state agencies and participating local government units.
- Experience in Request for Proposals.
- Experience in statewide cooperative contracts.

**Minimum Qualification**

A Bachelor's Degree in Business Administration or IT related field and four (4) years' experience with government contracts with an emphasis on IT. Substitutions Apply. See Substitution Table below.

**Substitution Table**

These combinations of education and experience qualify you for the position:

| | Education | | Experience | | Education | | Experience |
|---|---|---|---|---|---|---|---|
| 1 | High School Diploma or Equivalent | AND | 8 years of experience | OR | High School Diploma or Equivalent | AND | 8 years of experience |
| 2 | Associate's degree in the field(s) specified in the minimum qualification | AND | 6 years of experience | | Associate's degree or higher in any field | AND | 8 years of experience |
| 3 | Bachelor's degree in the field(s) specified in the minimum qualification | AND | 4 years of experience | | | | |
| 4 | Master's degree in the field(s) specified in the minimum qualification | AND | 2 years of experience | | | | |
| 5 | PhD degree in the field(s) specified in the minimum qualification | AND | 0 years of experience | | | | |

• Education and years of experience must be related to the purpose of the position.

• If Minimum Qualification requires a specific number of "semester hours" in a field (e.g. 6 semester hours in Accounting), applicants MUST have those semester hours in order to meet the minimum qualifications. No substitutions apply for semester hours.

**Employment Requirements**

Must possess and maintain a valid New Mexico Driver's License. Must possess and maintain a current Defensive Driving Course Certificate from the State of New Mexico or must pass and receive Defensive Driving Course Certification as a condition of continued employment.

**Working Conditions**

Work is performed primarily in an office setting at the Joseph Montoya Building with exposure to Visual/Video Display Terminal (VDT) and extensive personal computer and phone usage. Work extended hours and occasional travel may be required. Sitting/Standing, bending, squatting, climbing, and reaching for extended periods of time may be required.

**Supplemental Information**

Do you know what Total Compensation is? Click here

Agency Contact Information: Michael Saavedra: (505) 372-8489 or Michael.Saavedra@gsd.nm.gov Email

For information on Statutory Requirements for this position, click the Classification Description link on the job advertisement.

**Bargaining Unit Position**

GSD.009790

This position is covered by a collective bargaining agreement and all terms/conditions of that agreement apply and must be adhered to.

Return to Previous Page Switch to Internal View

EXHIBIT 3
BEAN & ASSOCIATES, Inc.

# Branch Manager

Apply

REGIONAL FINANCE | **Careers** | Sign In | Search for Jobs | Join Our Talent Community




## Branch Manager

Apply

---

- Santa Fe, NM
- Full time
- Posted Today
- R5811

Are you ready to take your career to the next level? Regional strives to positively impact the financial lives of our customers.

For over 35 years, our Team Members have been passionate about supporting customers through their financial challenges in life. They take pleasure in finding solutions and lending a helping hand, both to our customers and our communities. As we continue to grow and become a national brand in consumer financing, we hope you'll consider us for future career opportunities.

# Branch Manager

Apply

leading team members, managing the branch P&L, driving new loan growth, managing current loan portfolio, marketing, maintenance of current business partnerships, and development of new strategic business partners. The Branch Manager will perform in accordance with RMC's Mission, Vision and Shared Values.

**Why work at Regional?**

- Regional offers **competitive** pay! We do our best to show that we value our team members!
- You are eligible for a **monthly bonus**. Who doesn't love a nice cash reward for their hard work?
- You will have **promotion opportunities**. We love to train our Assistant Managers into future Branch Managers!
- All full-time team members have access to our **medical, dental, vision and 401(k) benefits**!
- Pays an average of $72,000, this amount can vary based on your location and cost of living adjustments!

**Duties and Responsibilities**

- Manages and inspires team members to perform to their full potential, thus driving branch profitability.
- Exercises a degree of independent judgment in making decisions affecting employees and the work of the branch within company policy guidelines and District Supervisor oversight.
- Subject matter expert on our personal loan product offerings in order to present loan solutions to current and potential customers that help them achieve their financial goals.
- Creates and maintains branch operations solvency by the control of assets, proper credit extension, and proper follow-up and counseling of past-due customers.
- Establish and build customer relationships through delivering exceptional service.
- Assigns duties to employees and frequently examines their work for accuracy, neatness, timeliness and maintaining efficiency by training employees and adjusting errors.
- Trains and develops employees with regard to current and new branch operations, company policies, procedures, and laws governing the consumer finance business.
- Works with Recruiting and District Supervisors to address branch staffing needs.
- Cultivates new relationships with local retail businesses. Partners with Account Managers to maintain strong relationships with current retail businesses, handle complaints and trains business partners in company policies and procedures.
- Oversees the following duties including but not limited to:
- Approves and closes loans, as necessary.
- Works with past-due customers by developing a plan for resolution.
- Delegates all collection activity on a daily basis and follows up to ensure completion.
- Process insurance claims for customers. Maintains proper insurance claims records and reports.
- Telephones and sends collection material to past-due customers, as needed.
- Accepts and posts payments.
- Processes and reviews loan documentation.
- Answers telephone, as needed.

# Branch Manager

Apply

Minimum Qualifications

- High School Diploma or Equivalent
- 2 years of management experience or completion of required Management Trainee program.
- Valid Driver's License and access to a dependable automobile with liability insurance coverage.
- Must pass drug screen, criminal and credit background checks.

Preferred Qualifications

- 1+ years of Consumer Finance experience.
- College degree a plus.
- Willingness to relocate for career advancement.

Critical Competencies

- Demonstrated passion for customer service.
- Excellent written and verbal communication skills.
- Customer service minded with a personality that relates well with a broad spectrum of people, including external customers, branch colleagues, and corporate co-workers.
- Thrives in a pay for performance atmosphere.
- Proven ability to multi-task.
- High degree of integrity.
- Confidence.
- Sales mentality.
- Adaptable to an ever changing environment.
- Desire for career advancement.
- Problem solving skills.
- Empowers others.
- Emotional Intelligence.
- • Conflict Management skills.

Working Conditions

This position works in an office providing consumer loan products in person and over the phone. This position will occasionally require driving in his/her personal vehicle. The Branch Manager typically works more than 40+ hours each week; Monday through Friday with some Saturdays and overtime required. This position is considered exempt for purposes of federal wage-hour law, which means that it is not eligible for overtime pay.

*If you are a job applicant who resides in the state of California, please review our California Employee Privacy Policy at the following link:*
*https://regionalfinance.com/wp-content/uploads/2022/11/UPDATED-Employee-Privacy-Policy-11.2022.pdf*

# Branch Manager

Apply

characteristic protected by applicable law ("Protected Characteristics"). Regional's policy of non-discrimination applies to all phases of the employment process and relationship, including, but not limited to, recruitment and selection; compensation and benefits; professional development and training; promotions and opportunities; transfers; social and recreational programs; layoff; and terminations.

## About Us

REGIONAL FINANCE

Founded in 1987, Regional Finance provides services to 450,000 customers annually and provides employment for over 1750 team members and growing. We place an emphasis on making a meaningful difference in peoples' lives by bringing a personal touch to finances and a commitment to diversity, equity, and inclusion that creates a work environment where all employees have a sense of belonging. Team members will have the opportunity to give back to their communities through our outreach program, Regional Reach, that services many organizations

Read More

## Why We're Smiling




At Regional Finance, we care about each other, our customers, and our communities and look for each Team Member's strengths to meet our shared goals. We offer a variety of incredible benefits, including but not limited to a comprehensive medical, dental, and vision plan, 401(k) plans with matching company contributions, PTO and paid holidays, paid parental leave and an employee assistance program for mental health and counseling.

Read More

## NOTICE TO CA APPLICANTS

**Notice to California Applicants**

# Branch Manager

Apply

Follow Us

workday.

© 2025 Workday, Inc. All rights reserved.

So at that point you know that that has happened before.
Q. Okay. But nobody that's been hired for a position has later been found to have misrepresented their experience?
A. Not that I'm aware of.
Q. Okay.
A. And I would have given her credit for Regional Finance Branch Manager, December 30, 2013, through October 12, 2018.
Q. Why?
A. Because she was responsible for all procurement of goods and services to include IT related for the department; some at low cost, others were price value.
"Oversee all contracts for the department, including auditing contracts for compliance of State and Federal regulations, records maintenance and retention/destruction."
IT hard files; assist customers with IT related issues; prepare, analyze, maintain budget and corresponding records of procurement, vendor services...
Q. What do those things have to do with the purpose of an IT Procurement Specialist?
A. I'm looking at the minimum qualifications of the job.
Q. Right. So it says, "four years' experience with



government contracts with an emphasis on IT."
Is a Regional Finance Manager for a private bank dealing with the Procurement Code?
A. I don't know.
Q. So would a Regional Finance Branch Manager be dealing with government contracts with an emphasis on IT when they're at a private bank?
A. I don't know.
Q. But don't you have to know that to apply, this experience?
A. What they're writing here is something that I would have put through because it's related to procurement, it's related to IT.
Q. Have you ever worked in procurement?
A. I've never worked in procurement, no.
Q. So you don't actually know what skills are needed for an IT Procurement Specialist?
A. I do because I was CPO certified when I was with the Legislative Counsel Services.
Q. So you took the experience from Ms. Sanchez from a private bank and gave her credit for State procurement experience?
A. Yes. My staff did, and I verified that it was correct. And this -- we did hire this individual for this position; and if I recall, it needed the State Personnel



Office approval.
So anytime a hire requires State Personnel Office approval, we send the application over along with a Compensation Action Form. We do an experience calculator to include the experience that we provided, and the State Personnel Office verifies what we're counting as experience. And they approved this action based on our analysis, so they agreed with our analysis. So I'm not sure --
MR. LOMAN: Let her finish her question.
THE WITNESS: Okay. Sorry.
BY MS. BURKE:
Q. I was just saying who at the State Personnel Office approved that?
A. I was going to say I'm not sure who the HR administrator was that worked on this comp action, but I did verify it. And our SPO analyst is Celeste DeBari.
Q. And so there's e-mails about that?
A. Uh-huh. So Celeste DeBari is our SPO analyst, and then from Celeste, it goes to her Division Director which is Cynthia Sandoval who also verifies what she is -- what we submitted. So she verifies that.
Then the State Personnel Office, who was Dylan Lang, signs off on approval. So besides the HR administrator verifying this, I verified it; and then



three people at the State Personnel Office all agreed with our recommendation.
Q. Why did State Personnel Office need to approve this position?
A. Because I believe it was over a 15 percent increase.
Q. And when they approved your hire, did they compare Ms. Sanchez to the other applicants?
A. They approved the internal comparators. So whoever the internal comparators were in the IT position is what they verified. So whoever was in the position, they -- we compare it with their education, experience; and that's where the recommended salary was given based on appropriate placement based on education and experience.
Q. So they compared her to people already working in the job, not the people who applied for the job?
A. Correct.
Q. So if people were more qualified who applied for the job than she was, they would have been especially qualified if they had been compared to the people in the job; correct?
A. No.
Q. Why not?
A. Well, because it's based on a committee, an interview committee that makes the decision.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN,**

**Plaintiff,**

**v.** **Case No. 1:23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT, et al**

**Defendants.**

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants, by and through their counsel, Jackson Loman Downey & Stevens-Block, P.C. (Eric Loman and Sarah Downey) submit the following reply in support of their Motion for Summary Judgment (Doc. 98).

**Introduction**

While Plaintiff's Response makes many statements of fact, none show a dispute of any fact that is material. Plaintiff cannot show any adverse employment action based on any form of discrimination, nor can she support a claim for hostile work environment. The undisputed facts of this case demonstrate Ms. Hunt-Brown has received all the leave she has requested. Further, Plaintiff is not entitled to work from home whenever she wants. Plaintiff's other claims also fail as discussed below.

**Reply to Plaintiff's Statements of Fact**

Plaintiff's Sham Affidavit

The factual statements found in Plaintiff's Response rely largely on an affidavit she prepared for purposes of the Response. However, that affidavit contradicts her deposition testimony in many respects. The "utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by

submitting an affidavit contradicting his own prior testimony." *Bell v. City of Tulsa*, No. CIV 21-0061 JB/CDL, 2024 WL 1018528, at *39 (N.D. Okla. Mar. 8, 2024). The "general rule is that affidavits that conflict with or contradict a party's prior deposition testimony should be disregarded in determining whether a genuine issue of fact exists…" *Moya v. City of Tucumcari*, No. Civ 03-0247 BB/KBM, 204 WL 2126335, at * 3 (D.N.M. Apr. 21, 2004). When "deciding whether an affidavit is an attempt to create a sham issue of fact, the relevant factors are whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002). The Court should ignore any factual statement in the Response supported by Plaintiff's own self-serving affidavit.

Local Rule 56.1

Plaintiff's Response makes several references to D.N.M.LR-Civ.56.1, suggesting Defendants' Statement of Undisputed Material Facts ("UMF") violates local rule by stating facts that are "improperly compounded [and] includes multiple facts…" See, e.g., Response (Doc. 105), p.3. Every fact stated in the Motion is supported by a citation to the record, with exhibits attached. Defendants have complied with Local Rule.

Plaintiff, however, has not complied with Local Rule 56.1(b), which requires her Response to "refer with particularity to those portions of the record upon which" she relies in her factual statements. Plaintiff's sham affidavit, for example, consists of 41 numbered paragraphs, but no paragraph is referenced in the Response. For example, where Plaintiff states the conclusion, she "was prejudiced by Defendants' interference in 2023," Defendants and the Court are then left to

comb 41 paragraphs to determine what, if any, admissible fact supports that statement. See Response, p. 12, ¶ L. Further, as detailed below, Plaintiff's Response contains several factual allegations that have no citation at all. The Court should ignore Plaintiff's factual statements supported by her sham affidavit or otherwise do not comply with local rule.

Defendants' Reply to Plaintiff's Response to
Defendants' Statement of Undisputed Material Facts

A. Response, pg. 2, ¶¶ 9-10: There is no such thing as an "informal performance improvement plan", as discussed below. Further, Plaintiff has not disputed the facts she intends to address, which is that Plaintiff's current supervisor, Ms. Leblanc, has done nothing to create a hostile work environment.

B. Response, pg. 2, ¶ 11: Plaintiff provides no citation to the record, but simply states she is suing other Defendants as well. Plaintiff's own testimony is that none of the parties listed here have done anything to create a hostile work environment. See Motion, (Doc. 98), Defendants' Statement of Undisputed Material Facts ("UMF"), ¶ 11.

C. Response, pg. 2, ¶ 12: Plaintiff's Response is supported only by her sham affidavit and should be ignored. Plaintiff's own testimony is that she has never been disciplined, suspended, demoted or terminated by GSD. See Motion, (Doc. 98) Defendants' UMF, ¶ 12.

D. Response, p. 2-4, ¶¶ 13-17: Plaintiff's Response does not dispute any facts set forth in Defendants' UMF, ¶¶ 13-17. The parties agree there were delays in certifying Plaintiff's FMLA leave for the years 2023 and 2024. However, Plaintiff has not, and cannot, dispute that she suffered no consequence as a result, as established in Defendants' UMF. Further, Plaintiff's factual statements here should be ignored to the extent they are supported by her sham affidavit.

E. Response, p. 4, ¶ 19: Plaintiff's Response does not address the undisputed fact it purports to. Further, to the extent Plaintiff intends to allege she was prohibited from using her

"available paid leave," the exhibit she refers to is an email in which she is told she can use her other forms of accrued leave. To the extent this response is intended to allege Plaintiff was prohibited from using her donated leave, her own testimony is that she received about one week of donated leave in 2024 and used it all. See Deposition of Kimberly Hunt-Brown, attached as Exhibit A, p. 134:4-8; 138:10-21.

F. Response, p. 4, ¶ 20: Plaintiff's Response does not dispute the fact it purports to.

G. Response, p. 5, ¶25: As cited in the Motion, Plaintiff testified she was aware that other employees also received post-COVID extension to continue telework in 2023 and that she received the longest of them all. Further, Plaintiff provides no evidence to dispute this fact.

H. Response, p. 6, ¶ 27: Plaintiff's Response does not dispute the fact stated at Defendants' UMF, ¶ 27. It is undisputed that during the July 31, 2023, interactive process meeting, the parties discussed Plaintiff's request to telework because of migraines. Following that meeting, Plaintiff formalized her request, which was denied, as discussed during the meeting. See Defendant's UMF, ¶ 30.

I. Response, p. 6, ¶ 28: Plaintiff's Response does not dispute Defendants' UMF, ¶ 28 and is supported only by her sham affidavit.

J. Response, p. 6, ¶ 30: Plaintiff relies on her sham affidavit to dispute the July 31, 2023, interactive process meeting was "about her migraine accommodation." However, Plaintiff's deposition testimony was that the July 31, 2023, meeting was "for the migraines specifically not being to drive in for the migraine." Ex. A, p. 110:3-13; see also Ex. A, p. 107:14-108:9 (describing the meeting and discussion of migraines).

K. Response, p. 6, ¶ 31: Plaintiff's Response does not dispute that a second meeting took place between the parties in which alternative accommodations were discussed. Further,

Plaintiff relies on her sham affidavit, which is contrary to her testimony as cited in Defendants' UMF ¶ 31.

L. Response, p. 7, ¶ 32: Although Ms. Moya worked from home for a brief period following knee surgery in November 2024, it was not a result of an accommodation requested by Ms. Moya, nor did she apply for FMLA leave. Rather, the GSD Cabinet Secretary asked her to work as needed while she recovered from her surgery and Ms. Moya agreed to do so. See Deposition of GSD (Rule 30(b)(6) deposition), attached as Exhibit B, p. 203:25-204:3. Ms. Leblanc testified that, while she might check emails while she is out of the office or after hours, she does not ever work a regular work day from home and is not aware of any other employees who do. See Deposition of Vanessa Leblanc, attached as Exhibit C, p. 86:6-22; p. 97:20 – 98:6.

Plaintiff attaches an Affidavit of Jose Puentes[1], who has never been identified as a witness in this case for any purpose. In his affidavit, Mr. Puentes states while employed by GSD he worked from home and characterized it as "off-site training" or "Remote Office Work Site." Even if true, Mr. Puentes' affidavit supports Defendants' testimony in this case, which is that no one was granted telework as an accommodation and, if anyone did telework, it was not with the approval of GSD or its H.R. department. As Ms. Moya testified, she cannot be certain no one ever teleworks because "a work schedule is between an employee and supervisor," but no one has been given approval to telework. See Deposition of Eunice Moya, attached as Exhibit D, p. 80:7-16. Mr. Puentes' affidavit should be disregarded by the Court as he has never been identified as a witness in this case, but even if considered by the Court, it does not create a factual dispute.

[1] A disgruntled former employee, Mr. Puentes has recently filed a lawsuit against GSD in State Court. See Puentes v. GSD, D-101-CV-2025-1722. In his Complaint, he alleges he was employed by GSD's Risk Management Division as an attorney.

M. Response, p. 7, ¶ 33: To the extent Plaintiff relies on her sham affidavit, this statement should be disregarded. Further, as noted above, Ms. Moya did not telework as an accommodation to her, but at the request of the Cabinet Secretary, and Ms. Leblanc has not teleworked. See, ¶ L.

N. Response, p. 7, ¶ 34: Here, Plaintiff relies solely on her sham affidavit. However, while it is undisputed that Plaintiff (and most other State employees) were required to telework during COVID, there is no evidence that Plaintiff ever submitted an accommodation request during that period (prior to January 2023) as suggested here.

O. Response, p. 7-8, ¶ 35: Although employees were required to work from home during COVID, GSD- following a directive by the State Personnel Office- told employees "all non-manager and non-supervisor employees… **must** return to the office full-time ***no later than*** February 2, 2023." See Deposition of GSD, attached as Exhibit B, Ex. 21 thereto. That employees were required to telework due to the COVID emergency has no bearing on whether GSD is required to allow telework as an accommodation now.

P. Response, p. 8, ¶ 43: This statement should be disregarded as it relies on Plaintiff's sham affidavit. Further, Plaintiff does not and cannot dispute the testimony cited in Defendants' UMF, which is that interviewers for Job #2954 noted Plaintiff was unable to answer questions about procurement during the interview.

Q. Response, p. 9, ¶ 45: Plaintiff does not dispute any fact stated in Defendants' UMF here. Ms. Leblanc's education is not referenced in Defendants' UMF and is immaterial.

R. Response, p. 9, ¶ 52: The interview notes from Ms. Sanchez's interview do not indicate she had six years of procurement experience; they indicate she had six years of experience "with [State Purchasing Division]." Ms. Sanchez had other qualifying work experience prior to

working for SPD and had the minimum qualifications for Job #49191. See Ex. B: p. 164:15-18; 150:7-24 (in addition to her 6 years of experience at SPD, Ms. Sanchez was given credit toward the minimum qualification (requiring 8 years' experience) for the five years she worked as a Regional Finance Branch Manager prior to coming to SPD).

S. Response, p. 9-10, ¶ 53: Plaintiff's Response does not dispute any fact stated in Defendants' UMF ¶ 53. Plaintiff provides no authority or evidence that Francine Martinez sitting on the interview panel for Job #49191 presented any 'conflict of interest.' Plaintiff does not dispute the evidence that she interviewed poorly and told interviewers she had 'little to [no]' relevant experience.

T. Response, p. 10, ¶ 55: Plaintiff relies on her sham affidavit and does not dispute the fact that, to at least one interviewer, she did not appear to be engaged in the interview or truly interested in the position.

U. Response, p. 10, ¶ 56: Here Plaintiff relies on her sham affidavit, which is inconsistent with her own testimony that she did not disclose any disability during the interviews (nor was she asked to), and does not dispute the evidence that the interviewers had no knowledge of any medical condition.

V. Response, p. 10, ¶ 59: As demonstrated by her own testimony as cited in Defendants' UMF, ¶ 59-61, it is undisputed Plaintiff knew she was required to have prior approval to flex her schedule and did not get that approval before working outside her regular work schedule on the day in question.

<u>Response to Plaintiff's Additional Facts</u>

W. Response, p. 11-12, ¶¶ A-I: These facts are not material. The parties agree there were delays in finalizing Plaintiff's annual FMLA certification for the years 2023 and 2024. What

is also undisputed is that Plaintiff was permitted to take off all the days she requested and suffered no adverse action as a result, as demonstrated by Defendants' UMF ¶¶ 15 – 17, 21.

X. Response, p. 13, ¶ Q: Mr. Puentes' affidavit should be disregarded as discussed above.

Y. Response, p. 13: ¶ R: This statement should be disregarded as it provides no citation or evidence in support.

Z. Response, p. 13-16, ¶¶ U – UU: These statements are immaterial and should also be disregarded to the extent they rely on Plaintiff's sham affidavit. As demonstrated above, all applicants for the positions (including Ms. Sanchez for Job #49191) had the minimum qualifications for the positions, as certified by the H.R. bureau. As demonstrated in Defendants' UMF, the interview panelists described reasonable and non-discriminatory reasons for their hiring decisions. Plaintiff has not provided any evidence to dispute these facts.

AA. Response, p. 16, ¶ VV: Plaintiff's Response cites to an Exhibit 20, but no such exhibit was filed or served. Further, this sentence appears to be incomplete and its meaning is unclear.

BB. Response, p. 16, ¶ WW: Plaintiff's Response draws a conclusion based on her paystubs. Even if it is true that Plaintiff's pay for one period was $175.90 less as a result of not taking paid leave, that does not mean she suffered any damages. Whatever accrued leave she had at that time did not disappear and would have been used the next time she took qualifying leave. Plaintiff acknowledges she often had no sick leave because it had all been used- in other words, Plaintiff routinely uses sick leave for her medical condition as fast as she can accrue it. See, e.g., Ex. A, p.68:14-69:3 (while she was waiting for her 2023 FMLA to be recertified, Plaintiff would call in and use sick leave if she had any accrued, and if not it was coded as leave without pay); p.

142:5-19 (Plaintiff noting she had no accrued sick leave in September 2024). Further, Plaintiff testified she had no lost wages as a result of the delay in recertifying her FMLA leave in 2023. Ex. A, ¶ 74:2-25.

**Points and Authority**

Although Plaintiff alleges many facts in this case, there are undisputed material facts that entitle Defendants to judgment as a matter of law.

I. Plaintiff Cannot Show FMLA Interference.

Arguing in favor of her FMLA claim, Plaintiff focuses on what at most amount to administrative errors in the H.R. office and a delay in recertifying her FMLA application for the years 2023 and 2024. Plaintiff's Response repeatedly concludes she was denied her FMLA leave, but that is simply not true. The undisputed facts are that Plaintiff continued calling in sick and was granted those days off. GSD never took any action against Plaintiff for her taking off those days, Plaintiff was never threatened with any action, and she suffered no damages as a consequence. In both years, once her FMLA was approved, she continued taking as much leave as she needed and either received paid leave (if she had any accrued) or unpaid FMLA leave. Plaintiff never lost any leave in any year, nor did she lose any pay as a result of the delays in certifying her FMLA leave.

Plaintiff's Response cites *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282 (10th Cir. 2007) in support of her FMLA claim. See Response, p. 19. In that case, the Tenth Circuit affirmed dismissal of FMLA claims even where the plaintiff had been terminated while out on FMLA leave. The undisputed facts here are that Plaintiff was never denied leave, took it whenever she wanted, and suffered no adverse action as a result of days initially being coded as Leave Without Pay or AWOL rather than FMLA days. Her FMLA claim must be dismissed.

II. Plaintiff's Accommodation Claim Should Be Dismissed.

The Human Rights Act provides "reasonable accommodation means modification or adaptation of the work environment, work schedule, work rules or job responsibilities…" N.M.S.A. § 28-1-2(V). This definition is consistent with the authority provided in the Motion and GSD's position that it is willing (and has offered) to modify or adapt the work environment or Plaintiff's work schedule, but is not required to provide accommodations outside the office. The HRA also provides a defense where an accommodation is denied based on a bona fide occupational qualification. N.M.S.A. § 28-1-7(A), *and see, Ramos v. Smith's Food & Drug Centers, Inc.,* No. A-1-CA-39583, 2023 WL 7166174, at *5 (N.M. Ct. App. Oct. 31, 2023) (dismissing a reasonable accommodation claim where the employer's decision was based on a bona fide occupational qualification). Requiring employees to work in the office is a reasonable and bona fide requirement of employment.

Plaintiff cites a D.C. Circuit for the proposition that an employee may be entitled to telework as a reasonable accommodation. See Response, p. 22 (citing *Ali v. Regan*, 111 F.4th 1264 (D.C. Cir. 2024). In that case, the employer offered telework to an employee as an accommodation and the plaintiff-employee refused. *Id.* at 542. The issue before the Court was whether an employer could force telework on an employee rather than explore traditional accommodations in the workplace, and the Court found it was a question of fact whether the employer could accommodate the employee in the workplace. *Id.* at 544. As such, the *Ali* case presents the opposite problem as this case and has no bearing here. Further, even if *Ali's* holding had the meaning Plaintiff attributes to it, that meaning is inconsistent with the cases from this District and Tenth Circuit cited in the Motion and below.

This District has found "the Court will generally defer to the employer's judgment when its description of what constitutes an essential function is job-related, uniformly enforced, and consistent with business necessity." *Forslund v. Nat'l Tech. & Eng'g Sols. of Sandia, LLC*, 516 F. Supp. 3d 1285, 1289 (D.N.M. 2021) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)). In *Forslund*, this Court found "[c]learly, attendance is also job-related and consistent with business necessity." *Id.* (also noting the "Tenth Circuit has recognized, and it is readily apparent, that physical attendance is an essential function of most jobs.").

Other courts have dismissed reasonable accommodation claims where the employee demanded accommodation for transportation to the office. *See, e.g., Robinson v. Bodman,* 333 Fed.Appx. 205, 208 (9th Cir.2009) (holding an employer is "not required to accommodate [the plaintiff's] inability to drive to work or use public transportation. Although an employer is required to make reasonable accommodations to eliminate barriers for a disabled employee in the workplace, the employer is not required to eliminate barriers outside the workplace that make it more difficult for the employee to get to and from work...."); *LaResca v. Am. Telephone & Telegraph,* 161 F.Supp.2d 323, 333 (D.N.J.2001) ("[T]he change to day shift sought by Plaintiff is not an 'accommodation,' that it is legally obligated to provide, but is simply a request for an easier, more convenient commute."); *Salmon v. Dade Cnty. Sch. Bd.,* 4 F.Supp.2d 1157, 1163 (S.D.Fla.1998) (rejecting plaintiff's claims that employer "failed to accommodate her disability by transferring her to a school which afforded her a shorter commute [because] plaintiff's commute to and from work is an activity that is unrelated to and outside of her job"); *Schneider v. Cont'l Cas. Co.,* No. 95 C 1820, 1996 WL 944721, at 9 (N.D.Ill. Dec. 16, 1996) (finding employer is not required to eliminate an employee's commute to accommodate the employee's back injury); *see also Chandler v. Underwriters Labs., Inc.,* 850 F.Supp. 728, 736 (N.D.Ill.1994) (employee's

inability to undertake a long commute because of back injury was not a disability for purposes of the employer's benefit plan but instead a limitation within the employee's control).

Indeed, "[w]hile an employer is required to provide reasonable accommodations that eliminate barriers in the work environment, an employer is not required to eliminate those barriers which exist outside the work environment. *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2012) (internal citation omitted). This holding is consistent with the federal statutory definition of reasonable accommodation, which provides:

> "The term "reasonable accommodation" may include--
>
> **(A)** making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> **(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

42 U.S.C. § 12111(9). Plaintiff is not asking for any accommodation described above.

If asked, GSD will discuss reasonable accommodation for Plaintiff in her workplace. However, GSD is not required to permit Plaintiff to work from home on days she claims she is able to work but unable to transport herself to the workplace because of the side effects of her migraine medication.

At page 24 of her Response, Plaintiff cites *Mason v. Avaya Comm's, Inc.*, 357 F.3d 1114 (10th Cir. 2004)- a case also cited in Defendants' Motion as it held an employee's request to work from home was not reasonable- and *Brown v. Austin*, 13 F.4th 1079 (10th Cir. 2021) for the proposition that GSD does not decide what are the essential functions of her job, if she can show GSD's "view is not job-related, uniformly enforced, or consistent with business necessity." *Id.,* at 1086. The next sentence of that opinion provides "[b]ut without such evidence, we generally defer

to an employer's judgment about whether a function is essential." *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021).

To be clear, there is no evidence that "past incumbents" have been permitted to telework as an accommodation. Eunice Moya, GSD's H.R Director (and not part of State Purchasing Division) did not request an accommodation to work from home; she was asked to do so by her Cabinet Secretary who did not want to be without his H.R Director for an extended period, and she agreed. There is no evidence that anyone who is currently or previously in Plaintiff's position has been given such an accommodation. Although managers may take their laptops home on evenings and weekends to catch up on email or other tasks, they are not permitted to telework during their regular work schedule. GSD has not approved anyone's request for telework as an accommodation or otherwise. Plaintiff's claim should be dismissed.

III. <u>There is no such thing as an "Informal Performance Improvement Plan."</u>

In the Response's statements of fact (and her sham affidavit), Plaintiff repeatedly suggests she was retaliated against by being placed on an "informal performance improvement plan." The Response provides no authority that having regular meetings with her supervisor is retaliatory or hostile. Surely, managers and subordinates meet routinely in all employment contexts. Plaintiff testified these meetings are professional in tone and helpful to keep her on track with her assignments. Even if Plaintiff was placed on a performance improvement plan ("PIP"), it would not have been an adverse employment action. *See, e.g., Lybrook v. Members of Farmington Mun. Sch. Bd. of Ed.*, 232 F.3d 1334, 1339 (10th Cir. 2000) (finding a PIP and requirement of regular meetings with a supervisor was not an adverse employment action); *Harper v. Aztec Mun. Sch. Dist. No. 2*, No. CV 05-113 JC/WDS, 2006 WL 8444162, ¶ 7-8 (D.N.M. May 2, 2006) (a PIP issued to plaintiff is not an adverse employment action). Having no adverse employment action

taken against her (and no evidence to support a hostile work environment) Plaintiff suggests that meeting with her supervisor is some form of harassment. The Court should reject that suggestion. There has been no adverse action or hostile work environment in this case.

IV. There Is No Evidence Of Age Discrimination.

Plaintiff has not presented any dispute of a material fact with respect to her age discrimination/ failure to promote claim. Despite what Plaintiff continues to claim, it is undisputed that Amber Sanchez had the minimum qualifications for her position, as certified by GSD's H.R. office. All candidates with the minimum qualifications were then granted interviews with a hiring panel, who made their choices for legitimate non-discriminatory reasons. Defendants' Motion relies on undisputed testimony of those who made the hiring decisions and articulated why other applicants were selected, including that when Plaintiff's was asked about her experience related to I.T. Procurements, she answered she had "little to none." The interviewers have also consistently testified about Plaintiff's demeanor and performance in interviews, in contrast with those who were selected. As noted in the Motion, the Tenth Circuit has held interview performance is a legitimate nondiscriminatory reason for hiring decision. See Motion, p. 20 (citing *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1216 (10th Cir. 2022). These claims must be dismissed.

V. Plaintiff's Minimum Wage Act Claim Should Be Dismissed.

Plaintiff's Response, without any legal authority in support, claims that she must be paid for time worked, even when she was not authorized to work at that time. Following that logic, Plaintiff should be permitted to work whenever she wants. The undisputed facts are that GSD has a policy that allows flex time only where an employee gets prior approval from her supervisor, and Plaintiff was aware of that policy. It is also undisputed that Plaintiff had been reminded of this issue in the past. See Motion, p. 12, ¶ 61. Plaintiff did not get approval from her supervisor to

work outside of her regular schedule on this particular day, September 6, 2024 and is not entitled to be paid for that unauthorized work. Her MWA claim should be dismissed.

## Conclusion

Despite making many claims and allegations, this case boils down to one where Plaintiff has suffered no adverse employment action or discrimination. Plaintiff has been permitted all the leave she has requested with no consequence. GSD has offered to make accommodations for Plaintiff in the workplace, but is not required to accommodate her outside the workplace. There is no evidence of age discrimination, nor is Plaintiff entitled to be paid for time she was not authorized to work. Her claims should be dismissed.

**WHEREFORE** Defendants respectfully request the Court grants their Motion for Summary Judgment.

Respectfully submitted,

**JACKSON LOMAN DOWNEY & STEVENS-BLOCK, P.C.**

/s/ by Eric Loman_____
Eric Loman
Counsel for Defendants
201 Third St. N.W., Ste. 1500
Albuquerque, NM 87102
(505) 767-0577
eric@jacksonlomanlaw.com

I certify the foregoing was filed via the Court's CM/ECF system on September 12, 2025, which causes all counsel of record to be served electronically.

/s/ by Eric Loman__________
Eric Loman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs

NEW MEXICO GENERAL SERVICES DEPARTMENT,
and VALERIE PAULK, EUNICE MOYA, JENNIFER
MORFIN, VANESSA LEBLANC, and NATALIE MARTINEZ
In their individual and official capacities,

Defendants.

DEPOSITION OF KIMBERLY HUNT-BROWN
MARCH 5, 2025
9:14 A.M.
201 THIRD STREET, NORTHWEST, SUITE 1500
ALBUQUERQUE, NEW MEXICO 87102

PURSUANT TO THE NEW MEXICO FEDERAL RULES OF CIVIL PROCEDURE this deposition was:

TAKEN BY: ERIC LOMAN, ESQ.
ATTORNEY FOR DEFENDANTS

REPORTED BY: KIM KAY SHOLLENBARGER
NEW MEXICO CCR#236
ALBUQUERQUE COURT REPORTING SERVICE, LLC
3150 CARLISLE BOULEVARD, NORTHEAST, SUITE 104
ALBUQUERQUE, NEW MEXICO 87110

Page 66

Q. You'll notice at the bottom there are numbers GSD36, GSD37, and so on. Do you see that?
A. Yes.
Q. I'm going to refer to those page numbers.
A. Okay.
Q. If you flip to the last page, which is 39, and I understand that this is not the entire communication between you and Kelly. Like I said, I've got an awful lot of paper here and I'm just trying to draw attention to certain things. So on February 17, 2023, you emailed Kelly and said, "hi, Kelly, the provider got the form back to me today, sorry it took so long, she's been really busy," et cetera. Do you see that?
A. Yes.
Q. My understanding was that your provider around that time had been out of the office for awhile, she may have gotten sick herself. Do you recall that?
A. She had COVID.
Q. Was that Anna Nance?
A. Yes.
Q. Do you remember approximately how long she was out of the office, as far as you know?
A. I do not recall that.
Q. Was it a period of weeks?
A. Yes.

Page 67

Q. Was it more than weeks? Was it a month?
A. Possibly around a month.
Q. And that was right around the same time that you were trying to get your FMLA approved, right?
A. Yes, of course.
Q. It's not Kelly Howley's fault that your doctor got sick, right?
A. It was not.
Q. So you have this back and forth with Kelly. On February 23rd, it looks like you sent her a document. I assume that was the doctor's form, looks like you meant to attach it the day before, but didn't attach it. Do you remember that, or do you see that in the emails?
A. I see it in the email. Do I remember not attaching it.
Q. It happens to all of us, right?
A. Right.
Q. You sent the email without the attachment, not a big deal. But you sent it to her the next day.
A. Yes.
Q. Kelly says, "good morning, received, and thank you, have a wonderful day." Did you have any face-to-face interaction with Kelly Howley during this period?
A. I have never met the woman.
Q. She's being very polite here, have a nice day, thank

Page 68

you so much, right, those sort of things?
A. She was very sweet to me through the entire interaction.
Q. So you ask her a question about your FMLA, this is on page 37, and there's some confusion. You say, "I'm really confused about your FMLA." And then moving on to the first page, she explains that your FMLA expired on December 13, 2022, so you can't invoke FMLA until your new request is approved. And then Eunice chimes in later that day. So during this time period that we're trying to get your FMLA recertified for the year, you were still having flare-ups and migraines as they come, right?
A. Yes.
Q. And when those would happen, my understanding is you would take a day and during this period that your FMLA was not yet recertified it would be recorded as absence without leave, as an unexcused absence essentially, right?
A. It would be recorded as either absent without leave, it would be recorded as sick leave, it would be recorded however I needed to record it.
Q. Do you remember if you took any of your accrued sick leave or annual leave during this period?
A. Specifically, I don't recall if I took -- I believe that had I had any accrued leave at the time, that I would have taken it, had I been able to.

Page 69

Q. But if you didn't have any sick leave to take it would have been coded as a leave without pay?
A. As a leave without pay, yes.
Q. Moving forward, you got your form back from your medical provider, right?
A. Yes.
Q. You sent that to HR.
A. Uh-huh.
Q. We'll call this Exhibit 5. On March 30, 2023, your intermittent FMLA was approved for that year, right?
A. Yes, yes, GSD approve it.
Q. Right. My understanding is, the next thing that happened was GSD retroactively applied your FMLA leave so that those absences you had that were coded as leave without pay, they went back and changed those to FMLA leave, right?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer.
A. I don't recall specifically if those were changed to FMLA on my timesheet.
Q. Let's talk about it. We're on Exhibit 6. Around this time you retained Heather Burke as your attorney, right?
A. Yes.
Q. Do you remember approximately -- let me just be clear. I am not asking you to tell me any conversations you've had with her. I'm only asking for a date, a time, a

Page 74

or '24.
Q. Just want to make sure we're on the same page here. As you sit here today, is it your recollection, is it your understanding that around March 30, 2023, they went back and changed your leave without pay to FMLA unpaid leave?
A. Yes, it is my understanding.
Q. Are you claiming that you have any lost wage damages as a result of that, the active application of your FMLA or the delay in getting your FMLA certified for that year?
A. Possibly not for '23, but possibly for '24.
Q. Well, we'll talk about what happened in 2024, but can we agree that in 2023 you didn't have any lost wages as a result of this issue with the certification of your FMLA leave?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: Go ahead.
A. Can we tentatively agree on that?
Q. Well, only if we can tentatively agree that you will come back for another deposition if you change your mind down the road.
A. Can I do a sidebar or something?
Q. No.
A. No, okay, all right, all right. Yeah.
Q. Can you answer that question?
A. All right, I'll agree to it.

Page 75

MR. LOMAN: We've been going for awhile and it's 11:52. I would like to give you a break and I would like to give Ms. Shollenbarger a break. So do you want to come back at 12:30? Does that work for you, Heather?
MS. BURKE: Let's do an hour, just because I don't know where to go for lunch around here and how long it will take. You probably know better than us.
MR. LOMAN: There is a deli downstairs by the elevators. There's also a restaurant in the hotel, on the hotel side around the corner. If you venture out of the building there's a number of -- there's sandwich shop right here on the plaza called Friends, across the street there's -- and Central is a block away. I'm fine coming back at 12:50. We have a lot to get through today.
MS. BURKE: Right.
MR. LOMAN: I don't want to extend this into a second day if we don't have to.
MS. BURKE: No, of course not.
MR. LOMAN: If that works for you, we'll come back at 12:50.
MS. BURKE: Okay.
(Recess at 11:50 a.m. to 12:59 p.m.)
Q. Are you ready, Ms. Hunt-Brown?
A. Yes. One second, if you will. Are we going to continue on from where we were or are we going into a new

Page 76

direction or something?
Q. I just keep asking you questions.
A. Okay, so before we continue on, I need to -- I wanted to go back in and take a moment to correct the record or --
Q. Okay, sure, go ahead.
A. Is that what you call it, correct the record. Okay, so on the last thing that we were talking about, about the time and everything in 2023.
Q. The retroactive --
A. The retroactive --
Q. -- changing of the --
A. Yes.
Q. Okay.
A. We were talking specifically about the unpaid leave.
Q. Uh-huh, yes.
A. I don't want to say, "yes, all of the unpaid leave has been changed and corrected." There was a leave without pay that happened in 2023 and that was a damage, that should not have been corrected, that was not corrected. That was, was part of this whole thing.
Q. It should not have been corrected?
A. No, no, that was very specifically held out.
Q. What do you mean it should not have been corrected?
A. That was not to have -- that was specific

Page 77

instruction was to not correct that, because that was a -- that was a damage.
Q. Specific instruction by whom?
A. By myself.
Q. You instructed GSD not to change one of the days from leave without pay?
A. From leave without pay, yes.
Q. Why?
A. The damage.
Q. I don't understand what you're telling me.
A. Because that is something that they should not have done to me. Leave without pay is not the same -- I'm sorry, excuse me. The AWOL, the AWOL should not have been changed, because it's not the same. Them, them taking an AWOL away from me and just changing it to leave without pay is not the same.
Q. I'm not following you, so let me ask some follow-up questions. GSD offered to change a day from AWOL to FMLA; is that correct?
A. Yes, I believe that is correct.
Q. And you instructed them not to?
A. Yes, I believe that is correct. There is email about that instance and I don't want to -- I don't want -- I'm reluctant to speak to any great depth about it, other than to say that I did not want them to simply change the

Page 106

A. That is fair.
Q. And then she says, "Dorothy and I are available to meet," then she gives you some other days. And she says, "as requested, I included the ADA forms," right?
A. Yes.
Q. Going back up, Eunice talks about the rescission of the -- well, she says that your telework trial period ended on August 2nd, or it is ending on August 2nd. And you accepted a position in Santa Fe, so you're going to need to report to the office on August 3rd. That's what she says, right?
A. That is what she says, yes.
Q. So my understanding is that on August 4, 2023 you had a meeting with Eunice and your attorney was present for that, right? Do you remember that meeting?
A. I remember the meeting. I don't remember the date, but I believe that was the date.
Q. Maybe it was just a phone call, so I shouldn't assume these things. I'm going to hand you Exhibit 12.
A. It was a Zoom meeting or something.
Q. Well, I wasn't there, so you can tell me what it was. Look at Exhibit 12. Do you recall getting this letter from Eunice?
A. Yes.
Q. It says on August 4th received request for

Page 107

accommodation. It says a phone conversation took place today, August 4th at 1:25, with Eunice and yourself. Was there a meeting -- was Ms. Burke part of that meeting?
A. Yes, this was, this was the -- this was the Zoom meeting that was rescheduled. This was the meeting that was rescheduled so that she could attend.
Q. Let me hand you another one, because you actually got two letters that day from Eunice. This is Exhibit 13. I'm not trying to trick you, I'm trying to understand the sequence of events. This one refers to a meeting that was held on July 31, 2023, virtually on Teams with Dorothy, Eunice and Heather Burke.
A. All right, that's...
Q. Do you recall having this virtual meeting on July 31st with Dorothy, Eunice and Ms. Burke?
A. I do remember the meeting, yes.
Q. Tell me what you remember about that meeting.
A. All right. So this is the meeting that was supposed to be the interactive, interactive -- what did they call it? Interactive meeting, which we would re-evaluate things, and there was nothing interactive about it. It was basically, I was told that I was reporting back to work, and I said -- I remember that I did request to, because of my migraines, go ahead and do a telework accommodation based specifically on taking my -- taking the computer home with me at night and

Page 108

then if I woke up with one of the severe migraines, that I would be able to -- if it cured to the point where I could go ahead and work part of the day at least, I would be able to do that. Even if I couldn't drive, I would still be able to do however how many hours of productive time to do my job, and I was told that basically that probably couldn't be accommodated. And I expressed my desire to go ahead and submit the formal accommodation anyways so that they could formally deny me and that's exactly what happened.
Q. Going on to the second page, they offered some other accommodations on a six-month trial basis to allow you to have your office door closed during work hours, attend meetings via Teams or provide an alternative work schedule. Do you recall those things being discussed?
A. Oh, yes, yes.
Q. Did you ever apply for an alternative work schedule?
A. The alternative work schedule is something that's done on a -- no, I didn't.
Q. What were you going to say?
A. It's something that's done on a -- it's not flex time. It's something that's done on a permanent basis, so it permanently changes your schedule. An alternative work schedule isn't going to help me with chronic migraines or with MS, that doesn't address those issues.
Q. Well, if the issue is there are days that you can't

Page 109

drive in the morning, but you might -- do I understand that you might be able to drive later in the day?
A. Yes.
Q. So if you had an alternative work schedule that was later, wouldn't that maybe give you time to be able to drive to work and work at the office?
MS. BURKE: Objection, form and foundation.
MR. LOMAN: You can answer.
A. That's assuming that I have some idea of when I'm going to have a migraine. I can't predict that.
Q. But when you have a migraine it's typically in the morning, is my understanding, right?
A. Typically, but not always.
Q. During this meeting did you speak for yourself or did Ms. Burke do most of the talking for you?
A. She did quite a bit of the talking. I won't say that she did all of the talking for me.
Q. Was everybody professional? Did everybody behave themselves in this meeting?
A. To the best that I can recall, yes.
Q. Going to Exhibit 12, Eunice refers to a phone conversation just between the two of you that day on August 4th. Do you recall that phone call?
A. I remember a phone call from Eunice, I don't remember any details of it, but I do remember receiving a

Page 110

phone call from her and I remember -- yes, she probably said exactly what she says here in the bullet point.
Q. Let's go back to Exhibit 13, please. This meeting that you had that Ms. Burke was involved in, I want to make sure I understand what was happening here. Was this to discuss your request for accommodation based on MS and migraines and not being able to drive or was this still asking for an accommodation because of your vulnerability to COVID?
A. No, this is for the migraines specifically not being able to drive in for the migraine. This is related to the accommodation request that I had filled out and sent in to her, your Exhibit Number 9.
Q. So Exhibit 9 was filled out by your doctor on August -- I'm sorry, you submitted Exhibit 9 on August 4th, right?
A. Yes.
Q. August 4, 2023.
A. Yes.
Q. So we need to go backwards a few days because you had this meeting that Ms. Burke attended on July 31st, okay. If you look at Exhibit 13.
A. My days are getting confused here.
Q. We're trying to get this sorted out here. In Exhibit 13 it says a meeting was held on July 31st, right?
A. Uh-huh.

Page 111

Q. If you go up a couple of paragraphs, do you see the paragraph that begins, "your accommodation request." Do you see that? Right here, that paragraph.
A. This paragraph, right?
Q. Yes. So that paragraph doesn't say anything about migraines or inability to drive. It's talking about COVID and that you want to continue to live and work isolated from unnecessary and casual contact, et cetera. Do you agree with me that's what it says?
A. This is what the paragraph says, yes.
Q. And it's before you submitted your accommodation request for migraines, right? This was a few days before that.
A. Sorry, I'm looking through the paperwork. I'm having trouble with the timeline on this right now. There's a possibility -- I'm not entirely certain. I was thinking we only had one meeting where Heather was present.
Q. Well, that's consistent with these documents. So Exhibit 13 describes a meeting that took place on July 31st and Ms. Burke was there and what was being discussed was your accommodation request to continue working from home because of COVID and your immune system, right?
A. And what she is speaking of in that second paragraph on this memo is that initial accommodation request.
Q. It would make sense to me that you're asking to

Page 112

extend the telework for COVID because your telework for COVID was about to expire just a couple of days later, right? So you were told that your telework was ending on August 2nd, so on July 31st we had a meeting to discuss extending that as an ADA accommodation. Does that make sense?
A. Yes. And that is true, that was on January 24th, that is true. And that accommodation request then was to continue working at home and that request was granted through August -- or up 'til August 4th or something, whatever day.
Q. That's Exhibit 11, right, is where Eunice tells you that you need to be back to work on August 3rd.
A. Back to work on August 3rd, yes, right.
Q. So I would understand, as you're approaching August 3rd you're asking to extend that accommodation request, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. So you had a meeting, it was rescheduled so your attorney could attend and that meeting occurred on July 31st, that's what this letter says, right?
A. Yes.
Q. It doesn't say anything in here about migraines or MS. It talks about your immune system and COVID, right?
A. On this August 4th letter, yes.

Page 113

Q. On Exhibit 13.
A. On Exhibit 13, yes.
Q. And then going on to the next page, GSD is offering to let you work with your office door close, to attend meetings remotely from your office and have an alternative work schedule. Wouldn't those be potential accommodations for someone who's worried about having contact with other humans because of COVID?
A. Yes, those would be accommodations for COVID, yes. Now, on the email, however, that I sent to Eunice on July 28th, I did say that this has to do with the ADA paperwork related to migraines and that was something that we brought up during that meeting.
Q. In that meeting you were talking about both COVID and the migraine issue?
A. Yes, and the accommodation was not for COVID. The accommodation didn't have anything to do with COVID.
Q. Well, it did in January.
A. It did in January, but this was a new accommodation. Completely new, not related to COVID.
Q. In January of 2023 you didn't ask for any accommodation based on --
A. Migraine.
Q. Let me finish my question.
A. I'm sorry.

Page 134

A. That is her job.
Q. Yes.
A. As HR, yes.
Q. Did anyone donate annual leave to you?
A. One of my colleagues donated a week of his leave, which came in, yes.
Q. And you were able to use that in 2024?
A. I was, eventually.
Q. That was nice of him. Who was that?
A. That was a colleague. My colleague was Clark Fountain.
Q. Going down, she says, "polite reminder, you are authorized up to four days a month of FMLA," and she's attached paperwork so you can get it renewed. This looks to me like it was a follow-up. Not the first time you had discussed this with Jennifer. Had you discussed this issue before with her, that she was interpreting your provider's form you were only approved up to four days?
A. I believe, I don't know for certain at what point the, at what point the actual interpretation that she had came into play. There's an email string, I know, out there somewhere, that -- between us.
Q. Between you and Jennifer?
A. Between myself and Jennifer, yeah, where I was saying, what is going on with this, I don't understand.

Page 135

Because we never had a definition of FMLA like this before, where you take a physician's estimate and say, well, this is how much you get per month.
Q. But that's how Jennifer was interpreting it at that time, right?
A. That's how she was doing it, yeah. So, yeah, that's a restatement of that and I don't know at what point -- I don't know if I had corresponded. Obviously I must have.
Q. So then I'll give you Exhibit 15. If you flip to the last page, it looks like your provider signed this on April 27th, I think. It could be a 29. Of 2024, right?
A. Yes.
Q. If you will flip to page -- if you see the small page numbers at the bottom -- KHB 751.
A. Yes.
Q. And I am going to read this handwriting and I want you to tell me if I'm reading something incorrectly, okay.
A. Handwriting at the top or the bottom?
Q. I'll start at the top. It says, "intermittent leave for flare-ups of chronic conditions, MS, migraines," right?
A. Yes, MS, migraines, yes.
Q. At the bottom she says, "over the next six months, episodes of capacity are estimated to occur up to 31 times per month," right?
A. Yes.

Page 136

Q. "And each episode can last from 4 to 72 hours," is what she says, right?
A. Yes.
Q. "Due to the unpredictable nature of these illnesses, I cannot guess about the frequency of episodes."
A. Yes.
Q. Does that say chosen frequency?
A. Yes.
Q. "Chosen frequency to account for all possibilities." Signed Anna Nance, right?
A. Yes.
Q. Ms. Nance filled out this form at your request, right?
A. Yes.
Q. And you submitted it back to Jennifer, right? Jennifer Morfin.
A. Yes.
Q. I will hand you Exhibit 16. On Exhibit 16 on May 3rd, Ms. Morfin emails back to you and says you're approved for intermittent leave up to 31 times per month, right?
A. That is what she says.
Q. Do you dispute that's what happened, that you are now approved to take up to 31 days a month of intermittent leave?
A. That is what her email says.

Page 137

Q. You're agreeing with me, right?
A. I'm agreeing that that is what her email says.
Q. Well, do you think that her email is not true? Do you think that something else is the case other than what's in her email? I don't understand why you're answering the question quite that way.
A. I'm answering the question based on what came after that email.
Q. What came after that email?
A. What came after that email is that she artificially restricted my FMLA leave by applying the physician's estimate that she had previously applied that artificial estimate, which is why the physician changed it.
Q. Right. But here we are May 3rd. On May 3rd you're approved to take up to 31 days per month of FMLA leave, right?
A. Right. So, yes, at this point and since then I have not had a problem with FMLA leave.
Q. Meaning you request it and they approve it, right?
A. I request it and they approve.
Q. Prior to this May 3rd email had you taken time off and had it coded as leave without pay during that year 2024?
A. Yes.
Q. Did GSD retroactively apply the FMLA leave to change all those leave without pay days to FMLA days?

Page 138

A. I would have to go back and look at my Share record to make sure that that all got changed.
Q. Was it your understanding that that's what they were going to do?
A. It is my understanding that that was going to happen, yes.
Q. And you don't know that it did not happen. I mean, as far as you know it happened, right?
A. As far as I know it happened, yes, yes.
Q. When did you use your seven days of donated leave?
A. Once the FMLA was returned back to a standard interpretation and I could actually take it so that it was FMLA leave, because that is the restriction that is imposed on donated leave according to HR, then I was able to go ahead and use that donated leave.
Q. I'm asking you, when did you use that donated leave?
A. Over a period of time. I would have to look at Share.
Q. A day here, a day there?
A. Oh, yeah. It wasn't all at once. I didn't go on vacation, you know.
Q. Are you aware that in your most recent Complaint you have made a claim under the New Mexico Minimal Wage Act?
A. Yes.
Q. And that is related to an incident that occurred in

Page 139

September of 2024, right?
A. On or about that time, yes.
Q. We'll mark this as Exhibit 18. This is a series of emails. Tell me what happened here, what happened on September 5th and 6th?
A. Give me just a moment to review the string, please. So I had a doctor's appointment and I had forgotten to go ahead and email Vanessa about that doctor's appointment to put in that leave ship through the Leave Management System and I think there had been an issue the previous week with my time, which was part of the problem with why I had not put in that leave slip.
Q. I'm sorry, say that again.
A. There had been an issue the previous week with my time reporting related to FMLA absences and such, and I was waiting to hear from Eunice on how I should code that and I didn't hear back from her. And Vanessa and I had a conversation about it and by the time Vanessa had left and by the time -- by the time Vanessa had left, I hadn't heard anything from Eunice, which is what I am conveying to her. I hadn't heard back from Eunice about my time.
Q. You're at the bottom of page --
A. I'm sorry, at the bottom of page 842, yes. The appointment I had was in Rio Rancho at five o'clock, so I had to leave no later than 3:30 on that day, from the office. I

Page 140

had worked an entire day.
Q. 4:19 p.m. on September 5th, right, you see that email. You email Vanessa and asked her if you could flex your time for the next day, right?
A. Yes, yes.
Q. And typically the way it would work is, if you needed to -- if you or anybody in the office needed to adjust your schedule for a day for an appointment or whatever, you would need to get approval from your supervisor first, right?
A. Yes. If we have an appointment, if we have a doctor's appointment or something like that, typically we turn in a leave slip by five o'clock and normally that's fine.
Q. But it needs to be preapproved by your supervisor; is that right?
A. Most circumstances, yes.
Q. When did you make this appointment, this doctor's appointment? Had it been on your calendar for some time?
A. I assume it had been.
Q. In other words, it wasn't an emergency appointment that you just made that day, right?
A. I don't think so. I don't think it was like a toothache or something that I had to -- no, it wasn't an emergency appointment.
Q. And you note that you forgot to put in a leave slip

Page 141

earlier for it, but you let her know about the appointment and sent this email at 4:19 p.m. on Thursday, right?
A. Uh-huh.
Q. Yes?
A. Yes, I'm sorry.
Q. And you were physically in the office this day?
A. I was, yes.
Q. Are you aware that Vanessa had already left the office that day at that point?
A. She had.
Q. And you knew that when you sent the email that she was gone for the day?
A. She normally leaves at 3:30, yes.
Q. And then she was out of the office for a couple of days after that, it looks like, right? Going on to the next email.
A. She was out and had no access to email through 9/9, whenever that was. Monday.
Q. Here on September 11th Vanessa says, "because you did not receive prior approval you'll have to claim leave from 3:45 to 5 p.m," and that's for September 6th, right?
A. Which page are you on?
Q. 842.
A. Oh, yes.
Q. She reminds you -- she says, "if she is out of the

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CASE NO.: 23-CV-00782 SMD-KK

KIMBERLY HUNT-BROWN, )
Plaintiff, )
vs. )
NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual and official capacities, )
Defendants. )

CERTIFIED TRANSCRIPT

VIDEOTAPED DEPOSITION OF EUNICE MOYA 30(B)(6)

Wednesday, July 9, 2025
9:11 a.m.
Cumbre Court Reporting Services, L.L.C.
531 Harkle Road, Suite A
Santa Fe, New Mexico 87505

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this DEPOSITION was:

TAKEN BY: HEATHER BURKE, ESQ.
ATTORNEY FOR PLAINTIFF

REPORTED BY: MAHLIA J. KENDRICK, RPR, CSR, CCR
CALIFORNIA CSR No. 14858
NEW MEXICO CCR No. 631
CUMBRE COURT REPORTING SERVICES, L.L.C.
531 Harkle Road, Suite A
Santa Fe, New Mexico, 87505
(505) 984-2244
cumbrecourt@comcast.net

Page 150

So at that point you know that that has happened before.
Q. Okay. But nobody that's been hired for a position has later been found to have misrepresented their experience?
A. Not that I'm aware of.
Q. Okay.
A. And I would have given her credit for Regional Finance Branch Manager, December 30, 2013, through October 12, 2018.
Q. Why?
A. Because she was responsible for all procurement of goods and services to include IT related for the department; some at low cost, others were price value.
"Oversee all contracts for the department, including auditing contracts for compliance of State and Federal regulations, records maintenance and retention/destruction."
IT hard files; assist customers with IT related issues; prepare, analyze, maintain budget and corresponding records of procurement, vendor services...
Q. What do those things have to do with the purpose of an IT Procurement Specialist?
A. I'm looking at the minimum qualifications of the job.
Q. Right. So it says, "four years' experience with

Page 151

government contracts with an emphasis on IT."
Is a Regional Finance Manager for a private bank dealing with the Procurement Code?
A. I don't know.
Q. So would a Regional Finance Branch Manager be dealing with government contracts with an emphasis on IT when they're at a private bank?
A. I don't know.
Q. But don't you have to know that to apply, this experience?
A. What they're writing here is something that I would have put through because it's related to procurement, it's related to IT.
Q. Have you ever worked in procurement?
A. I've never worked in procurement, no.
Q. So you don't actually know what skills are needed for an IT Procurement Specialist?
A. I do because I was CPO certified when I was with the Legislative Counsel Services.
Q. So you took the experience from Ms. Sanchez from a private bank and gave her credit for State procurement experience?
A. Yes. My staff did, and I verified that it was correct. And this -- we did hire this individual for this position; and if I recall, it needed the State Personnel

Page 152

Office approval.
So anytime a hire requires State Personnel Office approval, we send the application over along with a Compensation Action Form. We do an experience calculator to include the experience that we provided, and the State Personnel Office verifies what we're counting as experience. And they approved this action based on our analysis, so they agreed with our analysis. So I'm not sure --
MR. LOMAN: Let her finish her question.
THE WITNESS: Okay. Sorry.
BY MS. BURKE:
Q. I was just saying who at the State Personnel Office approved that?
A. I was going to say I'm not sure who the HR administrator was that worked on this comp action, but I did verify it. And our SPO analyst is Celeste DeBari.
Q. And so there's e-mails about that?
A. Uh-huh. So Celeste DeBari is our SPO analyst, and then from Celeste, it goes to her Division Director which is Cynthia Sandoval who also verifies what she is -- what we submitted. So she verifies that.
Then the State Personnel Office, who was Dylan Lang, signs off on approval. So besides the HR administrator verifying this, I verified it; and then

Page 153

three people at the State Personnel Office all agreed with our recommendation.
Q. Why did State Personnel Office need to approve this position?
A. Because I believe it was over a 15 percent increase.
Q. And when they approved your hire, did they compare Ms. Sanchez to the other applicants?
A. They approved the internal comparators. So whoever the internal comparators were in the IT position is what they verified. So whoever was in the position, they -- we compare it with their education, experience; and that's where the recommended salary was given based on appropriate placement based on education and experience.
Q. So they compared her to people already working in the job, not the people who applied for the job?
A. Correct.
Q. So if people were more qualified who applied for the job than she was, they would have been especially qualified if they had been compared to the people in the job; correct?
A. No.
Q. Why not?
A. Well, because it's based on a committee, an interview committee that makes the decision.

Page 162

Q. Okay. But so when Ms. Hunt-Brown went to interview for this position, even though she had a masters's degree and more experience than Ms. Sanchez, it didn't matter when it came time for the interview?
A. I don't know because I was not part of the interview panel. So I didn't sit in on the individuals that were interviewed, so I couldn't give my opinion on what was -- why they went with Ms. Sanchez over Ms. Hunt-Brown.
Q. So if they say that they relied on your assessment of the minimum qualifications, is that your job role in that?
A. It's just a piece of it; right? So as long as you meet the minimum qualifications of the job, that's what's awarding you -- affording you an interview if you're an internal applicant. The rest is based on how you answer the questions in the interview.
All the dynamics that go into an interview, it's just not -- just because I have 30 years of experience doesn't mean I'm going to get another job if I wasn't the right candidate or I wasn't -- they weren't -- I was interviewing for a HR position and I didn't have experience, maybe just alone in payroll, even though I have 30 years of HR experience. I would have definitely met the min quals if I would have had 30 years of

Page 163

experience, but maybe I only have 3 years of experience in payroll.
It depends how I answer the interview questions, the dynamics of the team, how they would interact with one another. Like, all of those when you're interviewing or sitting on an interview panel, I think all of those come into play. I wasn't part of that panel, so I'm not sure how they decided that Amber was the top candidate for this position. I don't know.
Q. So looking at page 29 of Exhibit 27, it has Amber Sanchez's resumé; correct?
A. Which exhibit? I'm sorry.
Q. 27.
MR. LAMAN: What page?
MS. BURKE: 27. Or 29 -- I'm sorry -- of 27.
THE WITNESS: So page 29?
MR. LAMAN: Her resumé?
MS. BURKE: Yes, her resumé. The first page of her resumé.
BY MS. BURKE:
Q. So under Financial Coordinate Compliance Officer, does Ms. Sanchez mention anything about IT work?
A. I went off of -- or whoever verified it went off what was on the application that she submitted.
Q. So whatever she put in that application is what

Page 164

you used --
A. To verify meeting the minimum qualifications.
Q. Do you think if those were significant factors in her job duties that they would appear in her resumé description as well?
MR. LAMAN: Object to form, foundation.
BY MS. BURKE:
Q. Go ahead and answer.
A. I don't know.
Q. So you didn't look at her resumé at all?
A. I don't believe I was the individual who referred the application. I looked at the resumé when the Compensation Action Form came to my desk to review and to sign, and I verified what was on her resumé.
Q. Based on just her representations of what she did; correct?
A. I verified what was on her application that she submitted for this position that she applied for.
Q. And just based merely on her word; correct?
A. Yes.
Q. So you said that this position in particular went through additional approval hurdles because of the huge jump in compensation for it; correct?
A. Because it was over a 15 percent increase.
Q. What percentage was it?

Page 165

A. I don't recall.
Q. This is Exhibit 32. 32 is Sunshine Portal Compensation Records for January 2023 for the State Purchasing Department. The second entry here is a Financial Coordinator-A, and that was a position that Amber Sanchez was holding at that time; correct?
(Exhibit 32 was marked for identification.)
A. I believe so.
Q. Does it say that her annual salary was $68,319?
A. Yes. What year was this? January 2023?
Q. Yeah.
A. Okay.
Q. Exhibit 33 is the same pay records but for January 2025 from the Sunshine Portal. Now, there are four IT -- GSD IT Procurement Specialists on this payroll sheet; correct?
(Exhibit 33 was marked for identification.)
A. Yes.
Q. And the last one on that list was hired on July 20th, 2024; correct?
A. Yes.
Q. And the job posting, as we can see in Exhibit 26, was posted on -- or the posting ended on the 18th of July 2024; correct?
A. Yes.

Cumbre Court Reporting
Exhibit 21
Date 07.09.2025
Eunice Moya

0

**Moya, Eunice, GSD**

| | |
|---|---|
| **From:** | Padilla, Teresa, SPO |
| **Sent:** | Monday, January 9, 2023 2:32 PM |
| **To:** | SPO-Cabinet Secretaries; SPO-AgencyHeads-NonCabinet; SPO-HR Managers |
| **Cc:** | SPO-- Employees |
| **Subject:** | CLARIFICATION: Sent on behalf of the State Personnel Office - ANNOUNCEMENT -- CLARIFICATION OF STATE EMPLOYEE RETURN TO OFFICE |
| **Importance:** | High |

Good afternoon,

We are receiving questions about the "on or before" language of our December 30, 2022, State Employee Return to Office announcement, attached below.
To clarify:

- Non-manager and non-supervisor employees on a 100% telework or hybrid telework schedule may work with their supervisor to coordinate return to the office full-time *before* February 2, 2023, and must return to the office full-time *no later than* February 2, 2023.

Thank you,

NEW MEXICO
STATE PERSONNEL OFFICE

**L Teresa Padilla** | Director
(505) 396-1982 | Teresa.Padilla@spo.nm.gov | spo.state.nm.us

Diversity · Partnership · Consistency

This email, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

**From:** Announcements, SoNM <SoNM.Announcements@doit.nm.gov>
**Sent:** Friday, December 30, 2022 2:22 PM
**Subject:** Sent on behalf of the State Personnel Office - ANNOUNCEMENT -- STATE EMPLOYEE RETURN TO OFFICE

Good afternoon,

Negotiations on the effects of the rescission of the statewide Non-Mandatory Telework Policy have concluded with both Unions. The important changes in implementation are as follows:

- All exempt employees, Managers, supervisors and directors will return to the office full-time on **January 3, 2023**.
- Non-manager and non-supervisor employees on a 100% telework or hybrid telework schedule will return to the office full-time **on or before February 2, 2023**.

Note that Employees already working in person in the office full-time will continue to report to the office.

Thank you for your continued service to the State of New Mexico.

NEW MEXICO
STATE PERSONNEL OFFICE

---

**L Teresa Padilla** | Director
Willie Ortiz Building – 2600 Cerrillos Road, Santa Fe, NM 87505
(505) 396-1982 | Teresa.Padilla@spo.nm.gov
spo.state.nm.us

**Diversity · Partnership · Consistency**

This email, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, please contact the sender and destroy all copies of this message.

MICHELLE LUJAN GRISHAM
GOVERNOR

JOHN GARCIA
CABINET SECRETARY

MICHAEL B. LUJAN
CFO & DIRECTOR
ADMINISTRATIVE SERVICES DIVISION

# State of New Mexico
General Services Department

ADMINISTRATIVE SERVICES DIVISION
(505)476-1857

FACILITIES MANAGEMENT DIVISION
(505)827-2141

PURCHASING DIVISION
(505)827-0472

RISK MANAGEMENT DIVISION
(505) 827-2036

STATE PRINTING & GRAPHIC SERVICES BUREAU
(505) 476-1950

TRANSPORTATION SERVICES DIVISION
(505) 827-1958

January 30, 2022

Via email: Kimberly.Hunt-Brown@gsd.nm.gov

Ms. Kimberly Hunt-Brown
SPD Procurement Specialist II

RE: ADA Accommodation Request

Dear Ms. Hunt-Brown:

On January 24, 2023, Human Resources Bureau received a Request for Reasonable Accommodation that you submitted under the Americans with Disabilities Act (ADA). Your request was accompanied by an "ADA Evaluation Tool" completed by your health care provider containing additional detail on your medical restrictions and recommended modifications to the manner in which your job is performed.

Your accommodation request was specifically to resume working a telework schedule that you had been working prior to Agency-wide schedule changes made in or around April 2022, at which time most or all employees were placed on a regular work scheduled or a two-day telework and three day in office work schedule that better met Agency needs by having employees present at work in a more consistent and reliable manner. In your request, you stated that under telework schedule, you will be able to continue to live and work isolated from as much unnecessary and casual contact as possible, thus supporting my immune system the best I can, until such time as there is a cure for either my disease or Covid-19.

Following consideration of your medical restrictions, your job requirements, and your requested accommodations, the following was determined:

- The Agency has decided to provide you with the five day telework schedule on a temporary, trial basis to evaluate whether Agency needs are being met with you teleworking, or whether your requested accommodation may create undue hardship.
- The trial period will last six months, beginning on February 2, 2023 and ending August 2, 2023.
- An interactive meeting will be scheduled to take place in the last week of the trial period to discuss whether you may continue on the requested schedule, or whether alternative

accommodations ne to be explored. If Management dete. .ies that the Agency is experiencing undue hardship as a result of your requested accommodation or the accommodations are ineffective, you will be expected to return to the office on August 3, 2023, as alternatives are explored.

- The requested accommodation is not a guaranteed, permanent schedule change. It may be reviewed, modified, and/or rescinded at any point after the trial period if the Agency determines that an undue hardship exists or the accommodations are ineffective.
- While on the telework schedule, your regular shift will be Monday - Friday 8:00 AM – 5:00 PM with an hour lunch, unless the Agency needs to modify that schedule.
- You will begin the trial period of your telework schedule on Thursday, February 2, 2023.

As GSD is granting your accommodation request of the five day telework schedule on a temporary basis, we presume that you require no further accommodations at this time. If that is incorrect or you need to discuss any additional accommodations or modifications, please contact me at 505-476-1859 or Eunice.Moya@gsd.nm.gov.

Thank you for your participation in the ADA accommodation process, and please do not hesitate to contact me with any questions you may have.

Sincerely,

Eunice Moya

Eunice Moya
HR Manager

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF VANESSA LEBLANC
March 11, 2025
9:08 a.m.
119 East Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(423P) RAB

EXHBIIT C

In the second one up from the bottom, Ms. Hunt-Brown writes: Hey, boss, are you in today or out of the office?
Were you in the office that day?
**A. I don't remember.**
Q. Do you ever work from anywhere but your office?
**A. I will periodically check emails if I have to.**
Q. What do _ou mean, check emails?
**A. Say if I'm out of the office, I can check m_ emails from m_ _hone.**
Q. Oka_. So _ou would be out on leave that da_ but still checkin_ _our email?
**A. I don't remember what was going on that da_.**
Q. Oka_. Do _ou ever work from home?
**A. No. Like I said, I'll check emails or complete tasks if I need to, but I'm not fully workin_ for the da_.**
Q. And _ou don't -- _ou don't take a laptop home with you or anything?
**A. I do have a laptop.**
Q. A work-issued one?
**A. Yes.**



Q. Okay. Why do you have a work laptop issued?
**A. Just for in case I need to complete something while I'm out of the office.**
Q. Are you an hourly employee still?
**A. Yes.**
Q. You're not salaried?
**A. No.**
Q. Okay. Because you're still classified, correct?
**A. I believe so.**
**(Exhibit 20 marked.)**
Q. Exhibit 20. Exhibit 20 is an email that at the top of the page is Vanessa LeBlanc to Kimberly Hunt-Brown, and it's regarding Wednesday time. It's the previous date to the last one, May 8th, 2024.
In this one at -- the previous email was sent at 2:52 p.m. that day, saying: Hey, Vanessa, are you good with me working over until 5:30 tonight so that I have a full 4.0 hours today, or do I need to leave at 5:00?
Did you approve that request?
**A. It looks like I did. I said: Hi, Kim. I'm not in, but you can leave at 5:30 today.**



Q. So what was the difference between this request to flex time and the September 6th requests that we looked at earlier?
**A. I couldn't tell you. I don't remember.**
Q. So you were checking your email but not in the office on the 8th of May and were able to approve her request for that day, correct?
**A. It looks so.**
Q. But the September 6th issue, she sent it to you the day before, but you weren't -- didn't check your email until the following week, correct?
**A. Correct.**
Q. So the approval just depends on when you happen to check your email?
**A. I guess you could say so.**
**(Exhibit 21 marked.)**
Q. Exhibit 21. Exhibit 21 is from Vanessa LeBlanc to Kimberly Hunt-Brown, copying Natalie Martinez, sent March 27, 2024, at 3:18. Subject, work assignments. The importance is high. And it says: Hi, Kim, below are some assignments that need to be completed tomorrow.
What can you tell me about these assignments?
**A. These were probably urgent assignments**



**that needed to be done quickly.**
Q. Okay. And so you anticipated that they needed to be done on the 28th of March?
**A. I guess so. I don't remember what happened in that timeframe.**
Q. That's what you're asking here, is that they need to be completed tomorrow, and since it's the 27th, we assume tomorrow is the 28th of March?
**A. Correct.**
**(Exhibit 22 marked.)**
Q. Exhibit 22, SHARE time sheets starting January 6th, 2024. Are you familiar with SHARE time sheets?
**A. Yes.**
Q. And is this an accurate view of a SHARE time sheet?
**A. I've never seen it in this format, but I guess so.**
Q. But this is the hours that somebody would report that they worked?
**A. It looks like it.**
Q. Okay. So looking on -- I apologize. I kind of flipped back and forth on the review, but on page 12 it shows the week of 3/23/24 to 3/29/24. Is that correct?

Q. Have you completed that?
**A. I'm not too sure.**
Q. You're not sure if you completed it?
**A. I'm not sure.**
Q. Didn't you say earlier today you hadn't taken any training on performance appraisals?
**A. I don't remember what I said, honestly.**
Q. So letter B under performance appraisals says: The performance appraisals of a career employee shall include at least a semiannual interim review and final annual review by the immediate supervisor by the employee's anniversary date. Correct?
**A. Under 1.7.9.9, correct?**
Q. That's correct. B.
**A. Can you repeat that?**
Q. So does it say that the performance appraisals of a career employee shall include at least a semiannual interim review and a final annual review by the supervisor?
**A. It does say that.**
Q. Why don't your other employees get an interim review?
**A. I'm not too sure of that.**
Q. Okay. Letter D says that the performance



appraisals of an employee shall be performed by the immediate supervisor, with employee input and participation. Additional input and participation from employee's peers, customers, subordinates and other appropriate personnel may be applied when appropriate. Is that correct?
**A. Yes.**
Q. Do you do that?
**A. I don't believe so.**
Q. Okay. On letter E it says: Performance appraisals may be performed whenever an immediate supervisor wishes to make an employee's performance a matter of record, upon change of immediate supervisor or whenever appropriate.
Is that what you guys are basing the every-three-month interim reviews on?
**A. I believe so.**
Q. Is that to make Ms. Hunt-Brown's performance a matter of record?
**A. I guess so. I was just directed to do these.**
Q. And that was Natalie that directed you?
**A. Yes.**
Q. Letter F says: Managers and immediate supervisors who failed to comply with the provisions



of 1.7.9 NMAC may be subject to disciplinary action, including dismissal.
Are you aware of that?
**A. I am not.**
Q. Regarding letter D of the performance appraisals part, do you believe that employee input and participation would include an in-person discussion with the employee about the review?
**A. It could.**
**(Exhibit 24 marked.)**
Q. Exhibit 24. Exhibit 24 is general services department's disability accommodations policy.
Ms. LeBlanc, are you familiar with this policy?
**A. Not really.**
Q. Have you reviewed it before?
**A. I'm not sure if I have or not.**
Q. Is it part of your job to be familiar with the GSD policies?
**A. I'm not aware.**
Q. As a manager, should you be aware of the GSD policies?
**A. I would think so.**
Q. So on page three, under procedures, the



procedure -- the first procedure for requesting a reasonable accommodation is to notify -- for the individual employee seeking an accommodation because of a disability is responsible for requesting a reasonable accommodation from his or her immediate supervisor or manager.
Are you aware that Ms. Hunt-Brown has sought a reasonable accommodation?
**A. She has never asked me.**
Q. So you're not aware of a need for accommodation?
**A. No. Other than FMLA, no.**
Q. Nobody's ever communicated with you her request for part-time telework?
**A. No.**
Q. Assuming Ms. Hunt-Brown came to you and requested an accommodation, what would be your next steps?
**A. I would check with my supervisors in HR.**
Q. Do any of your employees telework?
**A. No.**
Q. Never?
**A. No. We're not allowed to telework.**
Q. Nobody's allowed to telework?
**A. No.**

Q. Do you know why?
**A. After COVID-19, they rescinded their telework _olic_ .**
_ . Oka_ . And so no employees that you're aware of work from home?
**A. Not that I'm aware of.**
Q. Is that just in SPD or in GSD itself?
**A. I don't know.**
Q. What about when overtime was granted? When was that comp time worked?
**A. I don't know. Like I said, none of my employees took comp time.**
Q. And you didn't know of anybody taking any comp time?
**A. No.**
Q. Could people do comp time during the day?
**A. I don't know.**
Q. Is it possible to work extra time during your normal work day?
**A. Possibly if you're flexing it.**
Q. Okay. So looking back at Exhibit 17, it says -- at the bottom of the first paragraph, it says: If you will be taking your laptop home, please understand that you are responsible for any damage or loss.



Why would somebody be taking a laptop home to work comp time?
**A. I don't know.**
Q. Would that be because they were working on their laptop to do that comp time?
**A. It could be.**
Q. How else would they do comp time?
**A. I don't know, because I didn't grant any comp time.**
Q. Okay. It says here: Please keep in mind that comp time is to assist when you have several assignments that cannot be completed within an eight-hour work day.
Does that contemplate working after the eight-hour work day?
**A. It sounds like it.**
Q. And if somebody's taking their laptop home, does that contemplate them working from home?
**A. I would assume so.**
**(Exhibit 25 marked.)**
Q. Exhibit 25. Exhibit 25 starts at the top with an email from Vanessa LeBlanc to Kimberly Hunt-Brown, cc'ing Natalie Martinez, regarding, quote unquote, discussion on Monday, March 3rd, 2025 [sic]?



What is this in regards to?
**A. So I believe it was the prior week Kim left for lunch early and did not notify me, and she came back late, and I had to ask her to notify me when she got in, because it was unauthorized. She had to claim time on her time sheet, so we met regarding that.**
**And while I was out of the office, I believe on a Thursday that week, she went and questioned two other employees that are in my bureau, and it made them feel uncomfortable. I let HR know, and they told me I needed to have this discussion with Kim.**
Q. Why did the employees tell you they were both uncomfortable?
**A. They approached me and said they were uncomfortable with Kim approaching them. They felt she was grilling them for information.**
Q. What information was she grilling them for?
**A. Like their time, when they come in, things like that.**
Q. Okay. Is it reasonable for somebody to talk to their coworkers about application of time policies?



**A. I would assume so.**
Q. I mean, would a -- generally speaking, are all state employees subject to the same timekeeping rules?
**A. Yes.**
Q. So finding out if coworkers are also being, you know -- being required to follow the same flextime policies would be a normal thing to do, correct?
**A. I guess so.**
Q. So why was it necessary to have a discussion about it?
**A. That's what I was directed by HR to do.**
Q. And who directed you to do that?
**A. Eunice.**
Q. Okay. Why was a code of conduct attached to this email?
**A. Eunice attached it and asked me to forward it to Kim.**
Q. What was alleged to be a violation of the code of conduct here?
**A. I don't think it was alleging that there was a violation of code of conduct. She was just providing it for additional information.**
Q. Okay. Because it says, addressing

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

Plaintiff,

vs. NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT, and VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN, VANESSA LEBLANC, AND NATALIE MARTINEZ, in their individual capacities,

Defendants.

DEPOSITION OF EUNICE MOYA
March 7, 2025
9:04 a.m.
119 E. Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1950
Albuquerque, New Mexico 87102

(421P) RAB

EXHIBIT D

2023.
Is this the accommodations request for Ms. Hunt-Brown's accommodation for her migraines?
A. Yes.
(Exhibit 29 marked.)
Q. Do you recall we talked about Ms. Hunt-Brown's migraines in the July 31st meeting?
A. Yes.
Q. Okay. Exhibit 29 is a physician's statement that accompanied Exhibit 28. Are you familiar with this physician statement?
A. Yes.
Q. On page three of this document, which is GSD 180, at the top of the page it says suggested accommodations, and the suggested accommodations was to allow Kimberly to take her work laptop home each evening. If she awakens with a migraine, allow her to work from home, parentheses, VPN telework, beginning after headache symptoms diminish, typically no later than midday.
Did Ms. Hunt-Brown's physician request that she be allowed to telework part-time after having a migraine?
A. Yes.
Q. What was the basis for GSD's denial of the



physician's suggested accommodation?
A. We can accommodate an employee while they're in the office under alternative recommendations for accommodation.
Q. What do you mean you can accommodate while they're in the office?
A. When an employee accepts the position, they were notified that the position was in the office Monday through Friday, 8:00 to 5:00 -- I'm not sure at that point in time when Ms. Hunt-Brown was hired there was an alternative work schedule. I don't know the policy that far back.
So when an employee is in the office, we can accommodate them while they're in the office.
Q. Okay. Because that made Ms. Hunt-Brown being in the office an essential function of her position; did it not?
A. Yes.
Q. And the point of a reasonable accommodation is to assist Ms. Hunt-Brown performing the essential functions of her position, correct?
A. Correct.
Q. And so if an essential function of her position is to be able to be in the office, an accommodation to that essential function of telework



allowing her to virtually be in office would be a reasonable accommodation of the essential requirement to be in the office, correct?
A. No.
Q. Why?
A. Because we do not allow telework.
Q. GSD just doesn't allow telework no matter what?
A. That's what I said.
Q. Nobody at GSD ever teleworks?
A. I can't say that.
Q. But you would know, correct?
A. No, because a work schedule -- a work schedule is between an employee and supervisor. The only way I would know is if there was an accommodation request that came through HR.
Q. So you would only know if it's a reasonable accommodation --
A. Correct.
Q. -- not if nondisabled people were allowed to telework?
A. I don't know that.
Q. But GSD has never reasonably accommodated somebody with telework?
A. There was a slew of them around the same



time that your client was approved for.
Q. And you denied all of those?
THE WITNESS: Do I answer that?
MR. LOMAN: You can answer that.
A. They were given the same accommodation, the six-month, and then at that time they were asked to come back to the office.
Q. But wasn't the accommodation for six months for COVID issues, with being high risk?
A. No. It was whenever the accommodation was requested to work from home.
Q. So you looked at the request -- what was -- you looked at what was being requested, not why it was being requested?
A. Yes, what was -- why -- wait. No. Ask me that question again. I'm sorry.
Q. So when you extended the telework for people, you extended it based on the fact that you were extending telework, not that somebody had a specific need for telework?
A. No. I based it on the medical certification, not based on telework. Not on -- not on the -- not on the first part that you said.
Q. So looking back at Exhibit 29, the medical certification suggests that the accommodation for

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**PLAINTIFF'S REPLY IN SUPPORT OF HER PARTIAL MOTION FOR SUMMARY JUDGMENT ON COUNT III: FMLA INTERFERENCE**

COMES NOW, Plaintiff Kimberly Hunt-Brown, by and through her counsel of record, Heather Burke with her Reply in Support of her Motion for Partial Summary Judgment on Count III: FMLA Interference.

**Defendants' Disputes of Plaintiff's UMF**

Defendants attempt to raise any dispute to Plaintiff's 54 Undisputed Material Facts in 6 numbered paragraphs. In those paragraphs, Defendants claim to dispute only 6 or 8 of the facts, but for the reasons argued below, fail to raise any legitimate dispute as to those facts.

In **#1**, Defendants dispute Plaintiff's UMF 19, claiming without merit that Plaintiff's affidavit is a "sham" and contend that Plaintiff' never intended to be paid for March 1, 2023. Plaintiff's affidavit states she intended to use paid leave on March 1, 2023, which is consistent with the record. Defendants cite to deposition testimony where in which Mr. Loman asks Plaintiff "So whether we call it AWOL or FMLA unpaid, you're not getting paid that day, do we agree on that?" To which Plaintiff answer "yes." Mr. Loman literally asked Plaintiff if she would not be paid for an FMLA unpaid entry of time. The answer to that is, of course, yes. He did not ask her if she wanted to be paid that day, or if she intended to be paid that day. Mr. Loman did not ask Plaintiff what her repeated customary use of FMLA time was, which, like for most people, was to substitute her paid leave used concurrently with her FMLA leave. He did not show her exhibit 1, attached hereto, and ask her about it.

As Defendants are aware, Exhibit 26 shows that Plaintiff entered a comment into the SHARE time system on March 2, 2023 at 12:43 PM, stating:

> AWOLV and LWOPA codes entered by another user, not KAHunt-Brown (self); KAHunt-Brown was directed by Natalie Martinez to go into the timesheet and enter these codes instead of the FMLA codes that would have usually been entered to cover Annual Leave time taken due to illness because of a flare-up of her protected medical condition (Ex26)

Exhibit 1 is irrefutable evidence that as of March 2, 2023, Plaintiff attempted and intended to use annual leave for March 1, 2023, and her leave was changed by Defendants to LWOP and AWOL. Looking at Doc 105 Ex 2 which is a chart created by Defendants showing Defendants' retroactive FMLA designations, the Court can clearing see that for the 10 absences prior to March 1, Plaintiff had taken paid leave for her FMLA qualifying absences. Defendants then changed each entry to the FMLA paid time designation consistent with the leave Plaintiff had taken when she was denied FMLA. (Sick time, annual leave, etc) Because they had

prevented her from using paid leave on March 1, their improper retroactive designation kept the absence as unpaid. It was never Plaintiff's choice to not use paid leave on March 1, 2023. Defendants purported "evidence" fails to raise a legitimate dispute as to UMF #19.

In **#2**, Defendants dispute UMF 21, by claiming it is somehow "misleading." They then make an argument about other leave, but don't attach any evidence that Defendants' policy does not state what Plaintiff fact alleges that it does. They finish by making an unrelated argument about their unlawful retroactive designation of Plaintiff's absences, which has nothing to do with UMF #21. This fact is therefore unconverted.

In **#3**, Defendants dispute UMF 27 by misrepresenting the stated fact. This fact literally states that Defendants did not communicate or otherwise seek agreement with Plaintiff before unilaterally retroactively designating Plaintiff's absences as FMLA. Defendants attach no evidence that they communicated or sought Plaintiff's involvement or agreement before they made the changes to Plaintiff's time. Therefore, this fact remains uncontroverted.

In **#4**, Defendants claim to dispute UMF 28. Defendants state "Plaintiff was never discouraged or prohibited from taking a sick day for her FMLA-qualifying medical condition when she needed it." Even if it were true, this is not material to the claims at issue. This is an FMLA interference lawsuit. Plaintiff has produced irrefutable evidence of Plaintiff being repeatedly denied FMLA leave for her covered absences, including being marked AWOL, which policy states will subject her to discipline, and having to obtain discretionary permission for LWOP. She was also denied the use of available paid leave for her FMLA covered absences, expressly because Defendants were interfering with her leave and not letting her properly designate those absences as FMLA protected. Defendants argue that because Plaintiff continued to take leave, that this somehow means that their interference didn't discourage her from taking all the leave

she might have taken. That Plaintiff had to take some leave despite the risk in doing so is not the same thing as Plaintiff being able to take all the leave she would have liked to take. Defendants produce no evidence which contradicts Plaintiff's statement that she was discouraged from taking leave she otherwise would have taken.

Defendants then claim that UMF 28 contradicts UMF 7, as though they want this Court to forget that Plaintiff is having to sue for two different years and methods of interference, in which Defendants unlawfully interfered with her FMLA. In 2023, Plaintiff continued to designate her leave as FMLA qualifying, until Defendant Moya directed Kelly Howley to go into Plaintiff's time and change all of the FMLA time coded by Plaintiff to unprotected leave. [Doc 99 Ex 12] Defendants point to Plaintiff's testimony about whether any absences were coded with sick time or LWOP, while Defendants were interfering with her FMLA. Plaintiff has not averred that she did not take any absences while they interfered with her FMLA, she is stating that she was not able to take all of the leave she otherwise would have, but for Defendants' unlawful interference. The two facts are not contradictory.

Defendants do not attach any evidence which disputes whether Plaintiff took all of the FMLA leave she would have taken, had Defendants not interfered with her FMLA rights. Therefore UMF #28 is uncontroverted.

In **#5**, Defendants improperly dispute 3 different facts (47, 49 and 50) in one paragraph without listing evidence specifically to refute it. Facts that are not specifically controverted are deemed undisputed. Citing to Plaintiff's testimony that she <u>eventually</u> was able to use her donated leave is not evidence refuting the fact that she was not allowed to use it when she wanted to and needed it most, while her mother was dying and she was out of the office much more than usual. Defendants also produce no evidence of any policy that requires that donated leave only be used

when FMLA leave is allowed to be used, as they insisted to Plaintiff, or any evidence that Plaintiff was not forced to seek LWOP or that she was allowed to use paid leave for those absences. As Defendants failed to properly dispute UMF 47, 49, and 50, these facts remain undisputed.

In **#6**, Defendants refute UMF 54. Incredibly, Defendants tell this Court that they "meant" to retroactively designate Plaintiff's leave but didn't, and then disclose that **they went back in July 2025** and **altered Plaintiff's timesheets without communication or her permission**. Worse, they didn't even do so correctly. See Ex 27, Plaintiff's log of Defendants July 2025 changes to her time records. Defendants cite to an unattached affidavit of an unknown individual, so this Court cannot consider this fact properly controverted. However, the fact that Defendants waited until just before the summary judgment deadline and went back into Plaintiff's time records and changed the evidence to try to reflect more favorably on themselves is enormously problematic. As already argued, federal law prohibits retroactively designating time if their failure to properly designate it in the first place caused Plaintiff harm. There is no dispute that it did because Plaintiff has been suing Defendants for that harm. Plaintiff had to amend her complaint to include new allegations of interference in 2024, after she was already suing Defendants to enforce her federal rights.

**Response to Defendants Alleged Material Facts**

Defendants do not include their own additional facts in their Response to Plaintiff's Motion. They instead, state that they incorporate the material facts 13-22 from their own Summary Judgment Motion into their response. Plaintiff has already responded to those alleged material facts, in her own Response to that Motion. She incorporates her response to Defendants Material facts in Document #105 as though set forth herein.

## Argument

As an initial matter, Defendants gratuitously throw around the phrase "sham affidavit" but fail to establish any actual material conflict between Plaintiff's affidavits and her deposition testimony. There is no truth to their allegations.

As already argued, "A plaintiff on an FMLA interference claim must establish the following: (1) that he was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014). Here, parties do not dispute that Plaintiff was entitled to take FMLA leave in both 2023 and in 2024. Parties do not dispute that Plaintiff tried to take FMLA leave in 2023 and 2024, and that Defendants prevented her from taking FMLA protected leave, and told her that she could not take FMLA leave. As Defendants agree, "In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or **denied initial permission to take leave**." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)(emphasis added).

Loss of pay is well recognized as being materially adverse. In *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 73, 126 S. Ct. 2405, 2417 (2006), the Supreme Court found that an unpaid suspension remained materially adverse even after it was rescinded and the employee had received backpay. Similarly, being placed on involuntary unpaid leave is also recognized as an adverse action. See *Green v. Donahoe*, 760 F.3d 1135, 1137 (10th Cir. 2014) (being put on unpaid leave was a materially adverse action as it would dissuade a reasonable employee from engaging in protected activity); See *Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 506 (9th Cir.

2016) (an adverse action where the employee is placed on unpaid leave involuntarily) *O'Toole v. Ulster Cnty.*, No. 1:12-CV-1228 (LEK/RFT), 2014 U.S. Dist. LEXIS 138045, at *29 (N.D.N.Y. Sep. 30, 2014) (Defendant could not show that involuntary, unpaid leave did not constitute an adverse action.)

Here, there is no legitimate dispute that Defendants unlawfully interfered with Plaintiff's FMLA, and Defendants have admitted to their mistakes under oath. Plaintiff was denied initial permission to take FMLA leave in both 2023 and in 2024. In 2023, Defendants repeatedly unlawfully rejected her FMLA certification forms, telling her that she could not "invoke" FMLA leave. In 2024, Defendants improperly started restricting the amount of FMLA leave Plaintiff could take in a month, and instead of allowing her time to obtain another medical certification, began immediately denying her FMLA leave. In addition, they improperly conditioned the use of Plaintiff's available donated paid leave on whether they were allowing her to use FMLA leave for that absence. Obviously, attempting to take FMLA leave, and being told you cannot take FMLA leave is clearly related to the attempted exercise of FMLA rights. This unlawfully discourages employees from taking FMLA leave. Interfering with an employee's exercise of his FMLA rights also includes discouraging an employee from using FMLA leave. See 29 C.F.R. § 825.220(b).

However, Defendants argue that their repeated violation of federal law didn't harm Plaintiff and thus, doesn't matter. They cite no legal support for that argument. Plaintiff was never paid for March 1, 2023, nor was she paid for March 18, 20, 22, and 26, 2024 or April 19, 29, or 30th 2024. Each of these dates Plaintiff indisputably qualified for, and should have been able to take FMLA leave, but each of those dates, Defendants interfered by denying Plaintiff her federal right to that leave. The fact that Plaintiff used paid and donated paid leave eventually

instead of when she intended to has nothing to do with whether having to go without pay on these dates as materially adverse. This is like arguing that an unpaid suspension is not an adverse action because the employee was eventually allowed to earn money again after the unpaid suspension. Everyone has bills to pay and it is critical when and how much we are paid. Particularly in 2024, when Plaintiff's mother was dying in hospice, and Defendants acted to discourage Plaintiff from taking leave by limiting how much she could take. They made a bad situation worse for Plaintiff, and when she had no choice but to risk taking LWOP instead of paid leave concurrent with her FMLA leave, so she received substantially less money.

Because she was forced to take unpaid leave on March 1 2023, Plaintiff lost $281.69 in earnings. In March 2024, during the paid period between March 16 and March 29, was denied FMLA 4 times and had to take 22 hours of LWOP instead of FMLA leave. Because she was prevented from using FMLA, Defendants Morfin and Moya also wouldn't let Plaintiff use her available donated leave (35.62 hours), or the annual leave (6.70 hours) she had available. As a result, Plaintiff lost $862.17 in earnings, and her paycheck that period In April, Plaintiff yet again was denied FMLA leave, and earned $842.58 less even though she had enough paid leave available to cover those absences. Defendants want this Court to believe that them forcing Plaintiff to earn $1704.75 less in March and April 2024 didn't harm her. In addition, the fact that Plaintiff was forced to earn less, also resulted in smaller contributions to her PERA retirement account which extends the damage to Plaintiff into the future. Unlike the Defendants in *Burlington*, Defendants never reimbursed Plaintiff for her lost income, and that loss of income continues to prejudice Plaintiff. There is no way in which losing nearly $2000.00 in earnings is not a materially adverse action.

In addition to the violations above, in both 2023 and 2024, Defendants violated federal law when they went back and unilaterally changed Plaintiff's time to retroactively designate her time to FMLA. Their action was particularly egregious for 2024, because they waited until Discovery had closed in July 2025, and then went back 1.5 years and changed Plaintiff's time records without her permission. As they were already being sued for these violations, they knew that Plaintiff was alleging that she had been harmed by their failure to timely designate her leave. To make matters worse, and likely directly because they failed to involve Plaintiff at all, Defendants didn't even properly retroactively designate Plaintiff's absences. See Ex 27. Defendants failed to retroactively designate her absences on March 26, and April 29, 2024. Notably, April 29 was the absence to get the recertification demanded by Defendants, and is undisputably FMLA covered. They also wrongly changed a normal non-FMLA paid sick day into unpaid FMLA time, and then it appears they charged Plaintiff's sick leave in 2025, which is at a higher pay rate, to illegally seize monetary value from her[1]. It is a mess. As the FMLA year for 2024 ended in or around January 2025, Plaintiff received no absolutely benefit from Defendants' dishonest actions, and it was solely done to attempt to falsify the record and cover up their violations. Defendants self-serving changes to Plaintiff's time evidence their bad faith, and clear belief that blatantly violating the federal rights of their employees will carry no consequences for them at all. This cannot be allowed to be true, or the law loses all meaning.

There is simply no legitimate dispute of fact as to the elements of Plaintiff's FMLA interference claims. Defendants admit they did not follow the law, and Plaintiff was prevented from using available paid leave directly because of Defendants' violations. No reasonable jury could find that it is not a materially adverse action to prevent an employee from using hundreds

[1] This may constitute illegal conversion.

or thousands of dollars in available paid leave as a direct result of denying them the FMLA leave they are entitled to.

**Conclusion**

For the reasons argued herein, Plaintiff respectfully requests that this Court grant her Motion for Partial Summary Judgment on Count III: FMLA Interference, and award her damages, attorney's fees and costs associated with this claim and for whatever other relief this Court finds proper.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's e-file and serve system on this 12th day of September 2025.

Respectfully Submitted.

Heather Burke
Attorney at Law

1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com


GSD > > Home
Timesheet
General Services Department
Skyrim - Music & Ambience
New Mexico Public Procurement
https://hcm.share.state.nm.us/psc/hprd/EMPLOYEE/HRMS/c/TL_EMPLOYEE_FL.TL_ENTER_TIME_FLU.GBL?TL_JOB_CHAR=0
My Homepage
Enter Time
Job Title SPD Procurement Specialist II
18 February - 3 March 2023
New Mexico Biwkly Time Period
View Legend
Print Timesheet
Submit
*Time Reporting Code
Thursday
3-Friday
99 AWOLV - Absent without Leave
99 LWOPA - Leave without Pay - Autho
TELWK - Telework 2021
8.00
8.00
Comments
Time Reporting Comments
Comments related to Time entered for 03/01/2023
Comment once entered cannot be altered or removed.
Add a new Comment
Add Comment
Clear
Entered on 03/02/2023 12:43 PM by Kimberly Hunt-Br
AWOLV and LWOPA codes entered by another user, not KAHunt-Brown (self); KAHunt-Brown was directed by Natalie Martinez to go into the timesheet and enter these codes instead of the FMLA codes that would have usually been entered to cover Annual Leave time taken due to illness because of a flare-up of her protected medical condition.
46°F Cloudy
12:37 PM
3/2/2023

| | | | | | |
|---|---|---|---|---|---|
| 3/18/2024 | LWOP-Auth | 8 | FMLUP-Family Medical Leave | 8 | |
| 3/20/2024 | LWOP-Auth | 4 | FMLUP-Family Medical Leave | 4 | |
| 3/22/2024 | LWOP-Auth | 2 | FMLUP-Family Medical Leave | 2 | |
| 3/26/2024 | LWOP-Auth | 8 | LWOP-Auth | 8 | Not Modified |
| 4/17/2024 | FMLAN | 4 | FMLAN-FML Paid Annual | 4 | Not Modified |
| 4/17/2024 | FMLSK | 4 | FMLSK-FML Sick | 4 | Not Modified |
| 4/19/2024 | LWOP-Auth | 8 | FMLUP-Family Medical Leave | 8 | |
| 4/29/2024 | LWOP-Auth | 5.5 | LWOP-Auth | 5.5 | Not Modified |
| 4/30/2024 | LWOP-Auth | 8 | FMLUP-Family Medical Leave | 8 | |
| 5/3/2024 | SICKT | 3 | FMLUP-Family Medical Leave | 3 | Was Sick, should have been changed to FMLA-SICK, it was paid time |

99 FMACT - FMLA Admin Comp Time Taken

99 FMDAT - FML Donated Annual Paid

99 FMDST - FML Donated Sick Leave Paid

99 FMHAT - FMLA Holiday Accrued Taken

99 FMHCT - FMLA Holiday Comp Time Taken

99 FMHOL - FMLA State Holiday Paid

99 FMLAN - FMLA-Paid Annual

99 FMLCT - FMLA Comp Time Taken

99 FMLFT - FMLA Prem Overtime Taken

99 FMLSB - FMLA Standby Comp Time Taken

99 FMLSK - Family Medical Leave Sick

99 FMLUP - Family Medical Leave Unpaid

99 FMPER - FMLA Personal Leave Day Taken

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KIMBERLY HUNT-BROWN,

Plaintiff,

v. No. 1:23-cv-00782-SMD-KK

NEW MEXICO GENERAL SERVICES DEPARTMENT,
VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,
VANESSA LEBLANC, and NATALIE MARTINEZ,

Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND FOR SANCTIONS**

**THIS MATTER** is before the Court on Defendants' motion for summary judgment (Doc. 98) and Plaintiff Kimberly Hunt-Brown's partial motions for summary judgment on Count III (Doc. 99) and Counts I, II, and V (Doc. 100). Defendants responded to both of Plaintiff's motions (Docs. 103 and 104) and Plaintiff responded to Defendants' motion (Doc. 105). The parties then filed their replies. Docs. 107, 108, 109. Plaintiff also filed a motion for sanctions under Rule 37. Doc. 114. Upon review of the parties' motions, the relevant law, and the factual record, the Court hereby **GRANTS** Defendants' motion for summary judgment as to Counts III, IV, and V. The Court **DENIES** Defendants' motion for summary judgment as to Counts I and II. The Court **DENIES** Plaintiff's partial motions for summary judgment and motion for sanctions.

## BACKGROUND

The dispute presented before the Court today arises from a series of interactions between Plaintiff, who works as a procurement agent at the New Mexico General Services Department, and her employer and supervisors at GSD. Plaintiff suffers from multiple sclerosis and chronic migraines. These conditions have long impacted her ability to work at GSD and have necessitated

that she take protected leave under the Family and Medical Leave Act ("FMLA"). *See* 29 U.S.C. § 2601. In 2023 and again in 2024, Plaintiff struggled to renew her FMLA certification. This difficulty was in part the result of GSD's failure to comply with FMLA procedure and its insistence that she obtain unnecessary information to recertify her condition. Additionally, Plaintiff and Defendants have been in a stalemate over Plaintiff's ask to occasionally work from home when her migraine medication makes driving to the office unsafe. Because Defendants have refused to permit Plaintiff to telework, she has been forced to take entire days off work simply because she cannot drive. Plaintiff also alleges that Defendants have denied her a promotion multiple times because of her age and owe her wages for one day in 2024.

During the course of this litigation, Plaintiff deposed several of the Defendants to ascertain whether GSD is consistent in its denial of telework across all employees. Defendant Moya testified that GSD does not allow telework. Doc. 100, Ex. 7. In a later deposition, Defendant Moya admitted that she had teleworked for four weeks following knee surgery. Doc. 114 at 3–4. Similarly, Defendant Martinez testified that some supervisors, including Defendant LeBlanc, will telework on occasion. *Id.* at 5. Plaintiff also submitted a discovery request for "all daily GSD Network VPN connection logs from February 2023 to present." *Id.* at 8. GSD objected to the request and explained that GSD does not actively store logs related to VPN access. *Id.* at 8–9. GSD's Chief Information Officers, Alex Harding, submitted an affidavit confirming this statement. Doc. 114, Ex. 3. Plaintiff then sought to compel a deposition of Mr. Harding, which was denied. Doc. 140. Plaintiff now seeks to sanction Defendants under Rule 56(h) for submission of perjurious or blatantly false affidavits. Doc. 114 at 11 (citing Fed. R. Civ. P. 56(h)). As relief, Plaintiff seeks default judgment because it is "truly the only proper remedy for such egregious conduct." Doc. 114 at 17.

## LEGAL STANDARDS

I. Sanctions

Rule 56(h) permits a court to impose sanctions if an affidavit or declaration submitted in support of or in opposition to a motion for summary was filed in bad faith or solely for the purpose of delay. Fed. R. Civ. P. 56(h). "The Tenth Circuit has held that for a finding of bad faith intent is required, and negligence or mistake cannot supply the necessary showing of bad faith." *Harris v. McCurtain Cnty. Jail Trust*, 2025 WL 2963948, at *1 (E.D. Okla. Oct. 21, 2025). Further, the Advisory Committee Notes clarify that sanctions under Rule 56(h) are "discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions." Fed. R. Civ. P. 56(h) advisory committee's note to 2010 amendment. If sanctions are imposed, the court may require the submitting party to pay the other party reasonable expenses, including attorney's fees.

II. Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this requirement is met, the non-movant can defeat summary judgment by showing that there is a genuine dispute of material facts. *Id.* The non-movant's response must "set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). The court then reviews the proffered evidence and, drawing all reasonable inferences in favor of the nonmoving party, determines whether the facts "establish, at a minimum,

an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). Where, as here, the parties have filed cross motions for summary judgment, the court considers the motions independently of each other, such that "[t]he denial of one does not require the grant of another." *Christian Heritage Academy v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025 (10th Cir. 2007).

**STATEMENT OF MATERIAL FACTS**

Plaintiff alleges five counts. *See* Doc. 43 ("Am. Compl."). Count I is for unlawful discrimination on the basis of disability in violation of the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. § 28-1-7(A). *Id.* at 18–21. Count II is for failure to accommodate in violation of the NMHRA. *Id.* at 21–23. Count III is for unlawful interference with Plaintiff's rights under the Family and Medical Leave Act ("FMLA"). *Id.* at 24–26. Count IV is for age discrimination under the NMHRA. *Id.* at 29. Count V is for violation of the New Mexico Minimum Wage Act ("NMMWA"). *Id.* at 30. Defendants move for summary judgment as to all counts. Doc. 98. In their motion, Defendants ask for summary judgment on a hostile work environment claim, but Plaintiff does not assert that claim in her complaint nor address it in her response to Defendants' motion. Doc. 98 at 17; *see* Am. Compl. The Court finds Defendants' motion for summary judgment regarding an alleged hostile work environment to be moot. Plaintiff moves for summary judgment as to Counts I, II, and V in one motion, (Doc. 100), and Count III in a second motion (Doc. 99). However, Plaintiff does not allege any material facts regarding the NMMWA claim. Accordingly, the Court considers only the Defendants' undisputed material facts ("UMF") and Plaintiff's response when recounting Count V's pertinent facts.

Plaintiff objects to most of Defendants' facts as "improperly compound," meaning a numbered statement "includes multiple facts in violation of D.N.M.LR-Civ. 56.1," and is therefore

"impossible to properly answer." *See, e.g.*, Doc. 105 ¶ 1. "Improperly compound" is not a valid challenge to a proffered fact nor a practical hurdle to disputing Defendants' UMF. Plaintiff has not identified any authority, and the Court cannot locate any, prohibiting a party from including multiple facts within a numbered statement. The Local Rules are of no help in substantiating Plaintiff's position—despite her frequent citation to them—as they never mention compound facts. *See* D.N.M. LR-Civ. 56. The Court therefore disregards all objections Plaintiff makes on this ground. Additionally, Plaintiff disputes numerous facts on legal, rather than factual bases. For instance, Plaintiff agrees that Defendants retroactively designated her leave as FMLA protected, but argues that doing so violated the law. These contentions are not well-taken and are not considered disputes of fact. *See Glassock v. McCotter*, 56 F. App'x 452, 453 (10th Cir. 2003). Defendants accuse Plaintiff of submitting a sham affidavit to create a dispute of material fact. Doc. 107 at 1. Because the Court does not rely on Plaintiff's affidavit in reaching its conclusions, it does not consider this argument.

A. <u>FMLA Leave</u>

Plaintiff began working for the New Mexico General Services Department ("GSD") in May of 2014 as a procurement agent. Doc. 98 ¶ 1; Doc. 99 ¶ 1. Plaintiff has multiple sclerosis and debilitating migraines. Doc. 98 at 1. These conditions are covered under the FMLA and Plaintiff has received protected leave, meaning she is permitted to take reasonable unpaid leave from work without retaliation, since around 2017. *Id.* ¶ 1. On December 13, 2022, Plaintiff's FMLA certification was set to expire. *Id.* ¶ 13. Plaintiff submitted a request for renewed FMLA leave to Kelly Howley, one of GSD's human resource employees. *Id.*; Doc. 105 ¶ 13. Ms. Howley informed Plaintiff that more information was needed to approve her FMLA leave. Doc. 98 ¶ 14; Doc. 105 ¶ 14. Multiple delays, including Plaintiff's medical provider being out of the office for

a month and GSD's failure to understand Plaintiff's medical certification form, prevented GSD from certifying Plaintiff's FMLA leave until March 30, 2023. Doc. 98 ¶ 16; Doc. 105 ¶ 16; Moya Dep. 57:4–6. During that interim, Plaintiff took leave as needed and coded it as Leave Without Pay ("LWOP"). Doc. 98 ¶ 15; Doc. 105, Ex. 3. GSD recoded these days as FMLA protected leave after it granted her FMLA certification in March of 2023. Doc. 98 ¶ 16; Doc. 105 ¶ 16. Both the FMLA leave and the LWOP were unpaid.[1] Doc. 98 ¶ 17. In 2024, a similar chain of events unfolded: Plaintiff attempted to recertify her FMLA leave, GSD misunderstood her provider's authorization as only permitting four days of leave per month, Plaintiff secured an updated authorization from her provider, and GSD updated her FMLA leave permission to a maximum of thirty-one days per month. *Id.* ¶¶ 18–21.

B. <u>Telework Accommodation</u>

GSD operated under a telework policy, in response to the COVID-19 pandemic, until the end of 2022. Doc. 98 ¶ 23. After that policy was lifted, Plaintiff asked to continue working from home due to her heightened COVID vulnerability. *Id.* ¶ 24. GSD granted Plaintiff a six-month extension for telework. *Id.* ¶ 25; Doc. 105 ¶ 25. The extension was set to expire on August 2, 2023. Doc. 98 ¶ 26; Doc. 100 ¶ 5. On July 31, 2023, Plaintiff met with Defendant Eunice Moya and manager Dorothy Mendonca to discuss extending the telework accommodation. Doc. 98 ¶ 26. Plaintiff explained that her migraines sometimes render her unable to work. Doc. 105 ¶ 28. When that happens, she takes migraine medication. Doc. 98 ¶ 28. The medication can take several hours to take effect. *Id.* Once it sets in, her migraine may go away and enable her to work, but the medication can hinder "her balance and depth perception, rendering her unable to drive for the rest

---

[1] Plaintiff repeatedly cavils that FMLA leave can be substituted with paid forms of leave, such as annual or sick leave, and that she lost compensation when GSD forced her to take LWOP. Plaintiff does not cite to the record for this contention and therefore fails to meaningfully dispute it. *See, e.g.*, Doc. 99 at 13 (arguing, without citation, that "[b]eing forced to take an unpaid absence instead of a paid absence is an adverse action.").

of the day." *Id.* Plaintiff submitted a formal ADA request, asking that GSD allow her to work from home after her migraine resolves, rather than take FMLA leave for the entire day. Doc. 100 ¶ 9.

GSD denied Plaintiff's request. Doc. 98 ¶ 31; Doc. 100-3. GSD maintains that in-person attendance is an essential function of all non-manager and non-supervisor positions. Doc. 98 ¶ 37. However, managers, such as Defendant Moya, have worked remotely in limited circumstances. Doc. 105 ¶ 7; Doc. 107 ¶ L. GSD's decision to deny Plaintiff's request was not made with specific consideration for Plaintiff's position. Rather, GSD found telework to be presumptively impossible due to the blanket policy prohibiting remote work. Moya Dep. 90:8–17; Doc. 100 ¶¶ 10–11. When asked what essential functions of Plaintiff's position cannot be achieved through telework, Defendant Moya who serves as GSD's HR Director, said "I don't know." *Id.* 92:23–93:1. Defendant Moya further acknowledged that, during the pandemic, employees were able to perform most of their essential functions from home. *Id.* 92:17–22.

C. <u>New Mexico Minimum Wage Act</u>

GSD employees can "flex their time," meaning adjust the start or end of their shift for a singular day while still working a full eight hours. On September 6, 2024, Plaintiff had a doctor's appointment that she needed to leave work early to attend. Doc. 98 ¶ 59. Plaintiff neglected to obtain her supervisor's approval for flex time until 4:19 p.m. on September 5, 2024. *Id.* ¶ 60; Doc. 105 ¶ 59. Plaintiff claims that although she left early on September 6, she worked a total of 7.5 hours, but GSD counted her as having only worked 6.75 hours. Doc. 98 ¶ 62. Plaintiff asserts that this miscalculation violated her NMMWA rights.

D. <u>Age Discrimination/Failure to Promote</u>

Plaintiff applied for six higher-paying jobs at GSD, all in a one-year period beginning in August 2023 and ending in June 2024. Doc. 98 ¶ 41; Doc. 105 ¶ 41. The first job was for the role

of Construction Unit Supervisor. Doc. 98 ¶ 42; Doc. 105 ¶ 42. A different candidate, who scored higher during her interview and gave more detailed answers, was selected instead of Plaintiff. *Id.* Plaintiff next applied for the role of Purchasing Deputy Director. Doc. 98 ¶ 44. The hiring panel chose Ms. Martinez who "had many years more experience than Plaintiff" and was Plaintiff's direct supervisor at the time. *Id.*; Doc. 105 ¶ 44. Ms. Martinez's time as a supervisor was especially relevant since it was a management position. Doc. 98 ¶ 44; Doc. 105 ¶ 44. The third position, Procurement Specialist Bureau Chief, was given to Defendant LeBlance, who had more years of experience than Plaintiff, although she did not possess an advanced degree. Doc. 98 ¶¶ 45–46; Doc. 105 ¶¶ 45–46. Next, Plaintiff applied to three I.T. roles. Plaintiff has scant background in I.T. Doc. 98 ¶ 48; Doc. 105 ¶ 48. The interview panel chose candidates—Ms. Sanchez, Mr. Fisher, and Ms. Wulandari—who had I.T. experience for all three positions. Doc. 98 ¶¶ 50–55.

## DISCUSSION

I. Plaintiff's Motion for Sanctions

The Court does not consider the dispute over the Harding deposition and GSD's VPN information in evaluating Plaintiff's sanctions motion since Magistrate Judge Khalsa denied Plaintiff's motion to compel. Regarding the inconsistencies in some of the Defendants' deposition testimony, the Court is unpersuaded that these statements were made in bad faith. For one, Rule 56(h) targets attorneys' conduct, not deponents. Second, Defendants may have been confused as to whether Plaintiff's attorney was asking about telework for non-supervisors (who GSD expressly prohibits from teleworking) and supervisors (like Defendants Moya and LeBlanc). Since Plaintiff is not a supervisor, testimony that managers may work from home has little probative value in proving that telework is a reasonable accommodation. Third, Plaintiff does not make any credible

accusations of bad faith. She surmises that the inconsistent depositions "showcase[] a complete disregard for this Court's authority and the very meaning of a swearing an oath." Doc. 114 at 16. However, "such contradictions go to the weight and credibility of the evidence, not to the propriety of sanctions." *Harris*, 2025 WL 2963948, at *1. Plaintiff can cross-examine witnesses about these statements at trial. She has not shown that the depositions were "deliberately false and offered for an improper purpose." *Id.* Lastly, declaratory judgment is a wholly inappropriate remedy. Rule 56 sanctions typically result in payment of deposition or attorney's fees. Although the court may impose "other appropriate sanctions," default judgment is "an extreme sanction appropriate only in cases of willful misconduct." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). Absent proof of purposeful, egregious misrepresentations, default judgment is unwarranted. Plaintiff's motion for sanctions is denied. Doc. 114; *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873, 887 (11th Cir. 2015)

## II. Motions for Summary Judgment

### A. Failure to Accommodate

The NMHRA makes it "an unlawful discriminatory practice for . . . any employer to refuse or fail to accommodate a person's . . . serious medical condition, unless such accommodation is unreasonable or an undue hardship." N.M. Stat. Ann. § 28-1-7. Though Plaintiff brings her discrimination and failure to accommodate claims under the NMHRA, this Court will follow the New Mexico Supreme Court's practice, as well as the parties' briefing, and analyze them using the ADA's framework. *Latham v. Bd. of Educ. of Albuquerque Pub. Schs.*, 489 F. App'x 239, 247 (10th Cir. 2012) ("The New Mexico Supreme [Court] has looked to federal precedent in interpreting the ADA for guidance in construing NMHRA." (citing *Trujillo v. N. Rio Arriba*

*Electric Co-op, Inc.*, 41 P.3d 333, 338 (N.M. 2001)); *see, e.g.*, *Garcia v. T-Mobile*, Civ. No. 08-36 JP/RHS, 2009 WL 10696443, at *5 (D.N.M. Jan. 9, 2009).[2]

A failure to accommodate claim under the ADA begins with the plaintiff's prima facie case, demonstrating that (1) the plaintiff is disabled; (2) she is otherwise qualified for the position; (3) she requested a plausibly reasonable accommodation; and (4) the employer refused to accommodate the plaintiff's disability. *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020); *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012). "Once the employee produces evidence sufficient to make a facial showing on her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). An accommodation request is inherently unreasonable if it would force the employer to eliminate or alter any of a job's essential functions. *EEOC v. Picture People, Inc.*, 684 F.3d 981, 987 (10th Cir. 2012). Courts afford employers great deference in determining a job's essential functions. *Id.* This deference is not, however, limitless, as "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018). Thus, a function is not essential "simply because the employer says so." *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021).

The parties do not dispute that Plaintiff is disabled, nor that she is otherwise qualified for her current position (which she has held for seven years). Doc. 98 at 15. They do, however, splinter on whether telework is a reasonable accommodation. In Defendants' view, full in-person

[2] Plaintiff has exhausted her administrative remedies as required by the NMHRA. *See* Am. Compl. ¶¶ 9–11.

attendance is an essential function of Plaintiff's job and, consequently, occasional telework is an unreasonable accommodation. Throughout their discussion of Plaintiff's failure to accommodate claim, Defendants maintain that they "are not required to permit Plaintiff to work from home as a matter of law." *Id.* at 17. Plaintiff rebuts that Defendants have shirked their duty to individually analyze Plaintiff's role and requested accommodation, opting instead to "claim that every single position at GSD must be done in person only." Doc. 105 at 23. Plaintiff highlights that she does not meet with clients in person, that meetings with her supervisor are conducted remotely, and that there is "no work she performs that can only be performed in her Santa Fe office." Doc. 105 at 26; Doc. 103, Ex. A (discussing meetings held over Zoom and Teams between Plaintiff and her supervisors). Defendants do not provide any evidence to the contrary.

The Court finds that neither party is entitled to summary judgment on Plaintiff's failure to accommodate claim. It begins by correcting a fundamental misunderstanding of law that permeates Defendants' argument regarding the telework accommodation. The confusion stems from this district court's erroneous summary of the Tenth Circuit's decision in *Punt*. *See Duffee v. T-Mobile USA, Inc.*, 1:23-cv-536 MIS/LF, 2023 WL 6391376 (D.N.M. Oct. 2, 2023). *Duffee* incorrectly stated that "the Tenth Circuit has firmly established that requests to work remotely are not, as a matter of law, reasonable accommodations." *Id.* at *5 (citing *Punt*, 862 F.3d at 1050–51). *Punt* never made that finding. What that case reiterated is the basic tenet that "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." 29 C.F.R. § 1630.2(o); *see Picture People*, 684 F.3d at 987. Accordingly, telework is an unreasonable accommodation if the employer "has decided that physical presence at the workplace is an essential function of the position." *Punt*, 862 F.3d at 1051.

But an accommodation is always unreasonable if it asks an employer to alter or discard an essential function. *Punt*'s general acknowledgment that coming to the workplace is an essential function of many jobs does not excuse an employer from proving its veracity with regard to each employee's specific role. Indeed, courts cannot assume that telework is an unreasonable accommodation. *Unrein v. PHC-Fort Morgan, Inc.*, 993 F.3d 873, 877 (10th Cir. 2021). The employer always "bears the burden of demonstrating that a job function is essential because, after all, the employer is in the best position to do so." *Id.* As the Tenth Circuit explained over twenty years ago, "[t]he Supreme Court has generally eschewed per se rules under the ADA, and we think the determination of whether a request for an at-home accommodation is reasonable must likewise be made on a case-by-case basis." *Mason v. Avaya Commc'ns*, 357 F.3d 1114, 1124 (10th Cir. 2004). Other courts have also reached this conclusion: "full-time presence at work is not an essential function of a job simply because an employer says that it is. If it were otherwise, employers could refuse any accommodation that left an employee at work for fewer than 40 hours per week." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018); *cf. Lincoln*, 900 F.3d at 1192.[3] Thus, *Duffee* misrepresents that telework is per se unreasonable "as a matter of law" and treats what should be a fact-intensive inquiry as a foregone conclusion.

Since Defendants cannot dismiss Plaintiff's request for intermittent telework as unreasonable as a matter of law, the Court must consider whether there is a genuine dispute of material fact. Like most disability accommodations, telework "requires a context-specific

---

[3] Defendants also cite a Fourth Circuit case for the proposition that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise. Therefore, a regular and reliable level of attendance is a necessary element of most jobs." Doc. 98 at 17 (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994)). *Tyndall* is inapplicable to the present case. First and foremost, it was written in 1994, well before the advent of advance remote work capabilities. Second, Plaintiff's attendance record is not at issue in this case. She has been working at GSD for nearly a decade and is asking for a narrow accommodation on days where she wakes up with a migraine, not full-time remote work. Any inherent problem with that arrangement is indiscernible at this stage since, according to Defendant Moya, most GSD employees can complete their essential functions remotely.

inquiry." *Yochim v. Carson*, 935 F.3d 586, 592 (7th Cir. 2019). Because finding an appropriate accommodation is often a collaborative process, "the employee and employer frequently need to share information to find a workable solution." *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024). "'[I]nteractive process' is the label federal regulations and case law have given to this exchange of information, which often can facilitate the identification of an appropriate accommodation." *Id.* at 1274. "[E]ven if an employer does not engage in the interactive process, a plaintiff cannot survive summary judgment unless she can *also* show that a reasonable accommodation was possible." *Freeman v. City of Cheyenne*, No. 23-8022, 2023 WL 464069, at *3 (10th Cir. Feb. 7, 2024); *Brigham v. Frontier Airlines, Inc.*, 57 F.4th 1194, 1201 (10th Cir. 2023) ("[T]he failure to engage in an interactive process is not independently actionable under the [ADA].").

Defendants did not meaningfully engage in the interactive process with Plaintiff. They reflexively denied her request and moved on. For her part, Plaintiff has shown a genuine dispute over whether a reasonable accommodation—intermittent remote work—is possible. She performed "all of the functions of her position while teleworking from home for over 3 years." Doc. 100 at 11. Unlike in *Punt* where the plaintiff's "physical presence at the workplace was the most essential function of her job," Defendants have put on no evidence to support the claim that 100% in person attendance is an essential function of Plaintiff's job. *Punt*, 862 F.3d at 1051. Instead, Defendants underscore that in-office attendance is required of all non-manager/non-supervisor employees, including Plaintiff. But having an in-person attendance policy is not enough. After all, what the ADA requires (and what Plaintiff seeks) is an accommodation, meaning an adjustment to an employer's typical policies. Defendant Moya acknowledged that in considering Plaintiff's request, there was "no individualized assessment at all" and that "no matter

what any doctor requested for any employee, there would be no telework." Moya Dep. 90:13-17. Defendant Moya also admitted that she could not identify any essential functions of Plaintiff's that would be impossible to complete remotely. *Id.* 90:8–17. And GSD's reliance on remote work for nearly three years—which did not appear to impede the office's essential functions—makes their unyielding insistence on in-person work somewhat dubious. *Id.* 92:17–22; *cf. Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1235 (9th Cir. 2012) (finding that, in the case of a neo-natal intensive care nurse, showing up for work "really *is* essential"). GSD's claim that "determined working in the office is an essential function of Plaintiff's position" is buttressed only by their own "say so." *Brown*, 13 F.4th at 1086. At most, GSD's in-person policy provides a baseline expectation; it does not conclusively establish that the essential functions of Plaintiff's role necessitate one hundred percent in-person attendance. Moya Dep. 89:6–9. The Court finds that Defendants' mechanical application of its in-office policy, without consideration for the particularities of Plaintiff's role, to be inadequate for purposes of summary judgment. *Mason*, 357 F.3d at 1124 ("[S]ummary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position at home thereby making the at-home accommodation request at least facially reasonable."); *cf. Freeman*, 2023 WL 464069, at *6 (affirming grant of summary judgment on failure to accommodate claim where it was "undisputed that an essential function of the HR Director position was physical attendance for a minimum of forty hours per week").

A. Discrimination On the Basis of Disability

Plaintiff accuses Defendants of discriminating against her by failing to provide a reasonable accommodation.[4] As with her accommodation claim, Plaintiff asserts this claim under the

[4] Though Plaintiff undoubtedly argues that Defendants' failure to accommodate was discriminatory, she at times appears to also be working toward a disparate treatment claim. For instance, Plaintiff argues that "[i]t appears to be

NMHRA and the Court analyzes it under ADA precedent. The ADA bars employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Courts analyze ADA discrimination claims under the *McDonnell Douglas* burden-shifting framework, familiar to Title VII claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To start, the plaintiff must establish a prima facie case of disability discrimination, demonstrating (through direct or circumstantial evidence) that: (1) she has a disability; (2) she is a qualified individual under the ADA, meaning she may perform the essential functions of the job; and (3) the employer discriminated against her because of disability. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015).

Only the third prong is at issue in this case. Courts have interpreted "because of" to mean but-for causation, i.e. that GSD denying Plaintiff a remote work option was "by reason of" her disability (she does not need to show it was "solely by reason of" her disability). *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021). This element is "satisfied in a failure-to-accommodate claim as soon as the employer, with adequate notice of the disabled employee's request for some accommodation, fails to provide a reasonable accommodation." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 795 (10th Cir. 2020). "[O]nce plaintiffs have established their employers' failure to reasonably accommodate their disability, they need not go further and establish that they have suffered an adverse employment action." *Id.* Because failure to

just [her] who is not allowed to telework." Doc. 100 at 13. To whatever extent those efforts are being made, they fail. Plaintiff alleges differential treatment between herself and Defendants Moya and Leblance, who received permission to work remotely for health-related and childcare reasons, to articulate her discrimination claim. *See* Doc. 100, Ex. 10 97:14–98:4. But these Defendants are supervisors. Plaintiff is not. GSD's policy makes clear that the in-person requirement is applicable to non-supervisors/non-managers. While that does not preclude Plaintiff's failure to accommodate claim, it is detrimental to a disparate treatment claim. Here, Plaintiff's rank as a non-manager employee is what compelled GSD's decision, not her disability. *Crane*, 15 F.4th at 1313. Plaintiff has not provided any evidence that her disability motivated differential treatment from her employer.

accommodate may itself be a discriminatory act, there is a genuine dispute of material fact as to whether GSD's denial of Plaintiff's telework request was discriminatory. The Court therefore finds that neither party is entitled to summary judgment.

B. Interference with FMLA Leave

The FMLA guarantees up to twelve weeks of unpaid leave for eligible employees of covered employers for serious health conditions. 29 U.S.C. §§ 2612(a)(1), 2614(a). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's right to take such leave. *Id.* § 2615(a)(1). To establish an FMLA interference claim, a plaintiff must show: "(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with [her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [her] FMLA rights." *Jones v. Denver Public Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005). An adverse action occurs when the employee is prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). "[A] denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent." *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1180 (10th Cir. 2006).

Plaintiff's FMLA claim fails. Plaintiff has not alleged that there were any days during 2023 or 2024 where she wanted to exercise her right to leave, but was unwilling to do so for fear of retaliation. Instead, she complains that she was "discouraged from taking leave she otherwise would have taken," but cites no specific instances where she came to work despite a migraine or MS flare. Doc. 99 ¶ 28. Nor has she argued that Defendants prevented her from taking LWOP prior to renewing her certification. For the leave Plaintiff did take, she has not presented any

evidence of an adverse consequence that resulted from her exercising her right to take FMLA leave. Though she repeatedly states that prejudice is a necessary component of an interference claim, she neglects to make such a showing in her case. *See, e.g.*, Doc. 99 at 10 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). While it is true that Defendants failed to certify Plaintiff's FMLA leave for approximately 2.5 months in 2023 and again improperly denied lave in 2024, Plaintiff does not dispute that an employer "may retroactively designate leave as FMLA leave with appropriate notice to the employee," so long as this retroactive designation "does not cause harm or injury to the employee." 29 C.F.R. § 825.30(j). That is what happened here. Defendants retroactively certified Plaintiff's leave as FMLA protected. Still, Plaintiff criticizes Defendants for retroactively designating her leave "without her agreement or input." Doc. 99 at 14. But the FMLA does not require the employee's agreement or input to redesignate leave. It requires notice, which Plaintiff received.

Aside from the concerns over how Plaintiff's leave was designated, the Court cannot find any evidence of a concrete injury or adverse employment action. Plaintiff used the donated leave available, as well as her paid sick leave and annual leave. Her vague and unsupported statements regarding lost wages do not contradict those facts. Doc. 99 at 12 (alleging that Defendants' interference with Plaintiff's FMLA leave "resulted in clear loss of income"). Plaintiff's remaining attempts at creating any dispute over a negative outcome from the delay in certifying Plaintiff's leave are similarly unpersuasive. Plaintiff argues that she "was threatened with potential discipline by being marked AWOL." *Id.* at 20. Of course, potential discipline is not an adverse action—discipline is. *Cf. Dick v. Phone Directories Co.*, 397 F.3d 1256, 1258 (10th Cir. 2005) (explaining that unrealized threat of termination does not constitute an adverse employment action absent highly specialized circumstances). If Plaintiff suffered some harm or injury from this process, the

record does not reveal it. Additionally, Plaintiff's point that some employees only work four days a week and therefore "aren't doing their job from anywhere one day a week" is irrelevant to the telework claim because when Plaintiff is forced to take FMLA leave instead of teleworking, she is also not doing her job from anywhere. The Court grants Defendants' motion for summary judgment as to the FMLA interference claim and denies Plaintiff's motion for summary judgment for the same. *Carter v. Spirit Aerosystems, Inc.*, 827 F. App'x 864, 871 (10th Cir. 2020) (affirming dismissal of FMLA interference claim where plaintiff failed to plead any adverse action).

C. <u>Minimum Wage Claim</u>

Plaintiff alleges that Defendants violated the New Mexico Minimum Wage Act on September 6, 2024. Doc. 105 at 31. On her account, this violation occurred because she worked 7.5 hours, yet her timesheet only reflected 6.75 hours. Plaintiff seeks recovery for the .75 uncompensated hours. Plaintiff has not attached the time sheet to her motion, nor her response, and has not attached any pay stubs showing Plaintiff's normal rate of pay. The purchasing agent agreement attached to Doc. 100 states that Plaintiff's salary would have been between $15.28-$26.59 per hour. Plaintiff does not have a minimum wage claim unless her total compensation across the pay period was lower than $14.60 per hour (Santa Fe's minimum wage). Since she is not a minimum wage employee, a violation cannot be assumed and, even if it could be, it would still require proof at the summary judgment stage. *Presbyterian Healthcare Servs. v. Factory Mut. Ins. Co.*, 512 F. Supp. 1169, 1175 (D.N.M. 2021) ("[T]o defeat summary judgment, the nonmovant must articulate a viable legal theory."). Plaintiff has not cited to any exhibit, deposition testimony, or other evidence to support her claim for a violation of the NM MWA. The Court grants summary judgment to Defendants on Count V.

D. Age Discrimination/Failure to Promote

The ADEA makes it "unlawful for an employer . . . to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prove a prima facie case of age discrimination, a plaintiff must show: (1) she is over forty years old (the class protected by the ADEA); (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010). "An employee alleging intentional discrimination under the ADEA must prove that age was a 'determinative factor' in the defendant employer's action toward him." *Sloan v. Boeing Co.*, 105 F.3d 669 (10th Cir. 1997) (table decision). Plaintiff has not met that burden here.

Plaintiff fails to establish the third prong of her prima facie case under the ADEA—that she possesses "the objective qualifications necessary to perform the job at issue." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1274 (10th Cir. 2006). Plaintiff does not meaningfully contest the Defendants' hiring decision for the purchasing deputy director position nor the construction unit supervisor role. Doc. 98 ¶¶ 42, 44; Doc. 105 ¶¶ 42, 44. Regarding the Procurement Specialist Bureau Chief position, Plaintiff does not dispute that she lacked managerial experience. Her only rebuttal to Defendants' version of events is that "Plaintiff has a higher education than Defendant LeBlanc." Doc. 105 ¶ 45. A higher education does not automatically make an individual more qualified than someone with a lower degree. Experience matters. Moving to the three I.T. positions, Plaintiff has no background in I.T. Doc. 105, Ex. 1 ¶ 37 (declaration of Plaintiff stating that she "had not had the chance to work on any IT procurements"). Ms. Sanchez and Mr. Fisher

had more than ten years of experience in I.T. Doc. 105, Ex. 15; Doc. 105, Ex. 12 at 7.[5] Mr. Fisher had spent almost eight years as an I.T. supervisor and, before that, eight years as an I.T. specialist. Doc. 105, Ex. 12 at 2–3. Plaintiff's conclusory, and often unsupported, statements, which lack any citation to the record, cannot overcome this uncontroverted evidence. Claiming that "Defendants chose two less qualified, younger candidates over Plaintiff and other older applicants," with no evidence of the other candidates' ages, or that "Defendants have repeatedly hired younger candidates for their IT Procurement positions, passing over older, more educated and experienced applicants" is fruitless without some citation to the record. Doc. 105 ¶¶ 57–58. Plaintiff has also neglected to produce evidence insinuating that Defendants' hiring decisions were motivated by age-related bias. *Sloan*, 105 F.3d at *5 (affirming grant of summary judgment on age discrimination claims where plaintiff did not create "a genuine issue concerning the sincerity of [the employer's] proffered reasons for failing to promote him"). The Court grants Defendants' motion for summary judgment as to Plaintiff's claim for age discrimination under the NMHRA.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment as to Counts III, IV, and V is **GRANTED**. Defendants' motion for summary judgment as to Counts I and II is **DENIED**. Plaintiff's partial motions for summary judgment and motion for sanctions are **DENIED**.

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**

[5] Plaintiff does not dispute any of Defendants' facts regarding Ms. Wulandari. Defendants state that Ms. Wulandari had "extensive experience in I.T. and I.T." while Plaintiff "had very little experience in that area." Doc. 98 ¶ 48; Doc. 105 ¶ 48. Since Plaintiff admits these facts, there is no dispute that GSD's choice of Ms. Wulandari was based on their difference in credentials rather than age.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.** **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**
**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**
**VANESSA LEBLANC, AND NATALIE MARTINEZ,**
**In their individual and official capacities**

**Defendants.**

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that Plaintiff Kimberly Hunt-Brown hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Order Granting Defendants' Motion for Summary Judgment in Part [Doc. 146] which became a Final Judgment upon the granting of Plaintiff's Motion to Remand entered in this action on March 10, 2026. [Doc. 152]

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424

heather@hburkelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's e-file and serve system on this 8th day of April 2026.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

APPEAL

# U.S. District Court
# United States District Court - District of New Mexico (Albuquerque)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00782-SMD-KK

Hunt-Brown v. New Mexico General Services Department et al
Assigned to: District Judge Sarah M Davenport
Referred to: Magistrate Judge Kirtan Khalsa
Case in other court: USCA, 26-02042
First Judicial District Court, D-101-CV-23-01912
Cause: 28:1441 Petition for Removal

Date Filed: 09/13/2023
Date Terminated: 03/10/2026
Jury Demand: Plaintiff
Nature of Suit: 751 Labor: Family and Medical Leave Act
Jurisdiction: Federal Question

**Plaintiff**

**Kimberly Hunt-Brown**

represented by **Heather C. Burke**
Burke Law
1000 Cordova Place #24
Santa Fe, NM 87505
505-449-8833
Email: heather@hburkelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly B Williams**
Williams Law Firm, P.C.
1209 West Texas Avenue
Midland, TX 79701
432-682-7800
Fax: 432-682-1112
Email: holly@williamslawpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New Mexico General Services Department** represented by **Dyea Reynolds**
201 Third St. NW
Ste 1500
Albuquerque, NM 87102
505-767-0577
Email: dyea@jacksonlomanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah K Downey**
Jackson Loman Stanford & Downey, P.C.
201 Third Street NW
Suite 1500
Albuquerque, NM 87102
505-767-0577
Fax: 505-242-9944
Email: sarah@jacksonlomanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Loman**
Jackson Loman Downey & Stevens-Block, PC
201 3rd St. NW, Suite 1500
Albuquerque, NM 87102
505-767-0577
Fax: 505-242-9944
Email: eric@jacksonlomanlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Valerie Paulk** represented by **Dyea Reynolds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah K Downey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Loman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eunice Moya** represented by **Dyea Reynolds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah K Downey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Loman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Natalie Martinez** represented by **Dyea Reynolds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah K Downey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Loman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Vanessa LeBlanc** represented by **Sarah K Downey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jennifer Morfin**
*In their individual and official capacities*

represented by **Sarah K Downey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/13/2023 | 1 | NOTICE OF REMOVAL by Eunice Moya, Valerie Paulk, New Mexico General Sevices Department, Natalie Martinez from First Judicial District Court, case number D-101-CV-2023-01912. ( Filing Fee - Online Payment), filed by Eunice Moya, Valerie Paulk, New Mexico General Sevices Department, Natalie Martinez. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1, # 3 Exhibit 2)(Loman, Eric) (Entered: 09/13/2023) |
| 09/13/2023 | | Filing and Administrative Fees Received: $ 402 receipt number ANMDC-9002334 re 1 Notice of Removal, filed by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk (Payment made via Pay.gov)(Loman, Eric) (Entered: 09/13/2023) |
| 09/13/2023 | 2 | CERTIFICATE OF SERVICE by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk re 1 Notice of Removal, (Loman, Eric) (Entered: 09/13/2023) |
| 09/13/2023 | | United States Magistrate Judge Laura Fashing and United States Magistrate Judge Kirtan Khalsa assigned. (bc) (Entered: 09/13/2023) |
| 09/25/2023 | 4 | INITIAL SCHEDULING ORDER by Magistrate Judge Kirtan Khalsa. Counsel are to meet and confer by **October 12, 2023**. The parties' Joint Status Report and Provisional Discovery Plan is due by **October 23, 2023**. A Telephonic Rule 16 Initial Scheduling Conference is set for **November 2, 2023**, at 1:30 p.m. MT before Judge Khalsa. Counsel are to call Judge Khalsa's AT&T conference line at (877) 848-7030 and enter the code 7324132 to connect to the proceedings. Unless otherwise notified by the Clerk or the Court, a notice of consent or non-consent for this case to proceed before the trial Magistrate Judge should be submitted by each party no later than **October 27, 2023**. (nlb) (Entered: 09/25/2023) |
| 10/02/2023 | 5 | ANSWER to Complaint (Notice of Removal) by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk. (Loman, Eric) (Entered: 10/02/2023) |
| 10/17/2023 | 7 | PLEASE TAKE NOTICE that this case has been reassigned to Chief United States District Judge William P. Johnson as the trial judge.<br><br>Under D.N.M.LR-Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** **Kindly reflect this change in your filings.** |

| | | |
|---|---|---|
| | | United States Magistrate Judge Laura Fashing no longer assigned to this case. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 10/17/2023) |
| 10/23/2023 | 8 | Joint Status Report *and Provisional Discovery Plan* by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk (Loman, Eric) (Entered: 10/23/2023) |
| 10/27/2023 | 9 | NOTICE REGARDING DOCUMENT ENTRIES: Because this case has been reassigned to a district judge, please be advised that any documents filed by the parties under Rule 73(b) have been permanently removed from the docket. Document(s) removed: Nos. 3 and 6. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (kg) (Entered: 10/27/2023) |
| 10/31/2023 | 10 | CERTIFICATE OF SERVICE by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk *Defendants' Initial Disclosure* (Loman, Eric) (Entered: 10/31/2023) |
| 11/02/2023 | 11 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Telephonic Rule 16 Initial Scheduling Conference held on November 2, 2023. (dr) (Entered: 11/02/2023) |
| 11/02/2023 | 12 | ORDER ADOPTING JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN WITH CHANGES AND SETTING CASE MANAGEMENT DEADLINES by Magistrate Judge Kirtan Khalsa. Plaintiff to seek leave to join and amend by 12/18/23. Defendants to seek leave to join and amend by 1/12/2024. Plaintiff's expert disclosures due by 2/5/2024. Defendants' expert disclosures due by 3/4/2024. Discovery is due by 5/20/24. Discovery motions are due by 6/3/24. Pretrial Motions are due by 6/13/24. A proposed pretrial order is due from Plaintiff to Defendant by 9/11/24. Consolidated proposed Pretrial Order due from Defendants to Court by 9/25/24. (dr) Modified on 11/8/2023 (jg). (Entered: 11/02/2023) |
| 11/08/2023 | 13 | ORDER SETTING RULE 16 SETTLEMENT CONFERENCE by Magistrate Judge Khalsa. Rule 16 Settlement Conference is set for 5/13/2024 at 09:30 AM in Albuquerque - 440 Hondo Courtroom before Magistrate Judge Khalsa. A Telephonic Pre-Settlement Status Conference is set for 5/6/2024 at 4:30 PM before Judge Khalsa. Plaintiff and counsel are to call Judge Khalsas AT&T conference line at (877) 848-7030 and enter the code 7324132 to connect to the proceedings. Plaintiff's demand letter is due to Defendant by 4/19/2024. Defendant's counteroffer letter is due to Plaintiff by 4/29/2024. The parties' confidential position statements are due to the Court by 5/1/2024. (jg) (Entered: 11/08/2023) |
| 02/05/2024 | 14 | CERTIFICATE OF SERVICE by New Mexico General Sevices Department *GSD's First Discovery Request to Plaintiff* (Loman, Eric) (Entered: 02/05/2024) |
| 02/16/2024 | 15 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown *First Discovery Requests* (Burke, Heather) (Entered: 02/16/2024) |
| 03/20/2024 | 16 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown *First Discovery Responses* (Burke, Heather) (Entered: 03/20/2024) |
| 04/05/2024 | 17 | CERTIFICATE OF SERVICE by New Mexico General Sevices Department *for Responses to Plaintiff's First Interrogatories, Requests for Production and Requests for Admission* (Loman, Eric) (Entered: 04/05/2024) |
| 04/17/2024 | 18 | Unopposed MOTION to Amend/Correct *Complaint* by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit A - Amended Complaint) (Burke, Heather) (Entered: 04/17/2024) |

| | | |
|---|---|---|
| 04/25/2024 | 19 | Opposed MOTION to Compel *Discovery* by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Burke, Heather) (Entered: 04/25/2024) |
| 04/29/2024 | 20 | MOTION to Vacate *Settlement Conference* by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk. (Loman, Eric) (Entered: 04/29/2024) |
| 04/29/2024 | 21 | MOTION to Amend/Correct *Scheduling Order Deadlines* by Natalie Martinez, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk. (Loman, Eric) (Entered: 04/29/2024) |
| 04/30/2024 | 22 | ORDER VACATING RULE 16 SETTLEMENT CONFERENCE by Magistrate Judge Kirtan Khalsa. Defendants' Unopposed Motion to Reschedule Settlement Conference (Doc. 20) is GRANTED. The Rule 16 Settlement Conference previously set for May 13, 2024, before Judge Khalsa, and all associated deadlines and hearings as set forth in the Court's Second Order Setting Rule 16 Settlement Conference (Doc. 13), are VACATED, to be reset at a later date. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (KK) (Entered: 04/30/2024) |
| 05/03/2024 | 23 | ORDER by Magistrate Judge Kirtan Khalsa granting 18 Motion to Amend. Plaintiff may file the First Amended Complaint attached as Exhibit A to her Unopposed Motion for Leave to Amend Complaint within five (5) business days of entry of this Order. (jg) (Entered: 05/03/2024) |
| 05/03/2024 | 24 | ORDER MODIFYING CASE MANAGEMENT DEADLINES by Magistrate Judge Kirtan Khalsa granting 21 Motion to Amend/Correct. Discovery is due by 9/17/2024. Discovery Motions due by 10/1/2024. Pretrial Motions are due by 10/11/2024. (jg) (Entered: 05/03/2024) |
| 05/03/2024 | | Set/Reset Deadlines: Discovery due by 9/17/2024. Discovery Motions due by 10/1/2024. Pretrial Motions due by 10/11/2024. (jg) (Entered: 05/03/2024) |
| 05/03/2024 | 25 | AMENDED COMPLAINT against All Defendants. adding Jennifer Morfin and Vanessa LeBlanc filed by Kimberly Hunt-Brown. (Burke, Heather) Modified text on 5/6/2024 (bap). (Entered: 05/03/2024) |
| 05/10/2024 | 26 | NOTICE by Vanessa LeBlanc, Natalie Martinez, Jennifer Morfin, Eunice Moya, New Mexico General Sevices Department, Valerie Paulk re 19 Opposed MOTION to Compel *Discovery Notice of Extension of Time for Defendants Response* (Loman, Eric) (Entered: 05/10/2024) |
| 05/16/2024 | | Summons Issued as to Vanessa LeBlanc, Jennifer Morfin. (dr) (Entered: 05/16/2024) |
| 05/20/2024 | 27 | RESPONSE to Motion re 19 Opposed MOTION to Compel *Discovery* filed by New Mexico General Sevices Department. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Loman, Eric) (Entered: 05/20/2024) |
| 06/03/2024 | 28 | REPLY to Response to Motion re 19 Opposed MOTION to Compel *Discovery* filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 06/03/2024) |
| 06/03/2024 | 29 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 19 Opposed MOTION to Compel *Discovery* filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 06/03/2024) |

| | | |
|---|---|---|
| 07/03/2024 | 30 | SUMMONS Returned Executed by Kimberly Hunt-Brown. Vanessa LeBlanc served on 7/3/2024, answer due 7/24/2024. (Burke, Heather) (Entered: 07/03/2024) |
| 07/03/2024 | 31 | SUMMONS Returned Executed by Kimberly Hunt-Brown. Jennifer Morfin served on 7/3/2024, answer due 7/24/2024. (Burke, Heather) (Entered: 07/03/2024) |
| 07/09/2024 | 32 | ORDER SETTING HEARING ON PLAINTIFFS OPPOSED MOTION TO COMPELDISCOVERY AND FOR SANCTIONS by Magistrate Judge Kirtan Khalsa. Motion Hearing set for 7/15/2024 at 01:30 PM in Albuquerque - 440 Hondo Courtroom before Magistrate Judge Kirtan Khalsa. Joint Status Report due by 7/12/2024. (dr) (Entered: 07/09/2024) |
| 07/10/2024 | 33 | CERTIFICATE OF SERVICE by New Mexico General Services Department *First Supplemental Responses to Plaintiff's First Set of Discovery* (Loman, Eric) Modified text on 7/11/2024 (bap). (Entered: 07/10/2024) |
| 07/16/2024 | 34 | ORDER by Magistrate Judge Kirtan Khalsa granting in part and denying in part 19 Motion to Compel Discovery and For Sanctions. (jg) (Entered: 07/16/2024) |
| 08/08/2024 | 35 | NOTICE by New Mexico General Services Department *Certificate of Service of First Supplemental Response to Request for Production no. 7* (Loman, Eric) Modified text on 8/9/2024 (bap). (Entered: 08/08/2024) |
| 09/17/2024 | 36 | Unopposed MOTION for Leave to File *Second Amended Complaint* by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit A) (Burke, Heather) Modified on 9/18/2024 (bap). (Entered: 09/17/2024) |
| 09/17/2024 | 37 | Unopposed MOTION Stipulated Confidentiality Order by New Mexico General Sevices Department. (Loman, Eric) (Entered: 09/17/2024) |
| 09/18/2024 | 38 | RESPONSE to Motion re 36 Unopposed MOTION for Leave to File *2nd Amended Complaint* filed by New Mexico General Sevices Department. (Loman, Eric) (Entered: 09/18/2024) |
| 09/18/2024 | 39 | Joint MOTION to Extend (other) *Case Management Deadlines* by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 09/18/2024) |
| 09/25/2024 | 40 | ORDER GRANTING LEAVE TO AMEND by Magistrate Judge Kirtan Khalsa granting 36 Unopposed MOTION for Leave to File Second Amended Complaint. Plaintiff may file the Second Amended Complaint attached to her Motion within five (5) days of entry of this Order. (dr) (Entered: 09/25/2024) |
| 09/25/2024 | 41 | ORDER Setting Hearing on Motion 37 Unopposed MOTION Stipulated Confidentiality Order , 39 Joint MOTION to Extend (other) *Case Management Deadlines* by Magistrate Judge Kirtan Khalsa. Motion Hearing set for 10/10/2024 at 02:30 PM in Remote via Zoom before Magistrate Judge Kirtan Khalsa. The Zoom ID and Passcode will be filed separately. (dr) (Entered: 09/25/2024) |
| 09/25/2024 | 43 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants., filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 09/25/2024) |
| 10/10/2024 | 45 | *Defendants'* ANSWER to 25 Amended Complaint by New Mexico General Sevices Department.(Loman, Eric) (Entered: 10/10/2024) |

| | | |
|---|---|---|
| 10/10/2024 | 46 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Motion Hearing held on 10/10/2024 re 39 Joint MOTION to Extend (other) *Case Management Deadlines* filed by Kimberly Hunt-Brown, and 37 Unopposed MOTION Stipulated Confidentiality Order filed by New Mexico General Sevices Department. (eh) (Entered: 10/10/2024) |
| 10/10/2024 | 47 | STIPULATED CONFIDENTIALITY ORDER by Magistrate Judge Kirtan Khalsa. (eh) (Entered: 10/11/2024) |
| 10/11/2024 | 48 | ORDER SETTING RULE 16 SETTLEMENT CONFERENCE by Magistrate Judge Kirtan Khalsa. A Rule 16 Settlement Conference is set for 5/16/2025 at 09:30 AM in Albuquerque - 440 Hondo Courtroom or by Zoom Videoconferencing before Judge Khalsa. A Telephonic Pre-Settlement Conference is set for 5/8/2025 at 02:30 PM before Judge Khalsa. Counsel are to call Judge Khalsa's AT&T conference line at (877) 848-7030 and enter the code 7324132 to connect to the proceedings. Plaintiff's demand letter is due to Defendant by 4/21/2025. Defendant's counteroffer letter is due to Plaintiff by 5/2/2025. The parties' confidential position statements are due to the Court by 5/6/2025. (eh)<br>Modified text pursuant to 51 NOTICE entered on 11/1/2024.<br>Please be advised that the call-in number for the Telephonic Pre-Settlement Conference set for 5/8/2025 at 02:30 PM before Judge Khalsa has been changed. Counsel and any pro se parties are to call Judge Khalsa's WebEx conference line at (855) 244-8681 and enter the code 23117740507 to connect to the proceedings. (ng) (Entered: 10/11/2024) |
| 10/11/2024 | 50 | ORDER by Magistrate Judge Kirtan Khalsa Granting 39 Joint MOTION to Extend (other) *Case Management Deadlines* filed by Kimberly Hunt-Brown.<br>Plaintiffs' expert disclosures are due by 1/13/2025.<br>Defendants' expert disclosures are due by 2/12/2025.<br>Discovery is due by 3/14/2025.<br>Discovery motions are due by 4/4/2025.<br>Motions due by 4/14/2025.<br>A proposed pretrial order is due from Plaintiff to Defendants by 7/14/2025 and from Defendants to the Court by 7/23/2025. (eh) (Entered: 10/11/2024) |
| 11/01/2024 | 51 | NOTICE re 48 ORDER SETTING RULE 16 SETTLEMENT CONFERENCE by United States Magistrate Judge Kirtan Khalsa.<br>**Please be advised that the call-in number for the Telephonic Pre-Settlement Conference set for 5/8/2025 at 02:30 PM before Judge Khalsa has been changed.**<br><br>Counsel are to call Judge Khalsa's WebEx conference line at (855) 244-8681 and enter the code 23117740507 to connect to the proceedings. (ng)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 11/01/2024) |
| 12/10/2024 | 52 | ORDER RESETTING RULE 16 SETTLEMENT CONFERENCE AND ASSOCIATED DEADLINES by Magistrate Judge Kirtan Khalsa. Motions to reschedule settlement conference due by 4/25/2025. Pre-Settlement Conference set for 5/1/2025 at 02:30 PM in Albuquerque - Telephonic Hearing/Conference before Magistrate Judge Kirtan Khalsa. Counsel are to call the Court's WebEx conference line at (855) 244-8681 and enter the code 23117740507 to connect to the proceedings. Settlement Conference set for 5/9/2025 at 09:30 AM in Albuquerque - 440 Hondo Courtroom before Magistrate Judge Kirtan Khalsa. Parties may attend the settlement conference either 1) in person at the Pete V. Domenici United States Courthouse, 440 Hondo |

| | | |
|---|---|---|
| | | Courtroom, Fourth Floor, 333 Lomas Boulevard, Northwest, Albuquerque, New Mexico, or 2) via Zoom videoconferencing. The Zoom ID and Passcode will be filed separately in a Sealed Notice of Zoom Information; counsel are responsible for providing this Notice to their clients and any other persons who will be participating in the conference on their clients' behalf. (bc) (Entered: 12/10/2024) |
| 01/06/2025 | 54 | CERTIFICATE OF SERVICE by New Mexico General Services Department *Second Set of Discovery Request to Plaintiff* (Reynolds, Dyea) Modified text on 1/7/2025 (bap). (Entered: 01/06/2025) |
| 01/06/2025 | 55 | NOTICE of Appearance by Dyea Reynolds on behalf of New Mexico General Sevices Department, Valerie Paulk, Eunice Moya, Natalie Martinez, Vanessa LeBlanc, Jennifer Morfin (Reynolds, Dyea) (Entered: 01/06/2025) |
| 01/17/2025 | 56 | PLEASE TAKE NOTICE that this case has been reassigned to District Judge Sarah M Davenport as the trial judge.<br><br>Under D.N.M.LR-Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** **Kindly reflect this change in your filings.**<br><br>District Judge William P. Johnson no longer assigned to this case.<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (arp) (Entered: 01/17/2025) |
| 01/31/2025 | 57 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown *2nd Requests for Discovery* (Burke, Heather) (Entered: 01/31/2025) |
| 02/05/2025 | 58 | NOTICE by New Mexico General Services Department *Deposition of Kimberly Hunt-Brown* (Loman, Eric) (Entered: 02/05/2025) |
| 02/19/2025 | 59 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown *Plaintiff's Responses to Defendant's 2nd Disc Requests* (Burke, Heather) (Entered: 02/19/2025) |
| 02/19/2025 | 60 | CERTIFICATE OF SERVICE by New Mexico General Services Department *Supplement Response to Pltf's ROG No. 4* (Loman, Eric) (Entered: 02/19/2025) |
| 02/21/2025 | 61 | ORDER SETTING DISCOVERY STATUS CONFERENCE by Magistrate Judge Kirtan Khalsa. On the joint request of the parties, the Court will hold a discovery status conference on **Wednesday, February 26, 2025, at 3:30 p.m.** Counsel are to call the Court's WebEx conference line at (855) 244-8681 and enter the code 23081079716 to connect to the proceedings. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (bkr) (Entered: 02/21/2025) |
| 02/26/2025 | 62 | ORDER Modifying Case Management Deadlines by Magistrate Judge Kirtan Khalsa. The termination date for deposition discovery is extended to 4/18/25. All other discovery must be completed on or before 3/14/25. Discovery Motions Deadline is extended to 5/9/2025. Motions Deadline is extended to 5/19/2025. Deadlines related to preparation and submission of the proposed pretrial order are hereby vacated and will be reset by separate order. (eh) (Entered: 02/26/2025) |

| | | |
|---|---|---|
| 02/26/2025 | 63 | Clerk's Minutes before Magistrate Judge Kirtan Khalsa: Discovery Hearing held (Recording Info: Liberty-Remote) (kd) (Entered: 02/27/2025) |
| 03/03/2025 | 64 | CERTIFICATE OF SERVICE by New Mexico General Services Department re 57 Certificate of Service *Def's Resp to Pltf's 2nd ROGS & RFP* (Loman, Eric) (Entered: 03/03/2025) |
| 03/06/2025 | 65 | NOTICE of change of WebEx conference line number and code re Status Conference set for 5/1/2025 at 02:30 PM pursuant to 52 ORDER SETTING RULE 16 SETTLEMENT CONFERENCE.<br>Counsel are to call Judge Khalsa's WebEx conference line at (855) 244-8681 and enter the code 2308 107 9716 to connect to the proceedings. (eh)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 03/06/2025) |
| 03/10/2025 | 66 | MOTION for Protective Order by New Mexico General Services Department. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Loman, Eric) (Entered: 03/10/2025) |
| 03/11/2025 | 67 | **FILED IN ERROR**NOTICE OF DISCOVERY HEARING by Magistrate Judge Kirtan Khalsa. On the joint request of the parties, the Court will hold a discovery hearing on **Wednesday, March 12, 2025, at 1:30 p.m.** Counsel for Plaintiff and Defendant The Four Winds Society, Inc. are to call the Court's WebEx conference line at (855) 244-8681 and enter the code 23081079716 to connect to the proceedings. Counsel for Defendant The Chi Center, Inc. may attend the proceedings but is not required to do so. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (bkr) Modified on 3/11/2025 (dr). (Entered: 03/11/2025) |
| 03/11/2025 | 68 | NOTICE by New Mexico General Services Department *Non-Appearance* (Loman, Eric) (Entered: 03/11/2025) |
| 03/12/2025 | 69 | NOTICE of Hearing: Jury Selection set for 3/9/2026 at 09:30 AM in Las Cruces - 420 Mimbres Courtroom (North Tower) before District Judge Sarah M. Davenport. Jury Trial set for 3/9/2026 at 09:30 AM in Las Cruces - 420 Mimbres Courtroom (North Tower) before District Judge Sarah M. Davenport. Pretrial Conference set for 2/2/2026 at 11:00 AM in Las Cruces - 420 Mimbres Courtroom (North Tower) before District Judge Sarah M. Davenport. Other deadlines as set forth in Order. (mln) (Entered: 03/12/2025) |
| 03/18/2025 | | Reset Hearings: Pre-Settlement Conference RESET for 5/2/2025 at 02:30 PM in Albuquerque - Telephonic Hearing/Conference before Magistrate Judge Kirtan Khalsa. (jg) (Entered: 03/18/2025) |
| 03/21/2025 | 70 | Emergency MOTION to Compel *30(b)(6) Deposition*, MOTION for Sanctions by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit) (Burke, Heather) (Entered: 03/21/2025) |
| 03/21/2025 | 71 | RESPONSE in Opposition re 66 MOTION for Protective Order filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 03/21/2025) |
| 04/04/2025 | 72 | RESPONSE to Motion re 70 Emergency MOTION to Compel *30(b)(6) Deposition* MOTION for Sanctions filed by New Mexico General Services Department. (Attachments: # 1 Exhibit A) (Loman, Eric) (Entered: 04/04/2025) |

| | | |
|---|---|---|
| 04/04/2025 | 73 | REPLY to Response to Motion re 66 MOTION for Protective Order filed by New Mexico General Services Department. (Loman, Eric) (Entered: 04/04/2025) |
| 04/07/2025 | 74 | NOTICE of Briefing Complete by New Mexico General Services Department re 66 MOTION for Protective Order filed by New Mexico General Services Department (Loman, Eric) (Entered: 04/07/2025) |
| 04/15/2025 | 75 | REPLY to Response to Motion re 70 Emergency MOTION to Compel *30(b)(6) Deposition* MOTION for Sanctions filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 04/15/2025) |
| 04/15/2025 | 76 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 70 Emergency MOTION to Compel *30(b)(6) Deposition* MOTION for Sanctions filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 04/15/2025) |
| 04/25/2025 | 77 | ORDER SETTING HEARING ON MOTION FOR PROTECTIVE ORDER AND MOTION TO COMPEL DISCOVERY by Magistrate Judge Kirtan Khalsa. Motion Hearing set for 5/2/2025 at 02:30 PM Remote via Zoom before Magistrate Judge Kirtan Khalsa. Following the hearing, the Court will hold the Pre-Settlement Conference set for Friday, May 2, 2025, at 2:30 p.m. via the same Zoom video conference. The Zoom ID and Passcode will be filed separately in a sealed Notice of Zoom Information. (dr) (Entered: 04/25/2025) |
| 04/30/2025 | 79 | ORDER RESETTING HEARING ON MOTION FOR PROTECTIVE ORDER AND MOTION TO COMPEL DISCOVERY : by Magistrate Judge Kirtan Khalsa. Motions Hearing set for 5/7/2025 at 01:30 PM in Albuquerque via Zoom videoconferencing with all participants appearing remotely. The Zoom ID and Passcode will remain unchanged. (jg) (Entered: 04/30/2025) |
| 05/02/2025 | 80 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Telephonic Pre-Settlement Status Conference held on 5/2/2025. (dr) (Entered: 05/02/2025) |
| 05/05/2025 | 81 | Unopposed MOTION to Vacate 79 Order Setting Hearing on Motion, *PTO and MTC* by New Mexico General Services Department. (Loman, Eric) (Entered: 05/05/2025) |
| 05/05/2025 | 82 | STIPULATED ORDER GRANTING 81 UNOPPOSED MOTION TO VACATE AND RESCHEDULE THE HEARING SET FOR MAY 7, 2025 by Magistrate Judge Kirtan Khalsa. (jg) (Entered: 05/05/2025) |
| 05/09/2025 | 83 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Rule 16 Settlement Conference held on 5/9/2025. (Recording Info: N/A) (jg) (Entered: 05/09/2025) |
| 05/09/2025 | 84 | ORDER CONTINUING RULE 16 SETTLEMENT CONFERENCE AND EXTENDING DISPOSITIVE MOTIONS DEADLINE by Magistrate Judge Kirtan Khalsa.<br>Rule 16 Settlement Conference continued for 5/28/2025 at 09:30 AM in Albuquerque - 440 Hondo Courtroom before Magistrate Judge Kirtan Khalsa. Dispositive Motions due by 6/30/2025. (jg) (Entered: 05/09/2025) |
| 05/28/2025 | 85 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Rule 16 Settlement Conference held on 5/28/2025. Case did not settle. (bc) (Entered: 05/28/2025) |
| 05/28/2025 | 86 | ORDER by Magistrate Judge Kirtan Khalsa granting 66 Motion for Protective Order; denying 70 Motion to Compel; and Motion for Sanctions (bc) (Entered: 05/28/2025) |

| | | |
|---|---|---|
| 05/28/2025 | 87 | ORDER MODIFYING CASE MANAGEMENT DEADLINES by Magistrate Judge Kirtan Khalsa. Discovery due by 7/15/2025. Motions relating to Discovery due by 7/21/2025. Pretrial motions due August 15, 2025. (bc) (Entered: 05/28/2025) |
| 05/28/2025 | 88 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Motion Hearing held on 5/28/2025 re 66 MOTION for Protective Order filed by New Mexico General Services Department, 70 Emergency MOTION to Compel *30(b)(6) Deposition* MOTION for Sanctions filed by Kimberly Hunt-Brown. (Recording Info: Liberty-Hondo) (khs) (Entered: 05/28/2025) |
| 05/30/2025 | 89 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown *3rd Discovery Requests* (Burke, Heather) (Entered: 05/30/2025) |
| 06/27/2025 | 90 | CERTIFICATE OF SERVICE by New Mexico General Services Department re 89 Certificate of Service (Loman, Eric) (Entered: 06/27/2025) |
| 07/01/2025 | 91 | ORDER SETTING TELEPHONIC STATUS CONFERENCE REGARDING DISCOVERY DISPUTE by Magistrate Judge Kirtan Khalsa. On Plaintiff's unopposed request, a Telephonic Status Conference to address the discovery dispute Plaintiff identified in the request is set for **Tuesday, July 8, 2025, at 10:30 AM** before Judge Khalsa. Counsel are to call Judge Khalsa's WebEx conference line at (855) 244-8681 and enter the code 2308 107 9716 to connect to the proceedings. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (kmt) (Entered: 07/01/2025) |
| 07/02/2025 | 92 | ORDER CHANGING TIME OF TELEPHONIC STATUS CONFERENCE TO ADDRESS DISCOVERY DISPUTE by Magistrate Judge Kirtan Khalsa. The Telephonic Status Conference to address the parties' pending discovery dispute, which was previously set for July 8, 2025, at 10:30 AM, is hereby RESET for **Tuesday, July 8, 2025, at 9:30 AM** before Judge Khalsa. Counsel are to call Judge Khalsa's WebEx conference line at (855) 244-8681 and enter the code 2308 107 9716 to connect to the proceedings. This Order changes only the time of the Telephonic Status Conference. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (kmt) (Entered: 07/02/2025) |
| 07/11/2025 | 93 | Clerk's Minutes for proceedings held before Magistrate Judge Kirtan Khalsa: Telephonic Status Conference held on 7/08/2025. (Recording Info: N/A) (dr) (Entered: 07/11/2025) |
| 07/11/2025 | 94 | ORDER REGARDING DISCOVERY DISPUTES by Magistrate Judge Kirtan Khalsa. Defendant shall supplement its discovery responses as set herein no later than Friday, July 18, 2025. (dr) (Entered: 07/11/2025) |
| 07/18/2025 | 95 | CERTIFICATE OF SERVICE by New Mexico General Services Department re 90 Certificate of Service, 89 Certificate of Service (Loman, Eric) (Entered: 07/18/2025) |
| 07/21/2025 | 96 | Opposed MOTION to Compel *Alex Harding Deposition* by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Burke, Heather) (Entered: 07/21/2025) |
| 08/04/2025 | 97 | RESPONSE to Motion re 96 Opposed MOTION to Compel *Alex Harding Deposition* filed by New Mexico General Services Department. (Attachments: # 1 Exhibit Exhibit A) (Loman, Eric) (Entered: 08/04/2025) |
| 08/15/2025 | 98 | MOTION for Summary Judgment by New Mexico General Services Department. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Loman, Eric) (Entered: 08/15/2025) |

| | | |
|---|---|---|
| 08/15/2025 | 99 | Partial MOTION for Summary Judgment *Count III: FMLA Interference* by Kimberly Hunt-Brown. (Attachments: # 1 Affidavit Plaintiff Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25) (Burke, Heather) (Entered: 08/15/2025) |
| 08/15/2025 | 100 | Partial MOTION for Summary Judgment *Counts I, II and V* by Kimberly Hunt-Brown. (Attachments: # 1 Affidavit Plaintiff 2nd Dec, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11) (Burke, Heather) (Entered: 08/15/2025) |
| 08/18/2025 | 101 | REPLY to Response to Motion re 96 Opposed MOTION to Compel *Alex Harding Deposition* filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 08/18/2025) |
| 08/18/2025 | 102 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 96 Opposed MOTION to Compel *Alex Harding Deposition* filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 08/18/2025) |
| 09/02/2025 | 103 | RESPONSE to Motion re 100 Partial MOTION for Summary Judgment *Counts I, II and V* filed by Vanessa LeBlanc, Natalie Martinez, Jennifer Morfin, Eunice Moya, New Mexico General Services Department, Valerie Paulk. (Attachments: # 1 Exhibit) (Downey, Sarah) (Entered: 09/02/2025) |
| 09/02/2025 | 104 | RESPONSE to Motion re 99 Partial MOTION for Summary Judgment *Count III: FMLA Interference* filed by Vanessa LeBlanc, Natalie Martinez, Jennifer Morfin, Eunice Moya, New Mexico General Services Department, Valerie Paulk. (Attachments: # 1 Exhibit) (Downey, Sarah) (Entered: 09/02/2025) |
| 09/02/2025 | 105 | RESPONSE in Opposition re 98 MOTION for Summary Judgment filed by Kimberly Hunt-Brown. (Attachments: # 1 Affidavit Plaintiff's 3rd Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19) (Burke, Heather) (Entered: 09/02/2025) |
| 09/12/2025 | 106 | Unopposed MOTION to Extend (other) *Exceed Page Limits* by New Mexico General Services Department. (Downey, Sarah) (Entered: 09/12/2025) |
| 09/12/2025 | 107 | REPLY to Response to Motion re 98 MOTION for Summary Judgment filed by New Mexico General Services Department. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D) (Downey, Sarah) (Entered: 09/12/2025) |
| 09/12/2025 | 108 | REPLY to Response to Motion re 99 Partial MOTION for Summary Judgment *Count III: FMLA Interference* filed by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit 26, # 2 Exhibit 27) (Burke, Heather) (Entered: 09/12/2025) |
| 09/12/2025 | 109 | REPLY to Response to Motion re 100 Partial MOTION for Summary Judgment *Counts I, II and V* filed by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit 12, # 2 Exhibit 13) (Burke, Heather) (Entered: 09/12/2025) |
| 09/16/2025 | 110 | NOTICE of Briefing Complete by New Mexico General Services Department re 98 MOTION for Summary Judgment filed by New Mexico General Services Department (Loman, Eric) (Entered: 09/16/2025) |

| | | |
|---|---|---|
| 09/16/2025 | 111 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 100 Partial MOTION for Summary Judgment *Counts I, II and V* filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 09/16/2025) |
| 09/16/2025 | 112 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 99 Partial MOTION for Summary Judgment *Count III: FMLA Interference* filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 09/16/2025) |
| 09/16/2025 | 113 | ORDER by District Judge Sarah M. Davenport granting 106 Motion to Extend. (rz) (Entered: 09/16/2025) |
| 09/29/2025 | 114 | First MOTION for Sanctions by Kimberly Hunt-Brown. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Burke, Heather) (Entered: 09/29/2025) |
| 10/15/2025 | 115 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 114 First MOTION for Sanctions filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 10/15/2025) |
| 10/16/2025 | 116 | NOTICE by New Mexico General Services Department re 114 First MOTION for Sanctions (Attachments: # 1 Exhibit Exhibit A) (Loman, Eric) (Entered: 10/16/2025) |
| 10/20/2025 | 117 | RESPONSE to Motion re 114 First MOTION for Sanctions filed by New Mexico General Services Department. (Attachments: # 1 Exhibit Exhibit A) (Loman, Eric) (Entered: 10/20/2025) |
| 11/03/2025 | 118 | REPLY to Response to Motion re 114 First MOTION for Sanctions filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 11/03/2025) |
| 11/03/2025 | 119 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 114 First MOTION for Sanctions filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 11/03/2025) |
| 01/07/2026 | 120 | NOTICE of Appearance by Holly B Williams on behalf of Kimberly Hunt-Brown (Williams, Holly) (Entered: 01/07/2026) |
| 01/13/2026 | 121 | Opposed MOTION in Limine by New Mexico General Services Department. (Attachments: # 1 Motion In Limine Exs A-C) (Loman, Eric) (Entered: 01/13/2026) |
| 01/13/2026 | 122 | Witness List by New Mexico General Services Department. (Loman, Eric) (Entered: 01/13/2026) |
| 01/13/2026 | 123 | Witness List by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 01/13/2026) |
| 01/13/2026 | 124 | First MOTION in Limine by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 01/13/2026) |
| 01/20/2026 | 125 | Exhibit List *The Parties Stipulated Exhibit List* by New Mexico General Services Department.. (Loman, Eric) (Entered: 01/20/2026) |
| 01/20/2026 | 126 | Exhibit List *Defendants' Exhibit List* by New Mexico General Services Department.. (Loman, Eric) (Entered: 01/20/2026) |
| 01/20/2026 | 127 | Proposed Jury Instructions by New Mexico General Services Department. (Loman, Eric) (Entered: 01/20/2026) |
| 01/20/2026 | 128 | Proposed Jury Verdict Form by New Mexico General Services Department. (Loman, Eric) Modified text on 1/21/2026 (jn). (Entered: 01/20/2026) |

| | | |
|---|---|---|
| 01/20/2026 | 129 | RESPONSE to Motion re 124 First MOTION in Limine filed by New Mexico General Services Department. (Loman, Eric) (Entered: 01/20/2026) |
| 01/20/2026 | 130 | ORDER by District Judge Sarah M Davenport extending deadline to prepare and deliver physical copies of exhibits from January 20, 2026 [Doc. 59] to January 23, 2026. (gpb) (Entered: 01/20/2026) |
| 01/20/2026 | 131 | CERTIFICATE OF SERVICE by Kimberly Hunt-Brown (Burke, Heather) (Entered: 01/20/2026) |
| 01/20/2026 | 132 | Exhibit List *Plaintiff's Contested* by Kimberly Hunt-Brown.. (Burke, Heather) (Entered: 01/20/2026) |
| 01/20/2026 | 133 | Proposed Jury Instructions by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 01/20/2026) |
| 01/20/2026 | 134 | Proposed Jury Instructions by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 01/20/2026) |
| 01/21/2026 | | Status Conference set for 1/27/2026 at 02:00 PM in Las Cruces - Telephonic Hearing/Conference before District Judge Sarah M Davenport. The parties are directed to call the WebEx conference line at 1-855-244-8681 and enter access code 2308 356 2712 to be connected to the proceedings. When prompted for an attendee ID number, press #. (gpb) . [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 01/21/2026) |
| 01/21/2026 | 135 | STIPULATION *Statement of the Case* by Kimberly Hunt-Brown (Burke, Heather) (Entered: 01/21/2026) |
| 01/21/2026 | 136 | OBJECTIONS re 123 Witness List by New Mexico General Services Department (Loman, Eric) (Entered: 01/21/2026) |
| 01/21/2026 | 137 | Second MOTION in Limine by New Mexico General Services Department. (Attachments: # 1 Exhibit A- Discovery Responses) (Loman, Eric) (Entered: 01/21/2026) |
| 01/22/2026 | 138 | ORDER re 121 Opposed MOTION in Limine and 137 Second MOTION in Limine by District Judge Sarah M Davenport. Pursuant to the Court's Standing Order on Motions in Civil Cases (available on the Court's website), each party is limited to filing one motion in limine. This is designed to prevent piecemeal litigation and support the orderly administration of the Court's docket. Accordingly, it is hereby ORDERED that within SEVEN DAYS from the date of this Order, New Mexico General Services Department shall withdraw all motions in limine it filed to date without prejudice and with leave to file one consolidated motion. [THIS IS A TEXT ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (gpb) (Entered: 01/22/2026) |
| 01/22/2026 | 139 | RESPONSE re 136 Objections filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 01/22/2026) |
| 01/23/2026 | 140 | ORDER by Magistrate Judge Kirtan Khalsa denying 96 Opposed MOTION to Compel Alex Harding Deposition by Kimberly Hunt-Brown. (eh) (Entered: 01/23/2026) |
| 01/26/2026 | 141 | MOTION in Limine *Renewed Motion In Limine* by New Mexico General Services Department. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C) (Loman, Eric) (Entered: 01/26/2026) |
| 01/26/2026 | 142 | NOTICE OF WITHDRAWAL OF DOCUMENT as to document 121 Motion in Limine, 137 Motion in Limine by New Mexico General Services Department (Loman, Eric) (Entered: 01/26/2026) |

| | | |
|---|---|---|
| 01/27/2026 | 143 | AMENDED NOTICE of Hearing: Final Pretrial Conference set for 4/6/2026 at 11:00 AM in Las Cruces - 420 Mimbres Courtroom (North Tower) before District Judge Sarah M Davenport. Jury Selection/Jury Trial set for 5/4/2026-5/8/2026 at 09:00 AM in Las Cruces - 420 Mimbres Courtroom (North Tower) before District Judge Sarah M Davenport. (gpb) [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 01/27/2026) |
| 01/27/2026 | 144 | ORDER by District Judge Sarah M Davenport vacating deadlines set forth in this Court's previous trial setting order 69 . An amended order resetting all pretrial deadlines will be entered following the Court's resolution of the parties' pending motions for summary judgment. [THIS IS A TEXT ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (gpb) (Entered: 01/27/2026) |
| 01/29/2026 | 145 | Clerk's Minutes for proceedings held before District Judge Sarah M Davenport: Telephone Conference held on 1/27/2026. (gpb) (Entered: 01/29/2026) |
| 02/06/2026 | 146 | ORDER by District Judge Sarah M Davenport granting in part and denying in part 98 Motion for Summary Judgment; denying 99 Motion for Summary Judgment; denying 100 Motion for Summary Judgment; denying 114 Motion for Sanctions (gpb) (Entered: 02/06/2026) |
| 02/10/2026 | 147 | Opposed MOTION to Remand to State Court by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 02/10/2026) |
| 02/24/2026 | 148 | RESPONSE to Motion re 147 Opposed MOTION to Remand to State Court filed by New Mexico General Services Department. (Loman, Eric) (Entered: 02/24/2026) |
| 02/24/2026 | 149 | REPLY to Response to Motion re 147 Opposed MOTION to Remand to State Court filed by Kimberly Hunt-Brown. (Burke, Heather) (Entered: 02/24/2026) |
| 02/24/2026 | 150 | NOTICE of Briefing Complete by Kimberly Hunt-Brown re 147 Opposed MOTION to Remand to State Court filed by Kimberly Hunt-Brown (Burke, Heather) (Entered: 02/24/2026) |
| 02/27/2026 | 151 | MOTION for Leave to File *Updated MIL* by New Mexico General Services Department. (Loman, Eric) (Entered: 02/27/2026) |
| 03/10/2026 | 152 | ORDER by District Judge Sarah M Davenport granting 147 Motion to Remand to State Court (gpb) (Entered: 03/10/2026) |
| 03/11/2026 | 153 | Letter Remanding Case to First Judicial District Court, County of Santa Fe, State of New Mexico. (jn) (Entered: 03/11/2026) |
| 04/08/2026 | 154 | NOTICE OF APPEAL by Kimberly Hunt-Brown. (Filing Fee - Online Payment) (Burke, Heather) (Entered: 04/08/2026) |
| 04/08/2026 | | Filing Fee Received: $ 605 receipt number ANMDC-10663769 re 154 Notice of Appeal filed by Kimberly Hunt-Brown (Payment made via Pay.gov)(Burke, Heather) (Entered: 04/08/2026) |
| 04/09/2026 | 155 | Transmission of Preliminary Record to US Court of Appeals re 154 Notice of Appeal (Attachments: # 1 Preliminary Record) (vh) (Entered: 04/09/2026) |
| 04/09/2026 | 156 | USCA Information Letter with Case Number 26-2042 for 154 Notice of Appeal filed by Kimberly Hunt-Brown. (jn) (Entered: 04/09/2026) |
| 04/30/2026 | 157 | LETTER from USCA re 154 Notice of Appeal. (jn) (Entered: 04/30/2026) |

| | | |
|---|---|---|
| 05/01/2026 | 158 | NOTICE OF DEFICIENCY to Heather C. Burke re 154 Notice of Appeal (jn) (Entered: 05/01/2026) |
| 05/01/2026 | 159 | TRANSCRIPT ORDER FORM by Kimberly Hunt-Brown for the 154 Notice of Appeal (Burke, Heather) (Entered: 05/01/2026) |
| 05/05/2026 | 160 | NOTICE TO USCA that Record is Complete re 154 Notice of Appeal. (jn) (Entered: 05/05/2026) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/16/2026 09:19:33 | | | |
| **PACER Login:** | SusanOpperman | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00782-SMD-KK |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |